FILED
AUGUST 8, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BRICKSTOP CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08-CV-2690 |
| | ) | |
| v. | ) | Honorable Judge Gettleman |
| | ) | |
| VALLEY VIEW INDUSTRIES, H.C., INC., | ) | Magistrate Judge Cole |
| | ) | |
| Defendant. | ) | |

**DEFENDANT, VALLEY VIEW INDUSTRIES, H.C., INC.'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTION**

ATTORNEYS FOR DEFENDANT
VALLEY VIEW INDUSTRIES, H.C., INC.

Monica L. Thompson (ARDC # 6181455)
R. Blake Johnston (ARDC # 06239464)
Albert E. Hartmann (ARDC # 06256064)
**DLA PIPER US LLP**
203 North LaSalle Street, Suite 1900
Chicago, IL 60601
312 368-4000
monica.thompson@dlapiper.com
blake.johnston@dlapiper.com
albert.hartmann@dlapiper.com

CHGO1\31251850.1

## TABLE OF CONTENTS

I.      **INTRODUCTION**.................................................................................................. 1

II.    **BACKGROUND** .................................................................................................. 1

     A.    Innovation Of Products In The Hardscape/Landscape Industry ............................ 1

     B.    The Development of the Diamond Paver Edge ..................................................... 2

     C.    Valley View's Channels of Trade .......................................................................... 4

     D.    The Diamond Paver Edge Sell Sheet ..................................................................... 4

III.   **ARGUMENT** ...................................................................................................... 5

     A.    The B.E.A.S.T. Product Configuration is Not Proctectible ................................... 5

     B.    The B.E.A.S.T. product configuration is functional .............................................. 6

     C.    Brickstop is required to prove secondary meaning by more than an inference based on inherent distinctness ............................................................... 10

     D.    There is no actionable confusion .......................................................................... 13

     E.    No continuing acts exist to support an injunction based on copyright or unfair competition claims ................................................................................... 14

     F.    There is no irreparable harm and public policy favors competition. ................... 14

# TABLE OF AUTHORITIES

**CASES**

*Dorr-Oliver, Inc. v. Fluid-Quip, Inc.,*
    94 F.3d 376 (7th Cir. 1996) ..................................................................................13, 14

*Duraco Prods. V. Joy Plastic Enters., Ltd.,*
    40 F.3d. 1431 (3d Cir. 1994)...................................................................................14

*Health O Meter, Inc. v. Terraillon Corp.,*
    873 F. Supp. 1160 (N.D. Ill. 1995) ........................................................................9, 10

*Inwood Laboratories Inc. v. Ives Laboratories, Inc.,*
    456 U.S. 844 (1982)................................................................................................6, 10

*JCW Investments, Inc. v. Novelty, Inc.,*
    222 F. Supp. 2d 1030 (N.D. Ill. 2002) (Gettleman, J.) ...........................................5

*Qualitex Co. v. Jacobsen Products, Co., Inc.,*
    514 U.S. 159 (1995)................................................................................................5

*Sara Lee Corporation v. American Leather Products Inc.,*
    1998 WL 433764 (N.D. Ill., July 29, 1998)..............................................................9

*Talking Rain Beverage Co. Inc. v. South Beach Beverage Co.,*
    349 F. 3d 601 (9th Cir. 2003) .................................................................................6, 7

*Thomas & Betts Corp. v. Panduit Corp.,*
    65 F.3d 654 (7th Cir. 1995) ....................................................................................11

*Traffix Devices Inc. v. Marketing Displays Inc.,*
    532 U.S. 23 (2001)..................................................................................................6, 9, 12

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
    505 U.S. 763 (1992)................................................................................................10

*Versa Prods Co. v. Bilfold Co. Mfg. Ltd,*
    50 F.3d 189 (3d Cir. 1995)......................................................................................13

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.,*
    529 U.S. 212 (2002)................................................................................................6, 10, 15

*Yankee Candle Company, Inc. v. Bridgewater Candle Company, LLC,*
    259 F.3d 25 (1st Cir. 2001)......................................................................................5, 11, 14

**STATUTES**

15 U.S.C. §1125(a)(3)........................................................................................................6

CHGO1\31251850.1

Valley View Industries, H.C., Inc. ("Valley View") submits this Memorandum in Opposition to the Motion for Preliminary Injunction filed by BrickStop Corporation ("BrickStop").

## I.    **INTRODUCTION**

Valley View based its recently introduced Diamond Paver Edge ("DPE-8") product on BrickStop's "B.E.A.S.T." product because it had the right to do so. The B.E.A.S.T. product is not protected by any patent or copyright. The DPE-8 product is, like any number of products in the paver restraint market, an imitation with innovations. The public, meaning distributors and customers of this product, benefit from having a diversity of manufacturers and price competition.

BrickStop, on the other hand, is requesting that this Court grant is, in effect, a "super patent" for its product. It is basically asking for perpetual rights to be the exclusive manufacturer of a successful design of paver restraint. Trademark law, however, does not protect a manufacturer's monopolistic margins. Further, BrickStop cannot make the required showings of nonfunctionality, secondary meaning, or likelihood of confusion to support any form of trademark protection for the product's configuration.

## II.    **BACKGROUND**

Valley View is located in Crestwood, Illinois. It was started 30 years ago by Robert Rynberk and is now owned by his nephew, Howard Rynberk, who is the president and CEO of the company. Rynberk Aff. (Ex. 1)[1] ¶¶ 1-2. Its primary business has always been to make and sell landscape/hardscape products, including lawn and paver (brick and stone) edgers. *Id.* ¶¶ 3-5. Valley View makes most of its own products at its plant in Crestwood. It employs 60 people full time and an additional fifteen people on a temporary basis. *Id.* ¶ 3. Valley View has a National Sales Manager, but otherwise sells its products through ten or more independent sales representatives who are paid on commission. *Id.* ¶ 3.

### A.    **Innovation Of Products In The Hardscape/Landscape Industry**

In the landscape/hardscape industry, lawn and paver edger products are most frequently developed by imitation with each manufacturer adding its own innovations. *Id.* ¶ 10. For example, Robert Rynberk invented one of the first lawn edgers called "Black Diamond." *Id.* ¶ 4.

---

[1]  Unless otherwise noted, the evidence cited by Valley View is contained in its separately filed Index, and will be cited "Index Ex. ___."

1

This edger was designed to outline lawns and distinguish them from planting beds, mulch and rocks and to create borders around gardens and other planted areas. After the patent on this product expired, it had many imitators. *Id.* One of the most recent imitators was CobraCo Manufacturers, Inc. ("CobraCo") who introduced a copy of the Black Diamond with a corrugated sidewall and a "T" shaped bottom lip. *Id.* ¶ 10 & Ex. 1-D. When the CobraCo patent on this product expired, Valley View came out with its Diamond Back product and Master Mark Plastics developed its Viper product. *Id.* ¶ 10 & Ex. 1-E, F.

Similarly, Robert Rynberk developed the "L" shaped Diamond-Lok Paver Edge Restraint *Id.* ¶ 5 & Ex. 1-C. He did not patent this product and since its introduction it has been used as the basic pattern for numerous paver restraint edges, including one made by BrickStop called "Simflex." *Id.* ¶ 11 & Ex. 1-G. The Diamond-Lok design also influenced many other extruded paver designs, including OlyOla's "Bulldog-Edge," Master Mark's "Pave Master" product, and Dimex Corporation's "Edge Pro" product (Pl.'s Frieberg Decl. Ex. E-G).[2] Thus, in the landscape/hardscape industry, while one manufacturer may be the sole source of a specifically designed product for a period time, it is inevitable that competitors will copy successful designs and add their own innovations. Manufacturers who want periods of exclusivity with respect to product designs use patent protection. Rynberk Aff. ¶ 12 & Ex. 1-H.

## B.      The Development of the Diamond Paver Edge

In mid 2007, in response to reports from Valley View sales representatives, Valley View considered adding a more rigid, heavier grade of paver edger to its Diamond-Lok product line. Rynberk Aff. ¶¶ 13-14; Bertucci Aff. (Ex. 3) ¶¶ 4-10. In particular, Dominic Bertucci and others met with a significant potential customer, Unilock, who asked if Valley View could make a product similar to the B.E.A.S.T. Rynberk Aff. ¶¶ 13-14; Rynberk Dep. (Ex. 2) 96:6-9; Bertucci Aff. ¶¶ 4-10; Bertucci Dep. (Ex. 4) 54:21-58:11. Unilock is a hardscape distributor with several locations throughout the United States. It apparently had already had conversations with the manufacturer of the B.E.A.S.T. product, but was unable to come to terms with respect to price. Rynberk Aff. ¶ 13; Frieberg Dep. (Ex. 7) 70:21-73:9.

Once Valley View decided it would make a heavier product, it studied various products that were already on the market, including the products of Snap Edge, Dimex and BrickStop. Rynberk Aff. ¶¶ 14-15; Rynberk Dep. 75:4-13; Bertucci Aff. ¶¶ 9; Soukup Aff. (Ex. 6) ¶ 4.

---

[2]  Citations to exhibits to BrickStop's Motion will be to "Pl.'s Decl. Ex. _____."

Valley View asked its attorneys to do patent searches to determine if any of these products were protected by patents. Rynberk Aff. ¶ 15. Valley View learned that the Snap Edge product was covered by patent until year 2009. *Id.* The BrickStop B.E.A.S.T. product, however, had no patent protection. *Id.*

Valley View already had a small sample of B.E.A.S.T. which it obtained from one of its sales representatives. *Id.* ¶ 16. After it became interested in modeling a new product on the B.E.A.S.T. products design, Howard Rynberk asked Tameling Industries ("Tameling's") to obtain samples for him. *Id.* ¶ 17. Coincidentally, David Martinet, the buyer for Tameling's had independently determined that he would carry the B.E.A.S.T. product as one of the paver edges offered by Tameling's. *Id.* ¶ 18; Martinet Aff. (Ex. 10) ¶¶ 30-34. [3]

Once Valley View commenced its development project, Frank Soukup, the Plant Manager and Engineer and John Neblock became involved. Soukup Aff. ¶ 3. At the outset, Valley View determined that it would make the retaining wall of the product a little higher and a little thicker. Soukup Aff. ¶ 5; Rynberk Aff. ¶ 19(a). It added a chevron shaped slot to accommodate a V-shaped stake as an anchor because Valley View sold these products and believed that many contractors preferred stakes to nails. Soukup Aff. ¶ 5; Rynberk Aff. ¶ 19(b). Valley View, however, determined it would leave nail holes in the product for those contractors who preferred this method of anchoring the product. Soukup Aff. ¶¶ 4-5; Rynberk Aff. ¶ 19(b). Finally, Valley View determined that it would make the connector at the end pieces of the eight foot strips larger than those on the B.E.A.S.T. product so that they would hold more securely. Soukup Aff. ¶ 5; Rynberk Aff. ¶ 19(c).

Frank Soukup determined how the product should be made and determined to use low pressure injection molding both for its economy and scale. Rynberk Aff. ¶ 20. The product was designed in eight-foot strips because this is the largest pallet size that UPS will handle. Bertucci Dep. 77:21-24. Frank Soukup worked with toolmakers and the fabricator to determine other details of the product. Soukup Aff. ¶¶ 11, 14. In conjunction with the fabricator he also determined what type of pallet would be needed and how the product could best be packaged. *Id.*

---

[3]  Howard Rynberk has an ownership interest in Tameling's. He is not involved in its day-to-day operations. Rynberk Aff. ¶ 17. Tameling's buyer, Dave Martinet, determines what the store will carry based on his experience with what the contractors in his area like to use. Martinet Aff. ¶¶ 4-5. As a result, Tameling's carries products that are competitive with those of Valley View including Snap Edge and in this instance the B.E.A.S.T. *Id.* ¶¶ 5, 12, 32-34. Though BrickStop tries to make this purchase sound improper, the B.E.A.S.T. was publicly available and if the only reason Tameling's purchased this product was to obtain samples, it would not have bought a full pallet load of over 600 eight foot strips.

3

¶¶ 15-17. They ultimately settled on 630 pieces in bundles of ten because this was a size which would not crush the product on the bottom and would allow stacking of two pallets on the box trucks which they anticipated using for drop ship orders. *Id.*

Valley View clearly marks its DPE-8 product by raised lettering that is molded at the end of each strip stating "Valley View Industries" and "Diamond Paver Edge DPE-8" and containing the warning "always wear protection when installing." Rynberk Aff. ¶ 22 & Ex. 1-I. This type of marking is important because Valley View warrants its product for twenty years and paper or plastic labels adhered to a product would likely become illegible or completely destroyed by in-ground soil conditions over that period of time. *Id.* In addition, when Valley View sends samples of the product to customers for its consideration, it affixes a white label on the restraining wall which states "Valley View Industries" and "Diamond Edge Item #DPE-8." *Id.* ¶ 23 & Ex. 1-J.

### C.    Valley View's Channels of Trade

Valley View sells most of its products to distributors with whom it has a long-term relationship. Bertucci Aff. ¶¶ 18, 21. Many of the sales are made face-to-face or when salesmen call on buyers and at trade shows which Valley View attends or where it exhibits its products. *Id.* ¶ 21; Bertucci Dep. 135:17-142:8. Its salesmen also use telephone contact. Bertucci Aff. ¶ 21. Price competition is fierce. Bertucci Aff. ¶¶ 23-26; Bertucci Dep. 62:19-66:15, 67:12-68:11. Sales can be won or lost on pennies a foot or on freight concessions. Bertucci Aff. ¶¶ 23-26. Valley View does not sell direct to contractors nor does it sell the DPE-8 to consumers. Bertucci Aff. ¶ 19.

### D.    The Diamond Paver Edge Sell Sheet

In early 2008, before the launch of the product, the National Sales Manager asked the professional graphics artists hired by Valley View, to prepare a sell sheet for the Diamond Paver Edge. He showed this graphic artist various materials including a sell sheet from BrickStop for the B.E.A.S.T. product. *Id.* ¶ 13. Mr. Bertucci wrote all of the text for the Valley View sell sheet. *Id.* ¶ ¶ 13-15; Bertucci Dep. 113:2-9. He did not notice the similarity of the bricks on the BrickStop ad and those used in the pictures on the finished DBE-8 sell sheet largely because he focused on the product and the text. Further, he presumed that the professional artist was taking these materials from stock photographs. Bertucci Aff. ¶¶ 13-15. When BrickStop's attorneys wrote a letter complaining both about the Diamond Paver Edge product and its sell sheet, Valley View immediately shredded whatever stock it had on hand and notified distributors not to use it.

4

Bertucci Aff. ¶ 17; Rynberk Dep. 117:4-19. No use has been made of this sell sheet since March 7, 2008. Bertucci Dep. 46:7-48:23. Its new sell sheet, Pl's Frieberg Decl. Ex. U, to the best of Valley View's knowledge was completely redone based on the National Sales Manager's direction to the graphic artist. Bertucci Aff. ¶ 17.

## III.    ARGUMENT

As this Court has recognized, it can only enter a preliminary injunction if BrickStop demonstrates "(1) . . . likelihood of success on the merits; (2) absence of an adequate remedy at law; and (3) that [BrickStop] will suffer irreparable harm absent injunctive relief." *JCW Investments, Inc. v. Novelty, Inc.,* 222 F. Supp. 2d 1030, 1033 (N.D. Ill. 2002) (Gettleman, J.). "After these threshold requirements are met, the district court then balances the irreparable harm to [BrickStop] against the harm that would be suffered by [Valley View], as well as non-parties, if preliminary injunctive relief were granted." *Id.* BrickStop is not entitled to a preliminary injunction in this case because there is no likelihood that it will succeed on the merits; there is no harm to BrickStop and public policy favors competition.

### A.    The B.E.A.S.T. Product Configuration is Not Proctectible.

BrickStop is somewhat vague about exactly what constitutes its design. In its papers it discusses both the foot and the spacer of the B.E.A.S.T. product. Through the years, however, and even today, the spacer sometimes is a straight bar and sometimes an "X" configuration with a rectangular stiffer piece.[4] Further, BrickStop includes within the "B.E.A.S.T. design," the Son of B.E.A.S.T. and Edge All product designs which are smaller and missing certain features found on the B.E.A.S.T. itself. It is BrickStop's burden to clearly identify the trade dress at issue. *Yankee Candle Company, Inc. v. Bridgewater Candle Company, LLC,* 259 F.3d 25, 40 n. 9 (1st Cir. 2001). Since it has not done so, and, as the Valley View product is modeled on the B.E.A.S.T., the discussion below will focus on the features of the B.E.A.S.T. product's anchor wall including its foot and "X" shaped spacers.

There is an inherent tension between patent law, which grants inventors a monopoly over a new product design or function for a limited period of time, and a claim of trade dress protection for a product configuration, which in essence could extend forever whether the product's features qualify as patentable materials or not. *See Qualitex Co. v. Jacobsen Products,*

*Co., Inc.*, 514 U.S. 159, 164-165 (1995). This tension has been resolved in part by Congress when it amended the Lanham Act to recognize that "in a civil action for trade dress infringement under this Act for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. §1125(a)(3). This tension is further relieved by the holding in *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 212, 213 (2002), where the United States Supreme Court determined that a product's design cannot be "inherently distinctive," and that the party seeking trade dress protection for a product configuration must prove secondary meaning.

**B.      The B.E.A.S.T. product configuration is functional.**

The features of a product configuration are functional when they are "essential to the use or purpose of the device or when it affects the cost or quality of the device." *Traffix Devices Inc. v. Marketing Displays Inc.*, 532 U.S. 23, 33 (2001); *see also Inwood Laboratories Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n.10 (1982). It is helpful to analyze the design from a standpoint of its various features. *Traffix,* 532 U.S. at 33.

BrickStop attempts to characterize its product configuration as "distinctive ornamental design" which it likens to the distinctively curved leg of a chair, an analogy taken from the *Traffix* case. While a function of a product, such as support from the leg of a chair, or the fact that a bottle holds water, would not defeat a trade dress claim, calling out functions that exist in the product because the leg is curved (such as it fits under a table) or the bottle is square (can be stacked) can make the design functional. *Talking Rain Beverage Co. Inc. v. South Beach Beverage Co.,* 349 F. 3d 601, 603 (9th Cir. 2003) (whether the advertising touts a utilitarian advantage, and whether the design results from a simple or inexpensive method of manufacture, among other things were considered to determine if the product's design was functional). With this in mind, an examination of the features of the B.E.A.S.T. proves that its design is anything but "arbitrary and fanciful details."

The overarching functionality of a paver restrainer is to hold the pavers in place. To meet this level of functionality all paver restraint products have a retaining wall and some method of anchoring that wall in place. Bertucci Dep. 51:8-52:1, Rynberk Dep. 58:6-59:9. At this level the

---

(continued...)

[4] BrickStop claims that it changed to the "X" configuration in settlement of a patent infringement lawsuit brought by Snap Edge in 2005. Frieberg Dep. 238:13-241:15. The product with the straight bar foot, however, is still advertised

B.E.A.S.T. product's anchoring mechanism is its foot and the B.E.A.S.T.'s creators admit that if you remove the entire foot you would lose functionality. Frieberg Dep. 244: 3-9. This, however, is like the leg of a chair and does not to speak to the curve design.

To evaluate the functionality of the B.E.A.S.T. foot design, it is important to know what features are called out by advertising, and by manufacturing concerns related to the product. *Talking Rain,* 349 F.3d at 603. For example, the design of the B.E.A.S.T. makes it more than a simple paver restraint: it has rigidity, allows for lattice nailing, can be verse installed and is one system for straight and curved application. Bertucci Dep. 204:10-18.

BrickStop's own advertisements to contractors states that the B.E.A.S.T.:[5]

1-2.    Has "One piece that does both [1] straight lines and [2] curves";

3.    "Uses a lattice nailing pattern for strength and stability";

4.    Has "Structural Rib Re-enforcement SRR™ for perfect straight lines.";

5.    Has a "Stable Sure-gripping Footprint SSF™ for stability"; and

6.    Has a "reverse application."[6]

The first attribute, in part, is that the B.E.A.S.T. is suitable for straight line applications. App. A at 2; Dealey Rep. ¶¶ 49, 52-53; Soukup Decl. ¶ 8; Frieberg Dep. 232:9-233:9 & Dep. Ex. 9. The B.E.A.S.T. design meets this function because of its rigidity. It has rigidity because it is manufactured through a molded plastic process as opposed to extrusion which cannot create a product with the same thickness of materials. The design of the B.E.A.S.T. enhances its rigidity because, with the spacers attached, there is a solid anchor wall behind the retaining wall. It has legs that are of sufficient height and depth to resist the pressure exerted against the retaining wall by the pavers, the lower portion of the foot is partially filled to strengthen the foot from tortional pressure, and the spacer has four legs and a stiffer to give it added strength.

Second, the B.E.A.S.T. functions in the alternative, curved line applications. App. A at 3-4; Frieberg Dep. 109:23-110:8, 236:17-237:2; Dealey Rep. ¶ 50; Soukup Decl. ¶ 7. The B.E.A.S.T. functions because the shape of the foot tapers as it moves away from the retaining wall allowing the product to curve inwardly without overlapping the feet. The spacer is easy to

---

(continued...)

on the Internet. Bertucci Aff. ¶ 27.

[5] App. A (attached to this memo) is a demonstrative exhibit containing pictures of the product with the design elements performing the stated functions identified, along with explanations of the elements tied to the evidence.

[6] Source: Dep. Ex. 2 (reproduced in full at App. A at 1).

7

remove thereby lessening the rigidity and allowing for flexion and there is a triangular shaped opening in the base of the foot which permits some flexion across the base of the foot to make the curves smoother.

Third, the B.E.A.S.T. allows for lattice nailing patterns because it has more than one anchor hole on each foot. App. A at 5; Kurtz Dep. 16:23-17:1, 140:4-9; Soukup Decl. ¶ 8; Frieberg Dep. 228:13-229:18.A contractor can alternate the distance between the anchor nail and the retaining wall, a feature considered by some contractors to be a more stable nailing pattern as it does not run along the same horizontal line.

Fourth, the B.E.A.S.T. has Structural Rib Re-enforcement SRR™ on the legs along the top of the spacer.[7] App. A at 6; Frieberg Dep. 248:12-249:12; Kurtz Dep. 136:16-137:7; Dep. Ex. 9.

Fifth, the B.E.A.S.T. product has a Stable Sure-gripping Footprint SSF™ for stability. App. A at 7; Kurtz Dep. 137:8-137:18; Frieberg Dep. 252:3-21. Both Frieberg and Kurtz agree that this refers to the entire foot though they now claim this means nothing more than that the foot can be nailed to the surface. An equally valid reading of this particular attribute is that the openwork of the foot, due to the action of friction and catching of the various edges is more likely to ground it in its bedding material than a foot made of smooth plastic extrusion.

Sixth, the B.E.A.S.T. can also be used in reverse mode calls out two features. App. A at 8; Dealey Rep. ¶¶ 47-48, 100, 106; Bertucci Dep. 203:23-204:1. First, there must not be any raised ridges on the anchor side so that a brick or stone can lie flat on top of it. This is apparent when comparing the B.E.A.S.T. product configuration to others in the industry which have ribs or inclined planes on the anchor side used to add support but which would not tolerate a brick placement on the inside of the retaining wall. Second, because the pressures that will be exerted on the foot will be compression (if it is installed on the outside and the bricks push against the retaining wall) or tension (if the bricks are placed on top of the anchor foot and push against the inside of the retaining wall), the anchor mechanisms must be fully enclosed; meaning that the holes through which the nails and/or spikes are placed must have support on both sides.

The question of functionality does not end with the attributes called out by BrickStop's ads. There are certain features of the design that effect the success or cost of manufacturing.

---

[7] Though BrickStop would now like to deny this attribute, the fact that it included it in its advertising would indicate that, at one time, BrickStop considered it important. Further, the testing BrickStop allegedly did to determine the

CHGO1\31251850.1

App. A at 9; Soukup Decl. ¶ 9; Dealey Rep. ¶ 28. For example, the cut away portions and the reduced depth of the solid fill areas help to minimize the use of plastic thereby reducing the expense of manufacturing the products. Secondly, knit lines, areas where the flows of hot plastic meet, can create weak spots in the finished product. App. A at 10; Dealey Rep. ¶¶ 54, 58-59. The x-shaped legs on the spacers permit the flow of hot plastic during the injection molding process to move in such a way that the seam lines do not occur at structurally critical places, such as the apex of the foot. Finally, the ejector pin pads are placed on the foot at those areas where the effects of the shrinkage of plastic as it cools is likely to make the connections against the mold tightest and in greatest need of the ejection pins for removing the finished piece. By using the large size ejector pads, the mold maker always has the option of using sturdier ejection pins as opposed to those which are smaller but have a tendency to break more often.

Once the functionality of the design is established, there is no need to consider whether "there is a competitive necessity for the feature." *Traffix*, 532 U.S. at 33. Further, once the functionality of the design is established there is no need for competitors to explore other options as "other designs need not be attempted." *Id.* at 33-34.

The cases relied upon by BrickStop, *Sara Lee Corporation v. American Leather Products Inc.*, 1998 WL 433764 (N.D. Ill., July 29, 1998) and *Health O Meter, Inc. v. Terraillon Corp.*, 873 F. Supp. 1160 (N.D. Ill. 1995)[8], to the extent they suggest that there is nonfunctionality if there are alternative designs rely upon the wrong standards. This issue has been clearly decided by the United States Supreme Court in *Traffix*. Once functionality is found, thre is no need "to engage . . . in speculation about other design . . . possibilities." *Traffix* 532 U.S. at 33. Because the BrickStop design is functional, this Court need not consider whether BrickStop has established secondary meaning or confusion sufficient to support its trademark action. *Id.* BrickStop's request for preliminary injunction must be denied and ultimately its case must be dismissed because BrickStop cannot establish the trade dress rights on which its complaint is based.

---

(continued...)

functionality of this piece, i.e., Mr. Frieberg attempting to manually bend the piece after shaving down the ribs, is hardly scientific for determining what, if any, rigidity is added by this extra rib.

[8] In addition, defining functionality as what "competitors would find necessary to incorporate into their product in order to compete effectively," the court in *Health O Meter* used the wrong standard.

**C.    Brickstop is required to prove secondary meaning by more than an inference based on inherent distinctness.**

BrickStop cannot meet its burden to prove secondary meaning simply by relying on a presumption drawn from what it calls the inherent distinctiveness of its product design. As the Supreme Court stated in *Wal-Mart*, 529 U.S. at 212, "design, like color, is not inherently distinctive." The presumption that is drawn from inherently distinctive word marks or packaging does not arise in the case of a product configuration because consumers who may be aware that a word or a distinctive logo is meant to serve as a trademark do not expect that an unusual product design is meant to be a source identifier. *Id.* at 213. This is particularly true in the hardscape/landscape industry where professional purchasers expect that successful designs will be copied by more than one manufacturer with slight variations. *See* Rynberk Aff. ¶¶ 10-12; Martinet Aff. ¶ 15. Product imitation has been a practice in the industry for thirty years and it is likely to continue to the benefit of customers who, at the distributor level, differentiate products on the basis of pennies per foot. Martinet Aff. ¶¶ 40-50; Bertucci Aff. ¶ 26. In this respect, "consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that a product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrant based upon alleged inherent distinctiveness." *Wal-Mart*, 529 U.S. at 213.

BrickStop tries to liken itself to the plaintiff in *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992). As explained by the Supreme Court in *Wal-Mart*, the *Two Pesos* holding dealt with trade dress, not the product itself. Though traditional forms of trade dress may be inherently distinctive, a product configuration cannot be. *Wal-Mart*, 529 U.S. at 215.[9]

In order to establish secondary meaning BrickStop must prove that "in the minds of the public the primary significance of the [its product design] is to identify the source of the product rather than the product itself." *Id.* at 211, citing *Inwood*, 456 U.S. at 851 n.11. If the relevant market is distributors, the evidence shows that they are not expecting the product shape to denote a single source. The very act of calling a product a "knock off" implies that the person offering the product is not the original source. If the relevant market is the end user, the contractor, BrickStop presents no evidence as to this class of purchasers. According to Martinet, his customers look for features and they buy on the basis of how the product is used. Martinet Aff.

¶¶ 21-22. Thus, the record has, at best conflicting evidence on this point, and certainly nothing from which this Court can determine what a significant number of contractors understand about source based on the product's design.

The primary tool for showing secondary meaning is consumer surveys. *Yankee Candle*, 259 F.3d at 43. BrickStop has no survey. Its anecdotal information is presented in hearsay form (with the exception of the newly filed affidavit of Eric Aschenbrenner) in large part by either a distributor or a sales man whose livelihood depends upon maintaining some exclusivity for the BrickStop product.

Lacking direct evidence of secondary meaning, BrickStop asks the Court to infer secondary meaning from the amount of its advertising expenditures. This evidence, too, falls short of the mark. In claiming a total of $170,000 in advertising over the past seven years, Frieberg Aff. ¶ 15, BrickStop fails to understand that only "advertising that specifically directs a consumer's attention to a particular aspect of the product" is probative. *Yankee Candle*, 259 F.3d at 44. The advertising of the B.E.A.S.T. does not call out the product itself as a trademark. Merely picturing the product or having an artist's rendition in ads will not focus consumers on the product shape itself. *Id.* ("look for" advertising is such that it "encourages consumers to identify the claimed trade dress with the particular provider"), citing *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 662 (7th Cir. 1995). While the B.E.A.S.T. logo has an artist's rendition of the foot, there is no allegation that Valley View, which clearly trademarks its product as "Diamond Paver Edge," uses a name or logo that is confusingly similar. It would be turning trademark law on its ear if a stylized picture of a product used as a logo could be the basis for monopolizing a product design, particularly where there is no evidence that consumers recognize the product itself as a source indicator.

The advertising dollars spent are minimal at best. Even more telling is the fact that most of the activities on which these dollars were spent are not designed to make the public aware of the product's configuration. For example, within the $170,000 spent over the last seven years, are Raptor's tickets, the expenses for trade shows including hotel bills, cab rides, meals and drinks. While these may be part of the company's advertising expenditures, these particular

---

(continued...)

[9] Again, Plaintiff relies on the *Health O Meter* case which incorrectly determined that product configuration trade dress could be inherently distinctive. *Health O Meter,* 873 F. Supp. at 1169.

expenditures do not equate to public impressions of the B.E.A.S.T. product configuration made upon the public. Similarly, within the advertising dollars BrickStop includes the total production costs of every catalog in which the B.E.A.S.T. product is mentioned. The entire catalog, however, contains multiple pages and features many other products. The lack of apportionment again makes even the $70,000 allegedly spent on printing and distributing materials substantially overstated. The ad words for which expenses were supported did not include "B.E.A.S.T." or any design. Kurtz Dep. (Ex. 8) 99:6-100:24, 102:6-16; 104:4-112:5. Frieberg Dep. 178:22-180:2. The $100,000 that was spent in sending out samples and telemarketing include sending samples of other products and telephone calls that may or may not have had anything to do with B.E.A.S.T. because there is no way to discern those related to the B.E.A.S.T. from the records currently available. Kurtz Dep. 119:16-124:16. Finally, with respect to the sending of samples there is no indication that saw them or how many people saw them. It is possible that each box was opened and discarded by one person making the market penetration of this form of advertising very small.

There is no indication that the BrickStop is, as it has claimed to be, a market leader. BrickStop itself has absolutely no idea how large the market is for paver restraining products. Kurtz Dep. 25:20-26:24. It, therefore, has no way to estimate whether or not it is a market leader or follower. There is no reason to infer from this that BrickStop is a market leader or that a significant number of the people in the relevant market would recognize BrickStop solely by looking at its product's configuration.

BrickStop halfheartedly asserts that evidence of Valley View's copying is proof of secondary meaning because the Court should infer that Valley View wanted to trade on the reputation of BrickStop. This inference, however, is not permitted by the law. "Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as patent or copyright protects an item, it will be subject to copying." *Traffix*, 523 U.S. at 29. In this case, the logical explanation for the copying is that it takes less time to manufacture a new product based on an existing product than to re-invent the wheel. Based upon the submissions, the Court cannot do anything but guess at whether there is any secondary meaning for the B.E.A.S.T. product configuration.

12

**D.      There is no actionable confusion.**

The anecdotal information supplied by BrickStop does not support a finding of a likelihood of confusion as to source. In the affidavit of Aschenbrenner, he professes to have been confused not as to BrickStop being the source of the B.E.A.S.T. product, or Valley View being the source of the Diamond Paver Edge. His concern was that both parties may be distributing the same product from a common manufacturer. Indeed BrickStop does distribute a number of products that it does not manufacture. Kurtz Dep. 38:3-49:5. It is nonetheless a source for these products and that is all that the trademark signifies. Trademarks do not indicate who manufactures a product, only its source.

All of the other anecdotes concerning customers related by Jason Brown show that the customer clearly knew who BrickStop and Valley View were. They were just good buyers playing two ends against the middle looking for a lower price. Frieberg Dep. 91:6-103:12. The fact that BrickStop had to lower the price for the B.E.A.S.T. in order to meet competition does not mean that the competition was unfair. In fact, BrickStop must meet lower prices from competitors who have products that look substantially different from the B.E.A.S.T. Kurtz Dep. 210:4-8. Salesmen for Valley View have found that BrickStop's reputation stands on its own – where a customer likes BrickStop, they do not want a Valley View quote. Where the customer dislikes BrickStop they can't wait to purchase DPE-8. Casey Aff. (Ex. 9) ¶¶ 9-12.

The most important factor relating to confusion in a product configuration case such as this are the "marketing and labeling of the products." *See Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 381 (7th Cir. 1996), citing *Versa Prods Co. v. Bilfold Co. Mfg. Ltd*, 50 F.3d 189, 212 (3d Cir. 1995). In this case, Valley View has its name in raised letters in the end piece of each strip of the product. While BrickStop suggests that this is not prominent marking, it is marking that the contractors would be aware of as this is the name that they would look to in case of product failure in order to prove the warranty claims. Rynberk Aff. ¶ 22 & Ex. 1-I. More importantly, when Valley View is sampling the product it has a clear white label which indicates the source. Rynberk Aff. ¶ 23 & Ex. 1-J.

BrickStop's legal analysis of likelihood of confusion is incorrect in that it is too glib. It relies on trade dress cases, not product configuration cases. There is no reason to expect that similarities of products would be indicia of confusion where Valley View has a legal right to make the product. Intent to "knock off" is not intent to trade on good will. In fact, "exploiting the

13

good will of the article – the attractive features, of whatever nature, that the product holds for the consumer – is robust competition; only deceiving customers, or exploitation of the good will of another producer, is unfair competition." *Dorr-Oliver*, 94 F.3d at 383, citing *Duraco Prods. V. Joy Plastic Enters., Ltd.,* 40 F.3d. 1431, 1445 (3d Cir. 1994). There is nothing actionable in the acts of Valley View because "effective competition and the penumbra of the patent laws require that competitors be able to slavishly copy the designs of a successful product." *Dorr-Oliver*, 94 F.3d at 383.

**E.**    **No continuing acts exist to support an injunction based on copyright or unfair competition claims.**

In examining Valley View's current advertising, it appears that the only reason copyright and unfair competition claims are in this lawsuit is because one of Valley View's officers believes that to some minute degree, a leg of the B.E.A.S.T. product appears under the rendition of the Diamond Paver Edge. He also complains that one of the nails seems to be in the same position as in the previously used advertisement that was based on the B.E.A.S.T. advertisement. Frieberg Dep. 174:20-178:6 & Dep. Ex. (Ex. 11) 22. These minutia, even if true, would not support a copyright infringement claim as there is no substantial similarity between the current advertising used by Valley View and the ads created for BrickStop. *Yankee Candle,* 259 F.3d at 33 n.4; App. B: Side by Side Display of BrickStop and Valley View Advertising.

With respect to Valley View's original sell sheet, it is questionable whether the expression taken was original as opposed to stock photos or whether it was substantial enough to sustain a copyright infringement claim. Nonetheless, even if it were a copyright violation, it is over. Valley View ceased using the sell sheet immediately upon BrickStop's complaint. Bertucci Aff. ¶ 17. It has not resumed, nor is it likely to resume, use of this sell sheet. BrickStop has no evidence that it was ever used after March 7, 2008. Frieberg Dep. 169:20-23; Kurtz Dep. 245:9-23. This alleged copyright violation, therefore, cannot form the basis for entry of a preliminary injunction as there is no likelihood of future harm.

**F.**    **There is no irreparable harm and public policy favors competition.**

The only harm complained of by BrickStop is direct price competition. While BrickStop has alluded to the possibility *(See* Pl.'s Hutchinson Aff. ¶ 11) that products made with a low pressure molding process are more brittle and therefore more likely to fail than the process used by BrickStop, there is no empirical evidence presented by BrickStop to support this supposition.

14

Kurtz Dep. 220:6-221:19, Frieberg Dep. 247:17-248:9 (testifying as Rule 30(b)(6) witnesses on this point). Further, Valley View's expert has opined that the plastic used by Valley View, and the method used in its manufacture, makes a product satisfactory for the application and is not likely to fail as predicted by the BrickStop manufacture. Dealey Rep. (Ex. 5) ¶ 16. Therefore, there is not likely to be any reputational harm to BrickStop based on Valley View's continued sale of the Diamond Paver Edge product.

The balance of harm tips in favor of Valley View because the public policy is against monopolization where the claimant has not availed himself of the patent law. If BrickStop pursued patent protection for its product, the issue would have been different, because Valley View would not have based its new product design on a patented product.[10] However, having failed to obtain patent protection, there is no harm in allowing competitors to provide alternatives to a single source for a popular product. The public interest is best served by allowing Valley View to continue to sell the Diamond Paver Edge. It is in the public interest to obtain the valuable product for less. See *Wal-Mart*, 529 U.S. at 205-215.

For all of these reasons, this Court should deny BrickStop's motion for preliminary injunction.

Dated: August 8, 2008

Respectfully, submitted,

VALLEY VIEW INDUSTRIES, H.C., INC.

By:     /s/ Monica L. Thompson
        One of its Attorneys

Monica L. Thompson (ARDC # 6181455)
R. Blake Johnston (ARDC # 06239464)
Albert E. Hartmann (ARDC # 06256064)
**DLA PIPER US LLP**
203 North LaSalle Street, Suite 1900
Chicago, IL 60601
312 368-4000
monica.thompson@dlapiper.com
blake.johnston@dlapiper.com
albert.hartmann@dlapiper.com

---

[10] Ironically, in clearing a new product, BrickStop only checks for patents. It does not consider copyrights or trademarks. Frieberg Dep. 221:13-223:20.

15

## CERTIFICATE OF SERVICE

I, Monica L. Thompson, an attorney, depose and state that on August 8, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve electronic notice to all counsel of record.

By:    /s/ Monica L. Thompson
Monica L. Thompson

16

$\mathcal{A}$

# Appendix A: Functionality



B001537

B.E.A.S.T. in reverse application.

Source: Dep. Ex. 2.

# Function 1: One piece that does both <u>straight lines and curves</u> (Rigid Application)

## Leg Support Thickness Explanation:

"I'm of the opinion that the wall structure utilized in the anchoring foot is in fact viewed as a solid beam construction in function. This will provide support for the wall and connecting anchoring mechanisms." (Dealey Rep. ¶ 49.)

"I also thought the Brickstop product design appeared strong due to the thick legs of the foot design. The greater thickness of the legs in comparison to that of the fill regions allows for greater rigidity and support without using as much material. For example, a foot utilizing these legs with limited foot areas would be stronger than a solid foot of the thickness of the fill areas.... The Fill Regions also add stability to both Leg Supports. Likewise, the Leg Supports allow the force from nails or stakes to be dispersed from the Anchoring Points: the Center Nail Hole, the Top Nail Hole..." (Soukup Decl. ¶ 8.)

## Fill Regions Explanation:

"Two filled in areas, at the bottom of the part when viewed as installed, laying between the outer ribs and connecting the outer edges of the 'V' shaped feature function as a linear connecting mechanism and acts as a restraint for torsional forces and/or twisting in the 'X' axis (running the length of the part)."
(Dealey Rep. ¶ 52.)

"Q. When were they [the fill regions] inserted?
A. They were inserted after we had ran our mold. We pulled our pieces. We looked at the samples and we found that there was a weakness in this area. (indicating)
Q. A weakness in the foot?
A. In the foot.
Q. So they were added, then, to reinforce that?
A. These fill spaces were put in to give that area some structure, okay?
...
Q. But you're sure something had to be filled in to add some structural stability to the design of this foot?
A. I am, yes." (Frieberg Dep. 232:9-233:9 & Ex. 9.)



## Spacers Explanation:

"Another feature is positioned between the anchoring feet (with the exception of the last anchoring foot on each end), and is connected to the wall and then with a series of four ribs connects to the adjacent anchoring feet. This feature remains in place when the installation calls for a straight section of the wall and provides additional restraint to the wall and functions to increase stiffness." (Dealey Rep. ¶ 53.)

Function 2: One piece that does both straight lines and curves (Flexible Application)



# Function 2: One piece that does both straight lines and curves (Flexible Application)

## Easily Cut Spacers Explanation:

[When comparing the B.E.A.S.T.S functionality to that of another product:]

"A. Not that it failed, but that it was a complicated product to cut because it was basically -- the bottom of the foot is sort of like one piece. And they have to cut not little straps like ours or a ridge, but they have to remove portions of it. It's just a lot of cutting." (Frieberg Dep. 109:23-110:8.)

## Arched Shape of the Entire Foot Explanation:

"Q. And isn't it true that there is -- that the use of a slope of some sort, whether it's a curve or a straight line, but the use of a slope in the foot does allow for more of an interior bend on the product in its flexible stage with the spacers removed than you would have if that were a straight edge and there were an overlap?

A. Curve, slope, straight line, one of them could have come to a point. A triangle, but something." (Frieberg Dep. 236:17-237:2.)

"The arch design of the foot allows for proper installation of inside curves. For inside curves (the feet are curved together), the arch design allows the feet not to overlap. Overlapping of the feet prohibits proper installation of the restraint." (Soukup Decl. ¶ 7.)



## Open Triangle Region Between Leg Supports Explanation

"Additionally, the BrickStop foot has two ribs positioned at approximately a 60° included angle between the wall and the first anchoring opening, in essence functioning as the support mechanism. The opening between the two ribs allows for some flexing in non-linear applications while providing maximum wall support for this structure." (Dealey Rep. ¶ 50.)

# Function 3: Uses a lattice nailing pattern for strength and stability

## Top Nail Hole and Center Nail Hole Explanation::

"Q. By lattice nailing what are you referring to?

A. I'm referring to in each foot two nailing positions." (Kurtz Dep. 16:23–17:1.)

"Q. And when you speak of lattice nailing patterns, it would alternate using the outermost, the proximal and the distal –

A. That's correct.

Q. – depending on how you go down the line?

A. That's correct" (Kurtz Dep. 140:4-9.)

"Also, having multiple Anchoring Points on each foot supports lattice nailing. Lattice nailing installations alternate nailing anchoring devices into the Top Nail Hole and the Center Nail Hole to support the paver restraint with a staggered anchoring configuration." (Soukup Decl. ¶ 8.)

## Leg Supports Explanation:

"Likewise, the Leg Supports allow the force from nails or stakes to be dispersed from the Anchoring Points: the Center Nail Hole, the Top Nail Hole.…" (Soukup Decl. ¶ 8.)

"Q. Did you have any discussions of reducing – of eliminating the legs on either side of the top nail hole? And it might be easier if we pull up the picture in Exhibit 9 of the B.E.A.S.T. product. For instance, did you ever have any discussions that you recall about eliminating this (indicating) stretch of –

A. No.

…

Q. Well, you needed it in the sense that you had to have something to support –

A. If you wanted a second nail hole –

Q. I have to finish the question. You needed something, one of these. You needed something, one of these three, in order to have a second – the nail hole that's at the top or the apex of this foot, correct?

A. That is correct."

(Frieberg Dep. 228:13–229:18.)



# Function 4: Structural Rib Re-enforcement SRR™ for perfect straight lines.

## Double Ribbed Connectors Explanation:

"With that picture in front of you, do you agree with what — well, can you point out to me what you believe is referred to as the 'structural rib reinforcement, SRR, for perfect straight lines'?

...

A. Yeah.

Q. So what was he referring to, do you know?

A. Yeah. I think what he was referring to — and it would have been more apparent in the original design, but we followed through with it for the same reason — I believe was this 'D,' the upper portion of the — that rib."

(Frieberg Dep. 248:12–249:12 & Dep. Ex. 9.)

"Q. I would like you to designate for me — and why don't you do it with like the letter A so we can follow along — draw a line with the letter A. What is the structural rib reinforcements, I mean the SRR, that is for perfect straight lines?

A. You want me to draw a line and put an A next to the line?

Q. Draw a line next to the part and then put an A by it. That is a structural rib reinforcement?

A. Yes." (Kurtz Dep. 136:16–137:7 & Dep. Ex. 9.)



Double Ribbed Connectors

# Function 5: Stable Sure-gripping Footprint SSF™ for stability.

## Entire Anchor Foot Explanation:

"Q. And if you could draw a similar line with the letter B to the part that shows, or that denotes, 'stable sure gripping footprint,' SSF for stability?

...

A. I know. I know. It's the foot.

Q. The foot itself. So can you just draw like a --

A. (Witness complies.)

Q. Fine, and we'll put a B on that ..." (Kurtz Dep. 137:8-137:18.)



# Function 6: The B.E.A.S.T. can be used in reverse application.

## Reverse Application Explanation:

"The use of this product, from a design standpoint is that of a static application and the forces acting on the foot and spike or stake are then static in nature. In this regard when the foot is outside the paver the forces acting on the plastic are compressive. When the installation has the foot placement under the paver, the forces acting on the plastic are in tension."

"Therefore, the design and function of the anchoring foot must take into account both compression and/or tensile forces after installation."
(Dealey Rep. ¶¶ 47–48.)

"The Gator Edge product, unlike the BrickStop B.E.A.S.T., is designed with vertical ribs connecting the restraining walls to the feet, is intended for outside placement away from the pavers. Placing the Gator Edge under the paving blocks is not practical, as the vertical ribs would prevent the paving blocks from setting into its intended surface."
(Dealey Rep. ¶ 100.)

"The Snap Edge restraint has spaced ribs that extend up the outside of the wall surface about three-fourths of an inch. This would dictate that the restraint wall has to be on the outside of the pavers as opposed to an inside or under the paver installation."
(Dealey Rep. ¶ 106.)

"Q. Do either Snap Edge or Dimex allow for reverse installation?
A. No."
(Bertucci Dep. 203:23–204:1.)



# Function 7: Manufacturing Cost Savings

## Open Regions Explanation:

"The Open Areas in the foot create a cost savings by reducing material needed to make the product.  Also, by reducing the weight of the finished product, we save on freight costs." (Soukup Decl. ¶ 9.)

"It is also well known in plastic part design that the least amount of material used to manufacture a product that per-forms in that application is the preferred design approach.  As opposed to thick solid sections, beam and rib structures are the better choice and less costly to injection mold while using less material." (Dealey Rep. ¶ 28.)



Open Regions

## Function 8: Manufacturing Functionality

### Open Regions Explanation:

"The Open Areas in the foot create a cost savings by reducing material needed to make the product. Also, by reducing the weight of the finished product, we save on freight costs." (Soukup Decl. ¶ 9.)

"It is also well known in plastic part design that the least amount of material used to manufacture a product that performs in that application is the preferred design approach. As opposed to thick solid sections, beam and rib structures are the better choice and less costly to injection mold while using less material." (Dealey Rep. ¶ 28.)



Ejector Points

Spacers

B

# Appendix B

Left image from Pl.'s Frieberg Decl. Ex. U.

Right image from Pl.'s Wein Decl. Ex. A.

GO1191253148.1