**FILED**

**AUGUST 8, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BRICKSTOP CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08-CV-2690 |
| | ) | |
| v. | ) | Honorable Judge Gettleman |
| | ) | |
| VALLEY VIEW INDUSTRIES, H.C., INC., | ) | Magistrate Judge Cole |
| | ) | |
| Defendant. | ) | |

## DEFENDANT, VALLEY VIEW INDUSTRIES, H.C., INC.'S INDEX OF EXHIBITS FOR ITS MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTION

Defendant Valley View Industries, H.C., Inc. by its attorneys submit the following exhibits in support of their Response to Plaintiff's Motion for Preliminary Injunction:

1. Affidavit of Howard Rynberk.

   A. Picture of Valley View's Black Diamond lawn edger.

   B. Picture of Anchoring Stakes.

   C. Picture of Valley View's Diamond-Lok Flexible L-shaped paver restraint.

   D. Picture of CobraCo's Cobra paver edging.

   E. Picture of Valley View's Diamondback edging.

   F. Picture of Master Mark Plastics's Viper edging.

   G. Picture of Brickstop's Simflex edging.

   H. Patent Search Results

   I. Picture of Identifying End of Valley View's Diamond Paver Edge.

   J. Picture of Identifying White Label on Diamond Paver Edge.

2. Transcript Excerpts from Deposition of Howard Rynberk taken July 31, 2008. (Filed Under Seal).

3. Affidavit of Dominick Bertucci.

    A. Email message from D. Bertucci to H. Rynberk dated July 19, 2007.

    B. Email messages between Valley View and Vision Graphics.

    C. Copy of the Sure-loc Catalog.

    D. Copy of Dreamscape website

    E. Picture of product sold by Dreamscape.

4. Transcript Excerpts from Deposition of Dominick Bertucci taken August 1, 2008. (Filed Under Seal).

5. Expert Report of Robert W. Dealey.

6. Affidavit of Frank Soukup. (Filed Under Seal)

    A. Picture of Supporting Spacer with Ribbed Connectors Cut.

    B. Picture of Inside Curve Foot Configuration.

    C. Picture of Leg Support A, Leg Support B, and Fill Regions.

    D. Picture of Top Nail Hole, Center Nail Hole, Stake Chevron, and Open Areas.

    E. Email message from T. Walters to F. Soukup dated January 28, 2008.

    F. Email message from F. Soukup to D. Bertucci dated January 22, 2008.

    G. Email message from J. Dorgelo to F. Soukup dated February 15, 2008.

    H. Email message from J. Dorgelo to F. Soukup dated February 18, 2008.

    I. Email message chain between F. Soukup and J. Dorgelo between April 24, 2008 and May 6, 2008.

7. Transcript Excerpts from Deposition of David Frieberg taken July 30, 2008. (Filed Under Seal).

8. Transcript Excerpts from Deposition of Rubin Kurtz taken July 29, 2008. (Filed Under Seal).

9. Affidavit of Michael Casey.

10. Affidavit of David Martinet.

11. Deposition Exhibits (Filed Under Seal)

    A. Deposition Exhibit 2

    B. Deposition Exhibit 9

    C. Deposition Exhibit 20

    D. Deposition Exhibit 22

    E. Deposition Exhibit 37


Dated: August 8, 2008

Respectfully, submitted,

VALLEY VIEW INDUSTRIES, H.C., INC.

By:   /s/ Monica L. Thompson
     One of its Attorneys

Monica L. Thompson (ARDC # 6181455)
R. Blake Johnston (ARDC # 06239464)
Albert E. Hartmann (ARDC # 06256064)
**DLA PIPER US LLP**
203 North LaSalle Street, Suite 1900
Chicago, IL 60601
312 368-4000
monica.thompson@dlapiper.com
blake.johnston@dlapiper.com
albert.hartmann@dlapiper.com

1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BRICKSTOP CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08-CV-2690 |
| | ) | |
| v. | ) | Honorable Judge Gettleman |
| | ) | |
| VALLEY VIEW INDUSTRIES, H.C., INC., | ) | Magistrate Judge Cole |
| | ) | |
| Defendant. | ) | |

## **AFFIDAVIT OF HOWARD RYNBERK**

I, Howard Rynberk, being duly sworn state that if called as a witness in the above-captioned matter I would be competent to testify as follows:

1.    I am now, and for the past 12 years have been, the President and CEO of Valley View Industries ("Valley View"), the defendant in the current action.

2.    Valley View is a family owned business located in Crestwood, Illinois. The company was started 30 years ago and was operated by my uncle, Robert Rynberk, until I purchased the company from him in 1996.

3.    Valley View makes and sells products to landscape and hardscape distributors. Landscape distributors handle plants as well as other products for use in yards and outdoor areas while the hardscape distributors handle nonliving outdoor products such as pavers (that is, bricks, stones and rocks) used to make patios, walks and drives. Valley View makes most of its own products on site at its plant in Crestwood. It employs 60 people full time and an additional 15 employees on a temporary basis. Valley View has a National Sales Manager, but otherwise sells its products through 10 or more independent sales representatives who are paid on commission.

4.      My uncle invented several items which are now standards in the landscape and hardscape industry.  One of the first products invented by my uncle in 1968, and the product on which the company was founded, is the Black Diamond lawn edger pictured in Exhibit A.  This edger was designed to outline lawns and distinguish them from planting beds, mulch and rocks that were used to create borders around gardens and other planted areas of a lawn.  Other products sold by Valley View include anchoring stakes pictured in Exhibit B which are wider than the spiral nails or spikes used by some contractors to anchor lawn and paver edging products.  Valley View also sells polyboard which has the appearance of wood and can be used in many edging applications.  Other products include planters, and paver edging restraints

5.      Paver edging products are used to keep the bricks, stones or rocks that are used for walkways and other landscaping features from migrating when the ground shifts due to frost and thaw cycles, use or other reasons over time.  Among the paver edging products invented and sold by Valley View are the products sold under the "Diamond-Lok" trademark.  These paver restraints are made in T (meaning they have horizontal feet on either side of the restraining wall so that the paver covers one side after installation while the lawn covers the other side) and L (meaning that the anchoring feet run only on one side of the restraining wall and can be covered by the paver or the lawn after installation) configurations.  Both versions of the Diamond-Lok products are sold in rigid and flexible styles.  A picture of the Diamond-Lok flexible L shape product is included at Exhibit C.  All of the Diamond-Lok products are made of extruded plastic at Valley View's facilities.

6.      Valley View recently started making a paver edge product that is formed by injection molding called the Diamond Paver Edge or "DPE."  This product is made off site by manufacturers under contract with Valley View.

2

7.    Valley View sells its products nationwide throughout the United States. It also sells its products in Europe, the Middle East, Japan, Mexico and in some areas of Canada.

8.    Valley View's customers include, landscape distributors and dealers. In addition, it sells its paver edger products to hardscape distributors and paver manufacturers. Some of the Valley View products, but not including the Diamond Paver Edge, are sold through large retail stores such as Home Depot.

9.    The major competitors of Valley View include Dimex Corporation, Master Mark Plastics, Suncast Corporation and Patrician Products, Inc. In the paver edging product line, the competitors also include, among others, Snap Edge Canada, Ltd., Dimex Corporation, and Pave Tech, Inc.

## PRODUCT DEVELOPMENT IN THE HARDSCAPE/LANDSCAPE INDUSTRY

10.    Innovation in the landscape/hardscape industry is often made in small increments with competitors copying another manufacturer's successful design and incorporating small changes that improve the product or reduce the cost to the customer or both. For example, my uncle's original lawn edging has been copied numerous times. The most recent iteration of this product was made by CobraCo Manufacturing, Inc. which added a corrugated sidewall and a T-shaped bottom lip. See Exhibit D. The similarities with the Black Diamond (Exhibit A) are apparent, yet this product, called the Cobra Hitest, has several innovations over the older design. Now that the CobraCo product is no longer protected by patent, Valley View and other manufacturers have introduced products that incorporate the features added by CobraCo. Exhibit E is the Valley View Diamondback and the Exhibit F shows the Viper edging of Master Mark Plastics.

11.    Another product innovation of Valley View, the Diamond-Lok L-shaped paver edge was the basis for a whole line of paver edge products. In fact, many of the L-shaped paver

3

designs that are made from extruded plastic are very similar to the Diamond Lok L-design.  For example, compare BrickStop's Simflex paver restraint, shown at Exhibit G and the Diamond-Lok pictured in Exhibit C.

12.    Because copying the successful designs of another manufacturer with slight improvements or with better pricing for the customer is the natural and often repeated process for product innovation in our industry, it would not be reasonable to assume that customers automatically understand that unique or distinctive product design is meant to indicate a single source.  Manufacturers who do not want their products to be copied use patent protection to give them a period of exclusive use of a design.

## DEVELOPMENT OF THE DIAMOND PAVER EDGE

13.    In the year 2007, various salesmen who handled the Valley View products reported that their customers were asking for a sturdier grade of paver edgers to complement the product line offered by the Diamond-Lok products.  In particular, Dominick Bertucci, who was an independent sales representative for Valley View at the time, reported on a meeting with a significant potential customer, Unilock, who had asked if Valley View could make a product similar to that of the B.E.A.S.T. for them.  Unilock indicated that it was interested in selling a sizeable quantity of such products, but was unable to do so as the manufacturer for the B.E.A.S.T. would not sell to Unilock at a price that Unilock wanted to pay.

14.    Valley View began considering adding a sturdier paver edging product to its mix of paver restraints.  We began by examining a number of products that were selling successfully in the market.  Among them were the Snap Edge product and the B.E.A.S.T.

15.    One of the first things steps we undertook in the process of developing a new product was to have our attorneys check for existing patents owned by Snap Edge and BrickStop, two of the companies which made products that we were studying.  We were informed that Snap

4

Edge had a patent on its product that would not expire until the year 2009. BrickStop, on the other hand, had no valid, existing patents. See Exhibit H. We thus began to model our new product on the design of the B.E.A.S.T. product.

16.    I did not personally know of BrickStop, though from time to time, salesmen reported that some customers were selling the B.E.A.S.T. product. The first sample of the B.E.A.S.T. product came to me from a sales representative on the East coast who ran into the product at a tradeshow. This was approximately 5 months before Valley View began to take steps to make a comparable product.

17.    After we became interested in modeling a new product after the B.E.A.S.T. product, I asked the buyer at Tameling's Landscape Supply (Tameling's), Dave Martinet, to obtain a sample for me. Tameling's is a landscape distributor which I purchased from an aunt over 25 years ago, though I do not work there and do not involve myself in the day to day operations of the business. Two of my sons work there, but neither of them is in charge of purchasing products.

18.    Dave Martinet who is the Vice President and General Manager, has been with Tameling's for over 25 years and is very experienced in the landscaping business. Very near to the time that I asked if Tameling's could get a sample of the B.E.A.S.T. he had a pallet of the product delivered to Tameling's for resale. Dave Martinet had independently determined that he would buy a pallet of the B.E.A.S.T. product to sell along with the other paver edging products that he carried at Tamelings. I thus obtained several strips of the B.E.A.S.T. product for people at Valley View to study.

19.    In discussions with Frank Soukup, the Plant Manager and Engineer at Valley View, and John Neblock, Valley View's Plant Engineer we determined that we would make the following improvements on the B.E.A.S.T. product:

(a)     The retaining wall would be a little higher and a little wider to add stability. We knew that brick pavers are approximately 2" tall. The retaining wall of the B.E.A.S.T. product was only 1.75" tall. Our product has a retaining wall that is 1.85" in height.

(b)     We added a chevron shaped slot with supports to allow the installer to use a stake to secure the foot of the product. As mentioned above, Valley View is a proponent of stakes for stabilizing lawn and paver edging products. Valley View, however, decided to leave nail holes in the product so that contractors could use either securing method depending on their preference.

(c)     I also suggested that the connector at the end of the piece should be enlarged to make the connections between pieces of the paver more solid.

20.     Frank Soukup researched the manufacturing methods for developing the Valley View product. He determined that if we used a low pressure injection molding process that the product could be made less expensively and stronger. Frank Soukup worked out further details with the mold manufacturer and the fabricator in order to make the tools necessary to fabricate the product. I was involved at this stage only to approve expenditures and to help set price parameters for the purchase of the product. I also determined the range of the selling price that Valley View would charge its customers.

21.     When designing the Valley View Diamond Paver Edge product we did not include any purely ornamental features. Ornamental features, which are buried under ground like the foot of the paver edge after installation, would serve little function in making the product appealing to contractors.

## THE MARKINGS OF THE VALLEY VIEW PRODUCT

22.    All of the Valley View products are clearly identified as such. The Diamond Paver Edge, for instance, has the name "Valley View" and the mark "Diamond Paver Edge" in raised letters set into the pattern of the mold at one end of the 8' strip. See Exhibit I. This is a permanent marking that will not deteriorate with moisture or weather conditions. The reason it is important for Valley View to permanently mark its product is that the Diamond Paver Edge, like all Valley View products, has a 20 year warranty. The only way to determine whether a product which has been underground for any length of time was originally made by Valley View is through this form of permanent marking.

23.    In addition, we have white labels which show prominently against the black plastic with which the Diamond Paver Edge is made. See Exhibit J. The white labels identify Valley View as the source. These are placed on the product via adhesive. The reason we use these labels is so that when we send samples (which are generally about a foot in length) the customer will clearly see from whom it can order the particular product.

Further affiant sayeth not.

_____
Howard Rynberk

Subscribed and Sworn to
before me this _3/st_ day
of July, 2008

_____
Notary Public

"OFFICIAL SEAL"
NANCY A. HILLEGONDS
Notary Public, State of Illinois
My Commission Expires 07/20/10



# Exhibit A



# Exhibit B

# Exhibit C



# Exhibit D

CHOO1312411389.1

# Exhibit E



# Exhibit F

# Exhibit G



# BrickStop

## LANDSCAPE PRODUCTS



**The B.E.A.S.T.**

**SIMFLEX Paver Edging**



**100% Recycled Plastic Paver Edging**

**BrickStop Aluminum Paver Edging**

**EdgeStar Aluminum Landscape Edging**

## BRICKSTOP CORPORATION

For the past eighteen years, Brickstop has been the only company manufacturing quality plastic and aluminum paving restraint systems that effectively prevent the shifting and movement of pavers.

Tested and proven by landscapers, landscape architects and homeowners throughout North America, Brickstop ensures long-lasting results that will keep customer referrals coming year after year.

Suitable for all commercial, industrial and residential applications, available at over 1,500 retail locations.

*At Brickstop Corporation, we are always extending our line of products to serve the needs of our customers, providing tools & accessories for the landscape professional.*

## "ONE CALL DOES IT ALL"

FREE TECH SUPPORT

**CALL 1 800 565-2559**

205 Champagne Drive, Unit 8A, Toronto, ON, M3J 2C6, Canada
E-mail: brick@brickstopedge.com   www.brickstopedge.com

B001610

# Exhibit H

## Business Center - Chicago

**From:**  Ryther, James P. [James.Ryther@dlapiper.com]
**Sent:**  Friday, July 27, 2007 5:23 PM
**To:**  Howard Rynberk
**Subject:**  Brickstop search report

**Attachments:** Message_.pdf; Message_.pdf; Message_.pdf

Howard - the attachments constitute the results of the search conducted relative to Brickstop Corporation.

As you will see, U. S. Patent No. 5,212,917 issued to this company on May 25, 1993 and this is the only U. S. patent turned up in the search. I am assuming that this illustrates the paver restraint edging referred to in your request for the search.

Also attached is documentation from the Patent and Trademark Office establishing that this patent expired on May 27, 2001 because Brickstop did not pay the requisite maintenance fee. Under these circumstances, this patent cannot bar Valley View from making and selling this product.

The remaining attachment refers to trademarks registered by this company. You will note that there is no record that "Beast" was registered but it would still be wise to avoid using any similar name if you decide to adopt this product. In addition, you should, of course, avoid use of any name similar to "Brickstop."
Please let me know if there are any questions.  Jim.

 **DLA PIPER**

DLA Piper US LLP
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1293

www.dlapiper.com

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. To contact our email administrator directly, send to postmaster@dlapiper.com

Thank you.

6/28/2008                                                                                              VVW002075

US005212917A

# United States Patent [19]

Kurtz et al.

[11] Patent Number: 5,212,917

[45] Date of Patent: May 25, 1993

[54] BRICK EDGING DEVICE

[75] Inventors: Rubin Kurtz; David F. Karp, both of North York, Canada

[73] Assignee: Brickstop Corporation, North York, Canada

[21] Appl. No.: 812,467

[22] Filed: Dec. 23, 1991

[51] Int. Cl.⁵ ................................................ A01G 1/00
[52] U.S. Cl. ................................ 52/102; 47/33; 404/7
[58] Field of Search .............. 52/102; 47/33, 32; 404/7, 8

[56] References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,559,330 | 2/1971 | Klingberg | 47/33 |
| 3,676,952 | 7/1972 | Watts | 47/33 |
| 4,831,776 | 5/1989 | Fritch | |
| 4,863,307 | 9/1989 | Jonas | |
| 4,940,624 | 7/1990 | Iloriki et al. | |
| 4,969,287 | 11/1990 | Trifiletti | |

### FOREIGN PATENT DOCUMENTS

417724 of 1934 United Kingdom ........... 47/33

### OTHER PUBLICATIONS

Brochure—"Karob Rasenziofassung".

Primary Examiner—Richard E. Chilcot, Jr.

Assistant Examiner—Joanne C. Downs

[57]                    ABSTRACT

A brick edging device is disclosed for use as an interface or boundary of a bricked region In one aspect the edging device includes an elongate extruded aluminum strip extending in a longitudinal direction having a flange portion attached to an edge of the aluminum strip and extending in a transverse direction outwardly from one side of the strip. The flange is provided with a series of V-shaped cut-out portions spaced along the length thereof with the flat apex of the V being spaced from the edge of the elongate strip. The portion of the flange located between the cut-outs form individual flaps, each flap having an aperture extending therethrough to receive a spike. The apertures are countersunk so that the spike heads are flush with the flaps. There is an angle of at least 90 degrees between the sides of the V shaped cut-out portions and the aluminum strip is bendable at points adjacent to the apex of to at least 90 degrees. Located on the other side of the strip is an integrally formed loop which can receive therein a planar stake. Stakes are provided having a hooked end portion opposite a sharp end, the hooked portion having a protrusion projecting inwardly into the hooked portion which is releasably snapped over the loop when the stake is inserted into the loop. Bricks may be laid onto the flap portions while the aluminum strip acts as a barrier between the bricked portion and other areas.

15 Claims, 4 Drawing Sheets



VVW002076



FIG. 1

VWW002077



FIG. 2

VVW002078



FIG. 3

VVW002079

Case 1:08-cv-02690    Document 39-2    Filed 08/08/2008    Page 34 of 122



FIG. 5

FIG. 4

VVW002080

5,212,917

1

## BRICK EDGING DEVICE

### FIELD OF THE INVENTION

The present invention relates to brick edging devices.

### BACKGROUND OF THE INVENTION

The need for brick edging devices to separate bricked areas from different kinds of terrain is well known. There are several basic types of brick edging devices utilized for a similar application, namely edging grassy areas. One type includes a single upright elongate strip with a horizontal flange member or a plurality of discrete individual flap members extending away from the elongate strip to provide support for the strip or an anchoring base for the device. However, edgers known in the prior art provided with these horizontal extending flanges or flaps have been designed so that the flange prevents bending of the strip or the flaps interfere with one another when the strip is bent, thereby limiting the angle to which the edger can be bent. Prior art edgers have also not been produced to accommodate standard size bricks when the strips are bent, but rely on the bricks being cut to provide a snug fit. Furthermore, in prior art edging devices, the horizontal flange or flaps or other means of support for the upright strip is commonly designed to remain uncovered by grass, brick or, other substrate, thus producing a wide border between areas comprising both the upright strip and the support means.

We have found that we can overcome these disadvantages in the prior art by providing a brick edging device that is provided with flaps that are configured and spaced to allow for bending of the strip to a variety of angles and can accommodate a brick of a standard size without the need for cutting of the brick to obtain a snug fit. In addition, our device, when in place, provides a sharp, well-defined boundary between the bordered areas.

Another type of prior art device in this class provides for the stabilization and securing of the elongate strip in an upright position using spikes or stakes with hooks at one end which hook over the upper edge of the strip. A drawback to this kind of arrangement is that during frost heaving the stake is driven up out of the ground and since the hook is securely interlocked with the strip, the strip is also dislodged from the ground. We have found that we can provide an improved snap fitting engagement between the stake and the edging strip so that, in the event of pressure due to heaving of the substrate, the hook will disengage from the strip rather than lift the strip from its position.

A single securing means is commonly inadequate to securely hold a strip in place at the boundary of a bricked region since there is considerable outward pressure acting on the bricks due to vehicles or people walking over the bricks. We have found that a dual means of securing the edging strip is preferable and have thus provided securing means both by way of a stake on one side of the strip and spike on the other side of the strip.

Connecting pieces joining lengths of brick edging are well known but have in the prior art, fixed the joined pieces in a manner prone to separation without accommodating changes in grade of the substrate on which the edger is fixed. Our connecting pieces overcome these disadvantages allowing for changes in grade. Also, many of the prior art devices are fabricated from plastics which are prone to splitting in cold weather or

2

when struck during the installation step when driving spikes therethrough. Our device overcomes this disadvantage by being fabricated from materials resistant to splitting.

### SUMMARY OF THE INVENTION

The subject invention provides a brick edging device for use as an interface or boundary between a bricked region and other types of terrain.

In one aspect of the invention a brick edging device includes an elongate strip extending in a longitudinal direction and having first and second opposed sides and opposed edges. A flange member is attached to the elongate strip along a first edge thereof and extends transversely from a first side of the elongate strip. The flange includes a plurality of spaced flap members and the flap members are each provided with an aperture for receiving a spike therein. There are a plurality of spaced, V-shaped cut-out portions separating adjacent flaps wherein the apex of the cut-out V portion is flat and is spaced from the first edge of the elongate strip. There is an angle of at least 90 degrees between the sides of the V so that the elongate strip can be bent at a position between the flat apex and said first angle to an angle of at least 90 degrees. Included is a plurality of spaced stake receiving means located on the second side of the elongate strip between the first and second edges.

In another aspect of the invention, the brick edging device includes an elongate strip extending in the longitudinal direction and which is provided with first and second opposed sides and opposed edges. There is provided a flange member which is attached to the elongate strip along a first edge of the elongate strip and which extends transversely from a first side of the elongate strip. The flange member is provided with a plurality of spaced apertures extending therethrough. The brick edge device includes a plurality of spaced stake receiving means located on a second side of the elongate strip. At least one stake means is provided which is receivable by the stake receiving means. The stake means includes a releasable gripping means which is engageable by the stake receiving means for forming an interlocking connection between the stake means and the stake receiving means.

### BRIEF DESCRIPTION OF THE DRAWINGS

The brick edging device of the subject invention will now be described, by way of example only, with reference to the accompanying drawings, in which:

FIG. 1 is a perspective view of a first embodiment of the brick edging device embodying the subject invention;

FIG. 2 is a top view of the device of FIG. 1;

FIG. 3 is a sectional view of the brick edging device taken along the lines 3—3 of FIG. 1;

FIG. 4 is a sectional view taken along the lines 4—4 of FIG. 2; and

FIG. 5 is a perspective view of another embodiment of the brick edging device.

### DETAILED DESCRIPTION OF THE PREFERRED AND ALTERNATIVE EMBODIMENTS

In referring to the drawings like numerals refer to like parts. A first embodiment of a brick edging device 10 embodying the subject invention is shown in FIGS. 1–4 and includes an elongate strip portion 12 having a sub-

VVW002081

5,212,917

3

stantially planar portion 14, a first edge 16, a second
opposed edge 18, and wherein planar portion 14 in-
cludes opposed sides 20 and 22. Elongate portion 12
includes spaced, longitudinal strengthening ribs 24 and
26 integrally formed therewith and extending along the
full length of strip 12. Preferably ribbed portions in-
clude a rounded outer portion 28 and adjacent rounded
channel portion 30, see FIG. 4. Ribs 24 and 26 mitigate
against crimping of strip 12 during bending.

Brick edger 10 is provided with a substantially planar
flange member 32 connected to strip portion 12 along
edge 16 thereof. Flange 32 extends transversely with
respect to planar portion 14 and away from side 20.
Flange 32 includes a plurality of flap members 34 sepa-
rated from each other by V-shaped cut-out portions
shown generally at 36. An apex 37 of the cut-out V-
shaped portions is flat, not pointed, wherein the flat
apex portions 37 are parallel edge 16 and spaced about
0.08 to 1.0 mm from edge 16 defining a projecting por-
tion 39. Strip 12 may be bent or shaped by bending strip
12, inwardly or outwardly with respect to flaps 32, at
points adjacent flat apex portions 37 as illustrated in
FIGS. 1 and 2. The presence of projecting portion 39
mitigates against tearing or ripping of strip 12 when the
latter is being bent or shaped.

The size of the flap members 34 and spacing between
the cut-out portions may be chosen to correspond to the
width of a known standard size brick so that a single
brick may be bordered by the strip embodying the sub-
ject invention, see FIGS. 1 and 2.

In one embodiment of the brick edger there is an
angle of about 90 degrees between the sides of adjacent
flap members 34 so that strip 12 may be bent inwardly
by 90 degrees. It will be appreciated that in other em-
bodiments angles of greater than 90 degrees between
the sides of adjacent flaps may be formed, thus allowing
for bending of the strip 12 to angles greater than 90
degrees.

Flaps 34 are each provided with an aperture 38 which
may be countersunk. Apertures 38 are of a suitable size
to receive therein a spike 40. With countersunk aper-
tures 38, a head portion 42 of spike 40 will be flush with
the top surface of flap 34 when a spike is located in an
aperture.

Edger 10 includes a plurality of retaining loop mem-
bers shown generally at 44 located on side 22 of strip 12
each of which extends outwardly therefrom. A wall
portion 46 of loop 44 has a thickness of D1, a plurality
of planar stake members 48 are each provided with a
planar shaft portion 50 wherein loops 44 and stakes 48
are suitably dimensioned so that shaft 50 may be re-
ceived through loop 44. Stake 48 is provided at one end
with a sharpened end 52 adapted to be driven into the
ground and a hooked portion 54 located at the other end
thereof Hooked portion 54 is provided with an in-
wardly projecting protrusion 56 thereby forming a gap
58 between shaft 50 and protrusion 56. Gap 58 is of a
width slightly smaller than D1 so that when stake 48 is
received by loop 44 hook portion 54 snaps over wall 46
of loop 44 thereby fitting stake 48 in loop 44 with the
upper end portion of hook 54 located below edge 18. In
this way stake 48 and loop 44 form a snap fitting combi-
nation so that stake 48 is inhibited against moving with
respect to strip 12 absent the application of significant
pressure to release the snap fit.

The embodiment of the brick edger shown at 10 in
FIGS. 1-4 is bendable along strip portion 10 along lines
in the plane of planar portion 14 at a plurality of posi-

4

tions, examples of which are shown at 60. Since there is
at least a 90 degree angle between the edges of adjacent
flap members 34, strip 12 may be bent by up to at least
90 degrees, see FIGS. 1 and 2.

Brick edger 10 is preferably fabricated from extruded
aluminum with ribs 24 and 26, flange 32, flaps 34 and
retaining loops 44 being integrally formed therewith at
the time of fabrication.

In one embodiment, several individual strips 12 may
be collinearly coupled using ribbed securing
brackets such as those shown at 64 in FIGS. 1 and 2.
Strip 12 includes countersunk holes 66 with the latter
providing a recess in which the head of a screw 68 may
reside in order that bricks may be placed snug against
strip 12.

In operation, brick edger 10 is first shaped or bent as
desired and then secured to the ground at the boundary
of a region where bricks or concrete blocks are to be
placed. To secure edger 10 in place, spikes 40 are driven
through apertures 38 into the ground until spike head 42
is flush with the top surface of flap 34. Stakes 48 are
inserted through retaining loops 44 until hooked end 54
grips loop wall 46 as previously disclosed to releasably
lock stake 48 and strip 12 together. Bricks and the like
may then be laid flush against strip 12 directly on top of
flaps 34, as shown in ghost outline at 59 in FIGS. 1 and
2, rather than requiring a layer of sand or other spacing
material.

Securing strip 12 on both sides thereof provides a
more stable and secure brick edger so that strip portion
12 remains in the same position over time. When stake
48 is engaged in loop 44 strip 12 is inhibited from pivot-
ing with respect to stake 48 in addition to which stake
48 acts to assist in maintaining strip 12 vertically upright
at all times. Because stake 48 is releasably coupled to
strip 12 it will snap free of strip 12, without being dam-
aged, during frost heaving and the like, rather than both
the strip and the stake being dislodged. Since the upper
end of stake 48 is located below the upper edge of strip
12 the former will be rendered practically invisible
when grass and bricks extend above upper edge 18
thereof.

FIG. 5 illustrates another embodiment of the brick
edger at 70 comprising a plurality of short separate units
72 which may be attached to each other at 74 by brack-
ets 76. Each unit 72 includes a flange 72 which is coex-
tensive with strip 12, all other features being substan-
tially the same as edger 10.

While the present invention has been described and
illustrated with respect to the preferred and alternative
embodiments, it will be appreciated that numerous vari-
ations of these embodiments may be made without de-
parting from the scope of the invention, which is de-
fined in the appended claims.

We claim:
1. A brick edging device, comprising:
   a) an elongate strip extending in a longitudinal direc-
      tion and having first and second opposed sides and
      opposed edges;
   b) a flange member attached to the elongate strip
      along a first edge thereof and extending trans-
      versely from a first side of the elongate strip, the
      flange including a plurality of spaced flap member,
      said flap members each provided with an aperture
      for receiving a spike therein, a plurality of spaced,
      V-shaped cut-out portions separating adjacent
      flaps, wherein the apex of said cut-out V portion is
      flat and is spaced from the first edge of the elongate

VVW002082

5,212,917

5

strip, there being an angle of at least 90 degrees
between the sides of said V so that the elongate
strip can be bent at a position between the flat apex
and said first edge to an angle of at least 90 degrees;
and

c) a plurality of spaced stake receiving means located
on the second side of the elongate strip between the
first and second edges.

2. A brick edging device according to claim 1
wherein the apex of each V-shaped cut-out portion is
spaced 100 mm from the apex of the adjacent V-shaped
cut-out portion to accommodate the weight of a stan-
dard 100 mm × 200 mm brick on each flap member and
the length of such a brick on two flap members.

3. A brick edging device according to claim 1
wherein the flap members are provided with counter-
sunk apertures so that a top of a spike head of a spike
located in said aperture is flush with a top surface of said
flap member.

4. A brick edging device according to claim 1
wherein said stake receiving means comprises a loop
integrally formed from and extending from said elon-
gate strip.

5. A brick edging device according to claim 1 includ-
ing at least one stake suitable to be driven into the
ground, the stake including a releasable gripping means,
the stake being receivable by said stake receiving
means, the receiving means being engageable by said
gripping means for forming a releasable connection
between said stake and said stake receiving means.

6. A brick edging device comprising a plurality of
discrete elongate strips as claimed in claim 1 wherein
said edging device includes interconnection means for
collinearly interconnecting said discrete members in the
longitudinal direction.

7. A brick edging device according to claim 1
wherein said elongate strip is formed from extruded
aluminum, said flanges and said receiving means being
integrally formed therewith.

8. A brick edging device, comprising:

a) an elongate strip extending in a longitudinal direc-
tion and having first and second opposed sides and
opposed edges;

b) a flange member attached to the elongate strip
along a first edge thereof and extending trans-
versely from a first side of the elongate strip, the
flange member provided with a plurality of spaced

6

apertures extending therethrough for receiving
spikes therein;

c) a plurality of spaced stake receiving means located
on the second side of the elongate strip between the
first and second edges; and

d) at least one stake suitable to be driven into the
ground, the stake including a releasable gripping
means, the stake being receivable by said stake
receiving means, the receiving means being en-
gageable by said gripping means for forming a
releasable connection between said stake and said
stake receiving means.

9. A brick edging device according to claim 8
wherein the flange includes a plurality of spaced flap
members, a plurality of spaced, V-shaped cut-out por-
tions separating adjacent flaps, wherein the apex of said
cut-out V portion is substantially flat and is spaced from
the first edge of the elongate strip, there being an angle
of at least 90 degrees between the sides of said V so that
the elongate strip can be bent at a position adjacent the
flat portion of the V-shaped apex by at least 90 degrees.

10. A brick edging device according to claim 9
wherein the apex of each V-shaped cut-out portion is
spaced 100 mm from the adjacent V-shaped cut-out
portion to accommodate the width of a standard 100
mm × 200 mm brick on each flap member and the length
of such a brick on two flap members.

11. A brick edging device according to claim 8
wherein said apertures are countersunk so that a top of
a head of a spike located in said aperture is flush with a
top surface of said flap member.

12. A brick edging device according to claim 8 in-
cluding at least one spike adapted to be received by said
aperture located in said flange member.

13. A brick edging device according to claim 8
wherein said stake receiving means comprises a loop
integrally formed from and extending from said elon-
gate strip.

14. A brick edging device according to claim 8
wherein said elongate strip is formed from extruded
aluminum, said flanges and said receiving means being
integrally formed therewith.

15. A brick edging device according to claim 8 com-
prising a plurality of elongate strips wherein said edging
device includes interconnection means for collinearly
interconnecting said discrete members in the longitudi-
nal direction.

* * * * *

VVW002083

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO. :    5,212,917

DATED       :    May 25, 1993

INVENTOR(S) :    Rubin Kurtz and David P. Karp

It is certified that error appears in the above—identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims:

Claim 2, column 5, line 12, after the words "accommodate
the" delete "weight" and insert --width--

Signed and Sealed this

Eleventh Day of January, 1994

Attest:

BRUCE LEHMAN

Attesting Officer          Commissioner of Patents and Trademarks

VVW002084

USPTO - Patent Bibliographic Data (Patent Number: 5212917)                     Page 1 of 1







**United States
Patent and
Trademark Office**



| Patent Bibliographic Data | | 07/27/2 |
|---|---|---|
| Patent Number: | 5212917 | Application Number: 078124( |
| Issue Date: | 05/25/1993 | Filing Date: 12/23/19 |
| Title: | BRICK EDGING DEVICE | |
| Status: | Expired for non-payment on: 05/25/2001 | Entity: |
| Window Opens: | 05/25/2000  Surcharge Date: 11/28/2000 | Expiratio |
| Fee Amt Due: | $0.00  Surchg Amt Due: $0.00 | Total A |
| Fee Code: | | |
| Surcharge Fee Code: | | |
| Most recent events (up to 7): | 05/27/2001 | Patent Expired for Failure to Pay Maintenance Fee: |
| | 12/19/2000 | Maintenance Fee Reminder Mailed. |
| | 06/28/1997 | Payor Number Assigned. |
| | 05/19/1997 | Payment of Maintenance Fee, 4th Yr, Small Entity. |
| | 05/19/1997 | Surcharge for late Payment, Small Entity. |
| | 12/31/1996 | Maintenance Fee Reminder Mailed. |
| | --- End of Maintenance History --- | |
| Address for fee purposes: | SAMUELS, GAUTHIER & STEVENS<br>ATTN: MAURICE E. GAUTHIER<br>225 FRANKLIN STREET<br>BOSTON, MA<br>02110 | |

NOTE: All USPTO fees are subject to change. If you are making a payment by mail or fax,
link or contact the Maintenance Fee Branch (571-272-6500) to confirm the amount due on
is to be made. A maintenance fee payment can be timely made using the certificate of ma
transmission procedure set forth in 37 CFR 1.8.

[ Run Another Query ]

Need Help? | USPTO Home Page | Finance Online Shopping Page

VVW002085

# SAEGIS™

## Custom Search Report
## Created on 2007/07/27 18:34 GMT

## Strategy

**Your Reference** brickstop

**Selected Databases** Trademark Databases: U.S. Federal,International (IR) trademarks with protection in selected countries ONLY

**Criteria** Options: *Active Only: off* , *Plurals: on* , *Cross References: on*
Q1 :   4  -  Owner Name : brickstop

**Search Date** 2007/07/27 18:32 GMT

© 2007 Thomson CompuMark - All rights reserved.

VVW002086

# Hits Overview

| Hit No. | Query | Trademark | Database | Status | Class | Owner Name |
|---|---|---|---|---|---|---|
| US-1 | Q1 | BRICKSTOP GREENLINE EDGING | U.S. Federal | REGISTERED | 5 | BRICKSTOP CORPORATION |
| US-2 | Q1 | BRICKSTOP EDGE-ALL | U.S. Federal | REGISTERED | 20 | BRICKSTOP CORPORATION |
| US-3 | Q1 | BRICKSTOP | U.S. Federal | REGISTERED | 6 | BRICKSTOP CORPORATION |

VVW002087

# Full Text Record(s)

BRICKSTOP GREENLINE EDGING                                                                    US-1-D1

|  |  |
|---|---|
| Trademark | BRICKSTOP GREENLINE EDGING |
| Cross References | BRICK STOP GREEN LINE EDGING |
| Design Type | WORD ONLY |
| Database | U.S. Federal |
| Application Number | 78193418 |
| Registration Number | 2861520 |
| Status | REGISTERED |
| USPTO Status | (700) REGISTERED |
| USPTO Status Date | 06-JUL-2004 |
| Filed | 11-DEC-2002 |
| Allowance Filed | 25-NOV-2003 |
| Published | 02-SEP-2003 |
| Extension Approved | 29-MAR-2004 |
| Registered | 06-JUL-2004 |
| International Class(es) | 6 (Metal goods) |
| Goods and Services | (INT. CL. 6) EXTRUDED ALUMINUM EDGING FOR LANDSCAPING AND BRICKWORK |
| International Class | International Class: 06<br>First Used: FEB-2003<br>In Commerce: FEB-2003 |
| Registrant | BRICKSTOP CORPORATION<br>CANADA CORPORATION<br>363 CANARCTIC DRIVE<br>TORONTO, ONTARIO M3J2P9<br>CA (CANADA) |
| Owner at Publication | BRICKSTOP CORPORATION<br>CANADA CORPORATION<br>363 CANARCTIC DRIVE<br>TORONTO, ONTARIO M3J2P9<br>CA (CANADA) |
| Applicant | BRICKSTOP CORPORATION<br>CANADA CORPORATION<br>363 CANARCTIC DRIVE<br>TORONTO, ONTARIO M3J2P9<br>CA (CANADA) |
| Filing Attorney | DAVID L. SIGALOW, REGISTRATION NO. 36,005 |
| Reference Number | 32981 |
| Correspondent Info | DAVID L. SIGALOW, REGISTRATION NO. 36,00<br>ALLEN DYER DOPPELT MILBRATH & GILCHRIST<br>255 SOUTH ORANGE AVENUE SUITE 1401<br>ORLANDO FL USA 32802 |
| Domestic Representative | DAVID L. SIGALOW |
| Disclaims | "EDGING" |
| History | 06-JUL-2004 REGISTERED-PRINCIPAL REGISTER<br>03-MAY-2004 ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED<br>30-APR-2004 ASSIGNED TO EXAMINER<br>20-APR-2004 STATEMENT OF USE PROCESSING COMPLETE<br>20-APR-2004 USE AMENDMENT FILED<br>21-APR-2004 PAPER RECEIVED<br>29-MAR-2004 EXTENSION 1 GRANTED<br>23-MAR-2004 EXTENSION 1 FILED<br>23-MAR-2004 TEAS EXTENSION RECEIVED<br>25-NOV-2003 NOTICE OF ALLOWANCE-MAILED<br>02-SEP-2003 PUBLISHED FOR OPPOSITION |

VVW002088

13-AUG-2003 NOTICE OF PUBLICATION
20-JUN-2003 APPROVED FOR PUB - PRINCIPAL REGISTER
18-JUN-2003 ASSIGNED TO EXAMINER
05-MAY-2003 CORRESPONDENCE RECEIVED IN LAW OFFICE
05-JUN-2003 CASE FILE IN TICRS
05-MAY-2003 PAPER RECEIVED
30-APR-2003 NON-FINAL ACTION E-MAILED
17-APR-2003 ASSIGNED TO EXAMINER

VVW002089

BRICKSTOP EDGE-ALL                                                                                    US-2.01

| | |
|---|---|
| Trademark | BRICKSTOP EDGE-ALL |
| Cross References | BRICK STOP EDGE ALL |
| Design Type | WORD ONLY |
| Database | U.S. Federal |
| Application Number | 78193426 |
| Registration Number | 2861521 |
| Status | REGISTERED |
| USPTO Status | (700) REGISTERED |
| USPTO Status Date | 06-JUL-2004 |
| Filed | 11-DEC-2002 |
| Allowance Filed | 23-SEP-2003 |
| Published | 01-JUL-2003 |
| Extension Approved | 23-MAR-2004 |
| Registered | 06-JUL-2004 |
| International Class(es) | 20 (Furniture) |
| Goods and Services | (INT. CL. 20) PLASTIC EDGING FOR USE IN CONNECTION WITH LANDSCAPING AND PAVER RETENTION |
| International Class | International Class: 20<br>First Used: FEB-2003<br>In Commerce: FEB-2003 |
| Registrant | BRICKSTOP CORPORATION<br>CANADA CORPORATION<br>363 CANARCTIC DRIVE<br>TORONTO, ONTARIO M3J2P9<br>CA (CANADA) |
| Owner at Publication | BRICKSTOP CORPORATION<br>CANADA CORPORATION<br>363 CANARCTIC DRIVE<br>TORONTO, ONTARIO M3J2P9<br>CA (CANADA) |
| Applicant | BRICKSTOP CORPORATION<br>CANADA CORPORATION<br>363 CANARCTIC DRIVE<br>TORONTO, ONTARIO M3J2P9<br>CA (CANADA) |
| Filing Attorney | DAVID L. SIGALOW, REGISTRATION NO. 36,006 |
| Reference Number | 32981 |
| Correspondent Info | DAVID L. SIGALOW, REGISTRATION NO. 36,00<br>ALLEN, DYER, DOPPELT, MILBRATH & GILCHRI<br>255 SOUTH ORANGE AVENUE SUITE 1401<br>ORLANDO FL USA 32802 |
| Domestic Representative | DAVID L. SIGALOW |
| History | 06-JUL-2004 REGISTERED-PRINCIPAL REGISTER<br>03-MAY-2004 ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED<br>30-APR-2004 ASSIGNED TO EXAMINER<br>20-APR-2004 STATEMENT OF USE PROCESSING COMPLETE<br>20-APR-2004 USE AMENDMENT FILED<br>26-APR-2004 ASSIGNED TO EXAMINER<br>21-APR-2004 PAPER RECEIVED<br>23-MAR-2004 EXTENSION 1 GRANTED<br>23-MAR-2004 EXTENSION 1 FILED<br>23-MAR-2004 TEAS EXTENSION RECEIVED<br>23-SEP-2003 NOTICE OF ALLOWANCE-MAILED<br>01-JUL-2003 PUBLISHED FOR OPPOSITION<br>11-JUN-2003 NOTICE OF PUBLICATION<br>01-MAY-2003 APPROVED FOR PUB - PRINCIPAL REGISTER<br>17-APR-2003 ASSIGNED TO EXAMINER |

VVW002090

Reference: brickslop

VVW002091

BRICKSTOP                                                                                          US 3 01

Image



| | |
|---|---|
| Trademark | BRICKSTOP |
| Cross References | BRICK STOP |
| Design Type | WORD AND DESIGN |
| Database | U.S. Federal |
| Application Number | 76466660 |
| Registration Number | 2855594 |
| Status | REGISTERED |
| USPTO Status | (700) REGISTERED |
| USPTO Status Date | 22-JUN-2004 |
| Filed | 14-NOV-2002 |
| Published | 30-MAR-2004 |
| Registered | 22-JUN-2004 |
| International Class(es) | 6 (Metal goods) |
| Goods and Services | (INT. CL. 6) EXTRUDED ALUMINUM EDGING FOR LANDSCAPING AND BRICKWORK |
| International Class | International Class: 06<br>First Used: 01-JAN-1992<br>In Commerce: 01-MAR-1992 |
| Registrant | BRICKSTOP CORPORATION<br>CANADA CORPORATION<br>383 CANARCTIC DRIVE<br>TORONTO, ONTARIO, M3J2P9<br>CA (CANADA) |
| Owner at Publication | BRICKSTOP CORPORATION<br>CANADA CORPORATION<br>383 CANARCTIC DRIVE<br>TORONTO, ONTARIO, M3J2P9<br>CA (CANADA) |
| Applicant | BRICKSTOP CORPORATION<br>CANADA CORPORATION<br>383 CANARCTIC DRIVE<br>TORONTO, ONTARIO, M3J2P9<br>CA (CANADA) |
| Filing Attorney | DAVID L. SIGALOW, ESQ. |
| Reference Number | 32209 |
| Correspondent Info | DAVID L. SIGALOW, ESQ.<br>ALLEN, DYER, DOPPELT, MILBRATH<br>255 SOUTH ORANGE AVENUE, SUITE 1401<br>ORLANDO, FLORIDA 32801 |
| Domestic Representative | DAVID L. SIGALOW |
| Design Codes | 261131 RECTANGLES CONTAINING LETTERS OR NUMERALS ONLY<br>261137 RECTANGLES THAT ARE COMPLETELY OR PARTIALLY SHADED<br>071501 BRICKS AND STONES FOR BUILDING, INCLUDING CINDERBLOCKS |
| History | 22-JUN-2004 REGISTERED-PRINCIPAL REGISTER<br>30-MAR-2004 PUBLISHED FOR OPPOSITION<br>12-MAR-2004 NOTICE OF PUBLICATION |

VVW002092

10-MAR-2004 NOTICE OF PUBLICATION
08-JAN-2004 PAPER RECEIVED
22-DEC-2003 APPROVED FOR PUB - PRINCIPAL REGISTER
24-NOV-2003 COMMUNICATION RECEIVED FROM APPLICANT
24-NOV-2003 PAPER RECEIVED
27-MAY-2003 NON-FINAL ACTION MAILED
07-MAY-2003 ASSIGNED TO EXAMINER

VVW002093

# Owner Index

BRICKSTOP GREENLINE EDGING  BRICKSTOP CORPORATION
                            *Ref.US-1.01*

BRICKSTOP EDGE-ALL  BRICKSTOP CORPORATION
                    *Ref.US-2.01*

BRICKSTOP  BRICKSTOP CORPORATION
           *Ref.US-3.01*

VVW002094

# File Dates

**U.S. Federal** Date Updated: 26-JUL-2007
OFFICIAL GAZETTE PUBLISHED ON: 24-JUL-2007
USPTO TEXT
COMPLETE FILINGS THROUGH: 17-JUL-2007
ADDITIONAL FILINGS THROUGH: 19-JUL-2007
APPLICATION DRAWING PAGES
COMPLETE FILINGS THROUGH: 19-JUL-2007
ADDITIONAL FILINGS THROUGH: 23-JUL-2007
IMAGES CODED THROUGH: 18-JUN-2007

**International Register** Date Updated: 26-JUL-2007
Gazette of International Marks no. 23/2007, dated 12-JUL-2007
Unpublished Applications made available by the WIPO as of 18-JUL-2007

Reference Trickstop

VVW002095

# Exhibit I



# Exhibit J



2

Page 1

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

   BRICKSTOP CORPORATION,            )
4                                    )
                 Plaintiff,          )
5                                    )
              -vs-                   )  No. 08-CV-02690
6                                    )
   VALLEY VIEW INDUSTRIES, H.C.,     )  Judge Gettleman
7  INC.,                             )
                                     )
8                Defendant.          )

9

10

11           The deposition of HOWARD RYNBERK, taken

12   pursuant to the Federal Rules of Civil Procedure of

13   the United States District Courts pertaining to the

14   taking of depositions, taken before KRISTA R.

15   DOLGNER, Certified Shorthand Reporter of the State

16   of Illinois, at 2 North LaSalle Street, Suite 1808,

17   Chicago, Illinois, on Thursday, July 31, 2008, at

18   9:30 a.m.

19

20

21

22   Reported for
     LAKE SHORE REPORTING SERVICE, By:
23   Krista R. Dolgner, CSR, RPR
     Illinois License No. 084-002878.
24

Page 2

```
 1    APPEARANCES:

 2         HOVEY WILLIAMS LLP
           10801 Mastin Boulevard, Suite 1000
 3         84 Corporate Woods
           Overland Park, Kansas 66210
 4         (913) 647-9050  By:
           MR. SCOTT R. BROWN
 5         srb@hoveywilliams.com

 6             on behalf of Plaintiff;

 7
           DLA PIPER
 8         203 North LaSalle Street
           20th Floor
 9         Chicago, Illinois 60601
           (312) 368-4000 By:
10         MS. MONICA L. THOMPSON
           monica.thompson@dlapiper.com
11
               on behalf of Defendant.
12

13

14

15

16

17

18

19

20

21

22

23

24
```

1    landscape?

2         A.    It is.

3         Q.    So those terms are used somewhat

4    interchangeably?

5         A.    It is, yes.

6         Q.    What are the functional requirements of a

7    paver restraint?

8         A.    Well, I think the functional requirement

9    would be to hold the edging in place.

10        Q.    So the overall function is to hold the

11   pavers in place?

12        A.    Yes.

13        Q.    And to do that you need to be able to hold

14   the edging in place?

15        A.    Yes.

16        Q.    What is needed to achieve that function of

17   holding the edging in place?

18        MS. THOMPSON:  And I object only to the extent

19   it calls for any legal conclusions.  You can go

20   ahead.

21        THE WITNESS:  Well, you would have to have a

22   sidewall to hold the paver, and you would have to

23   have a footing of some sort to hold the restraint in

24   place.

Page 59

1    BY MR. BROWN:

2         Q.    Can you think of anything else you would

3    need to have in a paver edging restraint?

4         A.    Yeah.    You would have to have something to

5    put the -- to hold the restraint in the ground,

6    whether it be a stake, a nail, or any other type of

7    device.

8         Q.    Anything else?

9         A.    No.

10        Q.    So somewhere in the paver restraint you

11   would need to have a hole in order to put the stake

12   or nail in?

13        A.    That's correct.

14        Q.    Can you ever stake or nail through the

15   paver restraint without the hole?

16        A.    I have not seen it done.

17        Q.    So to have a functional paver restraint

18   all you need is a sidewall, a foot of some sort, and

19   a hole in the foot to receive the nail?

20        MS. THOMPSON:    Same objection.

21        THE WITNESS:    Yes.

22   BY MR. BROWN:

23        Q.    Does the foot have to be any particular

24   shape in order to achieve its function?

1    Mr. Bertucci suggested that you go to an

2    injection-molded product?

3        A.    That's my recollection.

4        Q.    And why did you select to imitate the

5    B.E.A.S.T. with the injection molding?

6        A.    Well, we didn't select to imitate it.  We

7    selected it to complement our line, and what we did

8    is brought in a number of rigid extruded -- or

9    injection-molded paver restraints.

10       Q.    Which did you bring in?

11       A.    Snap Edge, Pave Lock, Dimex, BrickStop.

12       Q.    Any others?

13       A.    Not that I can recall.

14       Q.    Why did you select BrickStop to imitate

15   out of those four?

16       A.    I think it complemented more of our L.

17   shaped.  It probably resembled our own L. shape, and

18   there were some existing patents on some of the

19   other products.

20       Q.    When you say it resembled the L. shaped

21   product that you produced, what do you mean?

22       A.    Well --

23       MS. THOMPSON:  You have to leave it as an

24   exhibit if you want to write on it.  Do you want

Page 96

1    asterisk.

2        A.    From the top?  Yes.

3        Q.    Do you know what Mr. Bertucci was talking

4    about here?

5        A.    Probably the Diamond Paver Edge.

6        Q.    And so is it your understanding that

7    Unilock was asking if Valley View could duplicate

8    the B.E.A.S.T. product?

9        A.    Correct.  But if we go back, you had asked

10   me before if there was a customer that asked, and

11   Unilock was not a customer at that time.

12       Q.    I understand.  So there was a potential

13   customer that asked?

14       A.    Right.

15       Q.    And was this the beginning of the idea to

16   follow the B.E.A.S.T. product when you developed the

17   Diamond Paver Edge?

18       A.    No, I think it actually came before this

19   in June.

20       Q.    Which came in June?

21       A.    Our idea of having another edging to

22   complement our Diamond Lock.

23       Q.    So in June you had the idea to make an

24   injection-molded edging?

1    any problems in the future, whether they were legal

2    or not.  I physically had our existing sales sheets

3    destroyed.

4        Q.   How many -- did you do anything else

5    yourself in response to the letter that was received

6    in which BrickStop complained about the --

7        A.   Yes, I referred it to our law firm for

8    response.

9        Q.   And did you do anything else?

10       A.   No.

11       Q.   So once you received the letter, you

12   directed that day that your existing sales sheets be

13   destroyed?

14       A.   I actually destroyed them.

15       Q.   You destroyed them?

16       A.   Yes.

17       Q.   How many were there?

18       A.   I don't know.  They went through a

19   shredder.

20       Q.   Had Valley View been handing out those

21   sales sheets prior to that complaint coming in?

22       A.   Evidently they did.

23       Q.   Do you know if Mr. Bertucci had them with

24   him at any trade shows?

3

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

BRICKSTOP CORPORATION,                     )
                                           )
            Plaintiff,                     )     Case No. 08-CV-2690
                                           )
      v.                                   )     Honorable Judge Gettleman
                                           )
VALLEY VIEW INDUSTRIES, H.C., INC.,        )     Magistrate Judge Cole
                                           )
            Defendant.                     )

## AFFIDAVIT OF DOMINICK BERTUCCI

      I, Dominick Bertucci, hereby state that if called as a witness in the above-captioned matter I would be competent to testify as to the following:

      1.      I am currently the National Sales Manager for Valley View Industries ("Valley View").

      2.      Before working for Valley View, I was a landscaper. I came to Valley View to buy product and when I determined that I no longer wished to be a landscaper, I went into sales for Valley View.

      3.      I was originally hired as a regional sales manager and served in this capacity for Valley View for four years. At that time, Howard Rynberk purchased the company. I then accepted a position as an independent sales representative. I made commission on the sale of products and my territory which included the Midwest and the Northwest, excluding Montana and Idaho. Last November, after serving as an independent sales representative for 11 years, Valley View asked me to become its National Sales Manager and I accepted the position.

      *Development of the Diamond Paver Edge ("DPE-8") product.*

      4.      While I was still an independent sales representative for Valley View, I attended a meeting with a potential large distributor, Unilock, who had locations both in the Midwest and in

the Eastern territories of the United States. Unilock informed Valley View that it was looking for a sturdy, paver-edge product similar to the B.E.A.S.T. product to sell in competition with the B.E.A.S.T.. I summarized this meeting in an email to Howard Rynberk and to others at Valley View and Tamelings in July of 2007. (A copy of the July 19, 2007 email is attached hereto as Exhibit A.)

5.     Prior to being approached by Unilock to make a product comparable to the B.E.A.S.T., I was not aware of the B.E.A.S.T. product as it was not sold largely in my territory. In the category of sturdy pavers, Snap Edge was the predominant product but it was very high priced.

6.     Over 75% of the customers on whom I called carried more than one brand of paver restraint. This allowed them to give their contractor/customers an option between various weights and flexibility. Knowing that the Diamond-Lok product was very well received within its class, I believed that if Valley View made a product that competed in the sturdier classes it would give Valley View an additional market share

7.     During the summer and early fall of 2007, I continued to gather information from customers about their preferences for a sturdy, paver-edge product. At some meetings, I showed distributors samples of the B.E.A.S.T. product to ask their opinions about the performance (or perceived performance) of the product. In some instances, the distributor was familiar with the B.E.A.S.T., but a number of the distributors whose opinions I sought did not have any familiarity with the product.

8.     At no time during my investigations, did any customer who was already aware of the B.E.A.S.T. indicate that they or their customers had any preference for a product made by BrickStop, as opposed to the features of the product and the methods by which it could be

installed. Rather, these distributors indicated that they welcomed competition and the opportunity to carry a product with comparable features for less money.

9.  At the time that Valley View was considering the development of a sturdier paver product, its Diamond-Lok products were Valley View's leading paver edge products. The manufacturers and products that were identified by distributors as being more rigid than the Diamond-Lok products included; Snap Edge (by Snap Edge), Pave Edge (by Pave Tech) Pro Edge (by Dimex) and B.E.A.S.T. (by BrickStop). I believe that Valley View investigated all of these competitors' products because I gave Valley View some information on each of these products.

10.  Later in the summer, Valley View informed me that it was going forward with the idea to make a product and that it would be similar to the B.E.A.S.T. product.

*Development of the Diamond Paver Edge Sell Sheet*

11.  After I became National Sales Manager, one of Valley View's new product offerings was the Diamond Paver Edge. In terms of sales cycle, Valley View was late in introducing this product as many sales for landscape/hardscape products to distributors occur in the fall of the prior year. At that time, Valley View did not have either product or literature to share with customers. I used drawings supplied to me by Frank Soukup to show customers what we expected the new product would look like.

12.  In February of 2008, I was attending the E.P. Henry trade show in New Jersey. This was the first time that I displayed samples of the Diamond Paver Edge product. I also had a sell sheet with me that pictured and described the product.

13.  In developing the sell sheet for the Diamond Paver Edge, I worked with Jim Hammar and others at Vision PS, ("Vision") the outside graphic arts firm hired by Valley View. I gave Vision a sample of a BrickStop advertisement for the B.E.A.S.T. product and other

materials to consider in producing the Valley View literature. At the time I told Vision that I wanted a sheet that would show what the product could do. I did not instruct Vision to copy the BrickStop advertisement and I presumed that Vision, being a professional organization for producing commercial literature, would know what could and could not be used from other advertisement. I further presumed that pictures of bricks were common elements and among stock photos that our commercial artist could access.

14.     The sell sheet went through several iterations. In some of the earliest examples, the pictures showed the B.E.A.S.T. product because our artist did not yet have a picture of the DPE-8. None of these were used by Valley View. Before the final version of the sell sheet was completed, I took samples of DPE-8 to Vision. Some of the email exchanges with Vision discussing the development of the sell sheet are attached hereto as Exhibit B.

15.     I insisted that the product pictured in the sell sheet be DPE-8. Ultimately, all of the wording and product pictures were original to Valley View. The only things I am aware of that was taken from the BrickStop sell sheet were pictures of bricks in a curved pattern which were ultimately outlined by the Diamond Paver Edge product and the bricks in a picture showing that the product could be used in reverse installation.

16.     After displaying at the E.P. Henry trade show one week later, I was in Nashville and a representative of BrickStop approached me. He indicated that BrickStop would sue Valley View. I questioned why, given that the BrickStop product was not covered by a patent and that it was common in the trade for competitors to model new products from existing successful patterns.

17.     Once Valley View received a letter from the attorneys for BrickStop complaining about the use of the advertise sell sheet and the pattern of the Diamond Paver Edge product,

Valley View immediately discontinued all use of the sell sheet. I contacted distributors and told them not to use the sell sheets. I am not aware of any instance where a distributor put a copy of the first DPE-8 sell sheet into any catalogue or used this version of the sell sheet after the beginning of March 2008 when I told them not to do so. Valley View has not used this sale literature at any time since March 7, 2008. I instructed Vision to redesign a sell sheet.

*Channels of trade for Valley View's paver edge products*

18.    Valley View has always sold landscape/hardscape products to supply centers and distributors. Some of the products, such as paver edgers, are sold to paver manufacturers and distributors who can offer the product as compliment to the stones and bricks they sell for paving applications.

19.    Valley View typically does not sell directly to contractors. Direct inquiries from contractors are referred to the closest distributor. To the extent that Valley View products are sold to consumer (and Diamond Paver Edge is not sold this way) it does so through major retailers such as Home Depot.

20.    As with many construction related products, homeowners and consumers would be unlikely to ever see the Diamond Paver Edge product as it is buried in the ground by their contractors during installation.

21.    Sales in the hardscape/landscape industry are made through personal contact with the buying agents for the various distributors. These contacts generally take years to develop and I have called on some customers numerous times before making a sale. In this face-to-face or telephonic selling environment, I have never experienced a situation where a customer is confused as to the source of any product that is being offered, particularly the Valley View products. With respect to the sale of the Diamond Paver Edge, I have never experienced a

situation where the customer had any doubt as to who was offering the Diamond Paver Edge product.

22.     I have experienced situations where, knowing that Valley View was willing to sell its Diamond Paver Edge at a specific price, the buyer would contact BrickStop and ask it to meet the Valley View price.

23.     In nearly all instances where Valley View obtained the business from a previous BrickStop customer, it was on the basis that Valley View offered a lower price to its customer than BrickStop. Where Brickstop lowered its price to meet competition, Brickstop usually maintained the business.

24.     Valley View attempts to sell its Diamond Paver Edge products to all of its customers and potential customers in the landscape/hardscape business and does not target BrickStop customers. In the East region, Dimex is a very aggressive competitor and they have a very successful sturdy product which competes in the same class as the Diamond Paver Edge and B.E.A.S.T. products. In the East, Valley View has had to lower its price to meet this competition with Dimex. I do not believe that the sales by Valley View in this region have been a factor with respect to BrickStop or its pricing as Valley View has not been able to achieve low enough prices to effectively compete in this market. To the extent BrickStop lowers its price in this market, it would largely be as a result of the same competition from Dimex and Snap Edge as Valley View faces.

25.     In the Chicago and Midwest area, Valley View is more price competitive in part because shipping in this area is not as expensive as shipping back East. Here I am aware that when competing for the same customers, Valley View and BrickStop have had to offer low pricing due to competition with each other.

26.    In my experience, price of the product is the single largest factor in determining which product of comparable features a customer will carry.  Some customers may prefer to carry one manufacturer because they have other products from the same source making deliveries easier to handle so that price on one product may not be as important.  At times customers develop brand loyalty for other reasons.  In no instance of which I am aware has Valley View attempted to confuse a purchaser so as to take advantage of a customer's brand loyalty for BrickStop.  In all instances of which I am aware, Valley View attempts to compete by offering its own version of a successfully designed product.

*Sales of BrickStop products without trademarks*

27.    In connection with this litigation, I have become aware that other persons are selling products similar to the B.E.A.S.T.  The Sure-Loc catalogue (a copy of which is attached hereto as Exhibit C) offers a product that looks like the B.E.A.S.T. under the "Sure-Loc" brand.  Similarly, on www.yardproduct.com, a company named Dreamscape offers a product that looks like the B.E.A.S.T. without trademark designation.  (a copy of the Dreamscape web page is attached hereto as Exhibit D)  I have seen a sample of the product sold by Dreamscape (a picture of which is attached hereto as Exhibit E).  The Dreamscape offering does not have the same spacer design as in the B.E.A.S.T. product.

Under 28 U.S.C. §1746, I verify under penalty of perjury that the foregoing is true and correct.

Executed on: August 7, 2008

Dominick Bertucci

# Exhibit A

## Business Center - Chicago

**From:** Dominick V. Bertucci [dvinb@yahoo.com]
**Sent:** Thursday, July 19, 2007 12:31 PM
**To:** Howard Rynberk
**Cc:** Howie Rynberk; Dave Martinet

**REDACTED**

**Subject:** Notes from Unilock meeting

Howard,

Here are the specifics from the meeting today. I am copying Howie and Dave should you be at          , in the future and need to reference.

*       currently buys from Snap Edge around $400-500,000 and around $50,000 in pave grip
* They at one point were at $600-700,000 before the Beast hit the market
* We need to be at .52 per foot *without* stakes ($7.80 for 15ft.) for          o make a margin to the dealer market to consider switching over to our Diamond Lok.
* Dave mentioned that has opening order next week would probably much higher if he were to have this price.
* If Valley View tries to duplicate the Beast product, we could increase our potential greatly with
*       has a total of 10 branches. Buffalo, NY has the main contact (Dave McIntyre) to iniate contacts with the other branches.
* ICPI show is a show to consider in Nashville next March.

Other thoughts........

If we give          : a lower price, we have to be prepared for repercussions from the market when there dealer price is listed. I'll cross that bridge once we get to it. It will be a good problem to deal with should          decide to go with us.

I want to contact the Buffalo, NY contact to let him know we are giving a "below market" price to          and we would expect them to consider for other branches to maintain this pricing. I want to reiterate with          that I would appreciate his recommendation of this nature with the buyer in Buffalo to go along with our desires.

Other notable customers in my current zone that could do a lot more with us should we develop a Beast type product:

*       , MN - They do $100,000 with us in edging and $0 with Diamond Lok because of the "perception" of a higher quality higher priced product in Pave Tech.
*                They sell alot of our competiion
*      
*                locations. A current          customer     **REDACTED**
*                :- Des Moines - They buy $0 in Diamond Lok
*      
* 75% of my customers who distribute Diamond Lok also sell one or more of our competitors. Another new sku could help them buy easier from us since they are already getting shipped.

See you around 11 on Friday at V.V.

Highly Confidential –
Attorneys' Eyes Only

VVW000598

Take the Internet to Go: Yahoo!Go puts the <u>Internet in your pocket:</u> mail, news, photos & more.

6/28/2008

# Exhibit B

## Business Center - Chicago

**From:**      James Hammar [JHammar@VisionPS.com]
**Sent:**      Tuesday, January 15, 2008 12:35 PM
**To:**        David T. Ignowski
**Cc:**        Dominick Bertucci
**Subject:**   PDF of Sell Sheet
**Attachments:** VV.diamond.sheet.pdf

Find attached a rough draft of the sell sheet. This is only for concept. Look over it and we can go in what ever direction you would like. I still need revised copy and product information for the chart from you. I also have a disk that I would like to send to you that has the line drawing on it in a couple of different formats. What address would you like that sent to ?

Thanks,
Jim Hammar

CONFIDENTIAL

VVW000802



The **NEW Diamond Paver Edging** is our most "Solid/edging" paver restraint, yet easily converts to flexible for curves. It is the most economically priced "solid/ridge" restraint on the market!

Anchoring stakes and spikes are recommended and sold separately.

**Valley View 20 Year Guarantee**
The name Valley View is stamped on all products and are guaranteed against cracking, fading, or breakage for 20 years!

VVW000803

Use Valley View
Anchoring Stake or
10"/12" nail

CONFIDENTIAL

**YOUR LOCAL DISTRIBUTOR:**

**DIAMOND PAVER EDGE ORDERING INFORMATION**

| Product | Item# | Description | Pack | UPC# |
|---|---|---|---|---|
| Bulk Anchoring Stakes | BAS | 9" anchoring stakes | 200 | |
| Anchoring Spikes | S12 | 12" anchoring spikes | 150 | |

Valley View Industries
13834 S. Kostner Ave.
Crestwood, IL 60445
www.valleyviewind.com
info@valleyviewind.com

**ValleyView®**
*Industries*

Toll Free: (800) 323-9369 • (800) 323-3256 FAX
International: (708) 597-0885 • (708) 397-9959 FAX

**Business Center - Chicago**

| | |
|---|---|
| **From:** | James Hammar [JHammar@VisionPS.com] |
| **Sent:** | Sunday, January 20, 2008 11:31 AM |
| **To:** | Dominick Bertucci |
| **Cc:** | David T. Ignowski; scottsriver@comcast.net |
| **Subject:** | RE: PDF of Sell Sheet |

I agree with you.... We have the basic idea of the sell sheet, lets wait until you have the real product.

hammar

-----Original Message-----
From: Dominick Bertucci [mailto:dbertucci@valleyviewind.com]
Sent: Sunday, January 20, 2008 11:23 AM
To: James Hammar; David T. Ignowski
Subject: RE: PDF of Sell Sheet

Jim,
Line art looks good.

I was wondering if we should hold off on the sell sheet until we have the actual product made? So that you have the real product to shoot. We will be producing it on February 7th and I can have a sample to you on the 8th. There is truly nothing between now and then that a sell sheet is going to be important for. Yes, we could make use of something. Though if it is going to be another week off, I figured I would just mention for the sake of not doing the sell sheet twice.
Let me know your thoughts. I will not be in front of a computer until Monday evening so I will communicate through David as to what you want to do.

Dominick


From: James Hammar [mailto:JHammar@VisionPS.com]
Sent: Tue 1/15/2008 12:35 PM
To: David T. Ignowski
Cc: Dominick Bertucci
Subject: PDF of Sell Sheet


Find attached a rough draft of the sell sheet. This is only for concept. Look over it and we can go in what ever direction you would like. I still need revised copy and product information for the chart from you. I also have a disk that I would like to send to you that has the line drawing on it in a couple of different formats. What address would you like that sent to ?


Thanks,

Jim Hammar

CONFIDENTIAL

VVW000936

·1

**Business Center - Chicago**

| | |
|---|---|
| **From:** | David T. Ignowski |
| **Sent:** | Wednesday, February 06, 2008 9:57 AM |
| **To:** | jhammar@visionps.com |
| **Cc:** | Dominick Bertucci |
| **Subject:** | Diamond Paver Edge Sell Sheet |

Hello Mr. Hammar,

Dominick will be dropping off a sample of our new paver restraint, the Diamond Paver Edge, this Friday. We will need you to produce the sell sheet within the week after. Thank you.

David T. Ignowski
Valley View Industries

CONFIDENTIAL

VVW000798

6/27/2008

# Exhibit C



# sure-loc

**Professional Grade Landscape Edging**



*Making beautiful, functional landscapes [...]
preparation, and hard work. Helping the[...]
the test of time, requires Sure-loc aluminu[...]*

*Manufacturing a complete line of alumin[...]
Sure-loc products add crisp, clean lines to [...]*

*When specifying Sure-loc aluminum edging, a designer can be
confident that their design will remain the way it was intended
for a lifetime.*

# Why Aluminum Edging?



* Lifetime performance makes the cost of aluminum edging lower than any other product.
* The resilient flexibility of aluminum allows for smoother curves.
* Crisp, straight lines can be achieved with minimal effort.
* High strength aluminum alloy withstands years of maintenance abuse, and is non-toxic with excellent corrosion resistance and high thermal conductivity. Aluminum edging is environmentally friendly & recycled.
* Long and wide grooved stakes help reduce the effects of frost heaving.
* Aluminum edging is light weight, forms easily and can be cut to length with minimal effort at the construction site lowering installation costs so budgets can be maintained.
* Aluminum edging will never rust, crack, rot or become brittle.

# Why Sure-Loc Aluminum Edging?

1. Our fully rigid and grooved design allows edging to retain solid grip in the ground.
2. Dual punch out pockets for stakes allow stakes to be driven down in a straight line.
3. Wider more rigid stake design will ensure a lifetime of performance.
4. Extra long stakes are available when extra depth is required for sandy soil.
5. End stake adapters that allow for adding stakes at all start and stop points, and provide extra strength.
6. Superior locking system. Dual stakes to ensure locking remains permanent.
7. No overlapping of edging. A Sure-loc connection allows for true snap lines and an invisible connection.
8. No compromise on thickness of residential or commercial edging.
9. We offer superior customer service. Most orders are shipped the same day with 100% on time delivery.
10. The Sure-loc guarantee: Lowest prices and superior product to our competitor's - or your money back.

Dual "Invisible" Stake Pockets



# Aluminum Edging – Available Sizes



**Stake Adaptor**

**Dual Stake Locking System**

**Anti-Frost Heave Technologyy**

### 1/8" x 4"

Primarily used in residential and light commercial applications where greater flexibility is desired. Prolonged straight runs are possible but will require additional labor. Applications include, but are not limited to, planting beds, tree rings, paver walkways and paths. Edging is packaged 15 pieces (240') per box (16 ft sections) or 15 pieces (120') per box (8 ft sections).

### 1/8" x 5.5"

Similar applications as 1/8" x 4" but used where additional depth would be beneficial. Edging is packaged 15 pieces (240') per box (16 ft sections).

### 3/16" x 4"

Primarily used in commercial, industrial, institutional projects, and other high traffic areas. Straight runs are easier than with 1/8" material with only slightly reduced flexibility. Applications include, but are not limited to, driveways, asphalt, maintenance strips, running tracks, and pathways. Edging is packaged 10 pieces (160') per box (16 ft sections).

### 3/16" x 5.5"

Similar applications as 3/16" x 4" but used where additional depth would be beneficial. Edging is packaged 10 pieces (160') per box (16 ft sections).

***All sizes available in Mill Finish and Black Anodized. Green, Brown, & Black Paint available in 1/8" x 4" Sizes (8' & 16') and 3/16" x 4" x 16'.***

## The Bottom Line:
### Sure-loc Aluminum Edging...

* Retains the designers original intent
* Can be installed with ease, and creates beautiful curves
* Has unmatched performance
* Has the greatest longevity of all other edging products
* Has basically no maintenance
* Allows you to stay within the landscaping budget

## Versus Other Edging...



**Creates Beautiful Curves**

**Steel Edging:** Rusts; Corrodes slightly over time; Does not bend or cut as easily; Steel prices can be unstable.

**Wood Edging:** Splinters; Rots; Fades; Weathers; Attracts insects; Is hard to create curves.

**Vinyl & Plastic Edging:** Becomes brittle over time; Is less resistant to material and mechanical wear; Has a large degree of thermal expansion; Is not UV stable; Are not as crisp in appearance.



**Available Finishes**
Brown Paint
Green Paint
Black Paint or Anodized
Mill Finish

**sure-loc**

**The One Source for Professional Grade Landscape Edging Products**







Dual Stake Locking System

# Steel Landscape Edging

*Sure-Loc steel edging offers your landscape design a permanent solution to edge control. With a variety of sizes to choose from, steel edging gives you strength to stand up to the most demanding applications and flexibility for creative design possibilities.*

*Sure-loc steel edging is painted for long lasting durability and prefabricated for easy connections. All edging is provided with stakes for a permanent installation.*

**14 ga. x 4" x 10'** .070 - .075" Average thickness. Primarily used in residential applications where imaginative, free-form design is combined with long-term performance and strength not found in wood or plastic edging.

**1/8" x 4" x 16'** .120 - .125" Average thickness. Primarily used in residential applications where flexibility and durability are a necessity. This versatile edging will meet most landscape needs. Applications include, but are not limited to, planting beds, tree rings, paver walkways, paths, and mulch bed divisions.

**3/16" x 4" x 16'** .182 - .188" Average thickness. Primarily used in commercial, industrial, institutional projects, and other high traffic areas. Straight runs are easier than with 1/8" material with only slightly reduced flexibility. Applications include, but are not limited to, driveways, asphalt, maintenance strips, running tracks, pathways, and bed division.



Available Finishes

Brown Paint
Black Paint
Green Paint
* also available in unpainted or galvanized

**1/4" x 5" x 16'** .182 - .188" Average thickness. Primarily used in commercial, industrial and high traffic areas. Heavy duty edging provides the ultimate strength and rigidity. Applications include asphalt and gravel retention in driveways, paths, and maintenance strips, as well as bed divisions and mulch retention in high traffic areas.

## Quality Features:  Sure-loc Steel Edging...

- Will not become brittle or decay compared to wood or plastic edging.
- Is extremely durable and is not easily damaged by maintenance equipment.
- Stays in the ground due to our dual stake locking system and it's substantial weight.
- Creates a permanent and maintenance free solution for all your landscape edging needs.
- Maintains strict material tolerances, ensuring no compromise in thickness of edging.
- Has high quality powder coating to ensure the material is evenly coated, fully covered, and will not chip or fade like spray or vat dipped paint. Powder coating also makes Sure-loc Steel edging resistant to PH swings in highly alkaline soils, minimizing corrosion.

**sure-loc**

# Aluminum Paver Restraints

Sure-loc aluminum paver edging will give your next paver brick project the strength and durability you desire. Sure-loc paver restraints give you the durability of aluminum, while allowing you design freedom.

You can achieve rigid straight runs, free flowing curves, and sharp corners without any tools. Sections join together with included hardware and stake into the ground with standard landscaping spikes to ensure a solid foundation for your project.

## Quality Features:

* Aluminum will not rust, rot, or become brittle.
* Non-overlapping joints minimize wasted material.
* Design allows for standard and reverse installation.
* Edging is completely unseen once installed.
* Straight runs, curves, and corners can be made without tools.



**Sturdy Locking System**

### Size Information:

**Length:** 8'-4" (2.5 m) **Flange:** 1-1/4" x 4" (3.2 x 10.2 cm)
**Height:** 1-3/8" (3.5 cm) **Finish:** Natural Aluminum
**Thickness:** 1/8" (3.2 mm) **Feet Per Box:** 250 ft

# Plastic Paver Restraints

Sure-loc plastic paver restraints will ensure that your next paver brick project receives the support and reinforcement professional landscapers require. With one-piece construction: rigid straight runs, free flowing curves and sharp corners are all easily accomplished.

Use Sure-loc on your next project to experience the benefits & cost effectiveness of plastic paver restraints.

### Size Information:

**Length:** 8' (243.84 m) **Width:** 2.5" (6.35 cm)
**Height:** 1.75" (4.45 cm) **Finish:** Black Plastic
**Depth:** 3" (7.62 mm) **Feet Per Box:** 160 ft





# Steel Edging
# Specifications & Technical Data

## I. General

### 1.01 Description

Landscape edging as a border between planting beds, pathways, drives, mulch & rock division, or anywhere separation and definition is required.

### 1.02 Submittals

Manufacturer's literature along with a sample 3" section of specified size and finish if requested.

### 1.03 Delivery

Can be coordinated directly with manufacturer or authorized distributor of Sure-loc Edging. Call 800-787-3562 for quotations and material coordination. Material should be ordered and accepted in original shipping cartons of standard size and stored in a flat area. Please note quantities per skid are 400', and due to weight, will require unloading equipment.

## II. Product

### 2.01 Product

As provided by Sure-loc Corporation of Holland, MI. Edging to be in 10' or 16' sections.

### 2.02 Material

Edging to be manufactured from steel with interlocking system and stake punch outs fabricated in each strip.

### 2.03 Locking System

Sections to lock together without offset or double thickness at the joints and secured with two 12" stakes at every joint.

### 2.04 Size

- 14 gauge thickness for residential applications where free-form design is combined with long-term performance and strength not found in wood or plastic edging.

- 1/8" thickness for residential or light commercial applications where flowing curves are desired. Applications include, but are not limited to, bed division, walkways, and light brick paver work.

- 3/16" thickness is available for commercial, industrial, and institutional applications where strength and durability are a necessity. Applications include, but are not limited to, walkways, asphalt borders, running tracks, and maintenance strips.

- 1/4" thickness for applications where the maximum strength is required.

### 2.05 Finish

Steel edging to be powder coated, baked on enamel supplied in green, black, or brown. Special order galvanized is also available.

### 2.06 Stakes

Stakes are to be a minimum of 12" long for 14 ga. and 1/8" edging and 15" long for 3/16" and 1/4" edgings. All stakes manufactured of steel.

## III. Execution

### 3.01 Site Inspection

Check to ensure that all underground lines, irrigation hoses, and other cables are installed below the maximum depth of edging to be used.

### 3.02 Trench

Edge all landscape beds, maintenance strips, and /or where noted on designer's plan. Define the area to be edged using string, garden hose or paint. Using a spade or mechanical trencher, cut a trench along area to be defined to depth so that top of edging will not exceed 1/2" above finish grade.

### 3.03 Installation

Install edging with stake pockets on inside of bed. Top of edging not to exceed 1/2" above finish grade as shown below.

### 3.04 Staking

A minimum of 5 stakes per section are to be used with each section of edging.

### 3.05 Back Filling

Back fill on both sides of edging during installation leaving no more than two sections unsupported at one time. Compact back fill along edging ensuring that top edge is no more than 1/2" above finish grade.



## Architect Specifications:

All Steel landscape edging shall be _____ thick X _____ deep X _____ long with _____ stakes per section, having a _____ finish , as distributed by Sure-loc Aluminum Edging Corporation and under its trade name Sure-loc.

**Sure-loc Edging Corporation**
494 E. 64th Street
Holland, MI 49423
Phone (800) 787-3562
Fax (616) 392-5194
Website: www.surelocedging.com

# Aluminum Paver Restraints
# Specifications & Technical Data

## I. General

### 1.01 Description

Aluminum paver edging designed to retain paver bricks. Used around patios, pathways, walks, driveways, or where permanent paver retention is critical.

### 1.02 Submittal

Manufacturer's literature along with a sample 4" section of material if requested.

### 1.03 Delivery

Can be coordinated directly with manufacturer or authorized distributor of Sure-loc Edging. Call 800-787-3562 for quotations and material coordination. Material should be ordered and accepted in original shipping cartons of standard size. Material should be stored in a flat area with cartons protected from rain.

## II. Product

### 2.01 Product

As provided by Sure-loc Corporation of Holland, MI.

### 2.02 Material

Edging to be manufactured from 6063 extruded aluminum alloy of T-5 hardness. Material to have 45 degree, "V" cutouts in base along with recessed stake pockets every 4 inches.

### 2.03 Locking Systems

Sections to lock together without offset or overlap. Joining tabs and hardware to connect sections supplied with product.

### 2.04 Finish

Mill finish constitutes a natural aluminum finish as found on extruded aluminum parts. There is no benefit to additional finishing due to the unseen nature of the product.

### 2.05 Stakes

Standard 3/8" x 10" steel spikes (not provided) should be used.

## III. Execution

### 3.01 Site Inspection

Check to ensure that all underground lines, irrigation hoses, and other cables are installed below the maximum depth of installation.

### 3.02 Measurement

Determine the amount of paver restraint required by measuring the perimeter of the project.

### 3.03 Base Course

For standard installation, prepare and compact base as recommended by the paver manufacturer in your area. Base should extend at least 6 inches beyond the edging.

### 3.04 Installation

For walks, patios, and light traffic areas, the standard or reversed installation is acceptable. For driveways or applications with heavy traffic, use only the standard method.

### 3.05 Staking

For walks, patios, and light traffic areas, use 1 spike every 20-24 inches and at each end. For heavy duty applications, use at least 1 spike every 10 - 12 inches and at each end.

### 3.06 Back Filling

Once the paver installation is complete, back fill up to grade with mulch, rock, topsoil, or specified cover. Installed edging should remain completely hidden from view.

### Standard Installation



### Reverse Installation



Sure-loc Edging Corporation
494 E. 64th Street
Holland, MI 49423
Phone (800) 787-3562
Fax (616) 392-5134
Website: www.surelocedging.com

## Architect Specifications:

All aluminum paver restraints shall be _____ thick X _____ deep X _____ long , having a _____ aluminum mill finish , as distributed by Sure-loc Aluminum Edging Corporation and under its trade name Sure-loc.



# Aluminum Landscape Edging Specifications & Technical Data

## I. General

### 1.01 Description

Landscape edging as a border between planting beds, pathways, drives, mulch & rock division, or anywhere separation and definition is required.

### 1.02 Submittals

Manufacturer's literature along with a sample 3" section of specified size and finish if requested.

### 1.03 Delivery

Can be coordinated directly with manufacturer or authorized distributor of Sure-loc Edging. Call 1-800-787-3562 for quotations and material coordination. Material should be ordered and accepted in original shipping cartons of standard size. Please note quantities per box on inside of brochure. Material should be stored in a flat area with boxes protected from rain.

## II. Product

### 2.01 Product

As manufactured by Sure-loc Corporation of Holland, MI. Edging to be in 16' or 8' sections.

### 2.02 Material

Edging to be manufactured from 6063 extruded aluminum alloy of T-6 hardness with interlocking system and 5 stake punch-outs fabricated in each 16' strip or 3 stake punch-outs for each 8' strip.

### 2.03 Locking System

Sections to lock together without offset or double thickness at the joints and secured with two 12" stakes at every joint.

### 2.04 Thickness (Size)

Aluminum edging available in 1/8" thickness for residential or light commercial applications where flowing curves are desired. Applications include, but are not limited to, bed division, walkways, and light brick paver work.

3/16" thickness is available for commercial, industrial, and institutional applications where strength and durability are a concern. Applications include, but are not limited to, walkways, asphalt borders, running tracks, and maintenance strips.

### 2.05 Depth

Aluminum edging of either thickness available in 4" or 5.5" depths.

### 2.06 Finish

Mill Finish constitutes a natural aluminum finish as found on extruded parts.

Black anodized is available in all sizes. Finish is not a paint but rather a die that is electrically absorbed into the outer layers of the metal.

Painted finish available in black, brown, or green paint. Available in 1/8" x 4"size only (both 8 ft & 16 ft sections).

### 2.07 Stakes

Stakes to be a minimum of 12" long, secured 1/2" below top of edging, and locked into place. Stakes to be placed on inside of bed areas.

## III. Execution

### 3.01 Site Inspection

Check to ensure that all underground lines, irrigation hoses, and other cables are installed below the maximum depth of edging to be used.

### 3.02 Trench

Edge all landscape beds, maintenance strips, and/or where noted on design plan. Define the area to be edged using string, garden hose, or paint. Using a spade or mechanical trencher, cut a trench along area to be defined to depth so top of edging will not exceed 1/2" above finished grade.

### 3.03 Installation

Install edging with radius edge and ridges pointing up. Stake pockets should be on inside of bed.

### 3.04 Staking/Connecting

5 stakes per 16' section and 3 stakes per 8' section are included with material. Stakes are to lock 1/2" below top of edging and to be placed in every available pocket.

### 3.05 End Stake Adapters

Use supplied end stake adapters at all start/stop points as well as to splice pieces of cut edging together.

### 3.06 Back Filling

Back fill on both sides of edging during installation, leaving no more than two sections unsupported at one time. Compact back fill along edging ensuring that top edge is no more than 1/2" above finish grade.





## Architect Specifications:

All Aluminum landscape edging shall be _____ thick X _____ deep X _____ long with _____ stakes per section, having a _____ finish as painted or anodized at the factory, as manufactured by Sure-loc Aluminum Edging Corporation and under its trade name Sure-loc.

Sure-loc Edging Corporation
494 E. 64th Street
Holland, MI 49423
Phone (800) 787-3562
Fax (616) 392-5134
Website: www.surelocedging.com

# Exhibit D

PRO® Paver Patio Brick Restraints 1/8" X 1-3/4" X 8' (160' per box) - Hard Plastic                Page 1 of 2



FAQs   How To Order   Help
Center   Resources   Testimonials

Are You a Contractor?  | Cart Contents | Checkout

 Home    PRO® Aluminum Landscape Edging   Decorative "Stone" Garden Edging   Sta-Right Edging (High Density)    Bamboo Edging    Outdoor Specialty Lighting   PRO® Paver Patio Brick Restraints    Contractor Grade Tools

**Search Products:** 

PRO® Paver Patio Brick Restraints
No refinement options

## 1/8" X 1-3/4" X 8' (160' per box) - Hard Plastic: $203.00
[P18PE]



Click to enlarge.

 $203.00

**Useful Links**

- Recommend This Product
- Quick Quote



Plastic paver restraint.
Used in paver projects for patio, drive, sidewalk installations.
Install with landscaping spikes (not included).
Standard pack size: 20 8 ft. pieces for a total box of 160'.

$1.27 per foot.

Take advantage of our on-line pricing now.

This pricing is only offered by Dreamscape Outdoor Living & Garden.
Please remember us at www.YardProduct.com



edge | pave

- Paver Eye
- Photo Gall
- Dreamscap

**Sales Discount**

| Sale Amount | % Off | Shipping |
|---|---|---|
| $1 + | Regular Price | Free |
| $1,000 + | 4% | Free |
| $2,000 + | 6% | Free |
| $3,000 + | 8% | Free |
| $5,000 + | 10% | Free |

**Shipping Rate**

Per Box

**Calculator**

**Base Price**
$203.00

**Quantity**
1

FREE   % 0   Off

**Shipping**

**Total**

PRO® Paver Patio Brick Restraints 1/8" X 1-3/4" X 8' (160' per box) - Hard Plastic

# Exhibit E



4

CONFIDENTIAL

Page 1

1            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4    BRICKSTOP CORPORATION,        )
                                    )
5                  Plaintiff,       )
                                    )
6           vs.                     )    1:08-CV-02690
                                    )
7    VALLEY VIEW INDUSTRIES, H.C.,)
     INC.,                          )
8                                   )
                   Defendant.       )
9

10          The deposition of DOMINICK V. BERTUCCI,

11   called by the Plaintiff for examination, pursuant to

12   notice and pursuant to the Rules of Civil Procedure

13   for the United States District Courts pertaining to

14   the taking of depositions, taken before Patricia S.

15   Mann, CSR, RPR,  License No. 084-001853, a notary

16   public in and for the County of Cook and State of

17   Illinois, at Suite 1808, Two North LaSalle Street,

18   Chicago, Illinois, on Friday, August 1, 2008, at

19   9:40 o'clock a.m.

20

21

22
     Reported for
23   LAKE SHORE REPORTING SERVICE, by:
     Patricia S. Mann, CSR, RPR.
24   License No. 084-001853

CONFIDENTIAL

```
 1    APPEARANCES:

 2             HOVEY WILLIAMS, L.L.P.,
                 10801 Mastin Boulevard, Suite 1000,
 3             84 Corporate Woods, Overland Park,
                 Kansas, 66210,
 4             (913) 647-9050, by:
                 MR. SCOTT R. BROWN,

 5
                     appeared on behalf of the Plaintiff;
 6

 7             DLA PIPER RUDNICK GRAY CARY US. L.L.P.,
                 203 North LaSalle Street, Suite 1900,
 8             Chicago, Illinois, 60601,
                 (312) 368-4027, by:
 9             MS. MONICA L. THOMPSON,

10                   appeared on behalf of the Defendant.

11                           *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24
```

CONFIDENTIAL

1      Q.    So you don't review their catalogs?

2      A.    No.

3      Q.    There was an original sell sheet for the

4    Diamond Paver Edge that caused BrickStop to

5    complain, do you recall that?

6      A.    Yes.

7      Q.    Did you give that sell sheet to any of

8    your independent reps?

9      A.    Yes.

10     Q.    Do you know in what volume you gave that

11   sell sheet to your independent reps?

12     A.    It was an electronic version.

13     Q.    So you gave them a PDF of it?

14     A.    Yes.

15     Q.    When did you do that?

16     A.    February of this year.

17     Q.    And was it your expectation or intent

18   that the reps would include the sell sheet in their

19   catalogs?

20     A.    Yes.

21     Q.    Do you know if any of them did that?

22     A.    Yes.

23     Q.    Who did that?

24     A.    It would be all the reps.

CONFIDENTIAL

```
 1        Q.    So you believe all the reps included the
 2   sell sheet in their catalogs?
 3        A.    Not all reps have their own catalogs.
 4        Q.    How many of your reps have their own
 5   catalogs?
 6        A.    I would say maybe three rep groups.
 7        Q.    Which three?
 8        A.    Hammond & Associates, Garden Sales and
 9   Spec Management.
10        Q.    Is that the full name, Spec Management?
11        A.    Yes.
12        Q.    And which region is Hammond selling in?
13        A.    That would be the East Coast.
14        Q.    How about Garden Sales?
15        A.    That would be strictly the State of
16   Indiana.
17        Q.    And Spec Management?
18        A.    California and Arizona.
19        Q.    Do you know if Hammond included the
20   original sales sheet in its catalog?
21        A.    I don't know that.
22        Q.    Do you know if Garden Sales included the
23   original sales sheet in its catalog?
24        A.    I don't know that.
```

CONFIDENTIAL

Page 48

1     Q.   Do you know if Spec Management included

2  the original sales sheet in its catalog?

3     A.   I don't know that.

4     Q.   Do you recall when you provided them --

5  specifically when in February you provided them the

6  sales sheet?

7     A.   It would have been mid February time

8  period.

9     Q.   After BrickStop complained about that

10  sales sheet, did you give any notice to any of your

11  independent reps about the complaint?

12     A.   Yes.

13     Q.   What did you tell them?

14     A.   I told them to stop marketing the sales

15  sheet.

16     Q.   And when did you tell them that?

17     A.   That was in late February.

18     Q.   Did any of them tell you it's already in

19  my catalog?

20     A.   No.

21     Q.   Did any of them tell you it would be

22  difficult for them to stop using the sale sheet?

23     A.   No.

24     MS. THOMPSON:  Can we have a break?  Finish

CONFIDENTIAL

1    reps to stop promoting that particular sales sheet.

2         Q.   Did you do anything to follow-up to see

3    if your independent reps actually stopped using that

4    sheet?

5         A.   I had made telephone calls and making sure

6    that they were clear that they weren't supposed to

7    be promoting that sheet.

8         Q.   In your understanding, what is required

9    of a paver edging in order for it to function for

10   its intended purpose?

11        MS. THOMPSON:  Objection, vague, objection to

12   the extent it calls for a legal conclusion and

13   possibly foundation.  You can answer.

14        THE WITNESS:  A.  Keeping the pavers in place.

15        MR. BROWN:  Q.  So that's the ultimate

16   function, to keep the pavers in place, right?

17        A.   Have a sturdy enough product that allows

18   for the use of the product to be functional in the

19   eyes of the user.

20        Q.   Are there any particular structural

21   features that are common to all paver edges?

22        A.   They all have sidewalls and they all have

23   anchor bases.

24        Q.   Anything else?

CONFIDENTIAL

Page 52

1      A.   No.

2      Q.   And when you say sidewalls, that's the

3  portion that is actually abutted against the

4  pavers?

5      A.   In one respect, it can be an inside,

6  depending on the design of the product, or an

7  outside, but in one way, shape or form, the sidewall

8  is touching one part of the pavers.

9      Q.   When you say an inside or an outside, I'm

10 not too clear on what you mean by that.

11     A.   Some paver restraints are manufactured to

12 where you can reverse them.

13     Q.   So some of them you could use either side

14 of the sidewall to abut the pavers?

15     A.   Correct.

16     Q.   Okay.  And when you say "anchor bases,"

17 what do you mean?

18     A.   The spot where an anchor product is used

19 to adhere the product to the ground.

20     Q.   And that anchor being either a nail or a

21 stake?

22     A.   Yes.

23     Q.   Are there any other types of anchors that

24 you've heard of being used?

CONFIDENTIAL

Page 54

1    paver restraint.

2        A.    Yes.

3        Q.    Okay.

4        A.    It just has to have a spot that works

5    with -- in the view of Valley View with our anchor

6    stake to work with the product.

7        Q.    So it has to have a spot to receive either

8    the nail or the stake?

9        A.    Yes.

10       Q.    Are there any other requirements that

11   you're aware of for the anchor base?

12       MS. THOMPSON:   Same set of objections.

13       THE WITNESS:   A.   It has to be functional

14   enough to keep the sidewall sturdy enough to act as

15   its -- as the products wants to as a restraint.

16       MR. BROWN:   Q.   Are there any other functional

17   requirements for the anchor base that you're aware

18   of?

19       MS. THOMPSON:   Same objections.

20       THE WITNESS:   A.   No.

21       MR. BROWN:   Q.   Why did Valley View decide to

22   imitate the Beast product?

23       MS. THOMPSON:   Form of question.   Go ahead --

24   and lack of foundation.   Go ahead.

CONFIDENTIAL

Page 55

1          THE WITNESS:   A.   It had been brought up with a

2      potential customer of Valley View back in July of

3      last year.

4          MR. BROWN:   Q.   Can you tell me what the

5      circumstances of that meeting were with the

6      potential customer?

7          A.     They had made mention and made -- made

8      mention of the name the Beast by name and had

9      mentioned the fact that it was affecting their

10     market share for the product they were currently

11     selling and they looked at Valley View to possibly

12     be a partner with them, having them distribute the

13     product for them.

14         Q.     Were you at that meeting?

15         A.     Yes.

16         Q.     And who was that meeting with?

17         A.     That was with Unilock.

18         Q.     When did that meeting occur?

19         A.     July of last year.

20         Q.     July of 2007?

21         A.     Yes.

22         Q.     Where did that meeting occur?

23         A.     That took place at the Aurora location of

24     Unilock.

CONFIDENTIAL

1    Q.   Is that Aurora, Illinois?

2    A.   Yes.

3    Q.   Can you tell me who Unilock is?

4    A.   Unilock is a paver manufacturer and also

5    a retaining wall manufacturer in the hardscapes

6    industry.

7    Q.   Were they at that point in time a present

8    customer of Valley View?

9    A.   No.

10   Q.   And who was present at that meeting?

11   A.   That was myself, Dave Keel of Unilock and

12   Howard Rynberk.

13   Q.   Was there anyone else from Unilock there?

14   A.   Yes, that would have been a gentleman by

15   the name of Mike Faraday.

16   Q.   Anyone else from Unilock?

17   A.   No.

18   Q.   Okay.  So from Unilock, Dave Keel and Mike

19   Faraday?

20   A.   Yes.

21   Q.   And from Valley View, Howard Rynberk and

22   yourself?

23   A.   Yes.

24   Q.   Who asked for that meeting?

CONFIDENTIAL

Page 57

1       A.    I believe Valley View did.

2       Q.    Had you -- had you tried to sell to

3    Unilock prior to that?

4       A.    Not myself.

5       Q.    Had Valley View tried to sell Unilock

6    prior to that?

7       A.    I think they had tried in the past.

8       Q.    And did Unilock say why they wanted the

9    Beast?

10      A.    They did not say they wanted the Beast,

11   they said that they needed something that was very

12   comparable to help their customer base with respect

13   to the Beast taking a lot of their business away.

14      Q.    Okay.  So Unilock said the Beast was

15   taking their business away and they wanted a

16   comparable product?

17      A.    Yes.

18      Q.    And they proposed some sort of arrangement

19   with Valley View for Valley View to make a

20   Beast-like product?

21      A.    Yes.

22      Q.    Were there any specifics exchanged?

23      A.    Not that I'm aware of.

24      Q.    And what did -- what did you and

CONFIDENTIAL

1   Mr. Rynberk think about the proposal?

2        A.   I thought it was a good idea, but it was

3   ultimately up to him since he was the owner of the

4   company and he had to go through the development

5   ideas of it and the cost.  So he was in the meeting

6   and it was in a nutshell his call on what he wanted

7   to do eventually from that point forward.

8        Q.   And did Unilock say in particular what

9   about the Beast product they would like to see in

10  this new product?

11       A.   No.

12       Q.   Was there any other -- were there any

13  other products discussed with Unilock at that time?

14       A.   Unilock had discussed the product they

15  were selling heavily which was a Snap Edge product

16  and that was, you know, something that they were

17  selling, but they wanted another product to sell

18  along with it.

19       Q.   And they expressed the concern that at

20  that time, they were losing Snap Edge product sales

21  to the Beast?

22       A.   That's how I had translated it.

23       Q.   Did Unilock say whether they had ever

24  approached BrickStop in order to get the Beast?

CONFIDENTIAL

1   transfer it to them, but it would be not our

2   knowledge.

3       Q.   Are you aware of any instances where

4   Valley View's Diamond Paver Edge has replaced the

5   Beast?

6       A.   Yes.

7       Q.   Where is that?

8       A.   Lervey's Landscape Supply in Des Plaines,

9   Illinois.

10      Q.   Anywhere else?

11      A.   In Illinois or anywhere?

12      Q.   Anywhere.

13      A.   Oconomowoc Landscape Supply in Oconomowoc,

14  Wisconsin; Illinois Brick, they have six locations

15  throughout the northern part of Illinois; Russo

16  Power Equipment based in Schiller Park, Illinois,

17  and Naperville, Illinois, and that's all I'm aware

18  of as of right now.

19      Q.   And do you know of any instances where

20  Valley View has been in a price competition with

21  BrickStop for a customer?

22      A.   Yes.

23      Q.   Where have you seen that?

24      A.   Anywhere where we've had an opportunity

CONFIDENTIAL

Page 63

```
 1   to sell against the Beast.

 2        Q.   What is the price that you quote when

 3   you're selling against the Beast?

 4        A.   Well, it depends the factors of freight

 5   and where the customer is located and, of course,

 6   having an idea what the market is.  Some customers

 7   would say this is what I'm paying for the Beast and

 8   we just give them a price and it's up to them, of

 9   course, to decide whether they want to go with us

10   or not.

11        Q.   Are you aware of any situations where your

12   customers have been playing BrickStop against Valley

13   View to get the best price?

14        A.   Yes.

15        Q.   Where has that occurred?

16        A.   Hodge Services in Minneapolis, Minnesota;

17   Allied Landscape Supply in Pennsylvania.  My reps

18   out east would have more of a knowledge of that

19   because they're constantly on those customers and

20   I'm just aware of the very big ones and those are

21   some of the big ones.

22        Q.   Are there any others that you're aware

23   of?

24        A.   I cannot recollect, but I -- there are
```

CONFIDENTIAL

Page 64

1    probably a few out there.

2         Q.    Have your reps told you that they are

3    competing directly with BrickStop on price?

4         A.    Yes.

5         Q.    Which reps have told you that?

6         A.    Michael Casey who covers Michigan, Indiana

7    and Ohio; Hammond & Associates which covers the East

8    Coast; and P.B. Marketing which covers southern

9    Illinois, Missouri and Kansas and, of course, my

10   own house area.

11        Q.    What is the price range that you are

12   authorized to quote for Diamond Paver Edge?

13        A.    Depending on the customer location,

14   anywhere from 49 cents a foot to 75 cents a foot.

15        Q.    And the customer location affects that

16   because of freight?

17        A.    Correct.

18        Q.    Are there any other factors you are

19   supposed to take into consideration with respect to

20   setting the price?

21        A.    No.

22        Q.    So, for instance, if a customer was close

23   enough, you could quote 49 cents regardless of

24   volume?

CONFIDENTIAL

1      A.    Not necessarily.  It has to be a viable

2   customer to -- you know, I have to know that there's

3   a volume there that, you know, they're going to get

4   a certain price.

5      Q.    Okay.

6      A.    That they're going to help promote it

7   throughout the trade.

8      Q.    You said "viable customer," what do you

9   mean by that?

10     A.    Well, that would be a distributor.

11     Q.    And is there an amount or expected

12  volume you use before you would quote the 49 cent

13  price?

14     A.    Yes.

15     Q.    What is that amount?

16     A.    It would be, you know, based on, you know,

17  four to six pallets as an estimate.

18     Q.    Four to six pallets per what time frame?

19     A.    Well, per order period.

20     Q.    And an order period being a season or a

21  year?

22     A.    Any time they order it, that they'd have

23  to order a minimum of that to receive that

24  particular price.

CONFIDENTIAL

Page 66

1     Q.   What is the lowest price you have quoted?

2     A.   49 cents a foot.

3     Q.   And did you consult with Mr. Rynberk

4   before you quoted that price?

5     A.   That I did not.

6     Q.   Did you make that sale?

7     A.   Yes.

8     Q.   Who was that to?

9     A.   Illinois Brick.

10     Q.   And did that sale replace BrickStop at

11   Illinois Brick?

12     A.   Yes.

13     Q.   Have you quoted 49 cents per foot at any

14   location that did not have BrickStop?

15     A.   I cannot recall.

16     Q.   Do you know if BrickStop sells any other

17   paver edgings besides the Beast?

18     A.   Yes, I'm aware that they sell an aluminum

19   style edging and a product that is a smaller version

20   of the Beast.

21     Q.   Any others?

22     A.   I'm not aware of any besides those two.

23     Q.   Does Valley View sell any aluminum paver

24   edgings?

CONFIDENTIAL

1      A.    No.

2      Q.    In your experience, do customers tend to

3  have a preference for one or the other type, the

4  distinction being between aluminum and plastic?

5      A.    Yes, but the aluminum market is a very --

6  we think is a very small market.

7      Q.    Do your independent reps have the same

8  price scale, in other words, can an independent rep

9  quote as low as 49 cents per foot?

10     A.    No, they would need my review of that

11 before that happens.

12     Q.    What are your independent reps allowed to

13 quote without seeking your review?

14     A.    They are at 55 cents a foot or higher.

15     Q.    Have you had any independent reps ask for

16 you to depart below the 55 cent price figure?

17     A.    Yes.

18     Q.    Which ones have asked for that?

19     A.    That has both been the Hammond -- two,

20 Hammond personnel and Michael Casey.

21     Q.    And were those in situations where they

22 were competing against the Beast?

23     A.    Yes.  And other times -- there was a

24 few other times where there was not the Beast

CONFIDENTIAL

Page 68

1    involved.

2        Q.    Have you let your independent reps depart

3    below the 55 cent per foot?

4        A.    Yes.

5        Q.    What's the lowest price anyone between

6    yourself and all of your independent reps have

7    quoted?

8        A.    49 cents a foot.

9        Q.    Have you let any of your independent reps

10   quote the 49 cent per foot?

11       A.    No.

12       Q.    I'm going to show you what we have

13   previously marked as Exhibit 25 and ask you if you

14   have seen that document before?

15       A.    Yes.

16       Q.    This is an e-mail from yourself to

17   Mr. Rynberk --

18       A.    Yes.

19       Q.    -- dated July 19th, 2007?

20       A.    Yes.

21       Q.    Is this -- does this constitute the notes

22   you have from the Unilock meeting that we discussed

23   earlier today?

24       A.    Correct.  I was -- I was just unaware that

CONFIDENTIAL

Page 113

1      A.    Correct.

2      Q.    Okay.  Other than hiring the company, did

3   you have any other involvement in the creation of

4   that original sell sheet?

5      A.    I wanted to make sure -- I was the one

6   who made the text available to the graphics company

7   with respect to what was said on the sell sheet

8   with ordering information, item numbers and the

9   description of the product.

10     Q.    Did you have any other responsibility

11  with respect to the sell sheet?

12     A.    I'm not -- I don't understand the

13  question.

14     Q.    Well, for instance, whose responsibility

15  was it to approve the final format of the sell

16  sheet?

17     A.    At that point, it would have been me.

18     Q.    Okay.  And what did you ask Vision

19  Graphics to do with respect to depicting your

20  product?

21     A.    I had asked them to show our product on a

22  sell sheet with pavers because it needed to show

23  what the use of it was and also with respect to

24  using our anchor stake with the slots so that when

CONFIDENTIAL

Page 135

1        Q.    And so you think DeKalb might have done

2    the only testing, but you don't know?

3        A.    Correct.

4        Q.    And you're not aware of any testing done

5    by Mr. Soukup?

6        A.    No, I am not.

7        Q.    Have you received any complaints about

8    product failure with respect to the Diamond Paver

9    Edge?

10       A.    No, I have not.

11       Q.    Is it fair to say that you target

12   customers who presently carry the Beast with your

13   Diamond Paver Edge product?

14       A.    Yes, it's fair to say that as well as

15   other customers that are in the market buying other

16   competitor paver restraints.

17       Q.    Which trade shows does Valley View

18   attend?

19       A.    On a yearly basis, it changes, sometimes

20   we do shows every year, sometimes we decide to do

21   it every two to three years, sometimes we might do

22   a show once and not go back again.  Through the

23   course of a year, there's two different segments of

24   shows that we do, one is our distributor shows

CONFIDENTIAL

1    where they have our customers come in and write in

2    orders where we show our product line, the other is

3    industry convention slash trade shows where we

4    promote the product line and we're not so much

5    taking orders at the booth, but we're educating the

6    attendee on our product line when they come by our

7    booth.  And it ranges anywhere from irrigation

8    shows where there might be high volume of

9    landscapers on the West Coast that do irrigation,

10   they also do landscaping, to the Midwest where

11   there's very little irrigation done, but there's

12   hardscapes and nursery, so we put ourselves in a

13   variety of different industry conventions and

14   shows.

15        Q.    Are there any big shows that you always

16   go to?

17        A.    Well, up until last year, yes, we've just

18   made -- made the decision in cost and the results

19   of some shows to bypass a year and maybe go back a

20   year later.

21        Q.    What shows do you know you've -- you or

22   an independent rep for Valley View have been to

23   where you have displayed the Diamond Paver Edge?

24        A.    That would have been at the E.P. Henry

CONFIDENTIAL

1    show in mid February, the ICPI show in Nashville in

2    late February, and that's coming to the end of the

3    show season.  So there would have been maybe in

4    March -- there could have been like a distributor

5    had an open house for his landscapers in March, we

6    might have had a rep show the product there to the

7    customer base; but as far as any industry shows --

8    and then there was the National Hardware Show in

9    May back in Las Vegas that has been a commonly

10    attended show for us in the last fifteen years, but

11    we're deciding not to go back again.  So those would

12    be the three or four core shows that we've done

13    since the introduction of the product.

14         Q.    Are there any shows in the fall?

15         A.    Yes, that's where they get busy.  More

16    importantly or more commonly, it's the distributor

17    writing shows for next year for like for the

18    distributor/dealers to come to the show, take a

19    look at the product line and actually sit in my

20    booth and write an order for next year and then the

21    industry conventions start to take place starting in

22    November going till March.

23         Q.    The distributor writing shows, are those

24    shows where more than Valley View appear?

CONFIDENTIAL

1       A.    Oh, yes.

2       Q.    So do your competitors appear at those

3   shows?

4       A.    Yes.

5       Q.    Can you name some of the distributor

6   writing shows?

7       A.    There would be Commerce in Grand Rapids,

8   Michigan, they also have a show in Baltimore,

9   Maryland; there's the Foster Show in Rochester,

10  Minnesota; there's the Wetzell Show in Castanea,

11  Pennsylvania; there's the Grow South Show in

12  Atlanta, Georgia.

13      Q.    Any others?

14      A.    There's the BWI show in Shreveport,

15  Louisianna; there is the Wyatt Coral's Show in

16  South Carolina; there's Garden Wyatt show in Denver,

17  Colorado; there is Beem & Hagman show in Peoria,

18  Illinois; George Keller show in Quincy, Illinois;

19  Cisco Show in Indianapolis, Indiana; Meyers Seed

20  Show in Baltimore, Maryland, and that's about the

21  extent of it for this fall.

22      Q.    And will Valley View attend all those

23  shows?

24      A.    We will be in -- as of right now, we

CONFIDENTIAL

Page 139

1    haven't made a determination of which ones for sure

2    we're going to be in, but probably 80, 90 percent

3    of those shows we will be in.

4         Q.    And then the -- those are distributor

5    shows.  What was the other flavor of show you talked

6    about?

7         A.    It would be an industry trade show slash

8    convention which draws in people regionally which

9    was the example of the ICPI show in Nashville that

10   brings in people from the region or a certain

11   segment of the country.  Those shows start in

12   earnest in November, like we have a show in Anaheim,

13   California, for the Irrigation Association and then

14   those shows progress throughout the winter, the

15   distributor shows stop when winter starts and the

16   regional shows take over.

17        Q.    And are you going to attend -- or is

18   Valley View going to attend any of those shows

19   beginning in November?

20        A.    Yes.

21        Q.    Do you know which ones?

22        A.    We are signed up for the irrigation show

23   and we are signed up in January for the ICPI show

24   which changed locations from Nashville to Atlanta.

CONFIDENTIAL

```
 1        Q.    Can distributors go to, for instance, the
 2   Irrigation Show?
 3        A.    Yes.
 4        Q.    Can resellers go to those shows?
 5        A.    Yes.
 6        Q.    Can contractors go to those shows?
 7        A.    Yes.
 8        Q.    Can all of those same types of people go
 9   to distributor writing shows?
10        A.    No, the distributor writing shows are
11   normally market segmented, someone that lives in
12   Pennsylvania wouldn't go to a distributor show in
13   Illinois.  It depends on the market that the
14   distributor services, he therefore invites his
15   dealer base and then it's up to them, of course,
16   if they want to come to see the show.
17        Q.    So at a distributor show, you get the
18   distributor and his customers will arrive there?
19        A.    Correct, I have -- yes.
20        Q.    And can contractors and installers go to
21   those shows?
22        A.    Yes.
23        Q.    And when you're at these shows, do you
24   have contact with both distributors and end users
```

CONFIDENTIAL

1    like contractors and installers?

2         A.    Well, I wouldn't have contact with the

3    distributors because I'm at a sole distributor show,

4    so I'm there for his benefit, not promoting another

5    distributor that he might be a competitor of theirs.

6    So when he has his viewer base or his contractor

7    base there, I'm there promoting the product to the

8    landscaper on behalf of the distributor.

9         Q.    So you would -- you would run into or you

10   would have contact with both dealers and end users

11   at a distributor show?

12        A.    That is correct.

13        Q.    Have you in any of these shows had a

14   contractor or installer tell you he thought that

15   your product looked like the Beast, the Diamond

16   Paver Edge?

17        A.    Yes.

18        Q.    When did that happen?

19        A.    When we were at the E.P. Henry show and

20   the ICPI show.

21        Q.    At the E.P. Henry show, how many

22   contractors or installers made that comment?

23        A.    I would say maybe a half a dozen.

24        Q.    How about at the ICPI show, how many

CONFIDENTIAL

Page 142

1    contractors or installers commented that your

2    product looked like the Beast?

3         A.    Probably about the same quantity which

4    would be about six.  But that show was more market

5    segmented for distributors than actual contractors,

6    though there were contractors in attendance, but

7    that show is more of an industry show for the

8    distribution market more than anything.

9         Q.    When you were at the E.P. Henry show, did

10   any one of the half dozen or so who commented about

11   your product looking like the Beast ask you whether

12   it was BrickStop's product?

13        A.    No.

14        Q.    At the ICPI show, did any of the half

15   dozen or so contractors who commented and said your

16   product looked like the Beast ask whether it was

17   BrickStop's product?

18        A.    No.  We were very clear in our literature

19   at that time -- I'm sorry, at the -- after we

20   corrected the literature, but at the booth, it's a

21   Valley View booth showing Valley View product, we

22   have a label on our product, we showed samples at

23   those two shows in Nashville and in Atlantic City

24   that were our product with our name stamped on it

CONFIDENTIAL

Page 203

1      A.    Yes.

2      Q.    Dimex's product is called what?

3      A.    I believe the Dimex product is called

4   BrickStop.

5      Q.    No, BrickStop's the name of the

6   Plaintiff.

7      A.    Oh, I'm sorry.  Brick Edge.

8      Q.    Brick Edge, okay.  But with respect to

9   either the Snap Edge or the Dimex product, do

10  either of those allow for lattice nailing?

11     A.    Can you repeat that, I'm sorry?

12     Q.    Do either of them permit the contractor to

13  use lattice nailing?  Do you know what lattice

14  nailing is?

15     A.    Twisted nails?

16     Q.    No.  A nailing pattern that is not in a

17  straight line, a nailing pattern that would have a

18  V-shape or an alternating --

19     A.    No, all of them have what from what I

20  understand a straight run of nail -- nail method.

21     Q.    Okay.  Or anchor receptacles?

22     A.    Yes.

23     Q.    Do either Snap Edge or Dimex allow for

24  reverse installation?

CONFIDENTIAL

1  A. No.

2  Q. Neither one of them?

3  A. No.

4  Q. And do either of them -- do both of them

5 allow for one system or one piece that can do both

6 curves and straight edge applications?

7  A. Yes.

8  Q. And both of them are rigid products?

9  A. Yes.

10  Q. Okay.  Is there any other product that

11 you're aware of besides BrickStop that has all four

12 of those functionalities?  By that I mean the

13 lattice nailing pattern, an ability to reverse

14 install, one system for curves and straight edge

15 and rigid product?

16  A. That would only be ours which would be

17 the Diamond Paver Edge, I'm not aware of anybody

18 else's.

19  Q. And BrickStop?

20  A. And BrickStop.

21  Q. You gave some testimony about -- oh, I

22 have to do this, he put it in, I have to show it to

23 you.  I didn't even mark it -- Exhibit 61 for

24 identification, if you can pull that one out.

5

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISCTICT OF ILLIONIS

| | |
|---|---|
| BRICKSTOP CORPORATION, INC.<br><br>Plaintiff,<br><br>v.<br><br>Valley View Industries, H.C., Inc.,<br><br>Defendant, | CASE<br><br>08CV2690<br><br>JUDGE GETTLEMAN<br><br>MAG. JUDGE COLE |

EXPERT REPORT OF ROBERT W. DEALEY

ON FUNCTIONALITY ISSUES

Aug 04 08 11:12a     BOB DEALEY            (414) 245-5700        p.1

| Report Contents | Page |
|---|---|
| Table of Contents | 1 |
| Declaration | 2 |
| Plastic Materials and Injection Molding | 3 |
| Valley View Diamond Edge Product | 6 |
| BrickStop B.E.A.S.T. Product | 10 |
| Dimensional Comparison Between Valley View and BrickStop | 13 |
| Plastic Materials Utilized for Paver Restraines | 14 |
| Comparison of Spikeedge Restraints to BrickStop B.E.A.S.T. | 15 |
| Comparison of Alliance Gator Edge to BrickStop B.E.A.S.T. | 17 |
| Comparison of Snap Edge to BrickStop B.E.A.S.T. | 18 |
| Summary | 20 |
| Exhibit A  CV Robert W. Dealey | 26 |
| Exhibit B  Work History – Robert W. Dealey | 37 |
| Exhibit C  List of References Used for Report | 43 |
| Exhibit D  Valley View Website | 45 |
| Exhibit E  Valley View Diamond Edge Section | 48 |
| Exhibit F  Rosato-Rosato pages | 51 |
| Exhibit G  Valley View Wall Ratio | 58 |
| Exhibit H  Valley View "V" Shaped Ribs | 60 |
| Exhibit I  Valley View Rib Connector Hole to Chevron Shaped Opening | 62 |
| Exhibit J  Valley View Rib Connecting Chevrons Shaped Opening to Walls | 64 |
| Exhibit K  Valley View Filled in Pads | 66 |
| Exhibit L  Valley View Stabilizing Pad Between Anchoring Feet | 68 |
| Exhibit M  Valley View Bad Foot and Warning Area | 70 |
| Exhibit N  BrickStop Website | 72 |
| Exhibit O  BrickStop Section | 74 |
| Exhibit P  BrickStop Foot | 77 |
| Exhibit Q  BrickStop "V" Shaped Ribs | 79 |
| Exhibit R  BrickStop Connecting Pads | 81 |
| Exhibit S  BrickStop Filled in Areas Connecting "V" Shaped Ribs and Walls | 83 |
| Exhibit T  BrickStop End Foot | 85 |
| Exhibit U  BrickStop Nomenclature | 87 |
| Exhibit V  BrickStop Ejector Pads | 89 |
| Exhibit W  BrickStop Ejector Pin Placement | 91 |
| Exhibit X  BrickStop and Valley View Wall | 93 |
| Exhibit Y  BrickStop and Valley View Rib Height | 96 |
| Exhibit Z  BrickStop and Valley View Rib Width | 98 |
| Exhibit AA  BrickStop and Valley View "V" Ribs | 100 |
| Exhibit AB  BrickStop and Valley View Center Rib | 102 |
| Exhibit AC  BrickStop and Valley View Stiffing Pad | 104 |
| Exhibit AD  BrickStop and Valley View Thickness of Stiffing Pad | 106 |
| Exhibit AE  BrickStop and Valley View Section Length | 108 |
| Exhibit AF  Spike Edge Web Site | 111 |
| Exhibit AG  Alliance Gator Edge Web Site | 113 |
| Exhibit AH  Snap Edge Web Site | 115 |
| Exhibit AI  BrickStop Voids and Valley View Section | 117 |
| Exhibit AJ  Outer Anchoring Foot Wall | 120 |
| Exhibit AK  Perpendicular Wall Section | 122 |
| Exhibit AL  Double Angle Wall | 124 |
| Exhibit AM  End Radius Termination | 126 |
| Exhibit AN  V Shaped Ribs | 128 |
| Exhibit AO  Connecting Ribs | 130 |
| Exhibit AP  Filled in Pads | 133 |
| Exhibit AQ  Center Stiffing Ribs | 134 |
| Exhibit AR  Four Ejector Pads | 136 |
| Exhibit AS  Center Strength Ribs | 138 |
| Exhibit AT  Spike or Stake Anchoring Openings | 140 |
| Exhibit AU  Valley View Web Site | 142 |

# Declaration

1.      I am Robert W. Dealey and I own and operate Dealey's Mold Engineering, Inc., a plastics management, marketing, and technical consulting firm.  I have 35 years of experience in the plastics industry and am presently an active consultant in such areas as plastics part design, mold design and engineering, mold building, injection molding, project management, and operational analysis.  I have a Bachelor of Science degree in Industrial Education from Stout State College, with additional courses in industrial and plastics engineering, molding, materials, design and plastics.

2.      In addition to plastics consulting, I have written chapters for books, numerous publications on topics related to plastics, mold making, mold design, tooling and injection molding. I have also delivered numerous papers and presentations, nationally and internationally, and conducted seminars that address such areas as plastics, part and mold design, mold tooling, and materials.   I have been a member of the Society of Plastics Engineers (SPE) since 1971 where I have held various offices and positions and been actively involved in several committees at the local, national and international level. I currently write the "Ask the Expert" column for the SPE Injection Molding Division newsletter.

3.      I have received several awards including being elected to Honored Service Member of SPE and being named Mold Designer of the Year in 1994 by the Mold Making and Mold Design Division of the SPE.  The cases in which I have been retained as a technical expert during the last four years are listed in my CV. My Curriculum Vitae is attached as Exhibit A.

4.      My company is being compensated at my regular consulting rate of $250 per hour plus expenses, for my work on this matter.  Compensation is not dependent upon any particular outcome of this matter.

2

5.      It is my opinion that one of ordinary skill in the art with regard to the evaluation of injection molded plastics part designs of olefin, strenic and vinyl bases plastics, including but not limited to polypropylene, polyethelyne, polystyrene, acrylonitrile butadiene styrene and polyvinyl chloride, would be someone having at least two-four years of technical education (serving an apprenticeship, attending a trade school or technical school) past high school or college and 5-10 years practical experience designing plastic parts for injection molding plastics with design features considering properties of plastics and application similar to those in the product at issue.

6.      I have worked with and trained engineers and technicians in the field of injection molding and processing of plastics, plastic part design, plastic part inspection, mold design and engineering and know what knowledge person of ordinary skill in the art has at this time and in the past 25 years. I am a person having at least ordinary skills in the art. My work history is attached as Exhibit B.

7.      I have been retained by Valley View Industries to render an opinion regarding the design intent features of the Valley View "Diamond Paver Edge" and BrickStop B.E.A.S.T. products.

## Plastic Materials and Injection Molding

8.      I have compared samples of injection-molded sections of the BrickStop and Valley View paver edge strips and viewed numerous product information sites on the web. A list of the documents that I reviewed is attached as Exhibit C.

9.      I believe that the BrickStop product and the Valley View Paver Edge that I analyzed are both molded from an olefin based plastic resin, either a polyethylene (PE) or polypropylene (PP) based material. I know this as both samples have a specific gravity of less than 1.00.

3

10.    I'm of the opinion that either material would work equally as well in the application when utilized with an ultra violet stabilizer and/or carbon black colorant. However, I'm of the opinion that PP would have an advantage over PE in this application due to the creep properties of PE and Flexural Modulus properties. (Flexural Modulus is defined as: Ratio of stresses within the elastic limit of stress to corresponding strain).

11.    PE has an advantage over PP in Flexural Strength. However, in this application the plastic component would only be flexed during the installation process and not continuously subjected to flexing. (Flexural Strength is defined as: Maximum pull force in psi to break a standard specimen).

12.    Injection molding is a cyclical permanent mold forming process whereby solid plastic granules (powder, flake or liquid in rare instances) are combined with appropriate additives, blowing agents or gases, and/or colorants are placed into a hopper on an injection-molding machine. The solid plastic is then heated in a barrel of the injection- molding machine until the plastic reaches a state of fluidity. The heating is accomplished with external heater bands on the barrel and with the addition of shear heat generated by shear in a rotating screw containing flights to condition the plastic and insure melt homogeneity. When the appropriate charge (volume) of plastic has been obtained in front of the screw, the plastic is injected into the mold filling the cavity. The plastic is allowed to solidify by cooling the plastic melt from several hundred degrees F° (typically from 350° F to over 800° F depending upon the family of plastics) to a temperature where the plastic has solidified to the point that the mold can open and the part can be ejected, typically 100 ° F to 175° F, depending upon the plastic and its properties required to maintain the molded part shape. Plastics are non-Newtonian fluids and require applied pressure to flow. Conventional injection-molding is considered a high-pressure process for fabricating a plastic product where pressures in the mold can range from 5,000 to 15,000 pounds per square inch.

4

13.   The elements in the injection-molding cycle are:  Mold closed; filling of the mold cavity; packing of the cavity; hold pressure on the plastic and at the same time recharging of the screw; cooling time; mold opening and part ejection.  The process is then repeated.

14.   Another variation of injection molding is considered "low pressure" or in some cases "structural foam" molding, incorporates a chemical blowing agent mixed with the plastic as with the conventional process.  This low-pressure injection molding process is basically the same as the conventional process, but the cavity is not packed out with high pressure, rather the blowing agent releases gas that in turn expands the plastic forcing it against the cavity.  Nitrogen gas and/or chemical blowing agents are typically used in this process. As the internal pressure against the mold is in the range of 600 pounds per square inch, the process is considered low-pressure injection molding.  As in conventional injection molding the elements of the cycle are the same with the exception that the pack stage is omitted and replaced by the gas blowing phases.  This process typically results in a solid resin rich surface with few, if any, miniature gas holes.  Rather the center of the wall thickness contains the evidence of the gas blowing process.

15.   The injection-molding process has many variations to the basic concept including: gas assist injection-molding; water assist injection-molding; foaming agent injection-molding; structural foam injection molding; reaction injection molding and thermoset injection-molding.

16.   Either injection-molding process, when properly performed will yield plastic parts of high quality adequate for the function of the products at issue in this case. The functionality of the product is more dependent upon the design and materials selected rather than the process of conventional or low-pressure molding.

17.   Counsel for Valley View has asked me to review the samples and documents and provide an expert report regarding the design and function of the Valley View Diamond product and that of various suppliers and compared to the BrickStop product from a viewpoint of design intent.

5

18.    I have now had the opportunity to examine the supplied BrickStop and Valley View products and review the literature related to other similar products and I'm prepared to include those findings in my report.

## Valley View Diamond Paver Edge

19.    The Valley View Diamond Paver Edge is a long "L" shaped component distinguished by a wall approximately 0.195 inch wide and about 1.850 inches tall. The intent is obvious as the function of one side of the shorter or horizontal portion of the "L" wall is to form an edging for retention of paving bricks or other landscaping blocks. The vertical or longer portion of the "L" contains an anchoring foot arrangement that generally repeats it self after the end units. The anchoring foot is distinguished with two ribbed walls on both sides, then doubled angled to a radius termination opposite the wall. Exhibit D contains information from the Valley View's web site. Exhibit E is a picture of the product, which I examined and was used to form my opinions.

20.    The anchoring feet function as a support to the wall and serve as a platform that secures the wall into the desired position for the application.

21.    The anchoring feet have a series of three openings where landscaping spikes or stakes can be driven into the ground to maintain the desired location and absorb any force exerted on the wall from the pavers or landscape material.

22.    The Valley View product has two round holes where spikes could be driven for retention. The first spike hole is slightly more than one inch from the inside wall. The second spike hole is less than two and one half inches from the inside wall. The chevron shaped stake hole is located between the two spike holes and in closer proximity to the second spike hole.

6

23.    The function of these anchoring feet is clear and with the option of the installer to utilize one or more of the options for securing the foot to the ground thereby supporting the wall in contact with the paving blocks.

24.    It is my understanding that installers sometimes utilized the hole closest to the wall on straight sections and the hole furthest from the wall in curved sections and both holes in lattice or staggered nailing. The choice of using spikes or stakes is dependent upon the ground surface and/or preference of the installer.

25.    The use of this product, from a design standpoint is that of a static application and the forces acting on the foot and spike or stake are then static in nature. In this regard when the foot is outside the paver the forces acting on the plastic are compressive. When the installation has the foot placement under the paver, the forces acting on the plastic are in tension.

26.    Therefore, the design and function of the anchoring foot must take into account both compression and/or tensile forces after installation.

27.    It is well known in plastic part design that "...thermoplastics are viscoelastic in nature, their properties are dependent on time, temperature and strain-rate. The ratio of stress and strain is linear at low strain levels of 1 to 2 percent, and, therefore, standard elastic design principles can be applied up to the elastic transition point." (p. 782 Rosato-Rosato) Exhibit F

28.    It is also well known in plastic part design that the least amount of material used to manufacture a product that performs in that application is the preferred design approach. As opposed to thick solid sections, beam and rib like structures are the better choice and less costly to injection mold while using less material.

29.    Rosato-Rosato, p.782 writes: "The composite cross section of a structural foam part contains an ideal distribution of material with a solid skin outer region and a foamed core. The manufacturing process distributes a thick, almost impervious solid skin, which is in the range of 25 percent of the overall wall thickness at the extreme locations, from the neutral axis (29-20a). These are the regions where the maximum compressive and tensile stresses occur in bending." Exhibit F

30.    I'm of the opinion that the structure of the anchoring feet is in fact viewed as an "I" beam construction in function. The ratio of thickness to width is two to one. This will provide excellent support for the wall and connecting anchoring mechanisms. Exhibit G.

31.    Additionally, the Valley View foot has a design feature of two ribs positioned at approximately a 60° included angle between the wall and the first anchoring opening, in essence functioning as the support mechanism. The opening between the two ribs allows for some flexing in non-linear applications while providing maximum wall support for this structure. Exhibit H.

32.    Another rib joins the chevron shaped stake hole with the first spike anchor hole and functions to absorb forces placed against the wall through the anchoring foot and to the stake. Exhibit I.

33.    The third anchoring hole is connected to the wall through the straight outer walls that have a double angle and radius termination. The inner wall of the chevron shaped opening also connects to the outer angled walls and provides strength acting as a rib like structure. Exhibit J.

34.    Two filled in areas, at the bottom of the part when viewed as installed, laying between the outer ribs and connecting the outer edges of the "V" shaped feature function as a linear connecting mechanism and acts as a restraint for torsional forces and/or twisting in the "X" axis (running the length of the part). Exhibit K.

8

35.    Another feature is positioned between the anchoring feet (with the exception of the last anchoring foot on each end), is connected to the wall and then with a series of four ribs connects to the adjacent anchoring feet. This feature remains in place when the installation calls for a straight section of the wall and provides additional restraint to the wall and increases stiffness.

36.    Each of the other feet has four ejector pins and pads. When ejector pins are positioned on part features that are not at least five-sixteenths of an inch in diameter, ejector pads are added to the part structure and function as a place to install ejector pins of a diameter sufficient that ejector pin breakage will not be problematical. Exhibit AR.

37.    The four angled connectors also function as a flow leader runner system feeding plastic to the anchoring foot during the injection phase of the injection molding cycle. This feature prevents or greatly reduces the location of two plastic flow fronts forming a knit line at the radius termination at the outer anchoring hole. The presence of a knit line at an area of high stress could result in a premature failure under tensile pressures concentrated in that area. Exhibit L.

38.    The connecting ribs can be cut or removed when installing the paver restraint in curved landscaping. Removal will allow the wall to be bent to conform to the desired contour.

39.    The end anchoring foot, as opposed to the other feet, has a solid wall on top of the anchoring foot (when viewed as installed). This solid wall with interruptions at only the spike/stake openings serves two functions. The first is to provide maximum support to the wall and strength for location preference during installation when only the end units are anchored. Exhibit M.

40.    The second function of the solid wall is to provide an area for safety warnings, material recycling information and/or other pertinent information that can be permanently molded into the part. Exhibit M.

9

41.     It is my opinion, as an expert in the design and injection molding of plastics, that all of the features found on the Valley View Diamond Edge product that I inspected are a function of the design intent for the stated application of providing a restraint in landscaping applications.

## BrickStop B.E.A.S.T.

42.     The BrickStop product is a long "L" shaped component distinguished by a wall approximately 0.195 inch wide and about 1.750 inches tall. The intent is obvious as the function of one side of the shorter or horizontal portion of the "L" wall is to form an edging for retention of paving bricks or other landscaping blocks. The vertical or longer portion of the "L" contains an anchoring foot arrangement that generally repeats itself after the end units. The anchoring foot is distinguished with two ribbed walls on both sides, then doubled angled to a radius termination opposite the wall.     Exhibit N contains information from the BrickStop web site.  Exhibit O is a picture of the product, which I examined and was used to form my opinions.

43.     The anchoring feet function as a support to the wall and serve as a platform that secures the wall into the desired position for the application.

44.     The anchoring feet have a series of two openings where landscaping spikes can be driven into the ground to maintain the desired location and absorb any force exerted on the wall from the pavers or landscape material.  The spikes can be straight sided or fluted; the quad lobed hole further from the wall appears to be suitable for a spiral spike. However, a straight spike or stake could also be utilized.

45.     The BrickStop product has two holes where spikes could be driven.  The first spike hole is slightly greater than one inch from the inside wall. The second spike hole is about two and three-eights inches from the inside wall

10

46.    The function of these anchoring feet is clear and with the option of the installer to utilize one of the two options for securing the foot to the ground thereby supporting the wall in contact with the paving blocks.

47.    The use of this product, from a design standpoint is that of a static application. The forces acting on the foot and spike once installed are not repeatedly applied as in a dynamic application. In this regard when the foot is outside the paver the forces acting on the plastic are compressive. When the installation has the foot placement under the paver, the forces acting on the plastic are in tension. Exhibit P.

48.    Therefore, the design and function of the anchoring foot must take into account both compression and/or tensile forces after installation.

49.    I'm of the opinion that the wall structure utilized in the anchoring foot is in fact viewed as a solid beam construction in function.    This will provide support for the wall and connecting anchoring mechanisms. Exhibit P.

50.    Additionally, the BrickStop foot has two ribs positioned at approximately a 60° included angle between the wall and the first anchoring opening, in essence functioning as the support mechanism.   The opening between the two ribs allows for some flexing in non-linear applications while providing maximum wall support for this structure. Exhibit Q.

51.    Another rib joins the quad lobed hole with the first spike anchor hole and functions to absorb forces placed against the wall through the anchoring foot and to the stake. Exhibit Q.

52.    Two filled in areas, at the bottom of the part when viewed as installed, laying between the outer ribs and connecting the outer edges of the "V" shaped feature function as a linear connecting mechanism and acts as a restraint for torsional forces and/or twisting in the "X" axis (running the length of the part). Exhibit R.

11

53.    Another feature is positioned between the anchoring feet (with the exception of the last anchoring foot on each end), and is connected to the wall and then with a series of four ribs connects to the adjacent anchoring feet. This feature remains in place when the installation calls for a straight section of the wall and provides additional restraint to the wall and functions to increase stiffness.

54.    The four angled connectors also function as a flow leader runner system feeding plastic to the anchoring foot during the injection phase of the injection molding cycle. This feature prevents or greatly reduces the likelihood of the two plastic flow fronts forming a knit line at the radius termination at the outer anchoring hole. The presence of a knit line at an area of high stress could result in a premature failure under tensile pressures concentrated in that area. Exhibit S.

55.    The end anchoring foot, as opposed to the other feet, has a solid wall on top of the anchoring foot (when viewed as installed). This solid wall with interruptions at only the two spike openings serves two functions. The first is to provide maximum support to the wall and strength for location preference during installation when only the end units are anchored. Exhibit T.

56.    The second function of the solid wall is to provide an area for safety warnings, material recycling information and/or other desired information that can be permanently molded into the part. Exhibit U.

57.    Each foot has ejector pins, utilized to eject the part from the mold in the injection-molding process. The end foot has three ejector pin marks. The ejector pins are placed on a solid surface and only show as round impressions of approximately five-sixteenths of an inch in diameter.

58.    Each of the other feet has four ejector pins and pads. When ejector pins are positioned on part features that are not at least five-sixteenths of an inch in diameter, ejector pads are added to the part structure and function as a place to install ejector pins of a diameter sufficient that ejector pin breakage will not be problematical. Exhibit V.

59.    Ejector pin placement is a function of determining how and where the molded plastic will shrink inward and onto the mold features. Experience tells us that openings and inner vertical walls will required the greatest forces where resistance to part removal (ejecting) will occur. Accordingly, ejector pins are then positioned in or near these areas. Polyethylene and Propylene have high shrinkage rates, which is partly a function of wall thickness, the grade of material and processing conditions. However, PE and PP have high shrinkage numbers that often range from 0.020 to 0.040 inch per inch and considerable force is often necessary to eject a part from the mold. Exhibit W.

60.    Ejector pins are always placed on the side of the mold, normally referred to as the "B" side, core side or ejector side and with some exceptions, where the ejector mechanism is located on the injection-molding machine utilized to mold the parts.

61.    It is my opinion, as an expert in the design and injection molding of plastics, that all of the features found on the BrickStop product that I inspected are a function of the design intent for the stated application.

## Dimensional Comparison Between Valley View and BrickStop

62.    The structure of the Valley View and BrickStop has similar features, however they have dimensional differences. The Wall, a feature that is common on all Paver restraint systems that I researched, is 1.853 – 1.856 inch tall on the Valley View product and 1.713 – 1.720 inch tall on the BrickStop product. (All dimensions stated are in inches) Exhibit X.

63.    The foot, measure from the far wall side to the tip of the radial termination measures 2.997 – 3.000 for the Valley View product and 2.988 –2.989 for the BrickStop Product.

64.    The height (thickness) of the outer rib connecting the wall and foot is 0.383 for the Valley View product and 0.365 – 0.370 for the BrickStop product. Exhibit Y.

13

65.    The width of the outer rib connecting the wall and foot is 0.170 – 0.175 for the Valley View product and 0.132 – 0.135 for the BrickStop product.  Exhibit Z.

66.    The width of the "V" shaped rib connecting the wall and foot is 0.195 – 0.196 for the Valley View product and 0.132 – 0.141 for the BrickStop product.  Exhibit AA.

67.    The width of the center rib connecting the restraint hole closest to the wall to the next restraint opening is 0.220 – 0.222 for the Valley View product and 0.143 – 0.146 for the BrickStop product.  Exhibit AB.

68.    The width of the stiffing pad between the two feet is 0.774 – 0.775 for the Valley View product and 0.750 – 0.755 for the BrickStop product.  Exhibit AC.

69.    The thickness of the stiffing pad rib between the two feet is 0.188 – 0.190 for the Valley View product and 0.189 – 0.191 for the BrickStop product.  Exhibit AD.

70.    While the sections are not necessarily exactly the same length, the Valley View (10.378 long) product has a weight of 115.0 grams and the BrickStop (10.320 long) product has a weight of 106.6 grams.  In essence the Valley View product is 1.0056 times longer than the BrickStop section, but the Valley View product 1.078799 times the weight. Exhibit AE.

## Plastic Materials Utilized for Paver Restraints

71.    Research related to plastic components utilized for Paver Restraints indicates that these products are injection molded from neat (having no fillers, reinforcements or foaming agents) Polyethylene and foamed Polyethylene, neat Polypropylene or foamed Polypropylene or neat rigid Polyvinyl Chloride and foamed Polyvinyl Chloride.  All materials are logical choices for exterior landscaping applications.

72.    Products that are extruded, but used for edge restraints in landscaping applications are typically made from neat Polyethylene, Polypropylene or Polyvinyl Chloride.

14

73.    The Valley View Diamond Edge that I inspected was molded from a Polypropylene base material, either co-polymer or homo-polymer with a chemical foaming agent.

74.    The BrickStop B.E.A.S.T. product that I inspected was molded from a neat polyethylene or polypropylene, either co-polymer or homo-polymer without a foaming agent.

## Comparison of Spikedge Restraints to BrickStop B.E.A.S.T.

75.    I have only preliminary reviewed this product from literature and did not actually have a product to examine. Even based on this preliminary review, however, I observed the following.

76.    The Spikedge edge restraint is molded in a foamed plastic, High Density Polyethylene, as opposed to the neat Polypropylene that the BrickStop B.E.A.S.T. product is molded from. Exhibit AF.

77.    As Polypropylene is extremely prone to warpage, a foamed molded part is more than likely to have less warp, resulting in a straighter and less stressed molded part.

78.    The two products both have a wall that will act as a restraint against the pavers or landscape materials.

79.    The two products both have anchoring feet, used to restrain the edge from moving.

80.    The Spikedge product has three holes for spikes to anchor the product; the BrickStop product has two holes.

81.    All holes in the Spikedge product are round, with the middle hole being larger in diameter and could be utilized with a straight or spiral spike and/or stake.

82.    The BrickStop product has two holes for anchoring the product; one hole is round for use with a straight spike. The second hole has a quad lobe design and can be used with a straight or spiral spike and/or stake.

83.    Spikedge and BrickStop can both be used in straight or contoured applications. Both have a tabs molded between the anchoring feet, which is left intact when installing in a straight section and can be removed when using in a contour application.

84.    The Spikedge edge restraint is supplied with a plastic spike that can be used for anchoring the feet of the product and the BrickStop product does not have an attached plastic stake.

85.    Spikedge refers to their "...sophisticated foam injection Process..." as producing a "...super strong..." spike and is molded as an integral component of the edge restraint using a foam plastic injection molding method. Exhibit AF.

86.    Both the BrickStop and Spikedge product function as a restraint system when installing landscaping.  Both products have a wall and anchoring feet and all of the component features are functional.

87.    The Spikedge product comes with it's own anchoring stake molded in.  This stake also functions as an overflow mechanism whereby the knit line of the molded plastic will flow past the critical area adjacent to the furthest anchoring hole from the restraining wall.

88.    The Spikedge product has three anchoring holes, allowing the landscaper the option of anchor placement, compared with the two anchor openings of the BrickStop product.

89.    The Spikedge product has similar function design features such as the restraining wall and anchoring feet with multiple spike openings and stiffing pads located between the feet.

90.    The lack of a wall section around the perimeter on the Spikedge product could result in the anchoring foot being less rigid than the BrickStop product.  However, the boss around anchoring holes allows a larger surface area to contact the spike or stake.

# Comparison of Alliance Gator Edge to BrickStop B.E.A.S.T.

91.    I have only preliminary reviewed this product from literature and did not actually have a product to examine.  Even based on this preliminary review, however, I observed the following.

92.    The Alliance Gator Edge Paving Edge is injection molded out of plastic, as is the BrickStop product.  Both are available in eight-foot lengths. Exhibit AG.

93.    Like the BrickStop product, the Gator Edge has a wall and anchoring feet spaced at intervals along its length.

94.    The anchoring feet feature only one anchoring hole option for the Gator Edge as opposed to the two anchoring holes incorporated into the BrickStop B.E.A.S.T. product.

95.    The Gator Edge product is available in two forms; the first is a flexible version for contoured edging and the second a rigid version for straight edge sections.

96.    The flexible Gator Edge for contoured surfaces has spaced feet without stabilizing pads between them.  This would be a disadvantage compared to the BrickStop product if any twisting forces were encountered.

97.    The rigid product Gator Edge has stabilizing pads connecting adjacent anchoring feet that are not intended to be removed.

98.    A functional disadvantage of the Gator Edge system is that stores and installers would probably need the two different restraining strips for their landscaping project.

99.    Another disadvantage when comparing Gator Edge to BrickStop would be when installing in an application where both straight and contoured architecture occurs in less than section lengths and the flex and rigid models need to be interchanged with the twist lock connector system.

17

100.   The Gator Edge product, unlike the BrickStop B.E.A.S.T., is designed with vertical ribs connecting the restraining walls to the feet, is intended for outside placement away from the pavers. Placing the Gator Edge under the paving blocks is not practical, as the vertical ribs would prevent the paving blocks from setting into its intended surface.

101.   The Gator Edge feet are spaced approximately one every 3.84 inches along its length, while the BrickStop Paver Edger has about an 3.967 center to center anchoring foot pattern.

102.   As the illustrations of Exhibit AG show, the Gator Edge vertical rib extends up on the outside wall surface approximately three-fourths of the way.  Theoretically, this rib would provide much more support in compression for loads bearing against the opposite wall and serve to support the top of the wall more robustly than the BrickStop product.

## Comparison of Snap Edge to BrickStop B.E.A.S.T.

103.   I have only preliminary reviewed this product from literature and did not actually have a product to examine.  Even based on this preliminary review, however, I observed the following.

104.   The Snap Edge system, like all restrainer edge products has a wall and anchoring feet arrangement.  The anchoring feet are linearly located approximately every four inches and function to securely hold the restraint wall against the paver or landscape material.  Exhibit AH.

105.   The Snap Edge anchoring feet each have one restrained hole that features an elongated or raised boss that function as additional surfaces to contact the anchoring spikes.

106.   The Snap Edge restraint has spaced ribs that extend up the outside of the wall surface about three-fourths of an inch.  This would dictate that the restraint wall has to be on the outside of the pavers as opposed to an inside or under the paver application.

18

107.    The Snap Edge, like the BrickStop B.E.A.S.T. product can be utilized in both contoured and straight applications. The Snap Edge product, unlike the BrickStop product, features a connecting horizontal section that runs the entire length connecting the feet at furthest distance from the wall.

108.    The Snap Edge web site, Exhibit AH, advertises that the "snap and spike ends are patented" and that they are injection molded from plastic, but did not specify which plastic.

109.    The Snap Edge rib provides more wall support and stability in the immediate connector rib area than the BrickStop system due to the position and height of the vertical rib connecting the foot to the wall. However, the BrickStop product has greater overall linear stability with the width and ribbing on the anchoring foot.

110.    As noted in Exhibit AH, the Snap Edge product with its open architecture between the retaining wall and real edge will allow the growth of grass or vegetation.

111.    The BrickStop product has greater strength between the spaced support ribs of the Snap Edge product and should maintain a straighter linear section.

112.    BrickStop has more options as to number and placement of spikes or stakes over the Snap Edge product.

113.    The Snap Edge design allows for easier cutting of the outer section in contour applications over the rib and pad removal of the BrickStop product.

114.    Both the Snap Edge and BrickStop products comprise functional design features intended for the edging of landscaping products. It is my opinion that all design features are functional in all of the restraint products that I reviewed.

# Summary

115.   It is my opinion that all of the design components of the BrickStop B.E.A.S.T. and Valley View Diamond Edge products are functional in the application of providing a restraint edge for landscape products.

116.   The BrickStop B.E.A.S.T. and Valley View Diamond Edge have similar perimeter anchoring foot shapes, which serve the function of forming and containing the retaining edge restraint.

117.   The design approach of the spike and stake openings differs, with the exception of the first hole closest to the restraint wall.

118.   The BrickStop product has two anchor openings, while the Valley View product has three anchor openings.

119.   The quad lobed opening of the BrickStop product functions as either a straight or spiral spike or stake opening.  The Chevron opening of the Valley View product serves only as a stake opening.

120.   The BrickStop product is molded, in my opinion without performing a laboratory analysis, from a neat polyolefin, with the high probability it is polypropylene.  The injection-molding of solid polyolefin's often results in a defect whereby the center of thick sections have voids as a result of the gate freezing off before the center of thicker sections freeze off. This hidden defect can substantially weaken the features of a structural product design.  The BrickStop product contains voids in at least one section.  Exhibit AI.

20

121.    The Valley View product is molded from a polypropylene with a chemical blowing agent added. Thus the part is considered structural foam molded. The same area where a void was noted on the BrickStop product does not exhibit a similar void due to the foam action in the foam injection-molding operation. Exhibit AI.

122.    The Valley View product has a larger perimeter wall (height and width) as well as larger strength ribs than the BrickStop product.

123.    When comparing a product molded from solid plastic to a structural foamed product, the structural foam product has about twice the rigidity over a structure with the equivalent amount of solid plastic. Rosato-Rosato writes on page 782: "However the structural foam cross section is analyzed, its composite nature still results in a two-fold increase in rigidity, compared to an equivalent amount of solid plastic, since the rigidity is a cubic function of wall thickness." Exhibit F.

124.    Rosato-Rosato continues on page 782: "The moment of inertia, $I_2$ is equal to: $I_x = bh^3/12$ where $b =$ width and $h =$ height. This commonly used approach provides acceptable accuracy when load-bearing requirements are minimal..." Exhibit F.

125.    Rosato-Rosato writes on page 782: "The second approach ignores the strength contribution of the core, and assumes that the two outer skis provide all the rigidity..." "The equivalent moment of inertia is then equal to: $I_x = b(h^3 - h^3{}_1)/12$. This formula results in conservative accuracy, since the core does contribute to the stress-absorbing function. It also adds a built in safety factor to a loaded beam or plate element when safety is a concern". Exhibit F.

126.    Rosato-Rosato then writes on page 784: "A third method is to convert the structural foam cross section to an equivalent I = beam section of solid resin material..." "The moment of inertia is then formulated as: $I_x = (bh^3 - (b - b_1)(b-2t_w)^3)/12$ where $b_1 = b(E_c)/(E_s)$; $E_c =$ modulus of

the core: $E_s$ = modulus of the skin; $t_{s \, (sic)}$ = thickness of the skin and $h_{t2}$ = height of the equivalent wet (core)." Exhibit F.

127.    What Rosato-Rosato tells us is that a solid beam has more strength over an I beam when both contain the same height and width.  However, when they have the same amount of material by weight, an "I" beam has about twice the rigidity.

128.    Rigidity will be a desired component function and will assist with the warpage normally associated with neat polypropylene in long injection molded parts.

129.    It is my expert opinion that the plastic materials and the injection molding process are appropriate in manufacturing a functional product in either foamed or neat polyolefin's.

130.    It is my expert opinion that all of the design elements of both the BrickStop B.E.A.S.T. and Valley View Diamond Edge products serve a functional purpose for the intended application.

131.    I'm of the opinion that the BrickStop and Valley View products have an advantage over competitive products due to the width of the outer foot wall section and provides for a sturdy footprint to support the restraining wall. The anchoring foot structure inside this wall forms the foundation connecting the anchoring holes to and with the restraining wall.  All design features function to add strength to resist deformation of the product in use.

132.    If this outer anchoring foot wall was omitted on the BrickStop or Valley View product the support to the restraining wall would be severely diminished.  Removing or interrupting any section of this wall would result in less support to the restraining wall.  Exhibit AJ.

133.    If the perpendicular section abutting the restraining wall was omitted on the BrickStop or Valley View product, the advantage of a wide foot print would be severely diminished.  Additionally the center stiffing pads would loose two of the outer rib supports, further weakening the restrainer wall.  Exhibit AK.

22

134.    The double angled surface, if eliminated or interrupted on the BrickStop or Valley View product, would eliminate the support of the quad lobed anchoring hole on the BrickStop product and render the outer spike and chevron stake opening useless on the Valley View product. Exhibit AL.

135.    The anchoring foot wall forming the end radius termination area on the BrickStop or Valley View product could not be removed or the outer anchoring opening would be rendered useless on both of the products. Exhibit AM.

136.    Should the "V" shaped ribs on the BrickStop or Valley View product be interrupted or removed the center support would be eliminated rendering the anchoring spike and/or stake hole regions practically useless. Exhibit AN.

137.    Removing the connector ribs between the anchoring feet on the BrickStop or Valley View product would remove a stiffing function between the anchoring feet and restraining wall, as well as removing a flow path for the plastic in the injection molding process and possibly creating a detrimental knit line in an area of high stress. Exhibit AO.

138.    The filled in area, connecting the "V" ribs to the outer wall serve the function of stabilizing the anchoring foot and the restraining wall on the BrickStop or Valley View product. Removal of this functional wall would weakening the support and remove torsional stiffing features, as well as weakening the product in either tension or compression forces in the application. Exhibit AP.

139.    The center stiffing pads on the BrickStop or Valley View product add strength and support to the connected anchoring feet and restraining wall in straight section applications. While they are intended to be disconnected in contoured applications, eliminating the pad all together would reduce the stiffness of the product. Exhibit AQ.

140.   Removing the four ejector pads on the BrickStop or Valley View product would force the mold builder to use smaller or alternative ejector mechanisms. Alternative mechanisms, including ejector sleeves and/or ejector blades would be a very costly endeavor and would not function as well in the ejection phase of the injection-molding operation. Utilizing smaller diameter ejector pins would result in extensive down time due to continuous replacement of ejector pins and subsequent mold damage. Exhibit AR.

141.   The center rib functions as a major strength element connecting the restraining wall via the outer wall, center "V" ribs and pads through the first anchoring hole to either the quad lobed opening in the BrickStop product or Valley View chevron shaped stake hole and outer spike hole opening. Removing this rib would greatly diminish the strength of the part. Exhibit AS.

142.   The anchoring openings on the BrickStop or Valley View product in the foot function to allow a straight spike, spiral spike or formed stake to secure the foot and restraint wall in the desired location. These openings allow the installer to secure the paving restraint in the desired location and provide the holding force to maintain that position. Obviously they cannot be eliminated and if a film of plastic were molded over it would make driving of the spike or stake more difficult. Exhibit AT.

143.   It is my opinion as an expert in the design of plastic parts and injection-molding that the BrickStop and Valley View products contain design features that serve as functional elements of the totality of the structure and removing or omitting any of these design and molded elements would diminish the overall effectiveness and operation of the product.

24

144.   I present this report for the preliminary injunction phase of the litigation.  I reserve the right to supplement it based on new facts as they become available.

145.   If called upon at trail, I can and will testify competently as a person with ordinary skills in the art of plastic part design and injection molding, as to the contents of my report.

Dated: August 4, 2008
Williams Bay, Wisconsin

_____
Robert W. Dealey

25

# Exhibit A

Page 26

# Robert W. (Bob) Dealey
## Curriculum Vitae
## Dealey's Mold Engineering, Inc.
## 351 Forest Drive, Williams Bay, WI 53191
## Phone 262-245-5800, Fax 262-245-5700
## MoldDoctor@DealeyME.com

Bob operates Dealey's Mold Engineering, Inc. A Plastics Management, Marketing and Technical Consulting Firm.  With 35 years plastics industry expertise he consults worldwide in injection mold tooling, injection molding, design, project management, operational analysis and productivity enhancement, troubleshooting, marketing studies, sales and operational strategy.

## Education
- BS Industrial Education Stout State College (University of Wisconsin-Stout) 1964
- Industrial and Plastics Engineering Courses, Milwaukee School of Engineering
- Numerous Courses, Seminars on Plastics, Plastic Part Design, Mold Design, Mold Building, Thermal Transfer in Molds, Geometric Toleranceing and Positioning, Plastics Molding, Management, Materials, Project Management, Design and Problem Solving.

## Work Experience
- Industrial Engineer Plastics - Electrical Manufacturer 1965-1966
- Tool Engineering Plastics - Electrical Manufacturer 1966-1969
- Supervisor -Tool & Manufacturing Engineering -Electrical Manufacturer 1970-1972
- Staff Tool Engineer - Automotive and Appliance Contract Manufacturer 1972-1979
- Manager of Tool Engineering and Model Shop - Appliance Manufacturer 1979-1982
- Manager of Engineering -- Molding, Tool and Runnerless Manufacturer 1983-1991
- Director of Engineering - Molding and Closure Manufacturer 1991-1994
- President-Plastics Management, Marketing and Technical Consulting Firm 1995-2008

## Honors
- Named Mold Designer of the Year, by the Mold Making and Mold Design Division of the Society of Plastics Engineers (SPE) 1994
- Elected to Honored Service Member of the Society of Plastics Engineers 1994
- Awarded patent on Runnerless Molding Component 1992
- Key Note Speaker, Modern Plastics Mold Expo -Detroit, MI 2000
- Key Note Speaker, Mexico Plastics Show - Guadalajara, Mexico 2001
- Named Manager of the Month Award by Closure Manufacture, 1992
- Received Plaque for Serving as Chair of the ITQ Foundation 1992
- Received Plaque for Special Recognition as Director of the ITQ Foundation 1991
- Awarded Plaque for Service of President of the MM&MD Division of SPE 1990
- Received PRIDE Award, Mold Making and Mold Design Division 1990
- Received PRIDE Award, Mold Making and Mold Design Division 1989

1

# Bob Dealey CV

## Membership and Offices

- Senior Member Society of Plastics Engineers since 1971
- Honored Member Society of Plastics Engineers since 1994
- Member of Milwaukee Section SPE Board of Directors since 2007
- Secretary, Milwaukee Section SPE 2007-2008
- Past President and member board of directors, MM&MD division of SPE
- Past President and member board of directors I.T. Quarnstrom Foundation
- Past Vice President and member board of directors NADC, Detroit, MI
- Member SPE Technical Volumes Committee and Seminar Advisory Board
- Founding Committee Member SPE Processors Conference
- Chairman - SME PMMA-PTMD Plastic Mold Committee 2000-2001
- Member Tri-State University Plastics Technology Advisory Board and Focus Team
- Member of SPE ANTEC Operating Committee 2008

## Seminars and Speaking Engagements

- SPE Mold Design and Mold Building Seminar Series 1996-2007
- SME and Tech-Trax Fundamentals of Mold Design 1996-2003
- SPI Injection Mold Concepts Seminars 2005-2008
- Akron Polymer Training Center, Injection Mold Design 2006-2008
- Mini Technical Conference – Milwaukee 2005
- CDA Use of Copper Alloys in Molds, 1995-2002
- Mold Design, Guadalajara Mexico, 2000-2007
- SPE ANTEC - Los Angeles, CA 1986
- SPE ANTEC - Atlanta GA 1989
- SPE ANTEC - Washington DC 1990
- SPE ANTEC - Charlotte, NC 2006
- SPE RETEC - Toronto, Canada 1987
- SPE RETEC - Southern California 1989
- SPE RETEC - Designing and Building Molds with Copper Alloys-Boston, MA 1996
- Mold Exposition 1986– Windsor, Canada
- Mold Making Technology 1998 – Columbus, OH
- Modern Plastics Mold Exposition 1998 & 2000– Detroit, MI
- Modern Plastics Mold Exposition 1999 – Chicago, IL
- Processors Work Shop 1999 - Greensboro, NC
- Injection Molding Conference 2000 - New Orleans, LA
- University of Massachusetts - Lowell - Lowell, MA 2000
- AMBA Fall Conference  - Chicago, IL 2001
- Mexico Plastics Institute - Guadalajara, Mexico 2001
- SPE Tech Fair - Kansas City, MO, Denver, CO and Salt Lake City, UT 2002

2

# Bob Dealey CV

- SPE Topical Conference - Harlingen, TX 2002
- Tool and Mold Expo - Anaheim, CA 2003
- General Electric – Molding Seminars, Toronto, Canada –1987
- Mid-Michigan SPE Section – Mold Design Presentation Midland, MI 2003
- Upper Mid-West SPE Section – Mold Design Seminar, Twin Cities, MN 2003
- Milwaukee SPE Section Mini-Tec – Mold Actions, Milwaukee, WI 2005
- Moraine Park Technical College, Mold Actions, West Bend, WI 2006
- International presenter of technical Injection Mold and Material related subjects, 1995-2001: (Belgium, Canada, China, Denmark, England, France, Germany, Italy, Japan, Mexico, Portugal, Spain, and Switzerland)
- Over 45 AMBA, CDA, SME, SPE and SPI presentations on molds and materials, 1995-2006: (Austin TX, Baltimore MD, Bartlesville OK, Bowling Green KY, Buffalo, NY, Chicago IL, City of Industry CA, Columbus NE, Dallas TX, Dayton OH, Denton TX, Denver CO, Detroit MI, El Paso TX, Greensboro NC, Greenville SC, Hartford CT, Indianapolis IN, Kansas City MO, Kalamazoo MI, Kingsport TN, Las Vegas NV, Lehigh Valley PA, Lincoln NE, Los Angeles CA, Louisville KY, Lowell MA, Midland MI, Milwaukee WI, Minneapolis MN, Nashville TN, Newark NJ, Omaha NE, Phoenix AZ, Pittsburgh PA, Philadelphia PA, Portland OR, Rockford, IL, Rochester NY, St. Louis MO, San Antonio TX, Sandusky OH, Salt Lake City UT, Toronto ON CA, Washington DC and Washington WV (and others)

## In Plant Technical Seminars
- Otakara Plasticicos, Guadalajara, Mexico Mold Design 2007
- Siemens VDO, Guadalajara, Mexico Injection Mold Design Tutorial, 2007
- Honda Corporation, Marysville, OH, Mold Design Techniques 2006-2007
- Intel, Chandler, AZ, Mold Design and Mold Building 2000
- Intel, Chandler, AZ, Trouble Shooting of the Injection Molding Process 2001
- Motorola – Libertyville, IL, Design of Molds for the Design Engineer 1998
- Eaton Corporation – Stevensville, MI, Mold Design 1999
- Alcoa – Howmet Division, Whitehall, MI, Mold Concepts for Ceramic Injection Molding Replacing Hand Book Molds 1997
- Alcoa – Howmet Division, Morristown, TN, Troubleshooting of the Transfer Molding Process 1998
- Lego, Ballon Denmark, Use of Thermal Transfer Materials in High Speed Injection Molds 1999
- Bemis Corporation, Mold Materials for Injection Molds, Sheboygan, WI 1997
- Bemis Corporation, Mold Materials for Injection Molds, Cedarburg, WI 1996
- Phillips Corporation, Use of Thermal Transfer Materials in Polyolifine Molding 1996
- Eastman Corporation, Use of High Thermal Mold Materials in Molding of Co-polyesters 1995

3

# Bob Dealey CV

## Publications

- Mold Making and Materials Chapter, SPI Plastics Engineering Handbook 5th Edition, Chapter 7, p. 201-238.
- Mold Design Chapter, SPE - Plastics Technician Toolbox-2002, The Society of Plastics Engineers, Volume 5, pp. 37-72.
- Mold Maintenance Chapter, SPE- Plastics Technician Toolbox-2002, The Society of Plastics Engineers, Volume 6, pp. 31-45.
- Collapsible Cores Chapter, SPE- Plastics Technician Toolbox-2002, The Society of Plastics Engineers, Volume 5, pp. 187-189.
- Copper Alloys - Mold Design Guidelines – CDA, Modern Mold & Tooling 2000
- Modern Mold & Tooling, Guia para el diseno de moldes, Nueve series patrocianadas por la, Cooper Development Association, Instituto Technologico de Plastico, A.C. Mexico, 2000.
- Contributing Editor, Modern Mold and Tooling, Modern Plastics and Modern Plastics International Magazines 1997-2003
- Injection Mold Design Tutorial, CD, Dealey's Mold Engineering, Inc. 2006
- Fundamentals of Injection Mold Design Tutorial for Motorola University, Dealey's Mold Engineering, Inc. 2008.

## Articles

- Bob Dealey, Don't Forget Mold Material Specifications Modern Mold & Tooling, April 1998, p. 12.
- Bob Dealey, Cheap Metal is Rotten to the Core, Modern Mold & Tooling, June 1998, p. 21
- Engelmann, P., Dawkins, E., Dealey, R., & Monfore, M., Getting heat out of the mold where water won't go. Technical Papers, volume 45, pp. 1063-1067, Brookfield, Ct: Society of Plastics Engineers, 1998
- Bob Dealey, Be Specific With Mold Finish Specifications, Modern Mold & Tooling, August 1998, p. 84.
- Bob Dealey, New Tool Stretches the Imagination, Modern Mold & Tooling, October 1998, p. 27.
- Bob Dealey, Mathematics Project Takes Shape in Very Intricate Mold, Modern Plastics, November 1998, p. 14.
- Bob Dealey, Mold Classification Needs Some Work, Modern Plastics, December 1998, p. 98.
- Bob Dealey, Expandable Cavity Shrinks Mold Size, Modern Mold & Tooling, February 1999, p. 18.

# Bob Dealey CV

- Bob Dealey, What is mold value and how do I get it, <u>Modern Mold and Tooling</u>, March 1999, p. 15.
- Bob Dealey, Sure-fire ways to pick a mold maker, <u>Modern Mold & Tooling</u>, April 1999, p. 18.
- Bob Dealey, Fifty Features are Molded into Demonstration Plaque, <u>Modern Mold & Tooling</u>, May 1999, p. 15.
- Englemann, P. and Dealey, R., Injection Mold Design Guidelines: Maximizing Performance Using Copper Alloys, <u>Modern Mold & Tooling</u>, May 1999, pp. 47-49.
- Bob Dealey, SPE Book Spells out Roto Tools, From Sand to Steel, <u>Modern Mold & Tooling</u>, June 1999, p. 14.
- Englemann, P. and Dealey, R., Injection Mold Design Guidelines: Maximizing Performance Using Copper Alloys, <u>Modern Mold & Tooling</u>, June 1999, pp. 45-48.
- Engelmann, P., Dawkins, E., Dealey, R., & Monfore, M., Maintaining the thermal balance core to cavity: The key to cooling efficiency. <u>Technical Papers</u>, volume 45, pp. 1048-1052. Brookfield, Ct: Society of Plastics Engineers. 1999.
- Hayden, K., Engelmann, P., Dealey, R., & Monfore, M., Mold wear vs. wall thickness: critical information for thin wall molding. <u>Technical Papers</u>, volume 45, pp. 1063-1067. Brookfield, Ct: Society of Plastics Engineers. 1999.
- Bob Dealey, Rapid Solidification Process: A new way to build molds, <u>Modern Mold & Tooling</u>, August 1999, p. 27.
- Englemann, P. and Dealey, R., Injection Mold Design Guidelines: Maximizing Performance Using Copper Alloys - Third in a series <u>Modern Mold & Tooling</u>, August 1999, pp. 47-50.
- Bob Dealey, Standardization of mold design makes sense, <u>Modern Mold & Tooling</u>, September 1999, p. 21.
- Englemann, P. and Dealey, R., Injection Mold Design Guidelines: Maximizing Performance Using Copper Alloys - Fourth in a series <u>Modern Mold & Tooling</u>, September 1999, pp. 57-60.
- Bob Dealey, Side action assembly is compact, reliable, <u>Modern Mold & Tooling</u>, October 1999, p. 17.
- Englemann, P. and Dealey, R., Injection Mold Design Guidelines: Maximizing Performance Using Copper Alloys - Fifth in a series <u>Modern Mold & Tooling</u>, October 1999, pp. 41-44.
- Bob Dealey, What development most shaped mold making?, <u>Modern Mold & Tooling</u>, November 1999, p. 22.
- Englemann, P. and Dealey, R., Injection Mold Design Guidelines: Maximizing Performance Using Copper Alloys- Sixth in a series <u>Modern Mold & Tooling</u>, November 1999, pp. 53-56.
- Bob Dealey, LighSpeed offers innovative approach for plastics training, <u>Modern Mold & Tooling</u>, December 1999, p. 18.

5

# Bob Dealey CV

- Englemann, P. and Dealey, R., Injection Mold Design Guidelines: Maximizing Performance Using Copper Alloys - Seventh in a series Modern Mold & Tooling, December 1999, pp. 37-40.
- Bob Dealey, What most shaped mold making in the 1900's?, Modern Mold & Tooling, January 2000, p. 16.
- Englemann, P. and Dealey, R., Injection Mold Design Guidelines: Maximizing Performance Using Copper Alloys - Eight in a series Modern Mold & Tooling, January 2000, pp. 49-52.
- Bob Dealey, What market studies tell us in tool procurement, Modern Mold & Tooling, February 2000, p. 11.
- Englemann, P. and Dealey, R., Injection Mold Design Guidelines: Maximizing Performance Using Copper Alloys - Ninth in a series Modern Mold & Tooling, February 2000, pp. 39-42.
- Bob Dealey, Some simple troubleshooting tips for injection molds, Modern Mold & Tooling, March 2000, p. 18.
- Bob Dealey, Locking cylinder holds slides in position, Modern Mold & Tooling, April 2000, p. 11.
- Bob Dealey, Caveat emptor when you go shopping in Hong Kong, Modern Mold & Tooling, May 2000, p. 14.
- Bob Dealey, Mold makers need competitive advantages, Modern Mold & Tooling, June 2000, p. 11.
- Bob Dealey, A survival checklist for the new millennium, Modern Mold & Tooling, July 2000, p. 11.
- Bob Dealey, Price shouldn't be the main competitive factor, Modern Mold & Tooling, August 2000, p. 11.
- Bob Dealey, Delivery and quality demands are crucial, Modern Mold & Tooling, September 2000, p. 11.
- Bob Dealey, Thrive on niches, technology, and services, Modern Mold & Tooling, October 2000, p. 12.
- Bob Dealey, Injection Mold Parting Lines, Modern Mold & Tooling, November 2000, p. 10.
- Bob Dealey, Ultrasonic Welding Associated Tooling, Modern Mold & Tooling, December 2000, p. 11.
- Englemann, P. and Dealey R., Modern Mold & Tooling, Mold Design Guidelines, A nine-part series sponsored by Copper Development Association, Modern Mold & Tooling, 2000.
- Bob Dealey, Evaluating an Injection Molding Operation from a Technical View Point, Modern Mold & Tooling, January 2000, p. 10.
- Bob Dealey, Generating 3-D CAD data or Reverse Engineering Mold Components from Non-Destructive Measurement, Modern Mold & Tooling, February 2000, p. 11.

6

# Bob Dealey CV

- Bob Dealey, Mold Quoting: The magic, art and science, <u>Modern Mold & Tooling</u>, March 2001, p. 10.
- Bob Dealey, Component Options for Plate Movement, <u>Modern Mold & Tooling</u>, April 2001, p. 11.
- Paul Engelmann, Kurt Hayden, Philip Guichelarr, Robert Dealey, Michael Monfore, Injection Mold Wear Mechanisms and Mold Design, <u>Plastics Engineering</u>, Society of Plastics Engineers, April 2001, pp. 40-42.
- Bob Dealey, Considerations for Mold Replacement, <u>Modern Mold & Tooling</u>, May 2001, p. M6.
- Bob Dealey, Considerations for Mold Replacement II, <u>Modern Mold & Tooling</u>, June 2001, p. M7.
- Bob Dealey, NTMA Mold Apprenticeship Award, Modern Plastics, July 2001, p.
- Bob Dealey, Metal Injection Molding aids Plastics Molding, <u>Modern Mold & Tooling</u>, August 2001, p. M3.
- Engelmann, P., Hayden, K., Guichelarr P., Monfore, M., & Dealey, R., Comparison of various hard coatings to protect copper mold components from erosive wear, <u>Technical Papers</u>, volume 47. Brookfield, Ct: Society of Plastics Engineers. 2001
- Hayden, K., Engelmann, P., Guichelarr P., Dealey R., & Monfore, M., Resistance to erosive wear by copper alloy mold components, <u>Technical Papers</u>, volume 47. Brookfield, Ct: Society of Plastics Engineers. 2001
- Bob Dealey, Method Assists a Mold's Setup on any Molding Machine, <u>Modern Mold & Tooling</u>, September 2001, p. M3.
- Bob Dealey, Tooling and Processing Insight for Plastic Auto Fuel Tanks, <u>Modern Mold & Tooling</u>, October 2001, p. M5.
- Bob Dealey, Considerations for Mold Replacement, <u>K-Show Daily</u>, October 25, 2001 p. 22.
- Hayden, K., Bob Dealey, Future Bright for Fuel Tanks, <u>K-Show Daily</u>, October 29, 2001 p. 23.
- Engelmann, P, Guichelaar P., Dealey, R. & Monfore, M., Resistance to erosive wear by copper alloy mold components. <u>Technical Papers</u>, volume 47,
- Bob Dealey, Insight on Mold Parting Lines, <u>Modern Mold & Tooling</u>, November 2001, p. M4.
- Bob Dealey, Build a Better Mold, and the Market will Respond, <u>Society of Plastics Industry-Mold Maker Trade Journal</u>, 2001 pp. 8-11.
- Bob Dealey, Cost-Evaluating an Injection Molding Operation, <u>Modern Mold & Tooling</u>, December 2001, p. M4.
- Engelmann, P., Hayden, K., Guichelarr P., Dealey, R. & Monfore, M., Entendendo os mecanismos de desgaste: A chave para a longevidade do molde. <u>Revista Plastico Industrial</u>, Brazil volume 32. 2001.
- Bob Dealey, Evaluating Mold Cost-Performance, <u>Modern Plastics</u>, January 2002, p. 59.

7

# Bob Dealey CV

- Bob Dealey, Mold Acceptance (Part I), <u>Modern Plastics,</u> filed for September 2003 edition
- Bob Dealey, Mold Acceptance (Part II), <u>Modern Plastics,</u> filed for October 2003 edition.
- Bob Dealey, Mold Acceptance (Part III), <u>Modern Plastics,</u> filed for November 2003 edition.
- Bob Dealey, Mold Acceptance (Part IV), <u>Modern Plastics,</u> filed for December 2003 edition.
- Bob Dealey and Pete Kambouris, Mold Engraving (Part I), <u>SPI Journal, Winter 2005.</u>
- Bob Dealey and Pete Kambouris, Mold Engraving (Part II), <u>SPI Journal, Spring 2005.</u>

## <u>Technical Expert-Legal Matters</u>

- D-M-E Company, as Manager of Engineering, coordinated with both outside and corporate legal, all matters related to intellectual property matters (patent, trade and service mark, propriety matters, copy right issues), for worldwide operation. Technical advisor, contact and engineering interface on legal matters for all advertising, catalog and technical literature, product liability, confidentiality and secrecy agreements, working agreements, engineering contracts, disclaimers, injury related to use and application of products and other customer related disputes. 1983-1990
- Continuation of patent litigation, retained by D-M-E Company, Madison Heights, MI 1994, Incoe vs. D-M-E (represent defendant) as technical advisor on patent litigation. Deposed in 1990. Trial found for the plaintiff.
- Retained by Phillips & Hale 2002, Tennessee, R.M. Engineering Vs. B & N Precision Tool & Die (represent defendant) as technical expert witness on mold contractual litigation. Case settled in favor of defendant after submission of expert report.
- Retained by Crowell-Moring, Washington DC, Sorenson vs. Daimler-Chrysler (represent defendant). 2003 Technical expert and research on patent litigation. Pre-trial settlement reached.
- Retained by ARC Industries, Schaumburg IL, ARC Industries vs. Seigel Robert (represent plaintiff). 2003 Expert witness on mold performance delivery issues. Case settled.
- Retained by Stark & Stark, Princeton NJ, 2003, LMT-Mercer Group vs. PolyOne Corporation, (represent plaintiff) expert witness on confidentiality agreement, trade secret litigation. Wrote expert opinion. Case settled in favor of plaintiff.

8

# Bob Dealey CV

- Retained by Tressler, Soderstrom, Maloney and Priess, DuPage, IL, Dekalb Molded Plastics Company vs. Contour Mold & Tool Corporation (represent defendant), Injection mold dispute. Wrote expert opinion. Deposed in 2003 and testified as expert witness in arbitration 2003.
- Retained by Beirne, Maynard & Parsons, Houston, TX, Furnace Company vs. Chevron-Phillips Corporation, (representing defendant) Plastic Product Liability 2004.  Settlement reached.
- Retained by Seyfarth Shaw LLP, Chicago IL, Plas-Tool Company vs. A-1 Tool Corporation (represented plaintiff), Contract Issue.  2004
- Retained by Banner & Witcoff, Chicago IL, RTC Industries, Inc vs. William Merit & Associates, Inc, (represented plaintiff) Plastic Part Assembly Issue. Expert report written. 2005. Pre-trial settlement reached.
- Retained by Alston & Bird LLP, Atlanta GA, Maytag vs. Electrolux, (represented defendant), Plastic Processing and Plastic Part Patent Issue. Wrote expert opinion. 2005 - Deposed in 2006 as expert witness. Case dismissed in Summary Judgement.
- Retained by Igloo Corporation, Houston TX, Igloo Corporation vs. Van Dorn-Demag Corporation, (represented plaintiff), Injection Molding Machine Performance Issue. 2005 Pre-trial settlement reached.
- Retained by Novack and Macey, Chicago IL, Plas-Tool Company vs. A-1 Tool Corporation (representing plaintiff), Trade Secret Issue 2006
- Retained by Ropak Corporation, California, Ropak Corporation vs. Plastican, Inc. (represented plaintiff), Patent Infringement Issue 2006, Deposed in 2007 as expert witness, pre-trial settlement reached.
- Retained by Buckley, Richardson and Gelinas, Boston MA, Advanced Cable Ties vs. Bay State Cable Ties, Mr. James Pateneau and Roger Tool, (representing defendant Mr. James Patreneau) Trade Secret Issue 2006.
- Retained by Curtis, Mallet-Prevost, Colt and Mosle, New York, NY, Advanced Cable Ties vs. Bay State Cable Ties, Mr. James Pateneau and Roger Tool, (representing defendant Bay State Cable Ties) Trade Secret Issue 2006.
- Retained by Niro, Scavone, Haller & Niro, Chicago IL, Sorensen vs. Black and Decker (representing defendant) Patent issue 2007.
- Retained by BIC Corporation, BIC Corporation vs. Outsourcing Network, LLC, (representing plaintiff) Contract issue 2007.
- Retained by Weil, Gotshal & Menges,  Sorensen vs. Lexar, (representing defendant) Patent issue 2008
- Retained by Moore and Van Allen, Sunny Delight vs. Rexam, (representing defendant) Contract Issue 2008.

9

# Exhibit B

Page 37

# Robert W. (Bob) Dealey
## Work History
### Page I

I started working with the plastic processes of injection, compression, transfer molding and secondary operations in 1965 as an industrial engineer with Square D Company, a manufacturer of electrical control and distribution products.

My duties as industrial engineer included establishing standards for processing methods, manufacturing records, generating sequence of operations and developing routing sheets, application of plastic materials to routing sheets, implementing cost reductions, taking time studies, applying labor rates, and assigning jobs to machine categories.

During this time frame I had formal training within Square D in Industrial Engineering and attended Milwaukee School of Engineering and took class work on Time and Motion Studies and Methods Time Measurement Standards.

In 1966 I continued work with plastics at Square D, as a tool engineer-plastics, primarily responsible for new tooling, maintenance of existing tooling, incorporating engineering changes and repair of molds and machinery primarily used in thermoplastic injection molded products, but also included thermoset compression and transfer molding.

This position had responsibilities of taking a part from inception to production included interfacing with product design on new product plastic part development and new product engineering. Additionally it included advising product engineering on proper part design for manufactuability, selection and application of plastics materials, quoting plastics part cost, quoting of tooling, specifying and applying mold standards, placement of mold design and building, approving of part and mold designs, sampling molds, molding and testing of plastic materials, establishing of processing parameters and interfacing with plastic raw material suppliers and training set up and process technicians.

# Work History
## Page II

This was a period of major introductions of new and improved plastic materials and an important part of my assignment was to interface with plastic materials suppliers, research, review, obtain, sample, evaluate and apply materials to new parts and their designs.

In this time frame I attended Milwaukee School of Engineering and took two semesters of Polymer Chemistry, attended yearly conferences at the University of Wisconsin-Madison on Plastic Part Design and Molding and participated in Manufacturing Engineering training within Square D. Additionally, I presented the material on Injection Molding, Mold Design and Mold Quoting for internal use at Square D and presented a class on plastics for the Milwaukee Section of the Society of Plastics Engineers at Gateway Technical College.

I also attended numerous plastics seminars and conferences presented by General Electric, Du Pont, Celanese, Monsanto, Bayer, Durez, Society of Plastics Engineers and Plastic Engineering Company on subjects of Plastic Material Selection and Properties, Plastic Part Design, Mold Design, Injection and Compression Molding, Secondary Operations, Fits and Functions and Troubleshooting of Plastics Related Problems.

I was appointed to the position of Supervisor of Process Control in 1970 with the Tool and Manufacturing Engineers for all of Square D's fabrication and assembly departments in the Industrial Controller Division reporting to me. The plastics group tool and manufacturing engineers reported to my position and I approved all mold and tooling procurements and expenditures, processes, purchase of primary and secondary processing equipment and new part material application for the plastic group, along with duties in other fabrication and assembly groups.

During this time frame I had formal Management and Supervision training within Square D Company and continued to attend plastics and metals seminars and conferences related to our fabrication process including those presented by the Society of Plastics Industries, Society of Plastics Engineers, American Society of Quality, Society of Manufacturing Engineers, University of Wisconsin-Madison and University of Wisconsin-Milwaukee

# Work History
## Page III

From 1973 to 1979, I served as a staff Tool Engineer for Lake Center Industries, Gale Products Division, a contract manufacturer of components for automotive and appliances.

There I had total responsibilities for the selection and specification of plastic materials, internal and external plastic part design consulting and costing of plastic products and molds. Additionally, I handled the primary tooling, secondary operation tooling and equipment acquisition. I also established the molding process, the procurement, design and building and approval of new molds, coordinated the mold sampling and the evaluating of plastic materials, handled mold introduction to production and performed mold, material and molding troubleshooting.

I interfaced with our customers and internal product design groups as well as plastic sales and technical service groups from suppliers of plastic materials. Our customers were the automotive OEM's, their tier one and two suppliers and small appliance marketing companies. An important aspect of my job was coordinating the sampling and evaluation of new or modified grades of plastics for our customer's applications, for product enhancement, problem resolution or cost reduction.

During this time frame I attended numerous conferences related to Plastic Part Design, Injection Molding, Mold Design, Geometric Tolerancing and Positioning, Plastic Molding Troubleshooting, Manufacturing and Quality Control. DuPont, General Electric, Hercules, Eastman, University of Wisconsin-Milwaukee and the Society of Plastics Engineers provided this training.

In 1979 I joined North American Systems, a large manufacturer of small appliances, as manager of tool engineering and the model shop. My major responsibilities included new tool procurement, engineering, design, building and introduction into production at custom molders and managing the generation of models and test equipment.

# Work History
## Page IV

Additionally, I advised product engineering on best practice of part design, plastic material application and specifications. I worked with material suppliers in material selection, and their technical support people with sampling, troubleshooting and developing best practice processing methods.

In this time frame took formal class work at Kent State University on Mechanical Drafting and Design and Computer Programming at the University of Akron. Additionally, I attended seminars and conferences on Plastic Material Selection, Plastic Part Design, Mold Design and Troubleshooting, presented by Bayer, Amoco and the Society of Plastics Engineers.

I joined D-M-E Company in 1983, first as a Senior Product Engineer responsible for runnerless molding systems and coordinator for plastics laboratory testing. Shortly after, I was named manager of mechanical engineering with the mechanical engineers and plastics lab reporting to my position. I was responsible for all mechanical design of tooling products, mold bases, mold components, internal plastic parts and runnerless molding systems. Later the electrical engineering group also reported to my position and the responsibilities included runnerless molding temperature and process control systems and my title was Manager of Engineering

The plastics laboratory was utilized to test internal and competitive products, demonstrate products to customers and provide a test site for plastic material suppliers where they could observe their materials being molded in a wide variety of runnerless molding systems and various molds under controlled and confidential conditions.

The engineering group and myself interfaced with customers and advised on plastic part design and application of our products for successful manufacturing in plastic and die cast related processes. Also, we were ultimately responsible for resolution of customer problems, be it product or plastic material related, in the application of our products. The chain of problem resolution went from inside to outside sales to the technical service group to the product engineers to myself.

# Work History
## Page V

Important parts of my job function were to liaison with outside and corporate legal and provide the technical input into intellectual property matters and liability issues as well as product liability issues. I routinely reviewed and signed confidentiality agreements from customers and material suppliers for D-M-E. I Collected, tracked, reviewed and archived patents related to plastics and die cast products and applications as well as submitted information related to patent applications for D-M-E.

During this period I attended numerous seminars, conferences and meetings Related to Plastics Material Properties, Plastic Part Design, Mold Design, Product Liability, Intellectual Property Matters, New Product Introduction, Die Cast Die Design, Quality Control and Control of Engineering Documentation.

DuPont, Monsanto, Bayer, Dow, Phillips, General Electric, Lawrence University, Oakland University, University of Wisconsin-Madison, University of Wisconsin-Milwaukee, University of Minnesota, Ferris State University, Society of Plastics Engineers, Society of Plastics Industry, and North American Die Cast Association conducted these offerings. Additionally, I delivered presentations at some of these conferences on Mold Design, Plastic Part Design, Mold Standards, Mold Components and Troubleshooting, and Applications.

I held the position of Director of Engineering for Seaquist Closures from 1991 to 1994. My major responsibilities were the quoting and placement of approximately seven million dollars annually for injection molds, primary and secondary operation tooling and equipment. My staff interfaced and advised on product design and productionizing of the equipment and handled new mold building and approval.

The group was responsible for troubleshooting of the injection molding process and interfaced with material suppliers in the application of materials and molding techniques unique to high cavitation unscrewing molding.

# Work History
## Page VI

In 1995 I formed Dealey's Mold Engineering, Inc., a plastics management marketing and technical consulting firm. I work with domestic and foreign clients in all phases of plastics manufacturing but specialize in the engineering design and building of injection molds and the injection molding process, productionizing, problem resolution and plastics and mold related marketing opportunities.

I present the Society of Plastics Engineering (SPE) Seminar on Mold Design and Mold Building and have held offices in the Mold Design and Mold Building Division of SPE. Also, I presented seminars for the Society of Manufacturing Engineers, Modern Mold and Tooling, Tech Trax, Standard Products Inc, Copper Development Association and University of Akron-Polymer Center on mold related subjects.

I've provided internal training for companies including: Alcoa (Howmet), Motorola, Eaton Corporation, Borg-Warner, Intel, General Electric, Honda, Phillips Electronics, Siemens and Universities including Ferris State University, Akron Polymer Institute, University of Massachuttes-Lowel, Oakland Community College and North Texas State University.

In 1994 I was name to Honored Member status and Mold Designer of the Year by SPE. I've made over 45 technical presentations to various plastic molding and/or mold-related interest groups with in the United States and international presentations in Asia, Europe and North America (Canada and Mexico).

Additionally, I authored the chapter on Mold Making and Materials for the SPI Handbook, 5th edition, the chapters on Mold Design and Mold Maintenance for the SPE-Plastics Technician Toolbox 2002 and co-authored the CDA Copper Alloys-Mold Design Guidelines - 2000. I was a contributing editor to Modern Mold and Tooling and Modern Plastics and Modern Plastics International magazine.

A Tutorial on Injection Mold Design that I generated was released in 2006 on a CD format for industry professionals to acquire technical knowledge of the injection mold design process.

# Exhibit C

Page 43

# List of References

Materials Reviewed for Preparation of my Report.

1. Section of Valley View Diamond Edge, Item #DPE-8. Exhibit D.

2. Section of BrickStop B.E.A.S.T. Exhibit D.

3. Injection Molding Handbook Edited by Dominick V. Rosato and Donald V. Rosato, © 1986 by Van Nostrand Reinhold Company Inc, LOC Number 84-25769, ISBN 0-442-27815-2, 15th printing. Exhibit F.

4. BrickStop website at www. brickstopcorporation.com

5. Valley View website at www.valleyviewind.com

6. Snap Edge website at www. snapedge.ca

7. Alliance Gator Edge website at www. alliancedp.com

8. Spikedge at www. Vannesstone.com/unilock/spikedge.htm

# Exhibit D

Page 45

# *New* DIAMOND PAVER EDGE

## P A V E R   R E S T R A I N T

1.85"

3"

*Use Valley View
Anchoring Stake or
10"/12" Nail*

The **NEW Diamond Paver Edging** (8 ft. length) is the most economically priced paver restraint on the market!! It has been added to our existing paver restraint product line. This is our most **Solid** paver restraint yet, though it can be easily converted to flexible 8' lengths.

**Additional anchor stakes recommended and sold separately. Five anchor stakes recommended per 8' length.**

30"



*Save $. Buy in pallet quantity.
Pallet consists of 63 bundles of 10.*

**DIAMOND PAVER EDGE ORDERING INFORMATION**

| Item # | Description | Pack |
|---|---|---|
| DPE-8 | 8' Diamond Paver Edge | 630/pallet (63 bundles of 10) |

*For additional paver restraints, displays and accessories, go to www.valleyviewind.com.*

**YOUR LOCAL DISTRIBUTOR:**

Valley View Industries
13834 S. Kostner Ave.
Crestwood, IL 60445
www.valleyviewind.com
info@valleyviewind.com

# **Valley View** ®
## *Industries*

**"Setting the landscape industry standard"**

Toll Free: (800) 323-9369 • (800) 323-3282 FAX
International: (708) 597-0885 • (708) 597-9959 FAX

# Exhibit E

Page 47

Valley View Section



Brick Stop Section



# Valley View Paver Edge Wall and Anchoring Foot



# Exhibit F

Page 51

Division of Gage Publishing Limited
164 Commander Boulevard
Agincourt, Ontario M1S 3C7, Canada

15 14 13 12 11 10 9 8 7 6 5 4 3 2 1

Library of Congress Cataloging in Publication Data

Main entry under title.

Injection molding handbook.

Includes index.
1. Injection molding of plastics—Handbooks, manuals, etc. I. Rosato, Dominick V. II. Rosato, Donald V. III. Society of Plastics Engineers. Injection Molding Division.
TP1150.I55   1985   668.4'12   84-25749
ISBN 0-442-37915-2



# INJECTION MOLDING HANDBOOK
## The Complete Molding Operation
## Technology, Performance, Economics

Edited by

**Dominick V. Rosato, P.E.**
University of Lowell

and

**Donald V. Rosato, Ph.D.**
Borg-Warner Chemicals/International Center
and University of Lowell



**VAN NOSTRAND REINHOLD COMPANY**
New York

Copyright © 1986 by Van Nostrand Reinhold Company Inc.

Library of Congress Catalog Card Number: 84-25769
ISBN: 0-442-27815-2

All rights reserved. No part of this work covered by the copyright hereon may
be reproduced or used in any form or by any means—graphic, electronic, or
mechanical, including photocopying, recording, taping, or information storage
and retrieval systems—without permission of the publisher.

Manufactured in the United States of America

Published by Van Nostrand Reinhold Company Inc.
135 West 50th Street
New York, New York 10020

Van Nostrand Reinhold Company Limited
Molly Millars Lane
Wokingham, Berkshire RG11 2FY, England

Van Nostrand Reinhold
480 Latrobe Street
Melbourne, Victoria 3000, Australia

Macmillan of Canada
Division of Gage Publishing Limited
164 Commander Boulevard
Agincourt, Ontario M1S 3C7, Canada

15 14 13 12 11 10 9 8 7 6 5 4 3 2 1

Library of Congress Cataloging in Publication Data

Main entry under title:

Injection molding handbook.

Includes index.
1. Injection molding of plastics—Handbooks, manuals,
etc. I. Rosato, Dominick V. II. Rosato, Donald V.
III. Society of Plastics Engineers. Injection Molding
Division.
TP1150.I55   1985        668.4'12        84-25769
ISBN 0-442-27815-2



nozzle equipment, or up to 35 pounds (15.9 kg) with single-nozzle equipment and hot-runner systems. Part size, in fact, is limited only by the size of existing equipment, while part complexity is only limited by tool design and material properties. Part cost can be kept in line through such advantages as parts consolidation, function integration, and assembly labor savings (32).

When an engineering plastic resin is used with the structural foam process, the material produced exhibits predictable behavior over a large range of temperatures. Its stress/strain curve shows a significantly linearly elastic region like other Hookean materials, up to the proportional limit.

However, since thermoplastics are visco elastic in nature, their properties are dependent on time, temperature, and strain-rate. The ratio of stress and strain is linear at low strain levels of 1 to 2 percent, and, therefore, standard elastic design principles can be applied up to the elastic transition point.

Large and complicated parts will usually require more critical structural evaluations to allow better predictions of load-bearing capabilities under both static and dynamic conditions. Thus, predictions require a careful analysis of the structural foam cross section.

The composite cross section of a structural foam part contains an ideal distribution of material with a solid skin outer region and a foamed core. The manufacturing process distributes a thick, almost impervious solid skin, which is in the range of 75 percent of the overall wall thickness at the extreme locations from the neutral axis (29-20a). These are the regions where the maximum compressive and tensile stresses occur in bending.

The simply supported beam has a load applied centrally. The upper skin goes into compression while the lower skin goes into tension, and a uniform bending curve will develop (Fig. 29-20b). However, this only happens if the shear rigidity or shear modulus of the cellular core is sufficiently high. If this is not the case, then both skins will deflect as independent members, thus eliminating the load-bearing capability of the composite structure (Fig. 29-20c).

The fact that the cellular core provides resistance against shear and buckling stresses implies an ideal density for a given foam wall thickness. This optimum thickness is critically important in the design of complex, stressed parts.

At a ¼-in wall (6.4 mm), for example, both modified polyphenylene oxide and polycarbonate resin exhibit the best processing, properties, and cost—in the range of 25 percent weight reduction. Laboratory tests show that with thinner walls, about 0.157 in. (4.0 mm), this ideal weight reduction decreases to 15 percent. When wall thickness reaches approximately 0.350 in. (8.9 mm), weight can be reduced 30 percent.

However the structural foam cross section is analyzed, its composite nature still results in a two-fold increase in rigidity, compared to an equivalent amount of solid plastic, since rigidity is a cubic function of wall thickness. This increased rigidity allows large structural parts to be designed with minimal distortion and deflection when stressed within recommended values for a particular foamable resin. Depending on the required analysis, the moment of inertia can be evaluated three ways.

In the first approach, the cross section is considered to be solid material (Fig. 29-21). The moment of inertia, $I_x$, is then equal to:

$$I_x = bh^3/12$$

where $b =$ width and $h =$ height. This commonly used approach provides acceptable accuracy when load-bearing requirements are minimal—for example, in the case of simple stresses—and when time/cost constraints prevent more exact analysis.

The second approach ignores the strength contribution of the core, and assumes that the two outer skins provide all the rigidity (Fig. 29-22). The equivalent moment of inertia is then equal to:

$$I_x = b(h^3 - h_1^3)/12$$

This formula results in conservative answers, since the core does contribute to the load-absorbing function. It also adds a

x
x
h
b
x
x
h
b

Fig. 29-21 Cross section of a solid material (32).

safety factor to a loaded beam or plate element when safety is a concern.

A third method is to convert the structural foam cross section to an equivalent I-beam section of solid resin material (Fig. 29-23). The moment of inertia is then formulated as:

$$I_e = [bh^3 - (b - b_1)(h - 2t_s)^3]/12$$

where $b_1 = b(E_c)/(E_s)$; $E_c$ = modulus of the core; $E_s$ = modulus of the skin; $t_s$ = thickness of the skin; and $h_1$ = height of the equivalent web (core). This approach may be necessary where operating conditions require stringent load-bearing capabilities without resorting to overdesign, and thus unnecessary costs. Such an analysis produces maximum accuracy and would be suitable for finite-element analysis on complex parts. However, the one difficulty with this method is that the core modulus and the as-molded variations in skin thicknesses cannot be accurately measured.

## Blowing Agents

Blowing agents, be they solid, liquid, or gaseous substances, are used to impart a cellular structure to molded thermoplastics. The blowing agent is a source of gas that can be used by the molder to control sink marks, provide resins savings, or manufacture structural foam parts (35).

In general, blowing agents can be classified as either physical or chemical. The physical blowing agents include compressed gases and volatile liquids. The volatile liquids are generally hydrocarbons such as hexane or pentane as well as other aliphatic hydrocarbons. The materials act as a source of gas by changing their physical state from liquid to gas during processing. Volatile liquids have not been extensively used in foaming thermoplastics to date.

The most widely used blowing agent of the physical type is compressed nitrogen. (Freon-22 gas has seen very limited use.) Nitrogen is injected directly into the polymer melt prior to injection. Advantages of nitrogen gas are that it is inert, leaves no decomposition residue, and is not limited to a specific decomposition temperature range.

In the United States nitrogen is by far the most widely used blowing agent, but in Europe chemical blowing agents are the most widely used. To a great extent this difference can be explained by the availability of structural foam equipment. Union Carbide has been a leader in promoting its structural foam process in the United States. In recent years, however, the structural foam equipment designed and

x
x
h
b
x
h
b

Fig. 29-22 Cross section of a sandwich structure.

# Exhibit G

Page 58

# Valley View Paver Edge Anchoring Foot

Rib Height

Rib Thickness

# Exhibit H

# Valley View Paver Edge Anchoring Foot



**30° Ribs
(60° Include Angle)**

# Exhibit I

# Valley View Paver Edge
## Anchoring Foot



Connecting Rib to
Chevron Opening

# Exhibit J

Page 64

# Valley View Paver Edge Anchoring Foot



Anchoring Hole For Chevron Shaped Stake

Anchoring Holes For Spikes

Ribs Connecting Chevron Shaped Hole to Walls

# Exhibit K

Page 66

# Valley View Paver Edge Anchoring Foot



Pads Joining Angled Ribs to Outer Wall

# Exhibit L

Page 68

# Valley View Paver Edge Anchoring Foot



Interconnecting Ribs And Flow Directors

Stabilizing Pad

# Exhibit M

Page 70

# Valley View Paver Edge



End Anchoring Foot

# Exhibit N

Page 72

Brickstop Corporation



### Edging - B.E.A.S.T.



**18 years experience and millions of feet of paver installations have gone into the development of B.E.A.S.T. which Brickstop Corporation distributes throughout the world.**

- **Super strength**
- **Super flexibility**
- **Amazing straight lines**
- **Perfect curves**
- **Pavers never looked this good**

### The BEAST advantages.

- Use edging for a perfect, long-lasting finish.
- It's easy to use.
- Just one piece that does both straight lines and curves.
- Withstands a wide temperature variance.
- Uses easy to find spiral nails.
- Designed to permit a lattice nailing pattern for strength and stability.
- Allows all natural vegetation growth.
- Backed up by a company with experience and staying power.

8 feet long x 1.75 inches high
3 inches deep x 2.5 inches wide



B.E.A.S.T.
can also be used
in reverse mode.

Profile | Installation | Architects | Distribution | Contact
B.E.A.S.T. | Son of the B.E.A.S.T. | Edgestar | Aluminum Edging | Plastic Edging | Bricktik | Geogrid | Nails
Hand Tools | Block & Paver Cutters | Lifting Equipment & Clamps | Landscape Accessories

Copyright © 2004 Brickstop Corporation. All rights reserved.
Site Design by: E-griculture Inc.

# Exhibit O

Page 74

Brick Stop Section



BrickStop Anchoring Foot

Tensile Forces

Compressive Forces

# Exhibit P

Page 77

# BrickStop Foot



# Exhibit Q

Page 79

# BrickStop "V" Ribs



30° "V" Ribs

# Exhibit R

Page 81

# BrickStop Connecting Pads



Connecting Pads Located Between Anchoring Feet

# Exhibit S

Page 83

# BrickStop Foot



Connecting Pads

# Exhibit T

# BrickStop End Foot



Covered End Foot

Exhibit U

Page 87

# BrickStop End Foot



Identification and
Warning Information

# Exhibit V

Page 89

# BrickStop Ejector Pads for Ejector Pins



Ejector Pads

# Exhibit W

Page 91

# BrickStop Ejector Pin Placement



Ejector Pads
For Ejector Pins

# Exhibit X

Page 93

BrickStop Wall





Valley View Wall

# Exhibit Y

Page 96

# Rib Height Comparison Between BrickStop and Valley View



# Exhibit Z

# Rib Width Comparison
# Between BrickStop and Valley View



Valley View

Rib Width Comparison

BrickStop

# Exhibit AA

Page 100

# "V" Rib Comparison
## Between BrickStop and Valley View



Valley View

"V" Rib Comparison

BrickStop

Exhibit AB

Page 102

# Center Rib Comparison
# Between BrickStop and Valley View



Valley View

Center Rib Comparison

BrickStop

# Exhibit AC

Page 104

# Stiffing Pad Comparison
# Between BrickStop and Valley View



# Exhibit AD

Page 106

# Stiffing Pad Height Comparison Between BrickStop and Valley View



# Exhibit AE

Page 108



BrickStop Paver Edge

Overall Length

10.320



Valley View Paver Edge

# Exhibit AF

Page 111



Spikedge™ is an innovative all-in-one edge restraint system that has the spikes connected right to the edge restraint, so that you have them where and when you need them. Made from the same super-strong material as the restraint itself, spikes have been conveniently attached to the edge restraint which easily snap off, giving you the right number of spikes for your installation. Spikedge™ reduces installation time and saves you money by eliminating the need for costly spikes.



**Dimensions:**
8'
2.44 m

**Installation:**
Spikedge™ can be installed in straight or curved applications. Simply snap one or more "stabilizer tabs", to allow Spikedge™ to flex for either inside or outside curved applications. 1. Remove spikes from strip with a knife or snips. 2. Snap our the "stabilizer tabs" (between base pads) for curved applications. 3. Using a 2 - 3 lb mallet to install spikes: Normal Load: walkways and patios 12" to 18" apart (on average every 4th hole). Heavy Load: driveways 12" apart (every 3rd hole). 4. Angle spikes inward, slightly towards the pavers when hammering them in. Hold spike with one hand while pounding in with the other to avoid vibration. (NOTE: hit spike head flush with mallet to avoid damaging the spike).

**Warning:**
NOTE: Do not install plastic spikes in gravels containing stones larger than 3/4" in diameter. CAUTION: Plastic may become brittle in cold weather. Always wear proper eye protection when installing plasic or metal spikes. Minimum radius 4 ft.

**Note:**
For exisiting installations simply peel away the sod from the edges of the pavers, remove the soil, add gravel, straighten the edge pavers if required, and install Spikedge™. Spikedge™ is made using a sophisticated foam injection process that produces a highly durable, weather resistant material. Unlike metal spikes that rust, Spikedge™ will not rust or decompose and will stand up to severe freeze and thaw conditions.

**Important:**
Read complete instructions on container prior to application.

# Exhibit AG

Alliance



# Exhibit AH

Page 115

Superior strength and simplicity...

...that's out of sight

**SNAP EDGE**

Snapedge Canada Ltd.
1-800-720-SNAP(7627)
Visit our website for more information
www.snapedge.ca

Made with Recycled Materials

Distributed by:

PRINTED IN CANADA

## Protect Your Investment

## Before & After

When it comes to turf barriers, SnapEdge is the ultimate edging choice.

### LIFETIME WARRANTY

Snapedge Canada Ltd. is proud of the quality standards engineered and manufactured into our products. That's why SnapEdge is guaranteed for a lifetime of use.

This lifetime warranty will apply to a lifetime of use by the original purchaser beginning on the date of purchase and covers all defects in components and manufacturing workmanship. In the event the product due to this defect. SnapEdge warranty may not be considered. Any self-installation voids the warranty.

For more information visit our website www.snapedge.ca

## Typical Cross Section

## Easy Installation

Ends interlock with each other for extra support, forming a tightly sealed joint with superior strength.

Secure Interlocking Ends

Outside Curve

Inside Curve

Inside Corner

Outside Corner

# Exhibit AI

Page 117



BrickStop Foot Rib

Void in Center of Rib

High Magnification



Valley View Paver Edge Anchoring Foot

High Magnification

Rib Area

# Exhibit AJ

Page 120

# BrickStop and Valley View Product



Valley View

Outer Anchoring Foot Wall

BrickStop

# Exhibit AK

Page 122

# BrickStop and Valley View Product



# Exhibit AL

Page 124

# BrickStop and Valley View Product

Valley View

Double Angled Wall

BrickStop

# Exhibit AM

Page 126

# BrickStop and Valley View Product



# Exhibit AN

Page 128

# BrickStop and Valley View Product



Valley View

"V" Shaped Ribs

BrickStop

# Exhibit AO

Page 130

# BrickStop and Valley View Product

Valley View

Connector Ribs

BrickStop

# Exhibit AP

Page 132

# BrickStop and Valley View Product



# Exhibit AQ

Page 134

# BrickStop and Valley View Product



# Exhibit AR

# BrickStop and Valley View Product

Valley View

Four Ejector Pads

BrickStop

# Exhibit AS

# BrickStop and Valley View Product

Valley View

Center Strength Rib

BrickStop

# Exhibit AT

Page 140

# BrickStop and Valley View Product



# Exhibit AU

Page 142

# New DIAMOND PAVER EDGE
## P A V E R   R E S T R A I N T

1.85"  3'

Use Valley View
Anchoring Stakes or
10"/12" Nail

The **NEW Diamond Paver Edging** (8 ft. length) is the most
economically priced paver restraint on the market!! It has been
added to our existing paver restraint product line. This is our most
**Solid** paver restraint yet, though it can be easily converted to
flexible 8' lengths.

**Additional anchor stakes recommended and sold
separately. Five anchor stakes recommended per
8' length.**



30"

Save $. Buy in pallet quantity.
Pallet consists of 63 bundles of 10.

**DIAMOND PAVER EDGE ORDERING INFORMATION**

| Item # | Description | Pack |
|---|---|---|
| DPE-8 | 8' Diamond Paver Edge | 10/bundle |
| DPE-8 | 8' Diamond Paver Edge | 630/pallet (63 bundles of 10) |
| RAS | | |

*For additional paver restraints, displays and accessories, go to www.valleyviewind.com.*

**YOUR LOCAL DISTRIBUTOR:**

Valley View Industries
13634 S. Kostner Ave.
Crestwood, IL 60445
www.valleyviewind.com
info@valleyviewind.com

# ValleyView®
## Industries

**"Setting the landscape industry standard"**

Toll Free: (800) 323-9369 • (800) 323-3262 FAX
International: (708) 597-0885 • (708) 597-9869 FAX

6

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

BRICKSTOP CORPORATION,                  )
                                        )
                    Plaintiff,          )        Case No. 08-CV-2690
                                        )
            v.                          )        Honorable Judge Gettleman
                                        )
VALLEY VIEW INDUSTRIES, H.C., INC.,     )        Magistrate Judge Cole
                                        )
                    Defendant.          )

## AFFIDAVIT OF FRANK SOUKUP

I, Frank Soukup, being duly sworn state that if called as a witness in the above-captioned

matter I would be competent to testify as follows:

## BACKGROUND

1.    I am the Plant Manager of Valley View Industries ("Valley View"), the defendant

in the current action. I started working at Valley View in 2006.

2.    My responsibilities at the plant include managing the entire Valley View Plant in

Crestwood, Illinois ("Crestwood facility"). This includes production, purchasing, and new

product development. With regard to production, I oversee shipping and receiving, the

warehouse, product and process engineering, and maintenance at the Crestwood facility. In

purchasing, I manage raw materials, equipment, and packaging materials, among other things.

3.    When Valley View started looking into the idea of creating an injection molded

paver restraint in the summer of 2007, I managed the design, manufacturing, and shipping

aspects of the new product. This new product was ultimately commercialized as the Diamond

Paver Edge or DPE-8.

CHGO1\31231598.3

## INITIAL RESEARCH FOR THE VALLEY VIEW PRODUCT

4.    Initially, I researched existing injection molded paver restraints in the market.  In this industry as in other industries, copying a competitor's unprotected design is an important way for a business to save money.  Looking at other designs is important because creating a new product design is time consuming and costly.  Starting from scratch would involve devoting members of my staff to testing different shapes and sizes to determine whether a design will even work, let alone work well.  I examined products from Snapedge, Dimex, and Brickstop, among others, so I would not have to "reinvent the wheel."  The Snapedge product is the industry leader but it was patented.  From my understanding, the Brickstop product did not have any patent protection.  Ultimately, basing the design of the Valley View DPE-8 on the sample of the Brickstop product represented a significant cost savings in man hours and materials.

5.    Also, design improvements were added over the Brickstop product.  I added a chevron for Valley View stakes to the design, increased the height of the wall, and increased the thickness of height of the joint at the end of each 8' strip of the DPE-8 to improve the interlocking feature of the product.  The DPE-8 also maintains a rough finish similar to our other product lines.

6.    There were many functional features that I noticed about the Brickstop product.  The overall arch design of the foot was appealing because some of our customers had requested one paver restraint product for both rigid and flexible applications.  Rigid products are ideal for straight paths but cannot be used for curved applications.  Flexible products are used for curved path applications but are not rigid enough for straight applications.  Like the Brickstop product, the DPE-8 is molded to be a rigid product but can be used in flexible applications by simply cutting out the supporting spacers between the feet.  See Exhibit A.

7.    The arch design of the foot allows for proper installation of inside curves. For inside curves (the feet are curved together), the arch design allows the foot not to overlap. See Exhibit B. Overlapping of the feet prohibits proper installation of the restraint.

8.    I also thought the Brickstop product design appeared strong due to the thick legs of the foot design. The greater thickness of the legs in comparison to that of the fill regions allows for greater rigidity and support without using as much material. For example, a foot utilizing these legs with limited foot areas would be stronger than a solid foot of the thickness of the fill areas. On the DPE-8, Leg Support A and Leg Support B are thicker than the Fill Regions C. See Exhibit C. The Fill Regions also add stability to both Leg Supports. Likewise, the Leg Supports allow the force from nails or stakes to be dispersed from the Anchoring Points: the Center Nail Hole, the Top Nail Hole, and/or the Stake Chevron. See Exhibit D. Also, having multiple Anchoring Points on each foot supports lattice nailing. Lattice nailing installations alternate nailing anchoring devices into the Top Nail Hole and the Center Nail Hole to support the paver restraint with a staggered anchoring configuration.

9.    The Open Areas in the foot create a cost savings by reducing material needed to make the product. Also, by reducing the weight of the finished product, we save on freight costs.

## OUTSIDE MANUFACTURER

10.    After settling on an initial design, I found an outside vendor to manufacturer our new product. I sent out different requests for proposals and information requests to a number of outside vendors such as: Buckhorn, FM Corporation, Horizon Plastics, DeKalb Plastics ("DeKalb"), among others. I also sent out samples of the Brickstop product to get the most accurate quotes possible. In the end, I recommended DeKalb because of its price quotes and its proximity to both our plant and some of our customers.

11.    As our chosen manufacturer, DeKalb acted as an "injection molded contract manufacturer" for Valley View and coordinated the search for an appropriate toolmaker as well as worked closely with me to create a suitable shipping method for our product.

**SHIPPING CONSIDERATIONS**

12.    Shipping the product to our customers was another project I managed. Valley View manufactures all of its products, with the exception of its planters and the DPE-8, "in house" at the Crestwood facility. We ship the bulk of our products from the Crestwood facility.

13.    Generally, when shipping, we want to "cube-out" or maximize the cubic space of the truck when shipping our product. That way we can save on freight costs. With the DPE-8, we needed to be able to include pallets on trucks loaded at Valley View as well as availability to have pallets of our new product shipped directly from our outside manufacturer to our customers according to different customer demands.

14.    DeKalb agreed to help me create a suitable pallet configuration as well as help with the other packaging aspects such as stretch wrapping or cable tying the product bundles. We had originally planned on shipping 1000 pieces per pallet. See Exhibit E. However, considering the cost, size, and weight of such a loaded pallet, we decided it was too prohibitive. In addition, feedback from Valley View's sales department indicated this was too large a quantity for many customers to handle. See Exhibit F.

15.    Although we want to be able to ship as much as possible to save on freight, the main concern is the need of our customers. A pallet that can hold a 1000 pieces of our product is great in theory, but if our customers do not have the proper forklift to take it off the truck, then that pallet is useless. Also, we have to take into account our customers warehouse and storage capability. Another consideration is the average order size. Because our customers are

CHGO1\31231598.2

suppliers, distributors, and dealers, it makes sense for them to be concerned about excess inventory. A pallet for 1000 pieces would simply be too expensive and take up too much space for all but the largest customers.

16.      We did not design our pallets to be identical to those of Brick Stop, though we looked at pallets of the Brick Stop product and Dimex product to get an idea how we might approach this problem. Unlike the Brick Stop product, the DPE-8 strips do not nest evenly. Likewise, the DPE-8 has a thicker joint on the end of the product. Therefore, DPE-8 has to be staggered to be stacked, necessitating a longer pallet.

17.      I asked DeKalb Plastics' Engineering Department if they could create a pallet that could handle 600 pieces. They were able to create a pallet configuration six (6) bundles high and nine (9) bundles wide, totaling 540 pieces. See Exhibit G. We increased the pallet configuration by adding one more layer of nine bundles, raising the number to 630 pieces, and were able to get closer to our target pallet configuration of 600 pieces. See Exhibit H. Even with the number of pieces established for our pallet configuration, we went through a few more iterations to get an acceptable configuration. We added additional supports underneath the pallets to support standard forklifts as well as tweaked the cross bracing on the sides of the pallet to protect the product. See Exhibit I.

Under 28 U.S.C. § 1746, I verify under penalty of perjury that the foregoing is true and correct.

Executed On: August 7, 2008        By:  *Frank Soukup*
                                          Frank Soukup

# Exhibit A



# Exhibit B

CHGO1\31241389.1

# Exhibit C

# Exhibit D



# Exhibit E

## Frank Soukup

| | |
|---|---|
| From: | Tina Walters [twalters@dekalbplastics.com] |
| Sent: | Monday, January 28, 2008 9:34 AM |
| To: | Frank Soukup |
| Cc: | Chet Kos |
| Subject: | CQ7728 4 Pavers.pdf - Adobe Reader |
| Attachments: | CQ7728 4 Pavers.pdf |

Good morning Frank,

Attached is the quote for the pavers, there was an increase in piece part price due to changing the packaging from 1000 pieces to 600 pieces.
There was also a increase in the cost of the resin, it went up $0.03 per pound.

We will need to have a revised PO.

Thank you,
Tina

Highly Confidential -
Attomeys' Eyes Only

VVW000071

1

# Exhibit F

**Frank Soukup**

From:          Frank Soukup
Sent:          Tuesday, January 22, 2008 8:57 AM
To:            Dominick Bertucci
Cc:            Frank Soukup
Subject:       RE: confirmation on pallet

There will be 60 bundles of 10 on each pallet. Each bundle of 10 will be strapped together with 10 columns of 6 bundles per column stacked on the pallet. The pallet size will be approximately 98"L x 34"W x 32"H. Each pallet will come shrink wrapped from the manufacturer ready for us to ship as is.

Frank Soukup
Plant Manager
Valley View Industries
13834 S. Kostner Avenue
Crestwood, Illinois 60445
P 708-597-0885
F 708-597-9959

From: Dominick Bertucci
Sent: Monday, January 21, 2008 9:05 PM
To: Frank Soukup
Subject: confirmation on pallet

Frank,
Please confirm how the pallet of 600 will be built. I need it to explain to distributors. People are asking for bundles of 10 strapped on a pallet for ease of distribution and working inventory off the pallet. Also, those pallets are going to have to be shrink wrapped either by us or the manufacturer.

Dominick

Highly Confidential -
Attorneys' Eyes Only

VVW000153

1

# Exhibit G

## Frank Soukup

| | |
|---|---|
| **From:** | Jeff Dorgelo [jdorgelo@dekalbplastics.com] |
| **Sent:** | Friday, February 15, 2008 1:58 PM |
| **To:** | Frank Soukup |
| **Cc:** | Chris Clear; Tina Walters |
| **Subject:** | FW: Valley View pack |
| **Attachments:** | nine per layer.JPG; four layers 21 inches.JPG; End View.JPG |

Good afternoon Frank,

After spending most of the day with your parts, please review the attached photos and comment on this pack.
The bundles were first rebuilt to offset the ends and then stretch wrapped. I was able to place nine (9) bundles on a layer orienting two layers so that for the most part the Edging remains flat across the width of the pallet and more importantly along its length. With the skid at 6" of height, I can confidently estimate 540 parts per skid: the six (6) layers of nine bundles each will fit on a pallet 47" wide, 9 ft long and 31" hi. The width includes 2" worth of vertically placed upright boards and the height includes the skid and a 1" board across the tops of the vertical boards that skid above would rest on.
Although the 97-1/2" skid shown in the photos has four pairs of uprights, the sample 9 foot skids coming in Monday will only have three pairs of uprights. We have requested the cost of this skid but have not received it from our vendor yet.
If we change away from the hand applied stretchwrap to something more rigid, we may only obtain 7 or 8 bundles per layer. I would be interested in finding out if you would entertain 'zip' ties rather than banding.

Looking forward to your reply,

Jeff Dorgelo

-----Original Message-----
**From:** Chris Clear
**Sent:** Thursday, February 14, 2008 5:23 PM
**To:** Jeff Dorgelo
**Subject:** Valley View pack

Frank at Valley View just called and said that he is getting a lot of pressure to define the pack (size & weight) so that his sales people can estimate the shipping costs for their customers.

His Goals: Step the ends so that the parts don't fan out so much
        Lay them so that the layers are flat
        Get 600 per skid
He is willing to sacrifice cubing out the truck to reach the above goals.
Cost is still a factor. They will still need to stack parts in the truck.

He indicated that you had probably discussed most of this, but he just needs to expedite the point of defining the size and weight.

Highly Confidential -
Attorneys' Eyes Only

VVW000054

1



Highly Confidential -
Attorneys' Eyes Only

VVW000055



Highly Confidential -
Attorneys' Eyes Only

VVW000056



Highly Confidential -
Attorneys' Eyes Only

VVW000057

# Exhibit H

## Business Center - Chicago

**From:** Jeff Dorgelo [jdorgelo@dekalbplastics.com]
**Sent:** Monday, February 18, 2008 8:43 AM
**To:** Frank Soukup
**Cc:** Chris Clear; Tina Walters
**Subject:** RE: Valley View pack

Good morning Frank,

Seven layers of nine bundles would yield 630 pieces per skid and take up 35 vertical inches in a trailer. Stacking them two high is the best scenario.
At 2.06 lbs apiece, 630 pieces would weigh 1300 lbs. Each skid is about 80 lbs.
Placing 2 rows of skids double stacked would mean 20 skids/ 53 ft trailer or 27,600 lbs (+/-) total
Please let me know if I can provide any further information.

Sincerely

Jeff Dorgelo

-----Original Message-----
**From:** Frank Soukup [mailto:fsoukup@valleyviewind.com]
**Sent:** Friday, February 15, 2008 6:02 PM
**To:** Jeff Dorgelo
**Cc:** Chris Clear; Tina Walters
**Subject:** RE: Valley View pack

Jeff,

I would like to go with 630 pcs per skid. We will probably get less pallets on the truck, but we can live with that more than less parts on a skid.

Please let me know what the final dimensions and pallet weight will be on Monday morning.

Thanks.

**Frank Soukup**
**Plant Manager**
**Valley View Industries**
**13834 S. Kostner Avenue**
**Crestwood, Illinois 60445**
**P 708-597-0685**
**F 708-597-9959**

**From:** Jeff Dorgelo [mailto:jdorgelo@dekalbplastics.com]
**Sent:** Friday, February 15, 2008 1:58 PM
**To:** Frank Soukup
**Cc:** Chris Clear; Tina Walters
**Subject:** FW: Valley View pack

Highly Confidential -
Attorneys' Eyes Only

VVW000203

Good afternoon Frank,

After spending most of the day with your parts, please review the attached photos and comment on

this pack.

The bundles were first rebuilt to offset the ends and then stretch wrapped. I was able to place nine (9) bundles on a layer orienting two layers so that for the most part the Edging remains flat across the width of the pallet and more importantly along its length. With the skid at 6" of height, I can confidently estimate 540 parts per skid: the six (6) layers of nine bundles each will fit on a pallet 47" wide, 9 ft long and 31" hi. The width includes 2" worth of vertically placed upright boards and the height includes the skid and a 1" board across the tops of the vertical boards that skid above would rest on.

Although the 97-1/2" skid shown in the photos has four pairs of uprights, the sample 9 foot skids coming in Monday will only have three pairs of uprights. We have requested the cost of this skid but have not received it from our vendor yet.

If we change away from the hand applied stretchwrap to something more rigid, we may only obtain 7 or 8 bundles per layer. I would be interested in finding out if you would entertain 'zip' ties rather than banding.

Looking forward to your reply,

Jeff Dorgelo

-----Original Message-----
**From:** Chris Clear
**Sent:** Thursday, February 14, 2008 5:23 PM
**To:** Jeff Dorgelo
**Subject:** Valley View pack

Frank at Valley View just called and said that he is getting a lot of pressure to define the pack (size & weight) so that his sales people can estimate the shipping costs for their customers.

His Goals: Step the ends so that the parts don't fan out so much
        Lay them so that the layers are flat
        Get 600 per skid
He is willing to sacrifice cubing out the truck to reach the above goals.
Cost is still a factor. They will still need to stack parts in the truck.

He indicated that you had probably discussed most of this, but he just needs to expedite the point of defining the size and weight.

Highly Confidential -
Attorneys' Eyes Only

VVW000204

# Exhibit I

## Business Center - Chicago

| | |
|---|---|
| **From:** | Frank Soukup |
| **Sent:** | Tuesday, May 06, 2008 11:48 AM |
| **To:** | 'Jeff Dorgelo' |

**Subject:** RE: Skid configuration

Jeff,

I received your fax regarding the packaging plan for the upcoming production run. Thanks for summarizing this. The plan looks great. This should give us the final info we need to settle on a final packaging plan.

Thanks again.

**Frank Soukup**
**Plant Manager**
**Valley View Industries**
**13834 S. Kostner Avenue**
**Crestwood, Illinois 60445**
**P 708-597-0885**
**F 708-597-9959**

**From:** Jeff Dorgelo [mailto:jdorgelo@dekalbplastics.com]
**Sent:** Monday, May 05, 2008 1:34 PM
**To:** Frank Soukup
**Subject:** RE: Skid configuration

Frank,

Thanks for the UPC info, we will be prepared to apply the stickers one at a time.

Regarding the skid cost and the quote- your price is based on three molding Operators whereas the original quote only had one Operator.
The cost of the skid, divided by 630 pieces per, can vary widely and still be only pennies per part. Trimming the gates, applying the sticker, stacking the parts in an offset manner, banding them and stacking them on the skid not to mention building the framework for the skid can only be accomplished by three people at this time. We did reduce your cost per part by being able to run the parts faster than we originally quoted but not enough to keep the price the same.

Sincerely

Jeff Dorgelo

    -----Original Message-----
    **From:** Frank Soukup [mailto:fsoukup@valleyviewind.com]
    **Sent:** Monday, May 05, 2008 11:27 AM
    **To:** Jeff Dorgelo
    **Subject:** RE: Skid configuration

Highly Confidential -
Attorneys' Eyes Only

VVW000332

    Jeff,

I sent you 50,000 more UPC labels to make sure you have enough for the upcoming production run. They are the 3" core. I am working on a smaller core diameter with the label supplier now. I will let you know the status once I have an update from him.

6/28/2008

**Frank Soukup**
**Plant Manager**
**Valley View Industries**
**13834 S. Kostner Avenue**
**Crestwood, Illinois 60445**
**P 708-597-0885**
**F 708-597-9959**

**From:** Jeff Dorgelo [mailto:jdorgelo@dekalbplastics.com]
**Sent:** Monday, April 28, 2008 9:43 AM
**To:** Frank Soukup
**Subject:** RE: Skid configuration

Frank,
We have approximately 30,000 UPC stickers left. If you order more, please consider having the roll made to a 1" core diameter and a 5" to 5-1/2" max OD to fit our hand applicator.
Thanks

Jeff D

-----Original Message-----
**From:** Frank Soukup [mailto:fsoukup@valleyviewind.com]
**Sent:** Friday, April 25, 2008 6:04 PM
**To:** Jeff Dorgelo
**Subject:** RE: Skid configuration

Jeff,

Please let me know how many UPC labels you have left for the DPE-8.

Thanks.

**Frank Soukup**
**Plant Manager**
**Valley View Industries**
**13834 S. Kostner Avenue**
**Crestwood, Illinois 60445**
**P 708-597-0885**
**F 708-597-9959**

**From:** Jeff Dorgelo [mailto:jdorgelo@dekalbplastics.com]
**Sent:** Friday, April 25, 2008 5:57 AM
**To:** Frank Soukup
**Subject:** RE: Skid configuration

Highly Confidential -
Attorneys' Eyes Only

VVW000333

Good morning Frank,

Attached is the revised skid drawing showing the side view. I have included the bottom boards on the end per your request. I was informed previously about the need to support the skid for standard length forks and have shown the second upright with the far edge 36" from the end of the skid. This is to support short forks (36") found on our standup lift truck.

Regarding the green production tickets, I have informed our Material Handlers to place the green production tickets on the outside of the stretchwrap and also notified our Shipping Dept to remove the green tickets prior to loading them on the trailer. Our ISO rules make us keep

the product identified in our plant at all times but they will be removed as they leave our building.

From our previous wood working experience we will attach the vertical boards with five screws using and X pattern with one at each end and one in the center. Nails will only be used to attach the horizontal top boards that support the skid above.

Sincerely,

Jeff Dorgelo x320

-----Original Message-----
**From:** Frank Soukup [mailto:fsoukup@valleyviewind.com]
**Sent:** Thursday, April 24, 2008 5:44 PM
**To:** Jeff Dorgelo
**Subject:** RE: Skid configuration

Hi Jeff,

I like the idea of the cross bracing on the sides. One other point of clarification, I think screws would be best for the vertical, horizontal and angled board attachment. I would also suggest a 3 point contact method.

There is an additional need on these pallets. Since we cannot be sure our customers are going to have extended forks, I need additional supports underneath the pallets to support standard 42" forks. One at each end and one about 32" from each end.

We delivered 10 pallets to our customer stacked on the truck and they did not off-load well with short forks. The deck boards were supporting the weight of the pallet. The pallet would tilt, some boards broke and the skid got hung up on the one underneath it. I will give you a call tomorrow to discuss in more detail.

One last issue is that I would like the green production tags taken off of the skids prior to shipment. Please pass this on to Jim Burns to make it part of the Inspection Report. I believe I need to sign off on the finalized Inspection Report of Jim's anyway.

Thanks.

**Frank Soukup**
**Plant Manager**
**Valley View Industries**
**13834 S. Kostner Avenue**
**Crestwood, Illinois 60445**
**P 708-597-6885**
**F 708-597-3959**

**From:** Jeff Dorgelo [mailto:jdorgelo@dekalbplastics.com]
**Sent:** Thursday, April 24, 2008 8:32 AM
**To:** Frank Soukup
**Subject:** Skid configuration

Highly Confidential -
Attorneys' Eyes Only

VVW000334

Good morning Frank,

As we move forward closer to a production date for your Diamond Paver Edging, I just wanted to confirm the skid design and intentions prior to packing the parts. We plan to have all skids made with four bottom boards per you earlier request. The four bottom

boards will result in four vertical side boards on each side of the skid and four horizontal top boards that a full skid of parts will rest upon when they are stacked two high. Each vertical side board rests on top of the slightly extended bottom board for strength. If we stayed with three vertical boards the center uprights would only be held in place by the attaching screws and would most likely fail under load.

During this production run we will sample two different skid framing configurations to prevent the top load from racking the frame underneath. One half of your pending order will have one angled board on each side while the other half of your order will have two angled boards on each side. Please see the attached .pdf sketch and let me know if this is acceptable as we will order skids in advance of production.

Sincerely,

Jeff Dorgelo
Mfg Eng
DeKalb Molded Plastics
(260)868-2105 x320
(260)868-2537 fax.

Highly Confidential -
Attorneys' Eyes Only
VVW000335

CONFIDENTIAL - ATTORNEY'S EYES ONLY

1             IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF ILLINOIS

3    BRICKSTOP CORPORATION,        )

4              Plaintiff,          )

5       vs.                        ) No. 08 CV 2690

6    VALLEY VIEW INDUSTRIES, H.C.,)

7    INC.,                         )

8              Defendant.          )

9

10    THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL.

11

12            The 30(b)(6) deposition of BRICKSTOP

13   CORPORATION, by DAVID FRIEBERG, called for

14   examination, taken pursuant to the Federal Rules of

15   Civil Procedure of the United States District

16   Courts pertaining to the taking of depositions,

17   taken before DINA G. VILLIS, a Certified Shorthand

18   Reporter within and for the State of Illinois,

19   CSR No. 84-3400 of said state, at Suite 1900, 203

20   North LaSalle Street, Chicago, Illinois, on the

21   30th day of July, A.D. 2008, at 9:36 a.m.

22

23

24

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 2

1    PRESENT:

2          HOVEY WILLIAMS LLP,

3          (10801 Mastin Boulevard, Suite 1000,

4          Overland Park, Kansas  66210,

5          913-647-9050), by:

6          MR. SCOTT R. BROWN,

7          srb@hoveywilliams.com,

8                appeared on behalf of the Plaintiff;

9

10         DLA PIPER US LLP,

11         (203 North LaSalle Street, Suite 1900,

12         Chicago, Illinois  60601-1293,

13         312-368-4027), by:

14         MS. MONICA L. THOMPSON,

15         monica.thompson@dlapiper.com,

16               appeared on behalf of the Defendant.

17

18

19   ALSO PRESENT:

20         Mr. Rubin Kurtz.

21

22

23   REPORTED BY:  DINA G. VILLIS, CSR, RPR

24               CSR No. 84-3400

CONFIDENTIAL - ATTORNEY'S EYES ONLY

1    Valleys that we deal with as well.  It was

2    Valley --

3          Q.    Aspen Valley?

4          A.    No.  I don't know if we -- well, we may

5    have quoted them a price.  We may have quoted Aspen

6    Valley a price.

7                No.  It was Valley Mason, like, in

8    New Jersey.  That's all I can think of.

9          Q.    Now, were you the salesman for BrickStop

10   on each of those accounts, or is it your collective

11   knowledge of the --

12         A.    It's just my collective knowledge.

13         Q.    UniLock is located where?

14         A.    UniLock has corporate offices in

15   Georgetown, Ontario.  They also have manufacturing

16   facilities in the United States.  I'm not sure of

17   all the locations.

18                I know they're in Boston.  I know

19   they're in Ohio.  They're in New York, and they're

20   in Chicago.

21         Q.    With respect to UniLock, were they a

22   customer of the B.E.A.S.T. prior to 2008?

23         A.    We had been negotiating with them to

24   purchase the B.E.A.S.T., but they were not a

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 71

```
 1    customer of the B.E.A.S.T.

 2                 They purchase other edging products from

 3    us.

 4         Q.    As far as their location in Illinois,

 5    you have an exclusive distributor in Illinois,

 6    correct?

 7         A.    Correct.

 8         Q.    And that is?

 9         A.    Superior Stone.

10         Q.    So could you have even supplied the

11    UniLock location or distributor in Illinois with

12    B.E.A.S.T. product?

13         A.    We could have.

14         Q.    That would not have violated your

15    exclusivity with Superior Stone?

16         A.    No.  We had discussed the possibility of

17    selling UniLock with our exclusive distributor who

18    did not have a problem with us doing that.

19         Q.    And why would that be?

20         A.    Well, it was additional business for

21    him.

22                 I mean, we weren't going to do it for

23    nothing.  We had agreed to give him a piece of some

24    of the profits.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 72

1     Q.     So you would have paid your exclusive

2  distributor for the right to furnish to UniLock?

3     A.     Yes.  I mean, it would have -- it would

4  have probably still gone through the same channels.

5            Although, we may have shipped directly

6  to UniLock based on, I would assume, truckload

7  quantities because they're a large user of the

8  B.E.A.S.T. product, or could have been.

9     Q.     I understand, though.

10           You weren't going to be cutting out your

11  exclusive distributor?

12     A.     No, no, absolutely not.

13     Q.     You were going to pay him for whatever

14  you sold to UniLock?

15     A.     Correct.

16     Q.     With respect to UniLock, at what level

17  were you negotiating this potential purchase of

18  B.E.A.S.T.?

19     A.     We've actually been discussing

20  B.E.A.S.T. for probably several years; in fact,

21  likely from the time that we produced the product

22  in 2001.

23     Q.     So for eight years, you've been pursuing

24  the UniLock business?

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 73

1    A.    They were actually pursuing us to buy

2  the product and had been pursuing us to buy the

3  product for the last several years.

4    Q.    But they obviously weren't offering to

5  pay the price you wanted, correct?

6    A.    That's correct.

7    Q.    Otherwise, I would assume there would

8  have been a sale?

9    A.    That's correct.

10    Q.    And do you know whether or not anyone

11  from UniLock approached Valley View and asked them

12  to make a product comparable to B.E.A.S.T.?

13    A.    I don't know that for a fact.

14    Q.    Have you heard anything to that effect?

15    A.    We spoke to the UniLock people earlier

16  in the year.

17        UniLock told us that they had been

18  talking to Valley View and they were in

19  negotiations to purchase their new Diamond Edge

20  product.

21    Q.    Did they indicate to you that they had

22  requested that Valley View make the Diamond Edge

23  product?

24    A.    I'm not aware of that.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 91

1    well as through BrickStop, correct?

2            MR. BROWN:  Objection; vague.

3            MS. THOMPSON:  That's a goofy question.

4    So I'll try again.

5    BY MS. THOMPSON:

6        Q.    You were here during the testimony of

7    Mr. Kurtz when we were talking about the catalogs,

8    the products that are offered through BrickStop?

9        A.    Yes.

10       Q.    And there are products that are offered

11   by BrickStop for which BrickStop is not the

12   exclusive source, correct?

13       A.    Correct.

14       Q.    In fact, the nails that you sell with

15   the B.E.A.S.T. product, you're not the exclusive

16   source for those nails, are you?

17       A.    I wish I was.

18       Q.    I take that as a, "No, I am not"?

19       A.    No, I am not.

20       Q.    And have you had any other further

21   conversations or communications with Annes

22   Landscaping?

23       A.    I, myself, have not.

24       Q.    Do you know if anyone at BrickStop has

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 92

1    with respect to the sale of the B.E.A.S.T. and/or

2    the sale of a Valley View Diamond Paver Edge?

3         A.    I would believe so.  All my salesmen, if

4    they're doing their jobs correctly, should be in

5    touch with each and every one of their accounts at

6    least, you know, every couple of weeks.

7              So I would assume he certainly had

8    ongoing conversation with Eric.

9         Q.    Has any of it been reported to you?

10        A.    Not that I recall.

11        Q.    And Jason is aware of this lawsuit, is

12   he not?

13        A.    Yes.

14        Q.    And he would report to you anything that

15   he thought was -- or, you would expect him to

16   report to you anything that he thought was

17   important with respect to this lawsuit?

18        A.    Absolutely.

19        Q.    What about Lurveys?

20        A.    Again, Lurveys was not a customer that I

21   had sold directly.

22        Q.    Who did?

23        A.    Pardon me?

24        Q.    Who did sell?

CONFIDENTIAL - ATTORNEY'S EYES ONLY

1      A.     I'm not sure who the salesman on that

2   one is.

3             I do know -- again, it was likely a

4   situation of confusion where someone was also

5   offering them a similar product.

6      Q.     Let's keep the record clean on this.

7             What specifically do you know about the

8   Lurveys situation?  Do you have any recollection of

9   anyone having a conversation with you about

10  Lurveys?

11     A.     No.

12     Q.     And you don't, today as you sit here,

13  know who the salesperson was that handled the

14  Lurveys matter?

15     A.     I think it may have also been Jason.

16     Q.     But you don't have any recollection of a

17  conversation where Jason said, "I've got a

18  situation with Lurveys"?

19     A.     I recall that Jason would have come into

20  my office or did come into my office and say that

21  Lurveys had been offered a price on a -- on the

22  Diamond Paver Edge.

23             I don't know if we've sold Lurveys any

24  material this year.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 94

1    Q.    Had you sold them prior to 2008?

2    A.    I believe we have.

3    Q.    And you sold them B.E.A.S.T. product?

4    A.    I believe we have.

5    Q.    With respect to Lurveys, did you lower

6    the price for the B.E.A.S.T. to meet the

7    competition from Valley View?

8    A.    I would think so.

9    Q.    You don't know for certain?

10    A.    Not for certain.

11    Q.    To find out who handles Lurveys, you

12    would have to look at the ACT database?

13    A.    Yes.

14    Q.    And you, personally, as you sit here,

15    have no information as to what anyone from -- do

16    you know the person at Lurveys that would have

17    called?

18    A.    No.

19    Q.    So you don't have any information as to

20    what anyone from Lurveys actually said?

21    A.    No.

22    Q.    With respect to Allied Instrument -- or,

23    is it Allied Industrial?

24    A.    It's Allied Industrial Products.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 95

```
 1      Q.      Where are they located?

 2      A.      I believe Pennsylvania.

 3      Q.      I should have asked this.  Where is

 4   Lurveys located?

 5      A.      I'm not quite sure.

 6      Q.      Aren't they in Illinois?

 7      A.      I think so.

 8      Q.      Would that have been an account handled

 9   by Superior Stone?

10      A.      No.  That may have been one that was

11   excluded also from the previous arrangement when we

12   switched from Bend Industries over to Superior.

13   Bend used to be the exclusive.

14      Q.      Allied Instrument in Pennsylvania, who's

15   the salesperson?

16      A.      Jason Brown.  A good salesman.

17      Q.      Did he say anything specific to you with

18   respect to any conversations he had with Allied

19   Industrial?

20      A.      He did.

21      Q.      When was this conversation?

22      A.      That was probably one of the first

23   instances where we had to lower our price

24   considerably.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 96

1          I think the Valley View representative

2     was in his office at the time when he called us and

3     said that, "The Valley View rep is here.  He has a

4     product that looks exactly the same as the

5     B.E.A.S.T.

6          "We've been selling multiple pallets of

7     your B.E.A.S.T. for several years, and he's

8     offering me a price of" -- I think it was, like, 55

9     cents a foot, 58, 55.  It was a low price.

10         Jason was, you know -- he was disturbed,

11    obviously.  The commission goes to him for the

12    sale, and it was a large account.  He asked, "What

13    should I do about it?"

14         I said, "Well, we're going to have to

15    lower our price.  We have no choice."

16         I believe, you know, it was in the low

17    50s.

18    Q.    So you lowered your price?

19    A.    We lowered the price.

20    Q.    But nothing that Jason told you about

21    this -- do you recall anything that Jason said,

22    specifically in terms of words, that he attributed

23    to anyone from Allied Industrial?

24    A.    Not specifically, just that the salesman

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 97

```
 1    was there, and he was sitting with the salesman
 2    that Jason deals with at the time.
 3             And, you know, he's trying to sell him
 4    their --
 5        Q.   So the person -- do you know who the
 6    person was at Allied Instrument -- Industrial?
 7        A.   No.  It's not one of my accounts.
 8             So I don't deal with him directly.
 9        Q.   But from what Jason told you, there was
10    no reason -- or, it would appear that the person at
11    Allied Industrial knew who BrickStop was and who
12    Valley View was?
13        A.   Yes.
14        Q.   And he was playing two ends against the
15    middle for the best price.  Isn't that correct?
16        A.   That's correct.
17        Q.   And Earth Works, that's located in --
18        A.   I think in Minnesota.
19        Q.   And who's the salesperson on that one?
20        A.   It's also Jason.
21        Q.   What happened with Earth Works?
22        A.   I really don't recall the exact
23    circumstances.
24             I know it was, you know -- it was also a
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 98

1   case of Jason coming into our office and saying

2   that a salesman had approached Earth Works with an

3   identical-looking product for a lower price.

4          It alarmed Jason.  It obviously alarmed

5   us.  I don't know if we lowered the price, and I

6   don't recall if they ever ordered from us again.

7      Q.    So Earth Works had been, again, an

8   account for the B.E.A.S.T. prior to 2008?

9      A.    I believe they were.

10     Q.    And do you know the name of the person

11  at Earth Works who's responsible for purchasing

12  paver edge products?

13     A.    I do not.

14     Q.    With respect to the conversation with

15  Jason concerning Earth Works, do you know when it

16  took place, or can you place it in the context

17  of --

18     A.    Again, it was probably sometime in

19  March when they first came to market with a copy of

20  the B.E.A.S.T.

21     Q.    But you can't place it in any closer

22  context to the date or the time that the --

23     A.    I can't.

24     Q.    And do you know, when Jason came in --

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 99

1   or, told you about it, was it immediately after he

2   had had the phone call?  Was it several days?  Was

3   it weeks?

4           Do you have any idea of what the

5   proximity is?

6      A.    Again, I would assume, you know,

7   Jason -- I mean, our office is not much bigger than

8   the room here, our entire office.

9           So I assume he came in as soon as he

10  hung up the phone, alarmed and disturbed, and

11  brought the matter to our attention.

12     Q.    And you don't know, as you sit here

13  today, whether BrickStop lowered its price to Earth

14  Works?

15     A.    I'm quite sure we would have offered a

16  lower price if he, in fact, was offered a lower

17  price to keep our customer.

18          I didn't have the conversation with the

19  guy there.  So...

20     Q.    Is there anything that Jason told you

21  about this event that causes you to believe it was

22  anything other than a buyer playing two ends

23  against the middle for the best price on the same

24  product?

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 100

1      A.      No.

2      Q.      And then you mentioned a company, Valley

3  Mason.  They're in New Jersey?

4      A.      Yeah.

5      Q.      Who's the salesperson on that account?

6      A.      I think it might be Rubin.

7      Q.      And what is it you know about the Valley

8  Mason account that -- as it relates to the Diamond

9  Paver Edge?

10     A.      I didn't have the conversation, but I

11  believe they received the product, had a look at

12  it, said it's the same as the B.E.A.S.T. and threw

13  it in the garbage.

14     Q.      So they didn't call you and ask for a

15  lower price?

16     A.      No.

17     Q.      To your knowledge, they didn't do

18  anything other than say, "No, I don't want to buy

19  from Valley View"?

20     A.      Well, to my knowledge.  I don't know if

21  they've since purchased product from them or not.

22     Q.      When did you first -- I got the name

23  Valley Mason when we were talking about places that

24  you believe BrickStop had lowered its price in

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 101

```
 1    order to keep a customer.

 2         A.    It's my understanding that we may have

 3    had to lower the price to keep a customer or that

 4    we offered a lower price.

 5               I think in that situation, we didn't

 6    offer a lower price.

 7         Q.    But you still kept the customer?

 8         A.    Yes.

 9         Q.    So you're still selling B.E.A.S.T. to

10    Valley Mason?

11         A.    I'm not sure if they were ever buying

12    B.E.A.S.T. from us or if they were buying some of

13    our other edging products from us.

14               I can't answer that question.

15         Q.    So you don't know if they were ever a

16    customer for the B.E.A.S.T.?

17         A.    That's correct.  I don't know.

18         Q.    And other than someone calling and

19    saying he has a product that looks identical to the

20    B.E.A.S.T., do you know anything more about the

21    Valley Mason call?

22         A.    I don't.

23         Q.    You mentioned Al Train with respect to

24    UniLock.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 102

1              Al Train isn't at UniLock, correct?

2    A.    Correct.

3    Q.    He's at Superior Stone?

4    A.    Correct.

5    Q.    Had he previously been at UniLock?

6    A.    You mean as an employee?

7    Q.    Yes.

8    A.    Not to my knowledge.

9    Q.    You didn't ever deal with him at

10   UniLock?

11   A.    No.  I don't even think he was ever

12   involved with UniLock.

13   Q.    I'm just clearing that one up.

14            Has Al Train reported any instances to

15   you with respect to sales in competition with the

16   Diamond Paver Edge?

17   A.    Yes.

18   Q.    Which ones?

19   A.    I don't know specifically what accounts

20   he's referred to.  I do believe that he has had

21   situations where people have called him and said,

22   "We have been" -- "We have a product that appears

23   to be the B.E.A.S.T.  It looks identical to the

24   B.E.A.S.T."

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 103

1                    I'm aware of that.

2          Q.     Who called him?

3          A.     I'm not sure.  I don't know the name of

4    the individual.

5          Q.     And do you know whether or not Al Train

6    has had to lower the price to meet competition from

7    Diamond Paver Edge?

8          A.     I believe he probably has.

9          Q.     Well, "probably has" -- I'm asking --

10         A.     Well, I had to.

11         Q.     I'm asking you --

12         A.     I had to.

13         Q.     I'm asking you, do you have actual

14   knowledge of an event where he had to do that?

15         A.     Not actual knowledge.

16         Q.     And you have not had to lower a price to

17   Superior Stone due to the Diamond Paver Edge, have

18   you?

19         A.     Yes, I have.

20         Q.     When did that occur?

21         A.     At the time we found out that

22   Valley View was selling a competitive-looking

23   product to ours.

24         Q.     In March of this year?

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 109

1    sold my B.E.A.S.T. product to other accounts,

2    whereby these accounts were purchasing B.E.A.S.T.,

3    decided to try another product.  They decided to

4    try the Allied.

5              I'm trying to think specifically -- I

6    have had a customer, now that I think of it, in the

7    Maritimes in Canada who bought Allied, tried the

8    product.  Contractors tried the product.  Failed.

9              They called back and said, "We're going

10   to continue to work with the B.E.A.S.T."

11        Q.    "Failed" meaning what?

12        A.    Well, it obviously did not please

13   whoever the end user was who was using the product.

14        Q.    But you don't know specifically in what

15   regard it failed?

16        A.    Specifically in what regard it failed, I

17   do not know.

18        Q.    And the same thing with the Brickhold

19   product?  You've heard that there were dissatisfied

20   customers?

21        A.    Yeah.  Just in terms of -- the

22   Brickhold, particularly, just in terms of how it

23   worked.

24        Q.    And what about how it worked that didn't

CONFIDENTIAL - ATTORNEY'S EYES ONLY

1    please customers have you heard?

2        A.    Not that it failed, but that it was a

3    complicated product to cut because it was

4    basically -- the bottom of the foot is sort of like

5    one piece.

6            And they have to cut not little straps

7    like ours or a ridge, but they have to remove

8    portions of it.  It's just a lot of cutting.

9        Q.    A lot more cutting?

10       A.    A lot more cutting.

11       Q.    And going back to Al Train training

12   people in terms of how to sell the B.E.A.S.T., you

13   said that, you know, he would explain to them that

14   the features would work.

15            What features, is what I was asking you

16   when you got to -- we got sidetracked.

17       A.    The fact that, A, it was a reversible

18   edge, that they could install it both in its

19   standard form and reversible form; B, that it was a

20   product that, you know, didn't have to be stocked

21   as a two-piece system.

22            So basically, it would take up less

23   inventory for them to stock because they can have

24   one product that functions to do both; that it's a

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 169

1          So that was the first sighting.  There

2     was a skeletal illustration, and that was all that

3     you could see.

4          So when we first saw that, we saw it and

5     we said, "Well, maybe this is a stamped version and

6     not an extruded version," because it was sort of a

7     crude line drawing of our B.E.A.S.T. foot.  It did

8     look a heck of a lot like it, but that's all that

9     was there.

10          I would say shortly thereafter -- it

11     could have been a couple of weeks, and it could

12     have been, again, somewhere around the beginning of

13     March that this first appeared.

14          And that was the time I first would have

15     seen this.

16     Q.    Where did you first see it?

17     A.    I saw it on the Internet.

18     Q.    Did you ever see a hard copy of it? .

19     A.    No, I didn't.

20     Q.    After March 7th, have you ever seen an

21     Internet page that contained the same information

22     that you're looking at in Exhibit 20B?

23     A.    Not the same, but some of the

24     information is still on another page on their

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 174

1      Q.      Okay.

2      A.      And the fading line and the parting line

3    here which is also --

4      Q.      I'm sorry.  The fading line?

5      A.      If you -- actually, if you look back on

6    this image and if you look back on the image that's

7    in the computer currently today, there's a defining

8    parting line where it goes distinctively black to a

9    grey, okay?  There's a vertical line in the edge.

10            Just -- approximately just after this

11    little spike or tent peg, whatever you want to call

12    it, but thereafter, just going around -- and I have

13    pretty good eyes, that appears to be the B.E.A.S.T.

14    foot.  That still continues around the corner.  I

15    mean, they didn't go as far as changing that.

16            So if you look at it --

17      Q.      How can you tell that's the B.E.A.S.T.

18    foot?

19      A.      How can I tell it's the B.E.A.S.T.?

20      Q.      Right.

21      A.      Because it doesn't appear to have that

22    little chevron in there to try to make theirs look

23    different than mine.

24      Q.      The first one there, there's a blade of

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 175

1    grass where the chevron would appear, correct?

2         A.    Yeah.  There is a tiny little blade of

3    grass there, but you can clearly see that -- I

4    mean, I can see it, and you can see it.  It's

5    clear.

6              You cannot see this (indicating) little

7    piece of plastic that's coming in around the stake

8    that houses the chevron.  I can see it.  Maybe my

9    eyes are better than yours.

10        Q.    Maybe you're looking for something.  I

11   don't see it.

12        A.    I'm not looking for something.  You

13   asked me.  So I'm just trying to identify it.  I

14   see it.

15        Q.    And going back to -- but the bricks

16   themselves are no longer there?

17        A.    We agree on that.

18        Q.    And is there anything else that you have

19   found that you think is still --

20        A.    Other than the nail.

21        Q.    Oh.  Asking about the nail, what

22   distinguishes the nail that Gary Wein drew from any

23   other nail?

24              I mean, they're going to be the same,

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 176

1    aren't they, in terms of the height and the

2    relative position to the --

3         A.    They are.  Interesting that you would

4    ask me that.

5              However, in this photo, they're using a

6    common nail.  In our older artwork -- and this

7    image has been around for a long time -- we used

8    the common nail.

9              However, we've recently changed.  I

10   think in the last year or two, we went to a spiral

11   nail because it only made sense that the majority

12   of the nails we sell are spiral.

13             That's the only difference.  I mean, a

14   nail, yes, you're right.  A nail can be drawn as a

15   nail in many ways.  This is exactly what our nails

16   are pictured in our brochure, identically in the

17   same spot.

18        Q.    But your nails are currently spiral

19   nails?

20        A.    They are now, but there is artwork that

21   shows that they used to be a common nail.

22             You have some of that in your exhibits,

23   I believe.

24        Q.    And you're saying that just because this

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 177

1    is a common nail, that's why you believe it was the

2    same -- it's the same image?

3         MR. BROWN:  Objection; mischaracterizes

4    the previous testimony.

5    BY MS. THOMPSON:

6         Q.     That's my question.

7         A.     The question again?

8         Q.     Because this is a common nail, you

9    believe that's why it's the same image?

10        A.     That, and where it's placed, yes.

11        Q.     Where it's placed meaning -- wouldn't

12   you place the nail in one of the holes or

13   receptacle for it?

14        A.     You would, but it's a coincidence that

15   ours is also placed in the second hole from the end

16   so that they choose to put theirs from the second

17   hole from the end.

18             They could put it in the third or the

19   fourth or the fifth.

20        Q.     Or the first or the second?

21        A.     Anywhere.

22        Q.     Other than those items, you've not seen

23   anything in this particular advertisement that is

24   in current use -- or, that has been used since

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 178

1    March 7th of 2000?

2        A.    No.  Even in the reversible form, which

3    was there before, that was Gary's artwork, and they

4    removed everything else.

5            So the only thing I see that remains

6    there would be what we just went through.

7            MR. BROWN:  Is now a good time for a

8    break?

9            MS. THOMPSON:  Yeah.

10                        (WHEREUPON, a recess was had from

11                        2:14 p.m. until 2:41 p.m.)

12    BY MS. THOMPSON:

13        Q.    In your affidavit, you supplied certain

14    figures with respect to the purchase of ad words on

15    Google.

16            I think you said it was $7,000 that was

17    spent placing ad words on Google?

18        A.    Yes.

19        Q.    Now, you were here when I spoke to

20    Mr. Kurtz about that?

21        A.    Yes.

22        Q.    And do you have any other information

23    with respect to the use of the word "beast" on any

24    Google ad word?

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 219

1      Q.      Does anybody make plastic nails these

2   days?

3      A.      There are people who are making plastic

4   nails.  And in fact, we've considered it as well

5   just because the cost of steel is going through the

6   roof.  So...

7      Q.      And do any of the plastic nails have

8   ribbing on them?

9      A.      Not that I've seen.

10     Q.      Are they all just round or spiral?

11     A.      The only one I've ever seen has been

12  just the round common plastic, yeah.

13     Q.      Going now to Exhibit 12.

14     A.      Yeah.

15     Q.      These drawings are from later in your --

16  the evolution here?

17     A.      No.  Actually, I know what these

18  drawings are.

19             And these were drawings -- as Rubin

20  mentioned yesterday, very early on, when we started

21  marketing this product -- and I believe we first

22  went to market and started shipping B.E.A.S.T. in

23  April of 2001.

24             Very shortly after we started selling

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 220

1    our product and it was making its way into the

2    marketplace, Snap Edge alleged that we were

3    infringing on their patent.

4            They sent a cease and desist to us at

5    the time.  Obviously we did everything prior -- or,

6    at least we thought we did everything prior to this

7    allegation to avoid any instances where we'd be

8    infringing on Snap Edge's patent.

9            However, when we received notice from

10   Snap Edge and they put us in a position of cease

11   and desist, we thought, "Geez, maybe we should

12   change the product."

13        Q.    Okay.

14        A.    And so we went through a series of

15   different designs here to try and come up with

16   another design to replace the current product that

17   we were manufacturing.

18        Q.    Between the time of the drawings in

19   Exhibit 11 and the first drawing in Exhibit 12 --

20        A.    Yes.

21        Q.    -- are you aware of the existence of any

22   other drawings that BrickStop has that relate to

23   the development of the B.E.A.S.T. product?

24        A.    No.  These were the only documents that

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 221

1    we had on hand that had any pictures of the

2    B.E.A.S.T.

3        Q.    When you were developing the B.E.A.S.T.

4    product, did you ask anyone to run patent searches

5    for you to determine whether or not your product

6    would infringe an existing patent claim?

7        A.    Absolutely.

8        MR. BROWN:    I just want to caution the

9    witness.

10        You can answer these questions about

11   discussions with counsel, yes or no.  Do not reveal

12   the communications you received from counsel or

13   that you communicated to counsel.

14   BY MS. THOMPSON:

15       Q.    Why don't you let me ask the question

16   and give him a second to determine whether he wants

17   to object on attorney-client grounds.  I'm not

18   trying to dig into that.

19        I'm trying to understand, though, why

20   would BrickStop have engaged in the practice of

21   asking for a patent review of its product?

22       A.    To make sure that we were not infringing

23   on someone else's product.

24       Q.    Is that standard practice at BrickStop

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 222

1    before it introduces any new product?

2        A.    No.

3        Q.    Do you do it before the introduction of

4    any of your paver edging products?

5        A.    Yes.

6        Q.    So this was not the first patent search

7    that the firm BrickStop had done?

8        A.    That's correct.

9        Q.    With respect to determining whether or

10   not you were in violation of any -- or, could be in

11   violation of anyone else's rights, did you do

12   anything other than requesting a patent search?

13       A.    I'm not sure if, at that time, we had

14   sought legal opinion.

15            I'm not sure at what point in time we

16   had sought legal opinion, but we did contact

17   solicitors at some point in time to get a legal

18   opinion to basically satisfy us that we weren't

19   infringing on someone's patent.

20       Q.    You're talking about patents.

21       A.    Yes.

22       Q.    I'm asking any other type of search or

23   legal opinion -- and I don't want the opinion, per

24   se.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 223

1            I just want to know any other type of --

2    did you ask about copyrights?

3        A.    No, I don't think so.

4        Q.    Did you ask about trademarks with

5    respect to your product?

6        A.    Rubin would be able to answer those

7    questions probably better than myself only --

8        Q.    Are you aware of whether BrickStop asked

9    for an opinion on any other type of potential

10   protection for your product --

11       A.    I am not.

12       Q.    -- or potential area of infringement of

13   somebody else's rights?

14            That's what I'm asking.

15       A.    I am not.

16       Q.    To your knowledge, has BrickStop ever

17   asked counsel to do a trademark or trade dress type

18   of analysis before opening -- before introducing a

19   new paver edging product?

20       A.    No.

21       Q.    But you have done patents before?

22       A.    I, myself --

23       Q.    Not you, personally, but, I mean, the

24   company has asked for that information before

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 228

1  structural concerns?

2      A.      I'm having trouble answering the

3  question because there were so many different

4  variations of this product that led us to its final

5  design.

6          There was omissions. ·There was

7  additions.  There was deletions.  So I guess the

8  answer is, yes.

9      Q.      Did you ever discuss the possibility of

10  taking out the straight edge that's between the top

11  nail hole and the middle nail hole?

12      A.      No.

13      Q.      Did you have any discussions of

14  reducing -- of eliminating the legs on either side

15  of the top nail hole?

16          And it might be easier if we pull up the

17  picture in Exhibit 9 of the B.E.A.S.T. product.

18          For instance, did you ever have any

19  discussions that you recall about eliminating this

20  (indicating) stretch of --

21      A.      No.

22      Q.      -- this leg?

23      A.      ·No.

24      Q.      Or either of these two -- and by "this

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 229

1    leg," I'm going to go backwards in the alphabet.

2             So I think I'll call the first thing I

3    asked you about a "Z."

4        A.    Yeah.

5        Q.    And then removing either of these two

6    legs?  And I'm calling them "Y."

7        A.    The fact is, you really didn't need any

8    of this, but this was part of our design.

9             These -- I mean, the whole --

10       Q.    Well, you needed it in the sense that

11   you had to have something to support --

12       A.    If you wanted a second nail hole --

13       Q.    I have to finish the question.

14            You needed something, one of these

15   three, in order to have a second -- the nail hole

16   that's at the top or the apex of this foot,

17   correct?

18       A.    That is correct.

19       Q.    And this was the way that you

20   positioned -- this is the way you determined to

21   support that nail hole?

22       A.    Yes.

23       Q.    And you used the three legs?

24       A.    Yes.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 232

1          I don't recall if, at this point, it was

2     there when we were working to get this final

3     design.

4          At the time, these fill regions -- at

5     some point in time -- and it didn't have this "X"

6     brace.  It was still the original design.

7     Q.     I understand that.

8     A.     They weren't in there, okay?

9     Q.     When were they inserted?

10    A.     They were inserted after we had ran our

11    mold.

12         We pulled our pieces.  We looked at the

13    samples, and we found that there was a weakness in

14    this area (indicating).

15    Q.     A weakness in the foot?

16    A.     In the foot.

17    Q.     So they were added, then, to reinforce

18    that?

19    A.     These fill spaces were put in to give

20    that area some structure, okay?  They were also

21    overdone at the time.

22         And unfortunately, it was, again, a

23    situation where your plastics company is trying to

24    sell you more plastics.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 233

1          So they say, "Fill in this entire

2     region."

3          Q.    You think you could have filled in less

4     of it?

5          A.    A hundred percent.

6          Q.    But you're sure something had to be

7     filled in to add some structural stability to the

8     design of this foot?

9          A.    I am, yes.

10          Q.    Going back to the -- let me get this

11     right.  These (indicating) are the release pins?

12          A.    I'm not going to help you.

13          Q.    I know you're not.  You're a mean man.

14     Ejection?

15          A.    Close.  Ejector.

16          Q.    Ejector.  Well, actually, they're the

17     ejector pin platforms because these aren't the

18     pins; the pins are in the mold itself?

19          A.    Correct.

20          Q.    And the ejector pin platforms, you heard

21     Mr. Kurtz's testimony that one of the tool

22     designers placed on there --

23          A.    Yeah.

24          Q.    -- and nobody moved them or said

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 236

1    pins pushing the finished product up and out of the

2    mold?

3        A.    I haven't seen the actual pins.  Again,

4    I'm not going to get close to that machine when

5    it's opening and closing.  Thank you very much.

6        Q.    And you heard the discussion with

7    Mr. Kurtz with respect to, if there is a slope in

8    the design of the foot, from -- a slope in the

9    design of the foot will accommodate or will allow

10   for an internal curve when the spacers are removed?

11       MR. BROWN:  Objection; mischaracterizes

12   the previous testimony.

13   BY MS. THOMPSON:

14       Q.    You were here yesterday.

15             Do you remember that discussion?

16       A.    Yes.

17       Q.    And isn't it true that there is -- that

18   the use of a slope of some sort -- whether it's a

19   curve or a straight line, but the use of a slope in

20   the foot does allow for more of an interior bend on

21   the product in its flexible stage with the spacers

22   removed than you would have if that were a straight

23   edge and there would be an overlap?

24       A.    Curve, slope, straight line, one of them

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 237

1    could have come to a point, a triangle, but

2    something.

3         Q.     But something that has a -- something

4    that has some slope, whether it's curved or a

5    straight line?

6         A.     Yes.

7         Q.     Now, let's go back to Exhibit 12.

8                You had originally put this product out

9    and saw lots of advertisements that included

10   pictures of the product with only the straight bar?

11        A.     Yes.

12        Q.     And then the rest of Exhibit 12 are

13   various designs you considered for the spacer

14   after -- in order to accommodate the concerns of

15   Snap Edge, correct?

16        A.     Yes.

17        Q.     And I see everything in here, except for

18   the one you used.

19               Do you know when you first came up with

20   the spacer design that's currently in use?

21        A.     Yes.

22        Q.     When?

23        A.     Probably somewhere in late 2004 or early

24   2005.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 238

1        Q.     And Snap Edge didn't actually sue you.

2    Is that true?

3        A.     They did.

4        Q.     They did sue you?

5        A.     Yes.

6        Q.     Where did they sue you?

7        A.     In the United States and in Canada.

8        Q.     In the United States where?

9        A.     I believe we were being sued -- can I

10   ask Scott?

11            MR. BROWN:  Just give her what you recall.

12   BY THE WITNESS:

13        A.     I believe we were being sued in

14   Kansas City, Missouri.

15   BY MS. THOMPSON:

16        Q.     You'd remember Kansas City if you had to

17   go there.

18        A.     I've never been there.  I didn't have to

19   go.

20        Q.     Did you have to give -- did anyone from

21   BrickStop, to your knowledge, have to give a

22   deposition in connection with the suit brought by

23   Snap Edge?

24        A.     I don't believe so.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 239

1     Q.    I know you're not a lawyer yet, but do

2 you know how far that lawsuit went in terms of --

3 they filed a complaint?

4           That's how you start a lawsuit?

5     A.    You've seen my legal knowledge.  I've

6 screwed up already, but I don't, you know -- I

7 don't recall the actual process.

8           Yes, we were sued.  How far did we go --

9     Q.    Did you have to give discovery responses

10 the way you've given in this lawsuit?

11    A.    As we're sitting here face-to-face

12 today?  No.

13    Q.    Did you have to do it, though, on paper,

14 the way you've done previously in this lawsuit?

15    A.    I think, if all I can recall is, we just

16 filed a very simple, you know, statement saying,

17 "No, we weren't infringing on your product."

18          There may have been requests for other

19 documents because I know we were in the process of

20 assembling documents.

21          And I'm not sure exactly of the legal

22 requirements, but we were at the stage where we

23 were redacting and going through invoices and --

24    Q.    Having lots of fun?

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 240

```
1        A.     Tons of fun.

2        Q.     Do you know whether the suit was

3   mediated or -- strike that.

4               The suit was obviously settled, correct?

5        A.     Yes.

6        Q.     There was no final judgment rendered?

7        A.     Well, again, you know, there was a

8   settlement.

9               There were documents of such by the

10  Courts that satisfied everybody that there was no

11  longer reason to continue.  So...

12       Q.     But what I'm getting at is, no Court

13  said, "You're right.  You're wrong."  It was an

14  agreed resolution of the case between the parties.

15              Is that your understanding?

16       A.     Yes, that's my understanding.

17       Q.     And within the period of time from the

18  time the suit was filed to the time that you had

19  reached some resolution, do you know how long that

20  period was?

21       A.     No.

22       Q.     And with respect to this lawsuit, do you

23  know when it was filed?

24       A.     I don't recall when it was filed.  I can
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 241

```
 1    recall when it was settled.

 2        Q.      When was it settled?

 3        A.      I believe it was January of 2005.

 4        Q.      And was it BrickStop Corporation that

 5    was sued?

 6        A.      Yes.

 7        Q.      So BrickStop's name would appear in the

 8    name of that lawsuit?

 9        A.      Yes.

10        Q.      And was Snap Edge the name of the

11    plaintiff?

12        A.      Yes.

13        Q.      And as part of the settlement, did you

14    have to show a design that you were going to go to?

15        A.      Yes.

16        Q.      And so that's how you know that by

17    January 2005, you had arrived at or settled upon

18    the design that is currently part of the B.E.A.S.T.

19    spacer?

20        A.      Well, I remember that that was the date,

21    and that was basically around the time that, you

22    know, we had agreed to a configuration and

23    started -- well, reconfigure it and continue to

24    sell the product.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 244

1    Q.    That (indicating)?

2    A.    Yeah.

3    Q.    With respect to saying that it "may be

4    altered or removed without loss of product

5    functionality," I just want to be really clear.

6          You're not suggesting that the entire

7    foot could be completely removed without loss of

8    functionality of the B.E.A.S.T., correct?

9    A.    That's correct.  I mean, I was talking

10    about certain parts of the product that can be

11    removed that would not affect the strengths of this

12    product whatsoever.

13          And I performed tests to that extent to

14    illustrate and satisfy myself that these components

15    could be removed.  And it would not have any effect

16    on the part whatsoever.

17    Q.    What tests have you performed?

18    A.    Well, the easiest one was just taking a

19    knife and cutting out a couple of things on this

20    product to see if it would affect its integrity or

21    strength whatsoever.

22    Q.    You took out a knife.  And what did you

23    cut out?

24    A.    Well, first of all, I removed these two

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 247

1    tests that I conducted, there was no effect on the

2    product whatsoever.

3         Q.    Now, so I understand, you took out

4    completely the "D's"?

5         A.    No.  Just --

6         Q.    You just shaved them down to be an even

7    space, as opposed to a ridged leg?

8         A.    Yes.

9         Q.    And your tests were hand-done?

10        A.    Yes.

11        Q.    So you don't have any quantitative

12   measurements to present to me to show that there

13   was no --

14        A.    I do not.

15        Q.    Is that all the testing that you did?

16        A.    Yes.

17        Q.    Now, with respect to testing, did you or

18   anyone ever, to your knowledge, test the Diamond

19   Paver Edge product to determine whether or not it's

20   more brittle in its application than the B.E.A.S.T.

21   product?

22        A.    No.

23        Q.    And you are aware that Mr. Hutchinson

24   submitted an affidavit suggesting that products of

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 248

1    low pressure injection mold intend to be more

2    brittle than high pressure injection molding?

3        A.    That's what he claims in his --

4        Q.    Affidavit?

5        A.    -- affidavit, yes.

6        Q.    But you're not aware of any testing

7    where that was proven out using the Diamond Paver

8    Edge product?

9        A.    I'm unaware of any tests.

10        Q.    I know it seems like a long day, but I'm

11    really close to being done with you.

12            With that picture in front of you, do

13    you agree with what -- well, can you point out to

14    me what you believe is referred to as the

15    "structural rib reinforcement, SRR, for perfect

16    straight lines"?

17        A.    Frank Belmont -- and Rubin was incorrect

18    yesterday when he thought it might have been Daniel

19    Davidson because Daniel wasn't with us at the time

20    that we designed this product.

21            It was Frank, and Frank was coming up

22    with all sorts of things that were "SSR" and

23    "IDF" -- I mean, he came up with a lot of stuff.

24            And half of it we threw out the window,

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 249

1    and then some of it sounded good, and we said,

2    "Yeah.  Let's run with it."  So --

3        Q.    Well, you ran with that one in

4    advertisements, correct?

5        A.    Yeah.

6        Q.    So what was he referring to, do you

7    know?

8        A.    Yeah.  I think what he was referring

9    to -- and it would have been more apparent in the

10   original design, but we followed through with it

11   for the same reason -- I believe was this "D," the

12   upper portion of the -- that rib.

13       Q.    The very things you cut away with a

14   knife to determine that it was not --

15       A.    Yeah.  Again --

16       Q.    So you're telling people in your

17   advertisements that that is -- adds structural --

18       A.    That's marketing.

19       Q.    -- for perfect straight lines, but

20   you're telling me today that you tested it by

21   cutting it away, and you didn't -- you don't think

22   it is?

23       A.    It's the same thing.  It's just

24   marketing.  It sounds good.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 252

1    Q.    You never asked him what he meant by it?

2    A.    No.

3    Q.    What did you understand him to mean by

4    it, or what did you understand the term to mean,

5    "stable, sure-gripping footprint"?

6    A.    Like, all these edgings have some sort

7    of a footprint.  Ours was unique.  It was different

8    from everybody else's.

9          So it sounded like a great opportunity

10   to claim that it had a -- what are you calling it,

11   a footprint?

12   Q.    A "stable, sure-gripping footprint."

13   A.    Yes.  That would be the outline of our

14   product.

15   Q.    And what about it is stable and

16   sure-gripping?

17   A.    It sits on the ground flat, and it

18   provides a vertical edge.

19         The grip would be based on putting the

20   nail or two nails into it and holding it down into

21   the ground.

22   Q.    Is that what you understood when you

23   put -- do you know who approved the final wording

24   of advertisements?

8

Page 1

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS

2

3    BRICKSTOP CORPORATION,              )
                                         )
4                   Plaintiff,           )
                                         )
5              -vs-                      )  No. 1:08-CV-02690
                                         )
6    VALLEY VIEW INDUSTRIES, H.C. INC., )  Judge Gettleman
                                         )
7                   Defendant.           )

8

9

10          The deposition of RUBIN KURTZ, taken pursuant

11   to the Federal Rules of Civil Procedure of the United

12   States District Courts pertaining to the taking of

13   depositions, taken before CHRISTINE LIUBICICH,

14   Certified Shorthand Reporter of the State of Illinois,

15   at 203 , 19th Floor, Chicago, Illinois, on Tuesday,

16   July 29, 2008, at 9:15  a.m.

17

18

19

20

21

22

23

24

Page 2

1    APPEARANCES:

2        HOVEY WILLIAMS

3        (10 801 Mastin Boulevard, Suite 1000

4        Overland Park, Kansas City Missouri  66209) by

5        MR. SCOTT BROWN

6            appeared on behalf of Plaintiff;

7            Brickstop Corporation,

8

9        DLA PIPER US LLP

10       (203 North LaSalle Street, 19th Floor

11       Chicago, Illinois 60601-1293) by

12       MS. MONICA L.  THOMPSON

13           appeared on behalf of Defendant;

14           Valley View Industries, H.C., Inc.,

15   ALSO PRESENT:

16       DAVID FRIEBERG.

17

18

19

20   REPORTED BY CHRISTINE LIUBICICH, CSR.

21

22

23

24

1   million dollars and up.

2       Q.   With respect to BrickStop, did there ever

3   come a time when you did start handling more products

4   than just the single paver edger?

5       A.   Yes.  We developed a plastic paver edger to

6   go along with our aluminum.  We took on a line of

7   paving and stone splitting equipment out of Italy, hand

8   tools out of the Czech Republic, hand tools from Italy,

9   equipment from Denmark.

10      Q.   At what point in time did you develop your

11  plastic paver edger?

12      A.   That's a very good question.  I would

13  probably have to say sometime around 1998.

14      Q.   When did you bring it to market first?

15      A.   '98, '99.

16      Q.   And your plastic paver edger, what was its

17  configuration?

18      A.   Shaped like an L, put lattice nailing

19  positions in it.

20      Q.   Did you have a product name?

21      A.   Yes.  BrickStop Reversible Plastic Paver

22  Edging.

23      Q.   By lattice nailing what are you referring to?

24      A.   I'm referring to in each foot two nailing

Page 17

1    positions.

2        Q.    And it was made of plastic by what method?

3        A.    It was an extruded PVC.

4        Q.    And did BrickStop actually make this product?

5        A.    No.  We subcontracted it out.

6        Q.    At the time that BrickStop developed its

7    extruded PVC edger, were there other extruded plastic

8    paver edgers in the market?

9        A.    Yes, there was.

10        Q.    What others were you aware of at the time?

11        A.    Olyola.  Their product is called Brick Edge.

12    I came across Valley View had Diamond-Lok.  You asked

13    plastic paver edges?  Is that what you asked?

14        Q.    Sure.

15        A.    There was Permaloc came up with an aluminum

16    paver edge.  Curve-Right came up with an aluminum paver

17    edge.  Pave tech came up with an L-shaped paver edge.

18    There was also the Snap Edge.  Let's see who else was

19    making them at that time?  I'm not sure.  Dimex may

20    have entered the business already.

21        Q.    D-I-A-M-E-X?

22        A.    No.  D-I-M-E-X.

23              There was Borderscapes.

24        Q.    With respect to the BrickStop Plastic Paver

Page 25

1      Q.    So, yes, the larger majority of your sales

2    are in the United States?

3      A.    That's correct.

4      Q.    And it's still in the corridor that you

5    described as being east of Ohio sort of inclusive and

6    north --

7      A.    No.  It has spread.

8      Q.    To what other areas, or geographic areas?

9      A.    Well, we've got customers from California to

10    Georgia, Louisiana, Texas, Arizona.

11      Q.    How much business do you do in Texas?

12      A.    Not as much as I'd like.  Probably in Texas

13    60, 70,000 a year sales.  And that is because Texas has

14    a lot of sandy soil.  Edging doesn't hold well in sandy

15    soil.  My customers tell me that there is a lot of

16    illegal migrant workers employed in Texas, and they

17    don't have the frost conditions, so they find it maybe

18    cheaper to just trowel in some concrete next to the

19    pavers.

20      Q.    Going back to the statement of BrickStop as

21    an industry leader, what does it take, in your mind, to

22    qualify as an industry leader?

23      A.    Market penetration.  We're exceedingly

24    well-known in the market.

1       Q.   With respect to market penetration,

2   what percent of the market has BrickStop penetrated?

3       A.   I am not sure.

4       Q.   Do you even know how large the market is for

5   pavers today?

6       A.   For pavers?

7       Q.   Paver edgers.

8       A.   No.

9       Q.   So you don't know what percentage of the

10  paver edger market BrickStop sales represents?

11      A.   No.

12      Q.   Could it be as low as 2 percent?

13      A.   I wouldn't know.

14      Q.   Could it be as low as 3 percent?

15      A.   It would probably be substantial higher, but

16  what percentage, I couldn't tell.

17      Q.   What is the highest percent that you believe

18  that BrickStop actually makes of the paver edger

19  market?

20      MR. BROWN:  Objection.  Calls for speculation.

21  BY MS. THOMPSON:

22      Q.   Is that true?  You just totally would be

23  speculating?

24      A.   That's correct.

Page 38

1      A.   We own the tooling.  Actually, this isn't our

2  most up-to-date contractor catalogue.

3      Q.   Do you know when this catalogue that's

4  Exhibit 2 was in use?

5      A.   This was probably in use up until last year.

6      Q.   Okay.  On page Bates 1541 you have a Go Stick

7  it Brick --

8      A.   Brickstik.

9      Q.   Brickstik.  This is an adhesive, correct?

10     A.   That's correct.

11     Q.   And Brickstik is a trademark owned by

12  BrickStop?

13     A.   It hasn't been trademarked.

14     Q.   Do you consider it a trademark?

15     MR. BROWN:  Objection.  Calls for a legal

16  conclusion.

17  BY MS. THOMPSON:

18     Q.   You still get to answer.

19     A.   Okay.  Yes, I would consider the name --

20  seeing as we were the first ones to use that name and,

21  to my knowledge, this would be trademarkable.

22     Q.   With respect to the Brickstik product,

23  BrickStop does not manufacture it, does it?

24     A.   No.

Page 39

1      Q.    And do you own any formula for it, the

2  adhesive?

3      A.    No.

4      Q.    So you purchased it from a third party?

5      A.    It's a private label that's done for us.

6      Q.    Going back to the B.E.A.S.T. product, you do

7  consider the name B.E.A.S.T. a trademark, correct?

8      A.    That's correct.

9      Q.    And also the trade name or the designation

10  Son of B.E.A.S.T.?

11      A.    That's correct.

12      Q.    You consider a trademark?

13      A.    That's correct.

14      Q.    With respect to Aluminum Paver Edging, do you

15  have any trademark that you associate with that

16  product?

17      A.    Trademark of the BrickStop logo.

18      Q.    But the company logo --

19      A.    Yes.

20      Q.    And the Edgestar, you consider the word

21  Edgestar a trademark, correct?

22      A.    I would have to say so, yes.

23      Q.    On page 1542, Bates labeled, what are these

24  products that are depicted here?

1        A.    Those are Paver and Natural Stone and

2    Retaining Wall Splitters.  They are used to cut stone.

3        Q.    And are these products in any way trademarked

4    or labeled by BrickStop?

5        A.    No.  We are the manufacturers exclusive rep

6    in North America for Montotil.

7        Q.    M-O-N-T-O-L-I-T?

8        A.    Uh-huh.

9        Q.    And do these products have any Montolit

10    trademarks on them?

11        A.    Yes.  Montolit is a worldwide trademark.

12        Q.    With respect to, you said you were an

13    exclusive manufacturer rep?

14        A.    Uh-huh.

15        Q.    For what territory?

16        A.    North America.

17        Q.    With respect to these products, when did you

18    first start offering them through BrickStop?  I'm

19    referring to the Montolit.

20        A.    Not sure, but I assume it has been eight or

21    ten years.

22        Q.    On page 1543, have you Stone Block and Wall

23    Cutters?

24        A.    Yes, these are the same just larger sizes

1    made by Montolit.

2        Q.    You would have started carrying them --

3        A.    Same time.

4        Q.    And they are under your exclusive

5    manufacturers rep --

6        A.    Yes.

7        Q.    -- arrangement with Montolit?

8        A.    That's correct.

9        Q.    On page 1544, you have -- it's -- the title

10   of page is "Paver tools?"

11       A.    Correct.

12       Q.    Can you tell me what the ones in the

13   left-hand upper corner are?

14       A.    If I could see them.  There appears to be an

15   Extractor and the Paver-Pry.

16       Q.    And the extractor, is that sold under a

17   BrickStop trademark?

18       A.    No.

19       Q.    Who makes them?

20       A.    We subcontracted it out.

21       Q.    You don't have any particular brand name for

22   these extractors then?

23       A.    No.

24       Q.    But when you say you subcontracted it out, do

Page 42

1    you have any ownership of tooling, or do you simply

2    purchase it from another manufacturer?

3        A.    We just purchase it.  They make them for us.

4    We don't own the tooling.  There is no real tooling

5    involved in the manufacture that I know of anyway.

6        Q.    And the Simflex Extractor?

7        A.    Uh-huh.

8        Q.    Is that Simflex, is that the same as the

9    other paver --

10       A.    No.

11       Q.    Who makes the Simflex extractor?

12       A.    It's called Unique -- Unique -- it's called

13   Unique Fabricators, Unique Manufacturing.

14       Q.    And does BrickStop sell it under any kind of

15   executive arrangement?

16       A.    He makes them just for us.  We subcontract

17   him to make them.  He does not sell them.

18       Q.    So you have an exclusive arrangement?

19       A.    Yes.

20       Q.    Is Unique prohibited from selling this

21   product to anyone else?

22       A.    Unique isn't in that business.  They are a

23   metal manufacturer.

24       Q.    To your knowledge, are they prohibited from

Page 43

1    selling the product to anyone else?

2        A.    No.

3        Q.    Going to the far right-hand upper corner, it

4    looks like Rakes?

5        A.    Uh-huh.

6        Q.    Those are the products that BrickStop offers?

7        A.    That's correct.

8        Q.    Are they products that are made exclusively

9    for BrickStop?

10       A.    No.

11       Q.    Who makes them?

12       A.    Sureloc, actually those are made by

13   Wolverine Tools.

14       Q.    And you purchase them through Sureloc.

15       A.    Yes.   Sureloc and Wolverine are the same

16   company.

17       Q.    Sureloc, is S-U-R-E-L-O-K?

18       A.    L-O-C.

19       Q.    I knew one of them was missing.

20             Is there any business affiliation between

21   Sureloc and BrickStop other than that you purchase

22   products from each other?

23       A.    No.

24       Q.    What I'm getting at, there is no corporate

Page 44

1    affiliations between the companies?

2        A.    None.

3        Q.    The product that's shown as 504 Paver

4    Aligning Bar?

5        A.    Uh-huh.

6        Q.    -- that's a product that's exclusive to

7    BrickStop?

8        A.    No.  Lots of companies make Paver Aligning

9    Bars.

10       Q.    This particular one, do lots of companies

11   sell this particular paver aligning bar?

12       A.    Two or three.  Not ours.  They make their

13   own.

14       Q.    Who makes the paver aligning bar shown in

15   picture 504?

16       A.    For us?

17       Q.    Yes.

18       A.    Unique.

19       Q.    Is Unique prohibited, to your knowledge --

20       A.    No.

21       Q.    -- from selling this bar to anyone else?

22       A.    No.  Unique is not in that business at all.

23       Q.    I understand, but do you understand my

24   question?

Page 45

```
 1        A.    Yes.

 2        Q.    Going into picture 2505B, Paver Lifter, who

 3   makes that product?

 4        A.    Unique.

 5        Q.    Again, is Unique prohibited from selling it

 6   to anyone else?

 7        A.    No.

 8        Q.    Go to page 1545.  You have a series of

 9   hammers or mallets?

10        A.    That's correct.

11        Q.    These mallets are made by BrickStop?

12        A.    That's correct.

13        Q.    You purchase them from whom?

14        A.    BrickStop C-Zed.

15        Q.    From BrickStop C.

16        A.    Zed.

17        Q.    Z.  Is this an affiliated company?

18        A.    No.

19        Q.    And BrickStop CZ, do they sell these mallets

20   to anyone else?

21        A.    Yes, they do.

22        Q.    So there's no exclusivity with BrickStop --

23        A.    Exclusive to me in North America.

24        Q.    You have an exclusive arrangement in
```

1     North America?

2          A.    Yes.

3          Q.    What is the country of origin?

4          A.    Czech Republic.

5          Q.    And with respect to the gloves?

6          A.    We import those from China or Korea.

7          Q.    And the gloves are not an exclusive product

8     for BrickStop, correct?

9          A.    No.

10         Q.    They do carry a BrickStop logo on them, do

11    they not?

12         A.    The ones that are exclusively sold by us do

13    have the BrickStop logo.

14         Q.    And those are the ones that are sold

15    exclusively by you?

16         A.    That's correct.

17         Q.    But you don't manufacture them?

18         A.    No.

19         Q.    And Heavy Duty Clamp that's made in Denmark,

20    that's a product for which BrickStop is a rep?

21         A.    That's correct.

22         Q.    Is an exclusive representative?

23         A.    That's correct.

24         Q.    And what company makes the product?

Page 47

1      A.    BSV of Denmark.

2      Q.    Is that the same for the products that are on

3   page 1547?

4      A.    That's correct.

5      Q.    The built in fork pockets -- excuse me the

6   BSV32/38, 32/42 and scissor clamp model thing?

7      A.    Those are made by BSV.  Their logo is

8   prominently displayed on the paver.

9      Q.    And they are resold by BrickStop --

10     A.    By Brickstop on an exclusive basis for

11   North America.

12     Q.    And just so we are clear and so our court

13   reporter doesn't kill both of us, you have to let me

14   finish a question before you --

15     A.    Sorry.

16     Q.    -- before you start answering or saying

17   anything, because she can only take one at time.

18     A.    Okay.

19     Q.    Going on to page 1548, again, this is a

20   equipment that's at least the first one is a BSV

21   product?

22     A.    That's correct.

23     Q.    The Pallet Fork?

24     A.    Uh-huh.

Page 48

1       Q.   And the sections Clamp that says "Made in

2   Canada," who makes that product?

3       A.   Um, what's its name?  Padesco Manufacturing.

4       Q.   I'm sorry.

5       A.   P-A-D-E-S-C-O.

6       Q.   Padesco, does it manufacture this product

7   exclusively for BrickStop?

8       A.   No.

9       Q.   So it can be sold through other distributors?

10      A.   That's correct.

11      Q.   And the page 1549, the stone tree wall

12   carrier, who manufactures that?

13      A.   I don't remember the name of that company

14   actually.  David probably would know it, but I don't

15   remember their name.

16      Q.   Do you know if it's sold by BrickStop under

17   an exclusive arrangement?

18      A.   No, it's not.

19      Q.   So other manufacturers or distributors could

20   carry this product?

21      A.   Yes.

22      Q.   And then the Paver Cart, is that a product

23   that's made exclusively for BrickStop?

24      A.   No, it is not.

Page 49

1       Q.    And other distributors could carry this

2   Paver Cart?

3       A.    Yes.

4       Q.    Do you know who makes the the paver cart?

5       A.    Padesco.

6       Q.    On the last page, 1550, the installations

7   that are listed at the bottom of the page?

8       A.    That's correct.

9       Q.    Paramount Canada's Wonderland, I assume

10  that's Canada?

11      A.    Yes.

12      Q.    What about Top-of-the-World-Way, where is

13  that located?

14      A.    Greenbrooke, New Jersey.

15      Q.    So the underneath is the location?

16      A.    That's correct.

17      Q.    And the Gillette Stadium is in Massachusetts?

18      A.    That's correct.

19      Q.    What about the Pratt and Whitney?

20      A.    I'm not sure where they are.

21      Q.    Are they in the United States?

22      A.    Yes, they are.

23      Q.    The Riverbank Zoo is in Columbus,

24  South Carolina?

1      Q.    I thought you were the only one for 16 and

2    17 --

3      A.    I will be the only one.  That's fine with me.

4      Q.    We'll move on.  We'll do it anyway.

5      A.    Then go ahead.  Go for it.

6      Q.    In connection with this litigation, are you

7    aware that the papers presented to the court indicated

8    that over I believe the period from 2001 through the

9    present that $170,000 had been spent to advertise and

10   promote the B.E.A.S.T. configuration?

11     A.    Yes.

12     Q.    Did you in any way assist in determining that

13   number?

14     A.    Yes.  I actually got my hands dirty looking

15   through the old archive files pulling out invoices.

16     Q.    And that's I want to talk about.  What did

17   you do to derive that number?

18     A.    We went into our stocks and we pulled out box

19   after box, going forward, everything that we had on

20   hand, went through and looked for files that were

21   marked advertising, printing, things like that, culled

22   out everything that had the name B.E.A.S.T. or

23   B.E.A.S.T. in it, and pulled it aside and handed it off

24   to one of my employees who tabulated it.

Page 100

1      Q.    By tabulating it, they simply added up the

2   invoices?

3      A.    They added up the invoices that had the

4   B.E.A.S.T. in it, or if B.E.A.S.T. was mentioned, they

5   took the figure next to it.  If it was an invoice and

6   it had various printings on it, the part that said

7   B.E.A.S.T. printing or catalogue because it contained

8   the B.E.A.S.T., that's what they did?

9      Q.    This did you include in this tabulation

10   attendance at trade shows at which THE B.E.A.S.T. was

11   displayed?

12      A.    I believe so.

13      Q.    When tabulating the attendance at trade

14   shows, what cost did you include in that calculation?

15      A.    The booth cost, the shipping of our booth

16   down there.  I'm not sure if employee hotels were in

17   there and meals, but cost of the shows, et cetera.

18      Q.    With respect to booths when you advertise at

19   trade shows, you didn't limit your advertising in those

20   booths solely to the B.E.A.S.T. product?

21      A.    The B.E.A.S.T. is the most prominent part of

22   our display.

23      Q.    You did not limit your advertising solely to

24   the B.E.A.S.T. product, correct?

Page 102

1        Q.    You do have sell sheets that feature the

2    B.E.A.S.T. product?

3        A.    Yes.  Strictly the B-E-A-S-T.?

4        Q.    Or Son of B-E-A-S-T.

5        A.    Separate sell sheets.

6        Q.    You would have included in that catalogues

7    that featured the B.E.A.S.T. product?

8        A.    That's correct.

9        Q.    But the catalogues would also feature other

10   products that are sold by --

11       A.    That's correct, but 60 percent of our sales

12   are the B.E.A.S.T.

13       Q.    That's irrelevant to the question I'm asking

14   you.

15             The catalogue itself has page after page of

16   products other the B.E.A.S.T. in it?

17       A.    Yes, it does.

18       Q.    But you included the full course of those

19   catalogues in your calculation.

20       A.    I believe so.

21       Q.    You included in this calculation magazine

22   advertisements?

23       A.    That's correct.

24       Q.    Do you know what magazines BrickStop has

Page 104

1      Q.    In midstream.  You really do have to let me

2  finish.

3      A.    Sorry.

4      Q.    I did you include the price of the display

5  racks that could be used with the B.E.A.S.T. product?

6      A.    I believe so.

7      Q.    You included the price of shipped samples of

8  the B.E.A.S.T.?

9      A.    I believe so.

10     Q.    I'm going to show you what we will mark as

11  Exhibit 8.

12                       (Whereupon, Rubin Kurtz Exhibit 8

13                        marked.)

14  BY MS. THOMPSON:

15     Q.    And I'm going to represent to you these are

16  not consecutively ordered Bates numbers, so we are

17  going to look at the individual pages.  This is group

18  Exhibit 8.

19             New England Grows, is that a trade show that

20  you attended in 2007?

21     A.    Yes, it is.

22     Q.    And is that one that you, the cost for which

23  you included in your advertising figures for the

24  B.E.A.S.T. configuration?

1      A.    It seems so, yes.

2      Q.    On page one which is B1064, can you tell me

3    what this is?

4      A.    It appears to be some receipt of a paid

5    invoice.

6      Q.    Is this a paid invoice for a booth location

7    at the --

8      A.    I'm not exactly sure.

9      Q.    Do you know why page 1064 was produced to us

10   in this litigation?

11     A.    I do know why?

12     Q.    Yes.  Do you know the relevance of it?

13     A.    I am sure it must be an invoice that we

14   showed that we spent for advertising and promotion.

15     Q.    Do you know who Freeman is?

16     A.    Freeman, I believe, is the people that run

17   the show.

18     Q.    And this is an invoice produced by Freeman?

19     A.    Or else Freeman is the people that provide

20   the loading and the unloading of the show.  Which is

21   actually what I think they do, because the show costs

22   substantially more than $700.

23     Q.    That's what 1064 shows?

24     A.    Yeah.

Page 106

1    Q.    Perhaps if you go to page 1065 that

2    immediately follows it, that's still part of the

3    Freeman invoice?

4    A.    Freeman is the one who supplies the

5    accessories as far as tables, chairs, carpeting and, I

6    believe, they handle the freight of your material.

7    Because most of these shows are union shops where you

8    can't set up your own booth.

9    Q.    Trust me, I know.  I tripped over a cord, and

10   I couldn't plug it back in, because I'm not a union

11   person.

12   A.    So you've been there.

13   Q.    I've been there, done that.

14   A.    That's very aggravating.

15   Q.    One should not be a klutz at a trade show.

16         The point here is that 1065 Freeman provided

17   set-up --

18   A.    That's correct.

19   Q.    -- at the show, and you included the charges

20   for Freeman within your calculations of the

21   advertising --

22   A.    Yes.

23   Q.    -- expenditures for promoting the B.E.A.S.T.

24   product configuration?

1      A.    Yes.

2      Q.    Page 1029 which follows, can you tell me what

3   that is?

4      A.    First I have to find it.

5      Q.    I'm going to do them in sequential order, but

6   the numbers are not sequential.  I tried to pull

7   everything that had the same date or time on them.

8      A.    This, I believe, is a cab receipt.  I didn't

9   attend the show, but it appears to be a cab receipt.

10      Q.    And page 990, can you tell me what that is?

11      A.    I can barely read it.  No.  I can't even see

12   what it is.  Maybe a restaurant bill.

13      Q.    I see the words "PM Bar."  Do you see that

14   under it says "242?"

15      A.    I see the word PM Bar, and I see a time.

16      Q.    But you don't know what this particular

17   receipt is for?

18      A.    I believe it was for a charge, a drink or

19   something, or a meal at the show, or in conjunction

20   with the show.  The salesman has to eat.

21      Q.    Page 991?

22      A.    I can't see at all.  I see something about

23   terminal in Massachusetts.

24      Q.    And Lobsters to Fly at the bottom of the

1    receipt?

2        A.    Lobsters to Fly.  You can't buy a lobster for

3    $31.  This is obviously some receipt at the terminal,

4    and I would say it's probably from Legal Seafood, and

5    that's probably just what they have on the bottom of

6    their invoice.  They pack up lobsters.

7        Q.    The point is, this was probably a meal for

8    one of the participants of the show?

9        A.    Yes.

10       Q.    Page 992, it's a receipt from the Boston

11   Convention Exhibition --

12       A.    Yes, for a burger.  I can see that.  That was

13   a meal.

14       Q.    -- for a food court meal?

15       A.    Uh-huh.

16       Q.    And 993 which follows, is a cab fare receipt?

17       A.    Exactly.  Yes.

18       Q.    Page 994, is a MBTA receipt?

19       A.    I don't know what MBTA is.

20       Q.    Isn't that the public transport in Boston?

21       A.    I don't know, because I've not attended that

22   show.

23       Q.    Who did attend that show on behalf of

24   BrickStop?

Page 109

1      A.    I believe Merrick Frieberg.

2      Q.    Merrick Frieberg is related to

3   David Frieberg?  His son?

4      A.    He's not that old.

5      Q.    I'm sorry.

6      A.    It's his brother.

7      Q.    Merrick is also affiliated with

8   Cobble Systems?

9      A.    Not at all.

10      Q.    Was he ever?

11      A.    Never.

12      Q.    The next page, 995, another food receipt?

13      A.    Uh-huh.

14      Q.    996, another food receipt?

15      A.    Yes.

16      Q.    997, more food?

17      A.    More food.

18      Q.    998, a cab?

19      A.    A cab.

20      Q.    999, do you have any idea what that receipt

21   is for?

22      A.    It looks like a taxi.

23      Q.    1000?

24      A.    Another taxi.

1       Q.   1001, more food?  Actually, that's soda.

2       A.   That boy can eat.

3       Q.   1002?

4       A.   It's a coffee.

5       Q.   Coffee.  1009?  It says Country Breakfast

6    Buffet.

7       A.   More food.

8       Q.   1010?

9       A.   Food.

10      Q.   1011?

11      A.   Food.

12      Q.   1012?

13      A.   Food.

14      Q.   1013?

15      A.   This is Jason.  It's a different salesman.

16      Q.   Is this Jason Brown?

17      A.   Yes.  Perhaps they both attended.

18      Q.   The Barking Crab, more food?

19      A.   More food.

20      Q.   1114 Barking Crab?

21      A.   Food.

22      Q.   1015?

23      A.   Big eaters.  Food.

24      Q.   1016?

1       A.    I don't know.  It has no name, but it's food.

2       Q.    1019?

3       A.    Food.

4       Q.    1020?

5       A.    Some swordfish.  More food.

6       Q.    And 1025?  It's a car rental.

7       A.    It's a car rental, yes.

8       Q.    And 1026, hotel room?

9       A.    Hotel room, yes.

10      Q.    And that is a sample, I'm not saying

11  exclusive, but a sample of the type of charges that you

12  added up to come to the number that was --

13      A.    Have you added these up?  These are very,

14  very small amounts.

15      Q.    I'm asking the question.

16      A.    Were these included?

17      Q.    That these are samples of the charges that

18  were included?

19      A.    I assume they were.

20      Q.    In determining the advertising expenses used

21  to promote the B.E.A.S.T. configuration, did you also

22  include charges for Raptors tickets?

23      A.    We shouldn't have.

24      Q.    Do you have any knowledge as to why invoices

Page 112

```
 1   for Raptors tickets were produced to us?

 2        A.   No.

 3        Q.   But you would agree they shouldn't have been

 4   included?

 5        A.   Raptors tickets should not be included.

 6        Q.   Is there any reason that invoices for

 7   Cobble Systems should have been included?

 8        A.   No.

 9        Q.   Do you know why invoices for Cobble Systems

10   were produced to us?

11        A.   Must have been a mistake.

12        Q.   But you would agree they should not have been

13   included?

14        A.   They should not have been included.

15        Q.   Do you know whether or not Jason Brown, the

16   expenses for Jason Brown attending a trade show in

17   London were included in the --

18        A.   I didn't know they were.

19        Q.   -- overall expenses?

20        A.   I didn't know they were.

21        Q.   So you don't know if they were one way or the

22   other?

23        A.   No.

24        Q.   But you would agree that his attendance, the
```

1       Q.   Could it have been in February?

2       A.   It could very well have been.

3       Q.   And do you know when the first time anyone

4    spoke to Valley View, or communicated with Valley View,

5    with respect to it's diamond paver edge product?

6       A.   I believe Valley View was at the Nashville

7    show.

8       Q.   Was that you?

9       A.   No.

10      Q.   Who was it?

11      A.   David Frieberg.

12      MS. THOMPSON:   We've got to leave some fun for

13   David for tomorrow.

14      DAVID FRIEBERG:    Can't wait.

15   BY MS. THOMPSON:

16      Q.   In the papers that were filed in the

17   preliminary injunction, there was a statement that

18   $100,000 was spent on telemarketing and distribution

19   samples.  Do you remember that?

20      A.   Yes.

21      Q.   Do you know who calculated that amount?

22      A.   My staff.

23      Q.   Were you supervising them at the time?

24      A.   I was instructing them, but not supervising

1    them, no.

2         Q.    What did you instruct them to include in that

3    calculation?

4         A.    I instructed them to include taking out all

5    the samples that we sent, and you can judge them by the

6    weight of the package.  And take those all from UPS

7    files and add them up.

8         Q.    That was all samples of the B.E.A.S.T.?

9         A.    Samples of the B.E.A.S.T., our other

10   products; the box that said "Beware, B.E.A.S.T.

11   inside."

12        Q.    So other products may have been sent at the

13   same time?

14        A.    Yes.

15        Q.    And did you instruct them to make any

16   allocation for what was B.E.A.S.T. and what was other

17   products?

18        A.    I don't believe so.

19        Q.    And you turned over samples of all of the UPS

20   shipping information, redacting customer names, but the

21   shipping information showing weight and price?

22        A.    I believe so.

23        Q.    You turned that over to your Counsel?

24        A.    I hope so.  All the ones we could find

1    anywhere.

2        Q.    Let me show you a sample page, B71.  Again,

3    I'm not making an exhibit of this, because I'm not

4    killing that many trees to do it.  Do you recognize the

5    format of the page?

6        A.    Yes.

7        Q.    Can you tell me what that is?

8        A.    UPS billing sheet, similar to what I get

9    every week from them.

10       Q.    Is this what you use to calculate the

11   shipping fees for samples of the B.E.A.S.T.?

12       A.    That's correct.

13       Q.    But you will agree that the UPS doesn't tell

14   you what products were shipped?

15       A.    No, UPS couldn't.  We judged that strictly by

16   the weight.

17       Q.    What weight would you look for if you were

18   trying to exclude all other products except the

19   B.E.A.S.T.?

20       A.    What weight I would look for?

21       Q.    Well, you said you could tell by weight?

22       A.    I can tell that samples usually run between 3

23   to 5 pounds.

24       Q.    That's samples of all products, right?

Page 122

1      A.    Yes.

2      Q.    So looking at the UPS billing sheet that you

3   have, B71, you would have no way of knowing what

4   products were shipped -- which products shipped were

5   represented on each of the line items there, correct?

6      A.    That's correct.

7      Q.    Could you tell from the customer name what

8   products were shipped?

9      A.    Are we talking samples or the orders?

10     Q.    I'm talking the samples.

11     A.    The samples?

12     Q.    You know, it is my understanding that

13  absolute destinations were redacted so we wouldn't have

14  customer information.  I'm just asking is there any way

15  that you are aware of that we can determine from

16  looking at the UPS sheets what products were shipped?

17     A.    I would just assume all our samples.

18     Q.    So each box contained one of all samples?

19     A.    Uh-huh.

20     Q.    And again, in calculating the amount that you

21  put forth to the court, you have made no effort to

22  limit it solely to B.E.A.S.T. samples?

23     A.    It would be impossible.  I could allocate

24  perhaps.

1     Q.   Did you allocate --

2     A.   I don't believe so.

3     Q.   -- your representations to the court?

4     A.   I don't believe so.

5     Q.   Now, going back to the statement, I believe

6 it appears in the preliminary injunction papers, it was

7 $100,000 on telemarketing and distribution of samples;

8 the UPS goes to the distribution of samples, correct?

9     A.   That's correct.

10    Q.   What is comprised of the telemarketing,

11 what's that include?

12    A.   Countless long distance calls to the

13 customers and potential customers, and it's mostly to

14 potential customers and phone bills.

15    Q.   With respect to determining the amount of

16 phone bills that you included in the figure you

17 represented to the court, what did you do?

18    A.   We added them up.

19    Q.   But you just added up the total phone bills?

20    A.   We added up the long distance portion.

21    Q.   Did you segregate long distance into the

22 United States from long distance to anywhere else?

23    A.   I believe so.

24    Q.   So you only counted the U.S.?

Page 124

1    A.    I believe so.

2    Q.    Since you're using only phone bills, you have

3    no way of knowing whether B.E.A.S.T. was actually

4    discussed or not for a particular customer?

5    A.    The B.E.A.S.T. is discussed on most calls.

6    It's our primary product.

7    Q.    As you are sitting here today, though, you

8    can't look at a phone bill and tell me --

9    A.    No, I can not

10   Q.    -- the content of any conversation?

11   A.    No, we did not record any of the

12   conversations.

13   Q.    So you made no effort then to segregate

14   B.E.A.S.T. calls from any others that may have

15   occurred?

16   A.    Impossible.

17   Q.    In relation to other invoices that were

18   submitted to us to support your advertising and

19   promotion costs, I just have a question:  Do you know

20   what a Patchy Printing, do you know who they are?

21   A.    Not offhand, no.

22   Q.    Do you know what products referred to when

23   they call it "Landscape Book Saddle Stitch, 28 page

24   cover?"

Page 136

1      Q.    And you can tell that it is tilted as it

2   would be in installation with the foot -- well, we're

3   looking at the foot and spacer side of the L-shaped

4   product?

5      A.    Yes.

6      Q.    And the straight line across the bottom is

7   actually a wall?

8      A.    Vertical wall.

9      Q.    And that is what abuts the paver?

10     A.    That's correct.

11     Q.    Now, I'm going to hand you a Sharpie, and I

12   would like you to make a --

13     A.    (Indicating a scribble noise.)

14     Q.    You mess up my picture, I'll be unhappy.

15     A.    Can I do a face on there?

16     Q.    I would like you to designate for me -- and

17   why don't you do it with like the letter A so we can

18   follow along -- draw a line with the letter A.  What is

19   the structural rib reinforcements, I mean the SRR, that

20   is for perfect straight lines?

21     A.    You want me to draw a line and put an A next

22   to the line?

23     Q.    Draw a line next to the part and then put an

24   A by it.  That is a structural rib reinforcement?

Page 137

1       A.    Yes.

2       Q.    SRR, I note, has a Tm besides it; have you

3    ever attempted to register the term SRR?

4       A.    No.

5       Q.    Have you ever considered SRR a trademark of

6    BrickStop?

7       A.    No.

8       Q.    And if you could draw a similar line with the

9    letter B to the part that shows, or that denotes,

10   "stable sure gripping footprint," SSF for stability?

11      A.    A lot of little acronyms.

12      Q.    I didn't invent them.

13      A.    I know.  I know.

14            It's the foot.

15      Q.    The foot itself.  So can you just draw like

16   a --

17      A.    (Witness complies.)

18      Q.    Fine, and we'll put a B on that.

19            What about the foot has stable sure

20   gripping -- is stable sure gripping?

21      A.    What about the foot?

22      Q.    Yes.  What about the foot?

23      A.    I would think it's just an advertising

24   statement.

Page 150

1    could provide technical support?

2        A.    That's correct.  As limited as the technical

3    sport is required.

4        Q.    Why did you change the B.E.A.S.T.

5    configuration from the straight bar depicted in

6    Exhibit 10 to the crosshatch with a rectangular thumb

7    piece, if you will, that's in Exhibit 9?

8        A.    There was an allegation that we were

9    infringing a patent.  So after negotiations we decided

10   to change it, came to an agreement with the allegator

11   (sic) we'll call him, and he said no problem, and we

12   changed it.

13       Q.    Who was the patent holder who alleged

14   infringement?

15       A.    Snap Edge.

16       Q.    Do you know which patent they were referring

17   to?

18       A.    I didn't know that they had a whole series

19   them.

20       Q.    Do you know if Snap Edge made the product

21   based on the patent that they alleged you were

22   infringing.

23       A.    Yes.

24       Q.    Is it the current product that Snap Edge

Page 210

1    who purchase more than one type of product from you?

2        A.    Not really.

3        Q.    Do you give pricing concessions in terms of

4    the providing, for instance, nails at a lower price to

5    someone who takes a volume of B.E.A.S.T. product?

6        A.    No.

7        Q.    Do you ever give --

8        A.    The shipping -- when we ship B.E.A.S.T. if a

9    customer is ordering nails or any of our tools, it goes

10   on top of the pallet of the B.E.A.S.T. so we are not

11   incurring a freight charge for instance to ship someone

12   a splitter, and that's because the pallet of B.E.A.S.T.

13   doesn't have that of weight, it takes up size.  So the

14   trucker is charging us two pallet spaces, two 4X4, so

15   we are able to -- if a guy wants ten cases of nails --

16   I don't have to worry about incurring extra freight to

17   get the accessories down, because the B.E.A.S.T.

18   allowed has allowed us to sell extra accessories to

19   these guys and tools and nails, whereas otherwise if a

20   guy phones and says, well, I want to order nails --

21       Q.    You got to add that wait to a truck?

22       A.    Nails themselves or is a splitter themselves

23   we have to charge them freight.  There is no way for us

24   to get the stuff to the customer and still make a

Page 220

1    Q.    I want to be able to do it by year.

2    A.    That would be difficult.

3    Q.    Okay.  You can't think of a way I could do it

4    using the information that's here?

5    A.    I don't think so.

6    Q.    Are you aware of any tests, studies or

7    observations that were done that determined anything

8    with respect to the quality of the Valley View Diamond

9    Paver Edge product versus the quality of the B.E.A.S.T.

10   product?

11   A.    None.

12   Q.    Do you have any information which would

13   indicate that Diamond Paver Edge product is more

14   brittle than the BrickStop B.E.A.S.T. product for the

15   purposes of applications that they are used?

16   A.    Any information whatsoever?

17   Q.    Any.  Yes.

18   A.    Well, it may be a bias bit of information,

19   but our salesmen from, and also the all the guys who

20   have been running this high pressure for us, and it may

21   be because they want us to stay at high pressure have

22   said low pressure is more brittle.

23   Q.    A saw that you have an affidavit from a

24   Mr. Hutchinson?

Page 221

```
 1       A.    Uh-huh.

 2       Q.    Is he a person who sells you high pressure

 3   molding services?

 4       A.    That's correct.

 5       Q.    Is he the only source that you've had tell

 6   you that --

 7       A.    No.  People at Royal told me the same thing.

 8       Q.    Royal industries?

 9       A.    Royal Group Technologies.

10       Q.    When was that?

11       A.    When they were running our product.

12       Q.    I see.

13       A.    And again, this is them telling us because

14   they run strictly high pressure, so -- I did ever, you

15   know, look further, no.

16       Q.    And you are not aware of any objective

17   testing that would prove those conclusions or those

18   statements?

19       A.    No.

20       Q.    Has the BrickStop B.E.A.S.T. product been

21   included in any tests or studies that compared various

22   brands of paver edge products or restraints?

23       A.    Yes.  I only know of one and it was put out

24   by Pave Tech, who is a competitor.
```

Page 245

1      A.    That maybe the second picture.  It may have

2   been one before that.

3      Q.    One before what, sir?

4      A.    There may have been a picture before this

5   that we saw that looked more like it, and this was the

6   second version where they covered and put

7   superimposed -- but you may be right.  I can't say that

8   I seen for sure.

9      Q.    Let's get your testimony straight.  Do you

10  know whether or not there is more than one version of

11  20B?

12     A.    No, I do not.

13     Q.    And after your attorney wrote and he was

14  responded to -- he received a response from

15  Valley View's attorney, correct?

16     A.    Uh-huh.

17     Q.    That was March 7th, was it not, 2008 that the

18  letter was dated in response to your attorneys letter?

19     A.    I believe.

20     Q.    After that date have you ever seen any

21  picture on the web or in any advertising that looks

22  like 20B?

23     A.    I have not.

24     Q.    So as you sit here today, is it your position

9

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

BRICKSTOP CORPORATION,                    )
                                          )
                Plaintiff,                )     Case No. 08-CV-2690
                                          )
        v.                                )     Honorable Judge Gettleman
                                          )
VALLEY VIEW INDUSTRIES, H.C., INC.,       )     Magistrate Judge Cole
                                          )
                Defendant.                )

## AFFIDAVIT OF MICHAEL CASEY

I, Michael Casey, hereby state that if called as a witness in the above-captioned matter I would be competent to testify as to the following:

1.    I have worked in the landscape and lawn and garden products industry for thirty (30) years.

2.    For the last ten years, I have been an independent sales representative for Valley View Industries ("Valley View"). Before that, I worked for Valley View for twenty (20) years.

3.    I sell lawn, garden, and landscape products to distributors and supply yards in Michigan, Indiana, and Ohio. A small percentage (approximately ten percent (10%)) of my sales are directly to landscape contractors.

4.    As part of my sales efforts, I attend trade shows where I talk directly to contractors as well as to representatives of distributors and supply yards. At trade shows, I have a Valley View banner displayed on my booth.

5.    I also visit or call distributors and supply yards to sell products. At all times, I identify myself as a sales representative for Valley View. I have never had a customer, or potential customer, express that they thought I was affiliated with BrickStop Corporation ("BrickStop").

6.     Since Valley View introduced its Diamond Paver Edge, I have approached approximately fifty (50) customers about this product.  I have established relationships with many of these customers from my years of sales efforts.

7.     Because I understand that BrickStop sells directly to many of the customers in my sales area, I believe that it is unlikely that they would be confused about the competitive relationship between BrickStop and Valley View.

8.     While some of these customers either carry, or know about, BrickStop's B.E.A.S.T. paver edge, and have even commented that the Diamond Paver Edge looks like the B.E.A.S.T., all of them have clearly expressed to me that they understood I was selling the Diamond Paver Edge for Valley View. None of them have been confused about the fact that the B.E.A.S.T. and the Diamond Paver Edge are different products made by different companies.

9.     In fact, my experience demonstrates that some customers make their purchasing decisions based on whether BrickStop or Valley View makes the product.

10.     For example, one potential customer told me not to bother to send a price quote for the Diamond Paver Edge because they "liked BrickStop."

11.     In contrast, another customer told me that they had decided to switch to the Diamond Paver Edge because they were unhappy with BrickStop's practice of selling to mass merchants, like Lowe's and Home Depot.

12.     In my experience, other purchasers of paver edging prefer to deal with American companies, especially in these tough economic times.  For those customers, Valley View would have a definite edge over BrickStop, which is a Canadian company.

13.     In my sales territory, I have observed that the Snap Edge paver edge product has the largest share of the market.  Based on my observations, I believe that, when considering their

entire range of paver edge product offerings, Valley View has a larger share of the market than BrickStop.

14.    The customers that I deal with recognize that Valley View, as well as other manufacturers, makes several different styles of paver edging. Many of those customers already carry other Valley View products, such as lawn edging or Diamond-Lok paver edging.

15.    In my thirty (30) years in the landscape products industry, I have observed a regular pattern with the introduction of new products. One manufacturer will develop a new product, and then other manufacturers will release variations on that product. Each manufacturer's product is slightly different, and the customers all understand that the different manufacturers are competing with each other with their different products.

16.    In my experience, distributors and supply yards, as well as the contractors who buy from them, focus on how a paver edge product works when making purchasing decisions. Once they find a style that they are comfortable with, they are reluctant to change. For example, some customers have decided not to carry the Diamond Paver Edge because they are pleased with the price and performance of the Diamond-Lok products.

Under 28 U.S.C. § 1746, I verify under penalty of perjury that the foregoing is true and correct.

Executed On: August __7__, 2008          By: _Michel Casey_____
                                             Michel Casey

\10

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

BRICKSTOP CORPORATION,    )
             )
    Plaintiff,    )  Case No. 08-CV-2690
             )
    v.      )  Honorable Judge Gettleman
             )
VALLEY VIEW INDUSTRIES, H.C., INC., )  Magistrate Judge Cole
             )
    Defendant.   )

## AFFIDAVIT OF DAVID A. MARTINET

I, David A. Martinet, hereby state that if called as a witness in the above-captioned matter I would be competent to testify as to the following:

1. I am the Vice President & General Manager of Tameling Industries ("Tameling's").

2. Tameling's is located in Willowbrook, Illinois, and sells landscape and hardscape materials and products. In this industry, "landscape" refers to plants and the other living parts of a homeowner's yard, while "hardscape" refers to non-living elements of a homeowner's yard, such as bricks and pavers.

3. I have worked for Tameling's since 1978. I began my employment loading and stocking products in the outside yard area of Tameling's, and worked my way up to my current position. During this time, I have gained significant experience in the hardscape industry.

4. As Tameling's Vice President & General Manager, I make the majority of the decisions about which products will be purchased and sold by Tameling's.

5. While Howard Rynberk, the President and CEO of Valley View Industries ("Valley View"), owns Tameling's and his sons also work at Tameling's, I make the majority of the purchasing decisions and I am not required to buy only Valley View products. For example,

Tameling's carries paver edge products, as well as other type of products, which directly compete with Valley View's products.

6.    When considering the purchase of a new product, or replacing an existing product with a similar product, the most important consideration for me is the quality of the new product. Tameling's has been in business for over 60 years, and has an excellent reputation in the community. Carrying quality products is part of that reputation, and product quality is more important to me than price in most cases. For example, I would decide to purchase and sell an expensive, high quality product rather than an inferior product with a lower price.

### Paver Edging

7.    I am familiar with a type of hardscape product called paver edging. Tameling's has sold paver edging for approximately eighteen (18) years.

8.    In the hardscape industry, there are different types or styles of paver edging products. I would not refer to different types of paver edging as different brands.

9.    Tameling's has increased the number of types of paver edging that it carries over time in response to increased demand for different types from customers.

10.    Tameling's currently carries three types of paver edging products: (1) Diamond paver edging; (2) T/L paver edging; and (3) Snap Edge paver edging.

11.    All three of these types are made of plastic. While some manufacturers make metal paver edging, there is not a demand from Tameling's customers for metal edging. I believe that this is because metal paver edging is harder to work with than plastic paver edging, and Tameling's customers focus on the actual use of the paver edging that they purchase when deciding which type to purchase.

12.    Right now, the Diamond and T/L paver edging sold by Tameling's are manufactured by Valley View Industries ("Valley View"). The T/L paver edging is Valley View's Diamond-Lok paver edging. The Snap Edge edging is manufactured by Snap Edge Corporation.

13.    The Snap Edge type is the most expensive paver edging sold by Tameling's.

14.    I am aware that there are numerous other manufacturers of paver edging. Tameling's receives advertising literature and trade publications, which I review. I have seen numerous ads for paver edging products, and these ads usually identify the manufacturer of the paver edging.

15.    I am also aware that different manufacturers make the same type of paver edging and include different features in their products. Because paver edging is designed to be entirely buried under either dirt or pavers, it does not have decorative or ornamental features. I have never heard either a customer or a salesperson refer to any feature of a paver edge as decorative or ornamental, and I would find it strange if someone did so. When I look at paver edging, I examine and evaluate all of the elements and features of that edging in terms of their actual function and use in a yard for restraining pavers.

### Tameling's Customers

16.    Tameling's main customers are small, locally-owned landscaping companies. Most of these companies have between six and ten employees.

17.    These customers account for approximately 60% of Tameling's overall sales, but account for a much higher percentage of sales of paver edging.

18.    Because they are small companies, Tameling's customers typically do not stock products, and instead stop at Tameling's on their way to a job site to purchase the products that they need for that job or that day.

19.    Based on the job specifications, Tameling's customers typically know how much of each product they need for that day and only buy what they need.  For example, if a customer is installing a paver walkway with 80 feet of edge, they will buy 80 feet of paver edging and the necessary installation supplies.

20.    Therefore, it is important that Tameling's have enough paver edging available to meet its customers' needs on a daily basis.

21.    In its store, Tameling's displays all three types of paver edging in the same area. This allows customers who are shopping for paver edging to examine and handle all three types when deciding which one to purchase.  I have observed many customers pick up and handle different types, and ask questions of Tameling's employees about the ways to install and use the different types.

22.    From my experience, different customers look for different features when choosing paver edging.  Some customers prefer flexibility, while others prefer more rigid products.  They evaluate the different types of paver edge based on how then will be used.

23.    Tameling's also carries nails and v-shaped stakes.  These nails and v-shaped stakes can be used to install paver edging, as well as other edging products sold by Tameling's. For example, Tameling's customers also use nails or v-shaped stakes to install round lawn edging.

24.    I have observed that Tameling's customers typically become familiar and comfortable with the use of either nails or v-shaped stakes to install different types of landscape

and hardscape products. They then look for multiple products which can all be installed using the chosen device. For example, customers who use v-shaped stakes to install lawn edging prefer paver edging which can also be installed using v-shaped stakes. This saves time and money for the customer, who only has to buy one set of tools and one type of installation device.

25.    In my experience, the main reason that a customer will choose to buy one type of paver edge instead of another is the chosen product's features.

26.    In my experience, once a customer chooses which type of paver edging they prefer to use, they tend to continue to buy that type of paver edging. This is because once a customer becomes familiar with a specific type of paver edge (and how to use it), they want to keep buying the same type so they can continue to use it in the same way.

27.    I have not observed any loyalty by customers to a particular manufacturer of paver edging. And, other than Snap Edge, I am not aware that customers ask for paver edging by identifying the manufacturer of the edging they want.

28.    Instead, Customers typically identify the paver edging that they want to buy by its type. For example, customers typically ask for "T" paver edging or "L" paver edging.

29.    Some customers come in with "shopping lists" based on the needs of their jobs for the day and ask a Tameling's employee for the materials. In my experience, these "shopping lists" identify paver edging by type.

### BrickStop and Valley View

30.    I understand that this lawsuit involves a dispute between BrickStop Corporation and Valley View Industries over paver edging. I am familiar with the B.E.A.S.T. paver edging produced by BrickStop ("BrickStop's Paver Edge"), as well as the Diamond Paver Edge produced by Valley View.

31.     I first learned about BrickStop's Paver Edge approximately eight (8) years ago. At that time, a company that manufactured pavers suggested using BrickStop's Paver Edge as a complementary product to the pavers that it made.  While Tameling's purchased other products manufactured by that company, it was not purchasing the pavers and I did not decide to purchase BrickStop's Paver Edge at that time.

32.     Approximately two (2) years ago, I decided to begin purchasing BrickStop's Paver Edge.

33.     Before I made the decision to purchase BrickStop's Paver Edge, I knew that this product was manufactured by BrickStop.  While Tameling's did not carry products manufactured by BrickStop, I was on BrickStop's catalog mailing list and was generally aware of its product lines.

34.     Tameling's purchased BrickStop's Paver Edge from one of its suppliers, Superior Stone.

35.     When purchasing such a product from a supplier, I typically receive a product brochure from the salesman which lists the manufacturer of the product.   Usually, the salesperson will also tell me who makes the specific products that I am purchasing, or considering purchasing.

36.     I first learned about Valley View's Diamond Paver Edge in approximately February 2008.

37.     I learned about the Diamond Paver Edge from another one of Tameling's suppliers, Unilock.  One of the Unilock representatives told me that Valley View was now manufacturing another type of paver edge (in addition to the T/L type that Tameling's was already purchasing).

38.    At no time did I ever think that Valley View was selling a product made by BrickStop. In fact, I immediately realized that Valley View was selling a competing product.

39.    I made the decision to stop purchasing BrickStop's Paver Edge and instead purchase the Diamond Paver Edge manufacturer by Valley View.

40.    The two main reasons that I decided to switch to the Diamond Paver Edge were quality and price. Valley View was offering the same quality of product at a lower cost than BrickStop's Paver Edge.

41.    The Diamond Paver Edge is the same quality of product as BrickStop's Paver Edge for two reasons.

42.    First, unlike BrickStop's Paver Edge which is designed to be installed using only nails, the Diamond Paver Edge can be installed using either nails or v-shaped stakes.

43.    One of the first things that I noticed about the Diamond Paver Edge was the ability to use it with v-shaped stakes because the Diamond Paver Edge has a v-shaped slot in addition to the two (2) round holes.

44.    Because Tameling's customers typically prefer to use either nails or v-shaped stakes (but not both) when installing various types of landscape and hardscape products, the ability to use either one with the Diamond Paver Edge provides a definite quality edge to that product and makes it a more flexible product than BrickStop's Paver Edge in terms of actual use by Tameling's customers. This feature also allows the Diamond Paver Edge to be used by more Tameling's customers.

45.    I believe that, like me, people who actually use paver edging would notice the v-shaped stake slot on the Diamond Paver Edge and recognize it as an advantage over a similar type of paver edging which can only be installed using nails.

46.    Second, the connection points between the 8-foot strips of Diamond Paver Edge are larger than those on BrickStop's Paver Edge.  The larger surface area on the Diamond Paver Edge strips results in a more secure connection, which is important since pavers are heavy and more secure connections work better to keep the pavers in place.

47.    In terms of cost, Tameling's purchases the Diamond Paver Edge for a lower cost-per-foot than it purchased BrickStop's Paver Edge.

48.    Transportation costs to Tameling's for the Diamond Paver Edge are also lower than they were for BrickStop's Paver Edge.  For products like paver edging that Tameling's purchases from both Superior Stone and Unilock, Tameling's sends trucks to pick up the products from the supplier.  Because Tameling's is closer to Unilock than it is to Superior Stone, Tameling's saves fuel costs by purchasing the Diamond Paver Edge instead of BrickStop's Paver Edge.

49.    Related to the lower transportation cost, the Diamond Paver Edge is more easily available to Tameling's than BrickStop's Paver Edge.  As discussed above, the easy availability of a product like paver edging is important to Tameling's customers.

50.    Tameling's sends trucks to Unilock once or twice every day to pick up numerous types of products.  This means that Tameling's can get more Diamond Paver Edge every day to sell to its customers, whereas Tameling's does not send trucks to Superior Stone on a daily basis.

51.    Since Tameling's switched from BrickStop's Paver Edge to Valley View's Diamond Paver Edge, I have not received any complaints from customers about either the switch or the Diamond Paver Edge.

52.    By switching to the Diamond Paver Edge, Tameling's obtained a higher quality product at a lower cost. Tameling's also obtained a product which works similarly, but is more useful to more customers.

Under 28 U.S.C. § 1746, I verify under penalty of perjury that the foregoing is true and correct.

Executed On: August 7, 2008    By: _____

David A. Martinet

A



B001535

EXHIBIT
Kurtz #2
7-29-8



B001538





BCD1859



B001540





BDO1642

B001545



B001544



E0001245



B001646





B00047



B0091580





EXHIBIT
1-27-8
Kurtz 46
PENGAD 800-631-6989

C

# Exhibit A



*Beauty and the* **BEAST™**

15 years experience and millions of feet of paver installations have gone into the development of B.E.A.S.T.

- SUPER STRENGTH
- AMAZING STRAIGHT LINES
- SUPER FLEXIBILITY
- PERFECT CURVES
- PAVERS NEVER LOOKED THIS GOOD

## WHY YOU NEED PAVER EDGING

Whether you are creating a driveway, walkway or patio, the most important part of your project is insuring that the pavers are installed properly. An edge restraint around the perimeter of the pavers is essential for eliminating horizontal creeping of the pavers and loss of the bedding sand.



Standard Mode / Reverse Mode

Pavers can be positioned on either side of B.E.A.S.T edging. Standard Mode as shown at left, or Reverse Mode shown at right.




Free Technical Support 1-800-565-2599

## Installation Tips

Patios and Walkways: Nail every 12"-20"
30.5cm - 50.8cm
Driveways: Nail every 8"-12" / 20.3cm - 30.5cm

## Specifications

8 feet long x 1.75 inches high
3 inches deep x 2.5 inches wide
*243.84 cm long x 4.45 cm high*
*7.62 cm deep x 6.35 cm wide*

# Exhibit B

cc diamond sheet grd  2/21/08  11:15 AM  Page 1



# New DIAMOND PAVER EDGE

## P A V E R   R E S T R A I N T

Use Valley View
Anchoring Stake or
10-1/2" Nail

The **NEW Diamond Paver Edging** is the most economically priced paver restraint on the market. It has been added to our existing paver restraint product line. This is our most **Solid** paver restraint yet, though it can be easily converted to flexible.

**Anchoring stakes and spikes are recommended and sold separately.**

### DIAMOND PAVER EDGE ORDERING INFORMATION

| Item # | Description | Pack |
|---|---|---|
| DPE-6-630 | 6' Diamond Paver Edge | 560 feet, 93 bundles of 10 |

For additional paver restraints, displays and accessories, go to www.valleyviewind.com

Reverse Form

YOUR LOCAL DISTRIBUTOR:

## ValleyView®
### Industries

*"Setting the landscape industry standard"*

Valley View Industries
13834 S. Koether Ave.
Crestwood, IL 60445
www.valleyviewind.com
info@valleyviewind.com

Toll Free: (800) 323-9369 • (800) 326-3282 FAX
International: (708) 597-0885 • (708) 597-9855 FAX

D

Customer Sales History By Item
Sorted By Customer Number
Fiscal Year 2008

# REDACTED

VALLEY VIEW INDUSTRIES (VVI)

| Customer Number | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Customer Type: DIST  Price Level: 1  Salesperson: HSE HOUSE
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | | | | | 630 |
| Dollars Sold | 0 | 0 | 0 | 0 | 3,270 | 0 | 0 | 0 | 0 | 0 | 0 | | 3,270 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | | | | | 630 |
| Dollars Sold | 0 | 0 | 0 | 0 | 3,270 | 0 | 0 | 0 | 0 | 0 | 0 | | 3,270 |

Customer Type: DIST  Price Level: 1  Salesperson: SPEC SPEC MANAGEMENT GROUP
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 0 | 200 | 0 | 0 | 0 | | | | | 200 |
| Dollars Sold | 0 | 0 | 0 | 0 | 1,040 | 0 | 0 | 0 | 0 | 0 | 0 | | 1,040 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 200 | 0 | 0 | 0 | | | | | 200 |
| Dollars Sold | 0 | 0 | 0 | 0 | 1,040 | 0 | 0 | 0 | 0 | 0 | 0 | | 1,040 |

Customer Type: DLR  Price Level: 2  Salesperson: JAH J.A. HAMMOND ASSOCIATES
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | | | | | 630 |
| Dollars Sold | 0 | 0 | 0 | 3,875 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 3,875 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | | | | | 630 |
| Dollars Sold | 0 | 0 | 0 | 3,875 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 3,875 |

Customer Type:   Price Level: 2  Salesperson: JAH J.A. HAMMOND ASSOCIATES
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 200 | 0 | 0 | 0 | 0 | | | | | 200 |
| Dollars Sold | 0 | 0 | 0 | 880 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 880 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 200 | 0 | 0 | 0 | 0 | | | | | 200 |
| Dollars Sold | 0 | 0 | 0 | 880 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 880 |

Customer Type: DIST  Price Level: 1  Salesperson: OVB BERTUCCI INC
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 100 | 1,890 | 630 | 3,780 | 0 | 0 | | | | | 6,400 |
| Dollars Sold | 0 | 0 | 538 | 9,072 | 3,024 | 18,144 | 0 | 0 | 0 | 0 | 0 | | 30,778 |

Customer Type: DIST  Price Level: 1
Item Code: DPE-8-630K  Description: DIAMOND PAVER EDGING 630 PLT  Unit of Measure: EACH

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | | | | | 2 |
| Dollars Sold | 0 | 0 | 6,048 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 6,048 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 102 | 1,890 | 630 | 3,780 | 0 | 0 | | | | | 6,402 |
| Dollars Sold | 0 | 0 | 6,586 | 9,072 | 3,024 | 18,144 | 0 | 0 | 0 | 0 | 0 | | 36,826 |

Customer Type: DIST  Price Level: 1  Salesperson: SPEC SPEC MANAGEMENT GROUP
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 1,260 | 0 | 0 | 0 | 0 | | | | | 1,260 |
| Dollars Sold | 0 | 0 | 0 | 5,613 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 5,613 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 1,260 | 0 | 0 | 0 | 0 | | | | | 1,260 |
| Dollars Sold | 0 | 0 | 0 | 5,613 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 5,613 |

Customer Type:   Price Level: 1  Salesperson: DOM DOMINICK BERTUCCI-ILLINOIS
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 0 | 0 | 3,780 | 0 | 0 | | | | | 3,780 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 14,818 | 0 | 0 | 0 | 0 | 0 | | 14,818 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 0 | 3,780 | 0 | 0 | | | | | 3,780 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 14,818 | 0 | 0 | 0 | 0 | 0 | | 14,818 |

Customer Type: DIST  Price Level: 1  Salesperson: SPEC SPEC MANAGEMENT GROUP
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 17 | 18 | 100 | 0 | 0 | 0 | 0 | | | | | 135 |
| Dollars Sold | 0 | | | 660 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 590 |



Highly Confidential -
Attorneys' Eyes Only

VVW001849

REDACTED

Sorted by Customer Number
Fiscal Year 2008

VALLEY VIEW INDUSTRIES (VVI)

| Customer Number | | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | | | | | | | | | | | | | |
| Quantity Sold | | 0 | 17 | 18 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 135 |
| Dollars Sold | | 0 | 0 | 0 | 560 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 560 |

Customer Type: DLR  Price Level: 2  Salesperson: DBIL, DOMINICK BERTUCCI-ILLINOIS
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| Dollars Sold | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Totals | | | | | | | | | | | | | |
| Quantity Sold | | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| Dollars Sold | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Customer Type: DIST  Price Level: 1  Salesperson: DVB BERTUCCI INC
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | | 0 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 630 |
| Dollars Sold | | 0 | 0 | 0 | 0 | 3,024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,024 |
| | Totals | | | | | | | | | | | | | |
| Quantity Sold | | 0 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 630 |
| Dollars Sold | | 0 | 0 | 0 | 0 | 3,024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,024 |

Customer Type: DIST  Price Level: 1  Salesperson: DVB BERTUCCI INC
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | | 0 | 100 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 730 |
| Dollars Sold | | 0 | 538 | 0 | 0 | 0 | 3,024 | 0 | 0 | 0 | 0 | 0 | 0 | 3,562 |
| | Totals | | | | | | | | | | | | | |
| Quantity Sold | | 0 | 100 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 730 |
| Dollars Sold | | 0 | 538 | 0 | 0 | 0 | 3,024 | 0 | 0 | 0 | 0 | 0 | 0 | 3,562 |

Customer Type: DLR  Price Level: 2  Salesperson: JAH J.A. HAMMOND ASSOCIATES
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 |
| Dollars Sold | | 0 | 0 | 0 | 625 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 625 |
| | Totals | | | | | | | | | | | | | |
| Quantity Sold | | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 |
| Dollars Sold | | 0 | 0 | 0 | 625 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 625 |

Customer Type: DIST  Price Level: 1  Salesperson: MPC MICHAEL CASEY
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | | 0 | 0 | 0 | 0 | 1,890 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,890 |
| Dollars Sold | | 0 | 0 | 0 | 0 | 7,862 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,862 |
| | Totals | | | | | | | | | | | | | |
| Quantity Sold | | 0 | 0 | 0 | 0 | 1,890 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,890 |
| Dollars Sold | | 0 | 0 | 0 | 0 | 7,862 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,862 |

Customer Type: DIST  Price Level: 1  Salesperson: DVB BERTUCCI INC
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | | 0 | 0 | 1,890 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,890 |
| Dollars Sold | | 0 | 0 | 8,435 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,435 |
| | Totals | | | | | | | | | | | | | |
| Quantity Sold | | 0 | 0 | 1,890 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,890 |
| Dollars Sold | | 0 | 0 | 8,435 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,435 |

Customer Type: DIST  Price Level: 1  Salesperson: DVB BERTUCCI INC
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| Dollars Sold | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Totals | | | | | | | | | | | | | |
| Quantity Sold | | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| Dollars Sold | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Customer Type: DIST  Price Level: 1  Salesperson: DBIL, DOMINICK BERTUCCI-ILLINOIS
Item Code: DPE-8  Description: DIAMOND PAVER EDGING  Unit of Measure: EACH

| | | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | | 0 | 0 | 0 | 1,260 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,260 |
| Dollars Sold | | 0 | 0 | 0 | 6,552 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,552 |
| | Totals | | | | | | | | | | | | | |
| Quantity Sold | | 0 | 0 | 0 | 1,260 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,260 |
| Dollars Sold | | 0 | 0 | 0 | 6,552 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,552 |

Highly Confidential -
Attorneys' Eyes Only

VVW001850

**REDACTED**

Fiscal Year 2008

VALLEY VIEW INDUSTRIES (VVI)

| Customer Number | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Customer Type: DIST Price Level: 1  Salesperson: PBM PB MARKETING | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | | | Unit of Measure: EACH |
| Quantity Sold | 0 | 0 | 0 | 0 | 0 | 60 | 0 | 0 | 0 | 0 | 0 | 0 | 60 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 336 | 0 | 0 | 0 | 0 | 0 | 0 | 336 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 0 | 60 | 0 | 0 | 0 | 0 | 0 | 0 | 60 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 336 | 0 | 0 | 0 | 0 | 0 | 0 | 336 |
| | | | | | | Customer Type: DIST Price Level: 1  Salesperson: DVB BERTUCCI INC | | | | | | | |
| | Item Code: DPE-5 | | | | | Description: DIAMOND PAVER EDGING | | | | | | | Unit of Measure: EACH |
| Quantity Sold | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | Customer Type: DIST Price Level: 1  Salesperson: DVB BERTUCCI INC | | | | | | | |
| | Item Code: GPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | | | Unit of Measure: EACH |
| Quantity Sold | 0 | 0 | 0 | 7,560 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,560 |
| Dollars Sold | 0 | 0 | 0 | 33,264 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33,264 |
| | | | | | | Customer Type: DIST Price Level: 1 | | | | | | | |
| | Item Code: DPE-8-630K | | | | | Description: DIAMOND PAVER EDGING 630 PLT | | | | | | | Unit of Measure: EACH |
| Quantity Sold | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| Dollars Sold | 0 | 0 | 29,736 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29,736 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 10 | 7,560 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,570 |
| Dollars Sold | 0 | 0 | 29,736 | 33,264 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 63,000 |
| | | | | | | Customer Type: DIST Price Level: 1  Salesperson: JAH J.A. HAMMOND ASSOCIATES | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | | | Unit of Measure: EACH |
| Quantity Sold | 0 | 0 | 50 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 680 |
| Dollars Sold | 0 | 0 | 269 | 0 | 2,772 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,041 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 50 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 680 |
| Dollars Sold | 0 | 0 | 269 | 0 | 2,772 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,041 |
| | | | | | | Customer Type: DLR Price Level: 2  Salesperson: DVB BERTUCCI INC | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | | | Unit of Measure: EACH |
| Quantity Sold | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | Customer Type:    Price Level: 1  Salesperson: DBIL DOMINICK BERTUCCI-ILLINOIS | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | | | Unit of Measure: EACH |
| Quantity Sold | 0 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 630 |
| Dollars Sold | 0 | 0 | 0 | 0 | 3,276 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,276 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 630 |
| Dollars Sold | 0 | 0 | 0 | 0 | 3,276 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,276 |
| Report Totals: | | | | | | | | | | | | | |
| Quantity Sold | 0 | 117 | 2,070 | 8,470 | 12,620 | 4,470 | 0 | 0 | 0 | 0 | 0 | 0 | 28,747 |
| Dollars Sold | 0 | 558 | 46,025 | 27,176 | 56,492 | 37,362 | 0 | 0 | 0 | 0 | 0 | 0 | 147,593 |

Highly Confidential -
Attorneys' Eyes Only

VVW001851

Customer Sales History By Item
Sorted By Customer Number
Fiscal Year 2008

**REDACTED**

VALLEY VIEW INDUSTRIES (VVI)

| Customer Number | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Customer Type: DIST Price Level: 1 Salesperson: HSE HOUSE | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | Unit of Measure: EACH | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 630 |
| Dollars Sold | 0 | 0 | 0 | 0 | 3,270 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,270 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 2,003 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,003 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 630 |
| Dollars Sold | 0 | 0 | 0 | 0 | 3,270 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,270 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 2,003 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,003 |
| | | | | | | Customer Type: DIST Price Level: 1 Salesperson: SPEC SPEC MANAGEMENT GROUP | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | Unit of Measure: EACH | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 0 | 200 | 0 | 0 | 0 | 0 | 0 | 0 | 200 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 1,040 | 0 | 0 | 0 | 0 | 0 | 0 | 1,040 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 0 | 638 | 0 | 0 | 0 | 0 | 0 | 0 | 638 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 0 | 200 | 0 | 0 | 0 | 0 | 0 | 0 | 200 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 1,040 | 0 | 0 | 0 | 0 | 0 | 0 | 1,040 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 0 | 638 | 0 | 0 | 0 | 0 | 0 | 0 | 638 |
| | | | | | | Customer Type: DLR Price Level: 2 Salesperson: JAH J.A. HAMMOND ASSOCIATES | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | Unit of Measure: EACH | | |
| Quantity Sold | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 630 |
| Dollars Sold | 0 | 0 | 0 | 3,875 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,875 |
| Gross Profit Amount | 0 | 0 | 0 | 2,608 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,608 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 630 |
| Dollars Sold | 0 | 0 | 0 | 3,875 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,875 |
| Gross Profit Amount | 0 | 0 | 0 | 2,608 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,608 |
| | | | | | | Customer Type: Price Level: 2 Salesperson: JAH J.A. HAMMOND ASSOCIATES | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | Unit of Measure: EACH | | |
| Quantity Sold | 0 | 0 | 0 | 200 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 200 |
| Dollars Sold | 0 | 0 | 0 | 880 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 880 |
| Gross Profit Amount | 0 | 0 | 0 | 476 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 476 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 200 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 200 |
| Dollars Sold | 0 | 0 | 0 | 880 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 880 |
| Gross Profit Amount | 0 | 0 | 0 | 476 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 476 |
| | | | | | | Customer Type: DIST Price Level: 1 Salesperson: DVB BERTUCCI INC | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | Unit of Measure: EACH | | |
| Quantity Sold | 0 | 0 | 100 | 1,260 | 630 | 3,780 | 0 | 0 | 0 | 0 | 0 | 0 | 6,400 |
| Dollars Sold | 0 | 0 | 538 | 8,072 | 3,024 | 18,144 | 0 | 0 | 0 | 0 | 0 | 0 | 30,778 |
| Gross Profit Amount | 0 | 0 | 331 | 5,273 | 1,758 | 10,546 | 0 | 0 | 0 | 0 | 0 | 0 | 17,908 |
| | | | | | | Customer Type: DIST Price Level: 1 | | | | | | | |
| | Item Code: DPE-8-630K | | 2 | | | Description: DIAMOND PAVER EDGING 630 PLT | | | | | Unit of Measure: EACH | | |
| Quantity Sold | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Dollars Sold | 0 | 0 | 6,048 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,048 |
| Gross Profit Amount | 0 | 0 | 6,044 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,044 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 102 | 1,260 | 630 | 3,780 | 0 | 0 | 0 | 0 | 0 | 0 | 6,402 |
| Dollars Sold | 0 | 0 | 6,586 | 8,072 | 3,024 | 18,144 | 0 | 0 | 0 | 0 | 0 | 0 | 36,826 |
| Gross Profit Amount | 0 | 0 | 6,374 | 5,273 | 1,758 | 10,546 | 0 | 0 | 0 | 0 | 0 | 0 | 23,951 |
| | | | | | | Customer Type: DIST Price Level: 1 Salesperson: SPEC SPEC MANAGEMENT GROUP | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | Unit of Measure: EACH | | |
| Quantity Sold | 0 | 0 | 0 | 1,260 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,260 |
| Dollars Sold | 0 | 0 | 0 | 5,813 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,813 |
| Gross Profit Amount | 0 | 0 | 0 | 3,080 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,080 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 1,260 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,260 |
| Dollars Sold | 0 | 0 | 0 | 5,813 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,813 |
| Gross Profit Amount | 0 | 0 | 0 | 3,080 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,080 |

Highly Confidential -
Attorneys' Eyes Only

VVW001852

Fiscal Year 2008

# REDACTED

VALLEY VIEW INDUSTRIES (VVI)

| Customer Number | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Customer Type:  Price Level: 1  Salesperson: DBIL DOMINICK BERTUCCI-ILLINOIS | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | | Unit of Measure: EACH | |
| Quantity Sold | 0 | 0 | 0 | 0 | 0 | 3,780 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 14,818 | 0 | 0 | 0 | 0 | 0 | 0 | 3,780 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 0 | 7,220 | 0 | 0 | 0 | 0 | 0 | 0 | 14,818 |
| | | | | | | | | | | | | | 7,220 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 0 | 3,780 | 0 | 0 | 0 | 0 | 0 | 0 | 3,780 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 14,818 | 0 | 0 | 0 | 0 | 0 | 0 | 14,818 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 0 | 7,220 | 0 | 0 | 0 | 0 | 0 | 0 | 7,220 |
| | | | | | | Customer Type: DIST  Price Level: 1  Salesperson: SPEC SPEC MANAGEMENT GROUP | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | | Unit of Measure: EACH | |
| Quantity Sold | 0 | 17 | 18 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 135 |
| Dollars Sold | 0 | 0 | 0 | 560 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 560 |
| Gross Profit Amount | 0 | 35- | 37- | 359 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 287 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 17 | 18 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 135 |
| Dollars Sold | 0 | 0 | 0 | 560 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 560 |
| Gross Profit Amount | 0 | 35- | 37- | 359 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 287 |
| | | | | | | Customer Type: DLR  Price Level: 2  Salesperson: DBIL DOMINICK BERTUCCI-ILLINOIS | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | | Unit of Measure: EACH | |
| Quantity Sold | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gross Profit Amount | 0 | 0 | 0 | 20- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20- |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gross Profit Amount | 0 | 0 | 0 | 20- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20- |
| | | | | | | Customer Type: DIST  Price Level: 1  Salesperson: DVB BERTUCCI INC | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | | Unit of Measure: EACH | |
| Quantity Sold | 0 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 630 |
| Dollars Sold | 0 | 0 | 0 | 0 | 3,024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,024 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 1,758 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,758 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 630 |
| Dollars Sold | 0 | 0 | 0 | 0 | 3,024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,024 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 1,758 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,758 |
| | | | | | | Customer Type: DIST  Price Level: 1  Salesperson: DVB BERTUCCI INC | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | | Unit of Measure: EACH | |
| Quantity Sold | 0 | 100 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 730 |
| Dollars Sold | 0 | 538 | 0 | 0 | 3,024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,562 |
| Gross Profit Amount | 0 | 331 | 0 | 0 | 1,758 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,089 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 100 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 730 |
| Dollars Sold | 0 | 538 | 0 | 0 | 3,024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,562 |
| Gross Profit Amount | 0 | 331 | 0 | 0 | 1,758 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,089 |
| | | | | | | Customer Type: DLR  Price Level: 2  Salesperson: | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | | Unit of Measure: EACH | |
| Quantity Sold | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 |
| Dollars Sold | 0 | 0 | 0 | 625 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 625 |
| Gross Profit Amount | 0 | 0 | 0 | 424 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 424 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 |
| Dollars Sold | 0 | 0 | 0 | 625 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 625 |
| Gross Profit Amount | 0 | 0 | 0 | 424 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 424 |
| | | | | | | Customer Type: DIST  Price Level: 1  Salesperson: MPC MICHAEL CASEY | | | | | | | |
| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | | | Unit of Measure: EACH | |
| Quantity Sold | 0 | 0 | 0 | 0 | 1,890 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,890 |
| Dollars Sold | 0 | 0 | 0 | 0 | 7,862 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,862 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 4,064 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,064 |
| Totals | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 1,890 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,890 |
| Dollars Sold | 0 | 0 | 0 | 0 | 7,862 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,862 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 4,064 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,064 |

Highly Confidential - Attorneys' Eyes Only

VVW001853

Fiscal Year 2008

# REDACTED

VALLEY VIEW INDUSTRIES (VVI)

| Customer Number | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Customer Type: DIST Price Level: 1   Salesperson: DVB BERTUCCI INC**

Item Code: DPE-8   Description: DIAMOND PAVER EDGING   Unit of Measure: EACH

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 1,890 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,890 |
| Dollars Sold | 0 | 0 | 9,435 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,435 |
| Gross Profit Amount | 0 | 0 | 5,523 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,523 |
| Quantity Sold | 0 | 0 | 1,890 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,890 |
| Dollars Sold | 0 | 0 | 9,435 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,435 |
| Gross Profit Amount | 0 | 0 | 5,523 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,523 |

**Customer Type: DIST Price Level: 1   Salesperson: DVB BERTUCCI INC**

Item Code: DPE-8   Description: DIAMOND PAVER EDGING   Unit of Measure: EACH

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 40 |

Totals

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 40 |

**Customer Type: DIST Price Level: 1   Salesperson: DBIL DOMINICK BERTUCCI ILLINOIS**

Item Code: DPE-8   Description: DIAMOND PAVER EDGING   Unit of Measure: EACH

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 1,260 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,260 |
| Dollars Sold | 0 | 0 | 0 | 6,552 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,552 |
| Gross Profit Amount | 0 | 0 | 0 | 4,019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,019 |

Totals

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 1,260 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,260 |
| Dollars Sold | 0 | 0 | 0 | 6,552 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,552 |
| Gross Profit Amount | 0 | 0 | 0 | 4,019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,019 |

**Customer Type: DIST Price Level: 1   Salesperson: PBM PB MARKETING**

Item Code: DPE-8   Description: DIAMOND PAVER EDGING   Unit of Measure: EACH

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 0 | 0 | 60 | 0 | 0 | 0 | 0 | 0 | 0 | 60 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 336 | 0 | 0 | 0 | 0 | 0 | 0 | 336 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 0 | 215 | 0 | 0 | 0 | 0 | 0 | 0 | 215 |

Totals

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 0 | 0 | 60 | 0 | 0 | 0 | 0 | 0 | 0 | 60 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 336 | 0 | 0 | 0 | 0 | 0 | 0 | 336 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 0 | 215 | 0 | 0 | 0 | 0 | 0 | 0 | 215 |

**Customer Type: DIST Price Level: 1   Salesperson: DVB BERTUCCI INC**

Item Code: DPE-8   Description: DIAMOND PAVER EDGING   Unit of Measure: EACH

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gross Profit Amount | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 |

Totals

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gross Profit Amount | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 |

**Customer Type: DIST Price Level: 1   Salesperson: DVB BERTUCCI INC**

Item Code: DPE-8   Description: DIAMOND PAVER EDGING   Unit of Measure: EACH

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 7,560 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,560 |
| Dollars Sold | 0 | 0 | 0 | 33,264 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33,264 |
| Gross Profit Amount | 0 | 0 | 0 | 18,069 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 18,069 |

**Customer Type: DIST Price Level: 1**

Item Code: DPE-8-630K   Description: DIAMOND PAVER EDGING 630 PLT   Unit of Measure: EACH

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| Dollars Sold | 0 | 0 | 29,736 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29,736 |
| Gross Profit Amount | 0 | 0 | 29,715 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29,715 |

Totals

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 10 | 0 | 7,560 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,570 |
| Dollars Sold | 0 | 0 | 29,736 | 0 | 33,264 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 63,000 |
| Gross Profit Amount | 0 | 0 | 29,715 | 0 | 18,069 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47,784 |

**Customer Type: DIST Price Level: 1   Salesperson: JAH J.A. HAANSON ASSOCIATES**

Item Code: DPE-8   Description: DIAMOND PAVER EDGING   Unit of Measure: EACH

| | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 30 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 660 |
| Dollars Sold | 0 | 0 | 269 | 0 | 2,772 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,041 |
| Gross Profit Amount | 0 | 0 | 165 | 0 | 1,506 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,671 |

Highly Confidential -
Attorneys' Eyes Only

VVW001854

Fiscal Year 2008

**REDACTED**

VALLEY VIEW INDUSTRIES (VVI)

| Customer Number | Per 1 | Per 2 | Per 3 | Per 4 | Per 5 | Per 6 | Per 7 | Per 8 | Per 9 | Per 10 | Per 11 | Per 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Totals** | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 50 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | | 680 |
| Dollars Sold | 0 | 0 | 269 | 0 | 2,772 | 0 | 0 | 0 | 0 | 0 | 0 | | 3,041 |
| Gross Profit Amount | 0 | 0 | 165 | 0 | 1,506 | 0 | 0 | 0 | 0 | 0 | 0 | | 1,671 |

Customer Type: OLR  Price Level: 2  Salesperson: DVB BERTUCCI INC

| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | Unit of Measure: EACH | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | | 20 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 40- | 0 | 0 | 0 | 0 | 0 | 0 | | 40- |
| **Totals** | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | | 20 |
| Dollars Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 40- | 0 | 0 | 0 | 0 | 0 | 0 | | 40- |

Customer Type:  Price Level: 1  Salesperson: DBd, DOMINICK BERTUCCI-ILLINOIS

| | Item Code: DPE-8 | | | | | Description: DIAMOND PAVER EDGING | | | | Unit of Measure: EACH | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | | 630 |
| Dollars Sold | 0 | 0 | 0 | 0 | 3,276 | 0 | 0 | 0 | 0 | 0 | 0 | | 3,276 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 2,010 | 0 | 0 | 0 | 0 | 0 | 0 | | 2,010 |
| **Totals** | | | | | | | | | | | | | |
| Quantity Sold | 0 | 0 | 0 | 0 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | | 630 |
| Dollars Sold | 0 | 0 | 0 | 0 | 3,276 | 0 | 0 | 0 | 0 | 0 | 0 | | 3,276 |
| Gross Profit Amount | 0 | 0 | 0 | 0 | 2,010 | 0 | 0 | 0 | 0 | 0 | 0 | | 2,010 |

| Report Totals: | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Sold | 0 | 117 | 2,070 | 5,470 | 12,820 | 8,470 | 0 | 0 | 0 | 0 | 0 | | 28,747 |
| Dollars Sold | 0 | 536 | 46,025 | 27,176 | 56,492 | 37,362 | 0 | 0 | 0 | 0 | 0 | | 167,593 |
| Gross Profit Amount | 0 | 295 | 41,740 | 16,181 | 31,126 | 20,337 | 0 | 0 | 0 | 0 | 0 | | 109,680 |

Highly Confidential - Attorneys' Eyes Only

Run Date: 6/30/2008  4:57:53PM
S/G Date: 6/30/2008

VVW0018S5

E

Bulldog-Edg, Paver Restraints, Water Garden Edgings - Oly-Ola Edgings Inc. "Premium Edging Prod...

Home | About us | Products | Installation & Tips | Event Calendar | Distributors | Contact Us



The Industry's Best

Search  find page with ⦿ all or ○ any of these words.

**You Gotta Keep em' Separated!**

May 30, 2008

Home
About Oly-Ola
Our Guarantee
Paver Restraints
Landscape Edgings
Low-Profile Edgings
Water Garden Edging
Retail Display Rack
Accessories
Stakes
Installation & Tips
About 'Plastic'
Event Calender
Office Hours
Photo Gallery
Submit Photos
Distributors
Testimonials
Request Newsletter
Employment
Advertisements
Contact Us

Bulldog-Edg™

Choose a Product



- The strongest paver restraint in Oly-Ola's line, Bulldog-Edg features a thicker PVC construction that makes it ideal for extra heavy-duty paver projects such as driveways and patios. Bulldog's one-piece design flexes without snipping or cutting to make tight curves. Its simple, yet effective, design makes it the perfect choice for serious professionals.

For a 1 inch version of the same restraint, check out STONE-EDG.

- And, as with all Oly-Ola products, Bulldog-Edg is made with high grade PVC with no fillers or blown in material. It can be install under or outside the paver.

### FLEXIBLE PIECES - Available in 7.5 ft. lengths or 15 ft. lengths



6 - 15 ft pieces per bdl or 12 - 7.5 ft pieces per box/bdl (90 ft)
Edging only - Steel stakes and H-clip sold separate at discount
Black Rigid PVC and carbon black concentrate
Vertical: .175 - .185 of an inch Horizontal: .155 - .165 of an inch
Depth: 1.75" Vertical leg Width: 2.75" Horizontal leg
15 foot bundle: 34 lbs.  7.5 foot bundle: 34 lbs.
7.5 foot box: 42 lbs. (incl stakes)





Install under paver   Install outside paver



EXHIBIT
37
Rynberk

Bulldog-Edg, Paver Restraints, Water Garden Edgings - Oly-Ola Edgings Inc. "Premium Edging Prod...







**Landscape Architects:** Please use 800-334-4647 on all specifications. This will allow us to help the contractor bid the job properly.

**For pricing information call or email us**

© Copyright 2003 Oly-Ola Edgings, Inc. All Rights Reserved
E-mail: edgings@olyola.com

Privacy Policy





## PaveMaster™ Benefits

Increase the value of your home with a paved surface! Do-it-yourself with easy to install *PaveMaster™* edging. Use for walkways, driveways, or patios being prepared with pavers, bricks, or stones.

*PaveMaster™* is made of heavy gauge HDPE recycled plastic for years of solid holding power. Available in 6' (1.8 m), 8' (2.4 m), and 15' (4.6 m) sections, this durable plastic edging will never rot or rust.

The unique design allows for installation in straight or curved areas with three options for anchoring - plastic stakes, steel stakes, or steel spikes.

No wonder homeowners, builders, and contractors choose *PaveMaster™*. Simply put, it is *the* top quality pavement edging.

An 8-Step Installation guide, including a checklist of recommended materials, is mapped out on the following pages. Because each pavement project is different, be sure to check with your paver supplier and local building codes to determine the necessary materials and guidelines.

*Start Paving Your Own Yellow Brick Road!*





**Master Mark Plastics**
One Master Mark Drive
Albany, MN 56307-9562
800-535-4838
www.MasterMark.com

Tour our facilities!
Builders, contractors, dealers, or distributors call us for plant tours at our Albany and Paynesville, MN locations.

Copyright Master Mark Plastics - PaveMaster

# 7-Step Installation Guide



**Materials:**
- *(text partially illegible)*
- 8138, 15125, 15226,
- 8138X, 43333, or 88220

**Equipment:**
- Three 2 x 4 x 10' boards
- Level
- Tape Measure
- Wheelbarrow
- Gloves & Eye Protection

**Materials:**
- Masonry Saw
- Paver Combination (ref: pg. 24)
- Soil Cover & Reinforcement

**1. Plan:** Plan for the area you wish to pave by bringing measurements to your paver supplier. This way, you get the right amount of pavers, gravel base, and concrete sand. Check with your supplier and with local building codes for any recommendations on your project.

**2. Dig Important:** Before you dig, have an inspection done to locate any underground cables! Excavate 3 inches wider than the area you plan to pave. Generally, dig 3 to 6 inches deep for pedestrian weight or 6 to 12 inches deep for vehicle weight. Run a plate compactor over the excavated area at least twice, being sure to overlap passes by a few inches. Make passes at 45° angles from each other.

Before filling in the gravel base, check with your paver supplier for recommendations on using landscape fabric. Landscape fabric aids in water drainage, helps distribute paver weight, and reduces shifting or sinking.

**3. Layer Gravel Base:** Preparation of the base is very important and could determine how long your pavement will last. If your base is uneven, your pavement will be uneven too.

A depth of 3 to 6 inches of gravel base is advised for installation in hard, stable soil that has remained undisturbed by supply or backfilling for at least 3 years. If the soil has been disturbed or the conditions cannot be determined, use 8 to 12 inches of gravel base. (See Fig. 1)

Base material consists of coarse gravel, no larger than 3/4", mixed with concrete sand (fine-grained sand, not cement). Spread 2 inches of the gravel base across the excavated area. Rake evenly, then pack down with the plate compactor. Start at the outer edges and work toward the center. Add another 2 inches and repeat until the desired height is reached. Never pack more than 2 inches at a time. Keep the gravel base moist, but not soggy, to help the material compact better.



**4. Check Slope:** While layering the gravel base, maintain a proper slope to guide water away from building! Place a 2 x 4 and level perpendicular to the house. Measure from the top of the gravel base to the bottom of the 2 x 4. Create a slope of 1 to 2 inches per 10 feet. (See Fig.2)

**PaveMaster** edging. Remove the concrete sand along the outside of the pavers. Place this edging on top of the exposed gravel base against the pavers. Tap edging with a rubber mallet until it is firmly against the pavers. Alternate between removing concrete sand and installing PaveMaster. (See Fig.5)

Use Master Mark Plastics stakes (see mate-rial), to anchor PaveMaster every 2 feet for straight sections. Make sure edging is secure and rests firmly against the pavers. For curved installa-tion, bend and contour the edging so it assumes the shape of your design. Anchor PaveMaster every 1 foot for curved areas.



**5. Finish:** Sweep off excess sand. Make a few more passes over your pavers with the plate compactor. Sweep more concrete sand or contractor's sand into any gaps to create a dry mortar. Keep making passes over the pavers and sweep-ing sand into the gaps until all gaps are full.

Sweep off all excess sand. Backfill with dirt and sod so that the anchors are covered and the lawn is flush against the wall of pavement. You have now finished your project! So take a walk down your proud-to-do-it-yourself yellow brick road!

**Check the final height of the pavement by screeding 1 inch of sand in a small area. Place a paver on the sand. If the paver is set too high, add more gravel base, not sand. If the paver is too low, remove some of the gravel base.**

**5. Layer Sand:** Spread exactly 1 inch of concrete sand (not cement) on top of the gravel base. To screed, use two 2 x 4's as guides, and the 3rd 2 x 4 to level the sand evenly. Remember: if your base is uneven, your pavement will be uneven too. Do not walk on the leveled sand. (See Fig.3)

**6. Lay Pavers:** Start laying pavers in the corner nearest your supply, preferably by a fixture such as your house. When putting your pavers into place, do not exceed a 1/8" gap between them. If the Some pavers are manufactured with spacer bars to ensure proper spacing. Lay pavers from right to left, left to right, one row at a time, and so on. Set pavers lightly on the sand. Do not push down, twist, or slide the pavers. Walk only on the installed pavers and not on the sand. (See Fig.4)

Some pavers will have to be cut into shape with a masonry saw. Please follow all manufacturer's guidelines and safety precautions when using this potentially dangerous equipment!

**7. Install Edging:** Once all the pavers have been laid, install



Spikedge™ is an innovative all-in-one edge restraint system that has the spikes connected right to the edge restraint, so that you have them where and when you need them. Made from the same super-strong material as the restraint itself, spikes have been conveniently attached to the edge restraint which easily snap off, giving you the right number of spikes for your installation. Spikedge™ reduces installation time and saves you money by eliminating the need for costly spikes.



**Dimensions:**
8'
2.44 m

**Installation:**
Spikedge™ can be installed in straight or curved applications. Simply snap one or more "stabilizer tabs", to allow Spikedge™ to flex for either inside or outside curved applications. 1. Remove spikes from strip with a knife or snips. 2. Snap our the "stabilizer tabs" (between base pads) for curved applications. 3. Using a 2 - 3 lb mallet to install spikes: Normal Load: walkways and patios 12" to 18" apart (on average every 4th hole). Heavy Load: driveways 12" apart (every 3rd hole). 4. Angle spikes inward, slightly towards the pavers when hammering them in. Hold spike with one hand while pounding in with the other to avoid vibration. (NOTE: hit spike head flush with mallet to avoid damaging the spike).

**Warning:**
NOTE: Do not install plastic spikes in gravels containing stones larger than 3/4" in diameter. CAUTION: Plastic may become brittle in cold weather. Always wear proper eye protection when installing plasic or metal spikes. Minimum radius 4 ft.

**Note:**
For exisiting installations simply peel away the sod from the edges of the pavers, remove the soil, add gravel, straighten the edge pavers if required, and install Spikedge™. Spikedge™ is made using a sophisticated foam injection process that produces a highly durable, weather resistant material. Unlike metal spikes that rust, Spikedge™ will not rust or decompose and will stand up to severe freeze and thaw conditions.

**Important:**
Read complete instructions on container prior to application.

Alliance



WEBDESIGN : CASSI

© ALLIANCE DESIGNER PRODUCTS INC., All rights reserved



Protect Your Investment

**LIFETIME WARRANTY**

Before & After

Typical Corner Section

Easy Installation

Secure Interlocking Ends

Outside Curve

Inside Curve

Inside Corner

Outside Corner

restraint

Dimex Corporation: Paver Restraint

# EdgePro®

*The Professionals' Choice!*

Heavy-duty PVC edging for interlocking concrete or brick pavers.

## EdgePro® Paver Restraint



- Extra rugged design withstands heavy traffic. **EdgePro®** can be used for either walkway, patio or driveway installations.

- Durable **EdgePro®** PVC will not crack, rot or deteriorate. Designed for both straight and radius installations without snipping or cutting.

- L-shape design eliminates turf "brownout" by allowing maximum backfill against the pavers.

- Compact 7 1/2 foot design is convenient and efficient, allowing easy storage and hauling.

- **EdgePro®** Paver Restraint can be anchored with standard 3/8 X 12 inch or 9 inch landscape stakes.



## EdgePro® Rigid Restraint

- Extra Rigid for big jobs with straight installations.

- Durable **EdgePro®** PVC will not crack, rot or deteriorate.

- Compact 7 1/2 foot design is convenient and efficient, allowing easy storage and hauling.

## Specifications

| | *EdgePro® Paver Restraint*<br>Engineered Rigid PVC Alloy | *EdgePro® Rigid Restraint*<br>Engineered Rigid PVC Alloy |
|---|---|---|
| **Material** | | |
| *Dimensions* | | |
| Length | 7 1/2 feet | 7 1/2 feet |
| Vertical Section | 1 7/8 inches | 1 7/8 inches |
| Horizontal Section | 3 1/2 inches | 3 1/2 inches |

restraint

**Minimum Wall Thickness**

| | | |
|---|---|---|
| Vertical Section | 0.125 inches | 0.125 inches |
| Horizontal Section | 0.220 inches | 0.125 inches |
| Minimum Rib Thickness | --- | 0.280 inches |

## Material Tests

| | *ASTM Test Method* | *Minimum* |
|---|---|---|
| Tensile Strength | D-638 | 5,000 PSI |
| Flexural Modules | D-790 | 280,000 PSI |
| Impact Strength | D-256 | 120 in lbs/inch |

**EdgePro® passes Ultraviolet and Weathering Tests per Federal Std 191 A, Method 5804.**



### Installation Guidelines

Install compacted gravel base. Consult your paving stone supplier for proper width and depth for the specific application.

After pavers have been set in place, install edging along outside row of pavers.

No snipping or cutting is necessary for easy installation of radius designs.  Simply bend **EdgePro®** Paver Restraint into the desired radius.



Secure **EdgePro®** by driving standard 9 inch landscape stakes or 3/8 x 12 inch landscape spikes into compacted base.

Recommended spike placement:

- Flexible section, every 18 inches
- Rigid section, every 24 inches



Backfill perimeter with topsoil, seed or sod as preferred.

© 2008 Dimex Corporation | Dimex@Dimexcorp.com | 1-800-334-3776

PAVE EDGE - Interlocking Concrete & Brick Paver Edge Restraints & Installation by PAVE TECH



PAVE EDGE - Interlocking Concrete & Brick Paver Edge Restraints & Installation by PAVE TECH



- Large, stronger design made especially for heavy vehicular, commercial, and industrial applications.
- Only Paver Edge Restraint large enough for use with the thicker paver and bedding layer on a typical permeable application.
- Designed for the harsh environment of Commercial and Industrial Pavements.

**HI-VIZ**




📄 View PDF - Hi-Viz Brochure
📄 View PDF - Hi-Viz Installation

- Bright yellow PAVE EDGE Rigid
- Lipped design enables HI-VIZ to hold pavers and sand in place
- Reduces trip hazards
- Transitions nicely from an aisle to booth area
- Easy to install
- 6' lengths

© Copyright 2005   PAVE TECH, INC.
Privacy Policy | Legal Notice | Support

Site by ClearImaging.com



*Flexible*



Search  Find page with ⦿ all or ○ any of these words.



July 25, 2008

Home
About Oly-Ola
Our Guarantee
Paver Restraints
Landscape Edgings
Low-Profile Edgings
Water Garden Edging
Retail Display Rack
Accessories
Stakes
Installation & Tips
About 'Plastic'
Event Calendar
Office Hours
Photo Gallery
Submit Photos
Distributors
Testimonials
Request Newsletter
Employment
Advertisements
Contact Us

**Bric-Edg™**

Choose a Product

- Introduced by Oly-Ola in 1992, it is the original "L" shaped paver restraint. Bric-Edg's simple design was no accident. At the time of its introduction, no paver restraints were available that could be installed underneath the pavers and the available restraints did not allow for turf growth alongside the paver after installation. Improving on an existing idea, it was determined that the "L" shape was the best design to solve these problems.

For a shallow version of the same restraint, check out SHALLOW BRIC-EDG

- And, as with all Oly-Ola products, this new restraint needed to be the strongest on the market; therefore, it was made with high grade PVC with no fillers or blown in material. Its success is evident by the many competitors who have since tried to copy the design. Today, Bric-Edg remains the industry leader.

### FLEXIBLE & RIGID PIECES - Available in 7.5 ft. lengths or 15 ft. lengths




Install under paver


Install outside paver

Bric-Edg, Paver Restraints, Water Garden Edgings - Oly-Ola Edgings Inc. "Premium Edging Products"





**Landscape Architects:** Please use 800-334-4647 on all specifications.
This will allow us to help the contractor bid the job properly.

**For pricing information call or email us**

© Copyright 2003 Oly-Ola Edgings, Inc. All Rights Reserved
E-mail: edgings@olyola.com

Privacy Policy

Case 1:08-cv-02690    Document 39-5    Filed 08/08/2008    Page 64 of 84

Stone-Edg, Paver Restraints, Water Garden Edgings - Oly-Ola Edgings Inc. "Premium Edging Produc...



The Industry's Best

Home | About us | Products | Installation & Tips | Event Calendar | Distributors | Contact Us

Search   Find page with ◉ all or ◯ any of these words:

**You Gotta Keep em' Separated!**

July 25, 2008

**Home**
**About Oly-Ola**
**Our Guarantee**
**Paver Restraints**
**Landscape Edgings**
**Low-Profile Edgings**
**Water Garden Edging**
**Retail Display Rack**
**Accessories**
**Stakes**
**Installation & Tips**
**About 'Plastic'**
**Event Calendar**
**Office Hours**
**Photo Gallery**
**Submit Photos**
**Distributors**
**Testimonials**
**Request Newsletter**
**Employment**
**Advertisements**
**Contact Us**

# Stone-Edg™

Choose a Product



**NEW** 1"

- The first 1" high PVC paver restraint has been introduced by Oly-Ola and it is the ideal restraint for architectural hardscape stones such as flagstone, bluestone, tumbled marble, slate, granite, quartzite, and more. Stone-Edg is a smaller version of Bulldog-Edg, and already great product; therefore, you know it is tough and flexible enough to handle all applications.

- Stone-Edg is a major time saver since there is no need to dig or score the ground during installation. And as with all our paver restraints, Stone-Edg can be installed against or under the stones or pavers.

### FLEXIBLE PIECES - Available in 7.5 ft. lengths or 15 ft. lengths











© Copyright 2003 Oly-Ola Edgings, Inc. All Rights Reserved
E-mail: edgings@olyola.com

Bric-Edg, Paver Restraints, Water Garden Edgings - Oly-Ola Edgings Inc. "Premium Edging Products"



The Industry's Best

**Home | About us | Products | Installation & Tips | Event Calendar | Distributors | Contact Us**

Search  Find page with ● all or ○ any of these words.

**You Gotta Keep em' Separated!**

July 25, 2008

Home
About Oly-Ola
Our Guarantee
Paver Restraints
Landscape Edgings
Low-Profile Edgings
Water Garden Edging
Retail Display Rack
Accessories
Stakes
Installation & Tips
About 'Plastic'
Event Calendar
Office Hours
Photo Gallery
Submit Photos
Distributors
Testimonials
Request Newsletter
Employment
Advertisements
Contact Us

**Bric-Edg II™** (no backlip)

Choose a Product



- Introduced shortly after the original Bric-Edg, this restraint features the exact same design without the 1/4" lip along the backside. Bric-Edg II is ideal for landscapers who prefer installing the restraint on the outside of the paver.

For a shallow version of the same restraint, check out SHALLOW BRIC-EDG II

- And, as with all Oly-Ola products, this restraint needed to be the strongest on the market; therefore, it was made with high grade PVC with no fillers or blown in material. Its success is evident by the many competitors who have since tried to copy the design. Today, Bric-Edg and Bric-Edg II remain the industry leaders.

### FLEXIBLE & RIGID PIECES - Available in 7.5 ft. lengths or 15 ft. lengths



# Install under paver    Install outside paver





Landscape Architects: Please use 800-334-4647 on all specifications. This will allow us to help the contractor bid the job properly.

**For pricing information call or email us**

© Copyright 2003 Oly-Ola Edgings, Inc. All Rights Reserved
E-mail: edgings@olyola.com

Privacy Policy



The Industry's Best

**You Gotta Keep 'em' Separated!**

July 25, 2008

**Home**
**About Oly-Ola**
**Our Guarantee**
**Paver Restraints**
**Landscape Edgings**
**Low-Profile Edgings**
**Water Garden Edging**
**Retail Display Rack**
**Accessories**
**Stakes**
**Installation & Tips**
**About 'Plastic'**
**Event Calendar**
**Office Hours**
**Photo Gallery**
**Submit Photos**
**Distributors**
**Testimonials**
**Request Newsletter**
**Employment**
**Advertisements**
**Contact Us**

## *Shallow* Bric-Edg™

Choose a Product

- As a slightly smaller version of Bric-Edg, Shallow Bric-Edg is the most cost effective paver restraint in Oly-Ola's line. Its reduced vertical leg makes for a great fit when restraining shallow pavers, patio block, flagstone, and even slate. This style features the same keyhole cuts and "L" shape design as all of Oly-Ola's paver restraints, making it flexible and durable.

**FLEXIBLE & RIGID PIECES – Available in 7.5 ft. lengths or 15 ft. lengths**





Install under paver    Install outside paver





**Landscape Architects:** Please use 800-334-4647 on all specifications.
This will allow us to help the contractor bid the job properly.

**For pricing information call or email us**

© Copyright 2003 Oly-Ola Edgings, Inc. All Rights Reserved
E-mail: edgings@olyola.com

Privacy Policy

Case 1:08-cv-02690   Document 39-5   Filed 08/08/2008   Page 70 of 84



The Industry's Best

Home | About us | Products | Installation & Tips | Event Calendar | Distributors | Contact Us

Search  Find page with ⦿ all or ◯ any of these words.

## You Gotta Keep 'em Separated!

(no backlip)

*Shallow Bric-Edg II*™

July 25, 2008

**Home**
About Oly-Ola
Our Guarantee
Paver Restraints
Landscape Edgings
Low-Profile Edgings
Water Garden Edging
Retail Display Rack
Accessories
Stakes
Installation & Tips
About 'Plastic'
Event Calendar
Office Hours
Photo Gallery
Submit Photos
Distributors
Testimonials
Request Newsletter
Employment
Advertisements
Contact Us



Choose a Product

- As a slightly smaller version of Bric-Edg II, Shallow Bric-Edg II is the most cost effective paver restraint in Oly-Ola's line. Its reduced vertical leg makes for a great fit when restraining shallow pavers, patio block, flagstone, and even slate. This style features the same keyhole cuts and "L" shape design as all of Oly-Ola's paver restraints, making it flexible and durable.

## FLEXIBLE & RIGID PIECES - Available in 7.5 ft. lengths or 15 ft. lengths



Install under paver   Install outside paver





**Landscape Architects:** Please use 800-334-4647 on all specifications.
This will allow us to help the contractor bid the job properly.

**For pricing information call or email us**

© Copyright 2003 Oly-Ola Edgings, Inc. All Rights Reserved
E-mail: edgings@olyola.com

Privacy Policy

**EdgePro** *by Dimex* · "The Professional's Choice" · 1.800.EDGEPRO

Home   Contact Us   Request Info   Products ▸

# EdgePro®



## EdgePro® Paver Restraint

Heavy-duty PVC edge restraint system for 60mm concrete or brick pavers. EdgePro® Paver Restraint is designed with a 1.75" vertical wall height for use with most standard pavers. Rigid option available for installations that require straight lines.



## EdgePro Low Profile™

Heavy-duty PVC edge restraint system for 40mm concrete or brick pavers. EdgePro Low Profile™ features a 1.25" vertical wall height that makes it ideal for thinner paving applications, including flagstone and wet cast pavers. Rigid option available for installations that require straight lines.

## EdgePro Max™

Heavy-duty PVC edge restraint system for 80mm concrete or brick pavers. EdgePro MAX™ is designed with a 2.75" vertical wall height for thicker paving applications, including driveway and commercial installations.





## We're taking EdgePro® to New Heights!

**Now there's EdgePro® Paver Restraint for most segmental paver applications.**

Home | Contact Us | Request Info | Disclaimer | Privacy Policy

Site best viewed with Internet Explorer and Adobe Reader.

Member of...

**Dimex LLC**
28305 St. Rt. 7, Marietta, OH 45750
Phone: 1.800.EDGEPRO (1.800.334.3776)
Fax: 1-740-374-2700
Email: EdgePro@Dimexcorp.com

dimex,paver restraint, lawn edging, chain lock, pvc, gardening, landscape, hardscape, pavers, paver installation, edging, lawn edging, aluminum edging, poly, aluminum, plastic, plant beds, landscape, landscape edging, erosion control, driveway, concrete edging, gravel walkways, landscape contractors, landscape installers, ultra, edgepro, prolock, patio,nova, novaedge,paving stone, anchoring spikes, landscape stakes, flexible, rigid,paver installation, edging installation, edgepro max, edgepro low profile, edgepro paver restraint,

edgepro professional, edgepro prolip, V-Lip, landscape border system, concrete sidewalks,tree rings, spike anchoring adaptors, click and lock connectors, steel, tree tie, chain lock, polyethylene, landscape professional, growers, nursery, orchards,pave, pavement, ICPI, contractor, garden center, plastic edging, brick, brick paver, steel edging, clay pavers, bed edging, sidewalk, walkway, interlocking, wet cast pavers, 60 mm, stone, decorative, stake, tree stake, black, flex, border, building supplies, concrete, curb, plant, paver edging, edge, pro edge,divider, bed divider, pave,brick, stop, paver tools, paver accessories, paver restraint, paver edging, aluminum paver edging, aluminum paver restraint, aluminum landscape edging, plastic paver edging, plastic paver restraint, plastic landscape edging, beast, paver tools, paver cutter, valley, view, ace, diamond, lok, poly, board, dandy, mighty, classic, easy, royal, thrifty, cobble, cobblestone, bric, edg, shallow, bulldog, king, knight, jack, black, trim, slim, super, pond, keeper, master, viper, contractor, pro, terrace, snap, tech, stone, pavestone, industrial, commercial, heavy duty, lock, holland, keylock, dublin, celtik, cambridge, tumbled paver



*Flexible*



Home | PAVE EDGE | SANDLOCK | Tools and Equipment | Adhesives | Chemicals | Material Handling Equipment | New Products

Home

PAVE EDGE

Tools and Equipment

Paver Brights

PAVE CHEM

Product Specials

Brochures & Promotional Items

Industry Calendar and News

Installation & Education

Paver School

Customer Projects and Comments

Hardscape Outfitters

About Us / Contact Us

## PAVE EDGE

Print this page

Features | Products | Specialized Applications | Specifications
Installation | Testing & Engineering | Job Cost Calculator

Pave Edge Video Section 1 (8.23mb)    Pave Edge Video Section 2 (16.5mb)

The Japanese have a philosophy called "Zero Defect." This concept states that "it is always cheaper and more profitable to do the job right the first time." It is unbelievable how much money it costs to go back and repair a job. Man hours, mileage, equipment, loss of customer confidence, damaged reputation, and loss of revenue from not working on a paying job.

PAVE EDGE offers unchallenged design flexibility, simple installation requirements, lightness in weight, superior strength and durability. Because it is the first edging designed exclusively for pavers, it is the most widely accepted and used paver edge restraint system in use today! Designed to match the durability of the pavers.

PAVE EDGE will maintain the perimeter interlock better than any other product. Designed to work well for sidewalks, patios and driveways.

## Products:

Click on a small image below to see larger PDF image!

Flexible    Rigid    Connection    Industrial

## RIGID - The original PAVE EDGE.



- Designed for straight areas, but flexible enough to support gradual curves. For smaller curves PAVE EDGE RIGID can be easily cut.
- If you run out of PAVE EDGE FLEXIBLE on the job, you can easily cut the back of our PAVE EDGE RIGID with a hacksaw to transform it into flexible edging.
- Designed to withstand loading forces equivalent to that of a heavily trafficked residential driveway and able to withstand occasional heavy truck loading.

## FLEXIBLE:



- PAVE EDGE FLEXIBLE combines the durability and design of PAVE EDGE RIGID with flexibility to produce tighter and shorter curves.
- Easily connected to PAVE EDGE RIGID, the two combine to do every job possible!
- Designed to withstand loading forces equivalent to that of a heavily trafficked residential driveway and able to withstand occasional heavy truck loading.

- Do not use PAVE EDGE FLEXIBLE edging on straight areas, use only for radius areas.

## INDUSTRIAL:



- Large, stronger design made especially for heavy vehicular, commercial, and industrial applications.
- Only Paver Edge Restraint large enough for use with the thicker paver and bedding layer on a typical permeable application.
- Designed for the harsh environment of Commercial and Industrial Pavements.

## HI-VIZ

 

View PDF - Hi-Viz Brochure
View PDF - Hi-Viz Installation

- Bright yellow PAVE EDGE Rigid
- Lipped design enables HI-VIZ to hold pavers and sand in place
- Reduces trip hazards
- Transitions nicely from an aisle to booth area
- Easy to install
- 6' lengths

© Copyright 2008  PAVE TECH, INC.
Privacy Policy | Legal Notice | Support

Site by ClearImaging.com





**Industrial PAVE EDGE**

# Bon

www.bontool.com

Bon Tool Co.
1-800-444-7060

🛒 Cart | Quick Order | Register | Sign In | Home | See All Products

MASONRY TOOLS | CONCRETE TOOLS | DECORATIVE CONCRETE | DRYWALL TOOLS | SEE ALL DEPARTMENTS

SEARCH [Keyword or Item #]   All Departments

Paver & Landscape Tools > Extractors & Alignment Tools > Extractors & Alignment Tools

YOUR SHOPPING CART

Checkout

No Items in Cart
Subtotal:$0.00

## SHOP ONLINE

Paver & Landscape Tools
Paver & Retaining Wall
Splitters
Sand & Lute Rakes
Stompers & Compactors
Sealers
Extractors & Alignment Tools
  ▪ Extractors & Alignment Tools
Specialty Hammers
Tongs & Lifters
Landscape Rakes & Yard Tools

**Login:** [          ]
**Password:** [          ]
Forgot your password?

# Bon Paver Tools

## LIGHTWEIGHT PAVER RESTRAINTS

- Lightweight PVC edge restraints are designed to be used with concrete or brick pavers
- The vertical wall height is 1 3/4" and can be used with most solid pavers
- 90 feet per box
- 12 pieces at 7' 6"

| Part Number | Style | Detail | Prices | | | Stock Status | Quantity |
|---|---|---|---|---|---|---|---|
| | | | As Low As: $90.00 each | | | | |
| 21-138-B7 | Flexible | 90' per box (12 pieces at 7'6") | 1 or more | $97.00 | | In Stock | |
| | | | 12 or more | $92.00 | | | |
| | | | 42 or more | $90.00 | | | |
| | | | As Low As: $90.00 each | | | | |
| 21-139-B7 | Rigid | 90' per box (12 pieces at 7'6") | 1 or more | $97.00 | | In Stock | |
| | | | 12 or more | $92.00 | | | |
| | | | 42 or more | $90.00 | | | |



## COMPANY INFORMATION
Home
Contact Us
About Us
Request a Catalog

## SALES TERMS
Payment Terms
Freight & Shipping
Returns & Refunds
Open Account Terms

## COMPANY POLICIES
Privacy Policy
Copyright & Terms of Access
Liability & Warranty
Registration Policy

## HELP
See All Products
FAQ
Vendor Information
New Product Submission

Enter Email Here...

Bon Tool Co., 4430 Gibsonia Rd., Gibsonia, PA 15044 • USA
Copyright notice 2006. All Rights reserved. Satisfaction guaranteed.
Use of this site is subject to the Terms and Conditions, which constitutes a legal agreement between you and Bon Tool Co.

Powered by BonSource™

☒

HOME PAGE    BRICKHOLD    BRICKHOLD INSTALLATION    WHERE TO BUY

**BORDERSCAPES** line of lawn and garden edging products

  

The reinforced anchoring hole has a frictional flange to hold spikes for easy one handed installation.

Spikes are driven in straight for conventional installation, or at an angle for installation after the pavers have been installed for a tighter fit.

Piece to piece connections are locked by a standard steel spike (10" 3/8"). No material waste.

  

Quickly peel away the frost lip and slice through the angled cutting guides for sharp curves, or the straight guides for gradual curves.

Designed for straight and curved edges. In a matter of seconds, the frost lip is removed to convert straight edging to curved **BRICKHOLD** sections.



With the frost lip removed, **BRICKHOLD** edging easily forms inside and outside curves.



## Superior Performance and Value





- Fast and easy installation, single product provides simplified inventory and use.
- Patented Structural Design guarantees you the latest technology.
- Piece to piece connection locked by standard landscape spikes. No material waste.
- Curved installations simplified with cutting guides and a peelable frost lip.
- Manufactured from environmentally responsible, recycled injection molded plastic.
- Full depth of soil along edging promotes superior grass growth.
- Needs fewer spikes than competition. Lowest installed cost.
- Provides proper separation of top soil and base material.
- Available in stackable 7' lengths.

## Click Here for the Installation Guide



**BORDERSCAPES, LLC**
A Division of PAVE TECH, INC.
P.O. Box 576, Prior Lake, MN 55372
Phone: 952-226-6400
Fax: 952-226-6406
sales@paveedge.com
**800-728-3832**

HOME PAGE | BRICKHOLD | BRICKHOLD INSTALLATION | WHERE TO BUY

**Back to Top**m

## CERTIFICATE OF SERVICE

I, Monica L. Thompson, an attorney, depose and state that on August 8, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve electronic notice to all counsel of record.

By:  __/s/ Monica L. Thompson____

Monica L. Thompson