IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BRICKSTOP CORPORATION, | ) | Case Number: 1:08-cv-02690 |
| | ) | |
| Plaintiff, | ) | Assigned Judge: Gettleman |
| | ) | |
| v. | ) | Designated |
| | ) | Magistrate Judge: Cole |
| VALLEY VIEW INDUSTRIES, H.C., INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF MATTHEW B. WALTERS
IN SUPPORT OF PLAINTIFF'S REPLY SUGGESTIONS**

I, Matthew B. Walters, declare:

1.     I am a member in good standing of the bar of the state of Kansas, am admitted pro hac vice in the above-captioned case, and am an associate in the law firm Hovey Williams LLP, 10801 Mastin Blvd., Suite 1000, 84 Corporate Woods, Overland Park, Kansas 66210 and represent BrickStop Corporation ("BrickStop") in the above-captioned case.  I have personal knowledge of the statements made herein.

2.     This Declaration accompanies BrickStop's Reply to Valley View Industries, H.C., Inc.'s ("Valley View's") Memorandum of Law in Opposition to Plaintiff's Request for Preliminary Injunction.

3.     Attached hereto as Exhibit A are true and accurate copies of █████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

4.     Attached hereto as Exhibit B is a true and accurate copy of █████

█████████████████████████████████████████████████████.

5.    Attached hereto as Exhibit C is a true and accurate copy of ███████
███████████████████████████████████████████████████.

6.    Attached hereto as Exhibit D is a true and accurate copy of ███████
███████████████████████████████████████████████████.

7.    Attached hereto as Exhibit E are true and accurate copies of engineering drawings produced by Valley View, which bear the bates labels ██████████████████, and VVW001856 – VVW001861.

8.    Attached hereto as Exhibit F are true and accurate copies of email correspondence produced by Valley View, which bear bates labels ███████████████████████████ ████████████████████ and VVW001915.

9.    Attached hereto as Exhibit G are true and accurate copies of ███████
██████████████████████████████████████████████████████████████████████████.

10.    Attached hereto as Exhibit H is a true and accurate copy of excerpts from the transcript of the deposition of David Frieberg and ████████████████████████
████████.

11.    Attached hereto as Exhibit I is a true and accurate copy of excerpts from the transcript of the deposition of Rubin Kurtz and ████████████████████████
████████.

12.    Attached hereto as Exhibit J is a true and accurate copy of excerpts from the transcript of the deposition of Howard Rynberk.

13.    Attached hereto as Exhibit K is a true and accurate copy of excerpts from the transcript of the deposition of Dominick Bertucci.

14.    Attached hereto as Exhibit L is a true and accurate copy of a digital image I printed off of the Dreamscape website on August 22, 2008.  I downloaded this image from the following url: www.yardproduct.com/popup_image.php?pID=374.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated:  August 22, 2008                    By:    _Matthew B. Walters_____

                                                          Matthew B. Walters

# Exhibit A

REDACTED

# Exhibit B

REDACTED

# Exhibit C

# REDACTED

# Exhibit D

# REDACTED

# Exhibit E

REDACTED



VVW001856



VVW001857



VVW001858



VVW001859



VVW001860



VVW001861

# Exhibit F

# REDACTED

Δ π EXHIBIT 61
Deponent_____
Date 8-1-08 Rptr.____
WWW.DEPOBOOK.COM

Herb Cantu

From:        Dominick V. Bertucci [dvinb@yahoo.com]
Sent:        Friday, February 29, 2008 9:48 AM
To:          Herb Cantu
Subject:     Sample

Herb,
Please send one 3' sample of DPE to below.

                              wrote:          

Subject: FW: Attn: Russ FW: jpeg of Diamond Paver Restraint
Date: Fri, 29 Feb 2008 09:35:26 -0600
From
To: "Dominick V. Bertucci" <dvinb@yahoo.com>

Dominick,

Can you have a sample piece of the new Diamond Paver Edge restraint sent to:

Attn:

Oconomowoc, WI

Thanks

From.
Sent: Friday, February 29, 2008 9:28 AM
To:
Subject: Attn:       FW: jpeg of Diamond Paver Restraint

Here's a picture of Valley View's new Diamond Paver Edge restraint. Their version to compete with the BEAST product. You can see from the picture, the cool feature they added was a slot for a regular landscape stake. So you can use spikes or stakes, whatever you prefer. Also means you can sell them spike or stakes. I'm going to have Valley View send you a piece to look at. These come packed 10 in a bundle, but really the best way to buy them is in a pallet that has 630 - 8' pieces, runs $5.60 a strip. From what I'm being told by other customers, thats better than what they're paying for the competitor, and they like this product better because of the stake feature. Look for the sample sometime next week. I'll be in touch.

Thanks

VVW001915

# Exhibit G

# REDACTED

# Exhibit H

CONFIDENTIAL - ATTORNEY'S EYES ONLY

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

BRICKSTOP CORPORATION,              )

        Plaintiff,              )

    vs.                             ) No. 08 CV 2690

VALLEY VIEW INDUSTRIES, H.C.,)

INC.,                               )

        Defendant.              )


  THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL.


      The 30(b)(6) deposition of BRICKSTOP

CORPORATION, by DAVID FRIEBERG, called for

examination, taken pursuant to the Federal Rules of

Civil Procedure of the United States District

Courts pertaining to the taking of depositions,

taken before DINA G. VILLIS, a Certified Shorthand

Reporter within and for the State of Illinois,

CSR No. 84-3400 of said state, at Suite 1900, 203

North LaSalle Street, Chicago, Illinois, on the

30th day of July, A.D. 2008, at 9:36 a.m.

# REDACTED

# Exhibit I

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

BRICKSTOP CORPORATION,                  )
                                        )
                Plaintiff,              )
                                        )
        -vs-                            )  No. 1:08-CV-02690
                                        )
VALLEY VIEW INDUSTRIES, H.C. INC., )  Judge Gettleman
                                        )
                Defendant.              )


        The deposition of RUBIN KURTZ, taken pursuant

to the Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking of

depositions, taken before CHRISTINE LIUBICICH,

Certified Shorthand Reporter of the State of Illinois,

at 203 , 19th Floor, Chicago, Illinois, on Tuesday,

July 29, 2008, at 9:15  a.m.

83

1    stopped selling in the shrink wrap form?

2          A.    I would assume three, four years ago.

3          Q.    Three or four years ago, however, is this a

4    correct depiction of the label that was used with the

5    EdgeALL product?

6          A.    It appears to be, yes.

7          Q.    Did you use more than one spacer design with

8    the EdgeALL product?

9          A.    What do you mean by spacer?

10         Q.    The anchor side of a paver --

11         A.    Uh-huh.

12         Q.    -- at least with respect to the B.E.A.S.T.,

13   Son of B.E.A.S.T. and EdgeALL has foot and a spacer --

14         A.    Uh-huh.

15         Q.    -- did the design of the spacer change, or

16   did you use more than one type of spacer design with

17   the EdgeALL product?

18         A.    I believe we did.

19         Q.    Did you use more than two?

20         A.    No.

21         Q.    Can you describe the two types of spacer

22   designs that were use in the EdgeALL product?

23         A.    One was a strap, and one was its current

24   little square with the Xs.

84

1      Q.   And the little square with X spacer design is

2 the one that's depicted --

3      A.   That's the printed one.

4      Q.   -- depicted in the court papers that were

5 filed in connection with this action, correct?

6      A.   That's correct.

7      Q.   Now, with respect to the strap, that is just

8 a single bar that goes between the feet?

9      A.   That's correct.

10      Q.   And the strap was used for how long?

11      A.   Three or four years.

12      Q.   And the strap designed for spacer, was that

13 used also with the B.E.A.S.T. product?

14      A.   Yes, it was.

15      Q.   For the same period of time?

16      A.   Yes, it was.

17      Q.   Is it currently used with any sale of

18 B.E.A.S.T. product today?

19      A.   No, it is not.

20      Q.   Do you know if it is advertised today with

21 just the strap design spacer?

22      A.   There maybe the odd guy that still has an old

23 picture that hasn't updated their site.

24      Q.   Do you know if there is a odd guy that still

1    sells the strap product --

2        A.    No.

3        Q.    -- the strap spacer product?

4        A.    No, there is not.  That I know of.

5        Q.    But the strap product, strap spacer design

6    with respect to the B.E.A.S.T., when was that changed

7    made?

8        A.    I believe 2005.

9        Q.    You had mentioned instructions earlier with

10   respect to the use of the paver edge products.  The

11   instructions that are on page 1369, are those the

12   instructions you are referring to?

13       A.    That's correct.

14       Q.    Now, it's true, is it not, that neither the

15   Son of B.E.A.S.T. nor the EdgeALL products can be used

16   with a lattice nailing pattern, correct?

17       A.    Excuse me.

18       Q.    The Son of B.E.A.S.T. and the EdgeALL

19   product, neither of those will take a lattice nailing

20   pattern, will they?

21       A.    Geeze, you've got me stumped.  I'm not sure.

22   I would have to have a piece in front of me.

23       Q.    I am not sure if your pictures are any better

24   than mine, but if you can look on page 1368, and this

1      A.    Yes.

2      Q.    SRR, I note, has a Tm besides it; have you

3  ever attempted to register the term SRR?

4      A.    No.

5      Q.    Have you ever considered SRR a trademark of

6  BrickStop?

7      A.    No.

8      Q.    And if you could draw a similar line with the

9  letter B to the part that shows, or that denotes,

10  "stable sure gripping footprint," SSF for stability?

11      A.    A lot of little acronyms.

12      Q.    I didn't invent them.

13      A.    I know.  I know.

14            It's the foot.

15      Q.    The foot itself.  So can you just draw like

16  a --

17      A.    (Witness complies.)

18      Q.    Fine, and we'll put a B on that.

19            What about the foot has stable sure

20  gripping -- is stable sure gripping?

21      A.    What about the foot?

22      Q.    Yes.  What about the foot?

23      A.    I would think it's just an advertising

24  statement.

# REDACTED

1    could guess dissociated?

2         A.    Sometimes it did go loosely in the box.

3         Q.    If it happened to be loosely in the box, then

4    the product itself didn't necessarily have a

5    BrickStop --

6         A.    It had no name on it.

7         Q.    -- stamp on?

8         A.    It had no name on it.  I was a generic --

9         Q.    So were you going to make something more

10   distinctive?

11        A.    Exactly.

12        Q.    This was an extruded product that you made?

13        A.    Uh-huh.

14        Q.    Was the extruded product as thick-walled as

15   the B.E.A.S.T., legs are?

16        A.    Close.

17        Q.    It was that thick?

18        A.    Fairly close.  When you -- are you talking

19   about thickness this way, thickness this way

20   (indicating?)

21        Q.    I'm talking about thickness this way

22   (indicating.)

23        A.    No.

24        Q.    Because you can't make extruded product

# REDACTED

# Exhibit J

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRICKSTOP CORPORATION,                )
                                      )
              Plaintiff,              )
                                      )
         -vs-                         )    No. 08-CV-02690
                                      )
VALLEY VIEW INDUSTRIES, H.C.,         )    Judge Gettleman
INC.,                                 )
                                      )
              Defendant.              )


        The deposition of HOWARD RYNBERK, taken

pursuant to the Federal Rules of Civil Procedure of

the United States District Courts pertaining to the

taking of depositions, taken before KRISTA R.

DOLGNER, Certified Shorthand Reporter of the State

of Illinois, at 2 North LaSalle Street, Suite 1808,

Chicago, Illinois, on Thursday, July 31, 2008, at

9:30 a.m.


Reported for
LAKE SHORE REPORTING SERVICE, By:
Krista R. Dolgner, CSR, RPR
Illinois License No. 084-002878.

7

BY MR. BROWN:

    Q.   But do you understand that if you don't understand what I am asking you, you can ask me to clarify?

    A.   I do.

    Q.   Have you ever been involved with a lawsuit prior to this dispute and the real estate matter that you mentioned before?

    A.   You mean not in the real estate?

    Q.   Let me restate the question.

    A.   Yeah.

    Q.   Other than the real estate matter --

    A.   No.

    Q.   -- have you had any time prior to this lawsuit when you have come to any understanding about trademark law?

    MS. THOMPSON:  Objection, vague.

    THE WITNESS:  No.

BY MR. BROWN:

    Q.   Prior to this lawsuit, had you ever heard of trade dress?

    A.   I have.

    Q.   In what context had you heard of trade dress prior to this lawsuit?

8

1        MS. THOMPSON:  And I'm going to impose an

2    objection only in so far as to instruct the witness

3    if it was in conversations with an attorney about

4    whom you were seeking advice, you would not discuss

5    your conversations with the attorney.  If there was

6    some external event or something other than in

7    conversations with an attorney, you can speak.

8        THE WITNESS:  It was only in conversations with

9    an attorney.

10   BY MR. BROWN:

11       Q.   Can you tell me what the subject matter

12   was?

13       A.   Yes.  It related to a lawn edging.  It did

14   not relate to this case.

15       Q.   How long ago was that?

16       A.   Oh, I think it's been maybe a year ago,

17   two years ago.

18       Q.   And was another party making an allegation

19   about trade dress in a lawn edging?

20       A.   They were asserting a trade dress.

21       Q.   Who was that party?

22       A.   Cobraco Manufacturing in Illinois.

23       Q.   Is that Cobraco?

24       A.   Yes.

1       Q.    What was the name of the lawn edging

2    involved, Cobraco's lawn edging?

3       A.    I don't recall.

4       Q.    And what specifically did they allege

5    about -- I assume this was an activity of Valley

6    View Industries that they were complaining about?

7       A.    No, it wasn't.

8       Q.    What were they complaining about?

9       A.    They weren't complaining to me.  They had

10   alleged that years ago that their design was a trade

11   dress.

12      Q.    And why were they raising that with you?

13      A.    They didn't raise it with me.

14      Q.    How did it come about that you learned

15   about their allegations about trade dress?

16      A.    Because another manufacturer was making

17   their similar lawn edging.

18      Q.    Was the claim that Cobraco was making, did

19   it relate to the product configuration of the lawn

20   edging?

21      A.    It did.

22      Q.    So explain to me how this Cobraco

23   allegation came to your attention.

24      A.    Originally it came back to my attention,

1    probably their patent ran out, and, again, you are

2    going to ask me years, and I don't recall the years;

3    so I'm going to estimate their patent might have run

4    out in 2002.

5        Q.    So Cobraco had a patent on a lawn edging

6    that expired?

7        A.    Uh-huh, that's correct.

8        Q.    And then how did you learn that they were

9    making allegations about trade dress in the lawn

10   edging?

11       A.    Because another manufacturer was making

12   that lawn edging after their patent expired.

13       Q.    I see.  And who was it they were

14   complaining about?

15       A.    Master Mark.

16       Q.    And what were the circumstances that you

17   learned about Cobraco's allegations against Master

18   Mark?

19       A.    Just hearsay in the marketplace.

20       Q.    I see.  So you learned that Cobraco -- had

21   they brought a lawsuit?

22       A.    No.

23       Q.    Master Mark had come out with a new

24   product?

# REDACTED

1    landscape?

2        A.    It is.

3        Q.    So those terms are used somewhat

4    interchangeably?

5        A.    It is, yes.

6        Q.    What are the functional requirements of a

7    paver restraint?

8        A.    Well, I think the functional requirement

9    would be to hold the edging in place.

10       Q.    So the overall function is to hold the

11   pavers in place?

12       A.    Yes.

13       Q.    And to do that you need to be able to hold

14   the edging in place?

15       A.    Yes.

16       Q.    What is needed to achieve that function of

17   holding the edging in place?

18       MS. THOMPSON:   And I object only to the extent

19   it calls for any legal conclusions.   You can go

20   ahead.

21       THE WITNESS:   Well, you would have to have a

22   sidewall to hold the paver, and you would have to

23   have a footing of some sort to hold the restraint in

24   place.

59

1    BY MR. BROWN:

2        Q.    Can you think of anything else you would

3    need to have in a paver edging restraint?

4        A.    Yeah.    You would have to have something to

5    put the -- to hold the restraint in the ground,

6    whether it be a stake, a nail, or any other type of

7    device.

8        Q.    Anything else?

9        A.    No.

10        Q.    So somewhere in the paver restraint you

11    would need to have a hole in order to put the stake

12    or nail in?

13        A.    That's correct.

14        Q.    Can you ever stake or nail through the

15    paver restraint without the hole?

16        A.    I have not seen it done.

17        Q.    So to have a functional paver restraint

18    all you need is a sidewall, a foot of some sort, and

19    a hole in the foot to receive the nail?

20        MS. THOMPSON:    Same objection.

21        THE WITNESS:    Yes.

22    BY MR. BROWN:

23        Q.    Does the foot have to be any particular

24    shape in order to achieve its function?

1      MS. THOMPSON:  Can I just impose a continuing

2   objection for as long as you use the word function?

3   To the extent it has any legal significance, I

4   object to it, but he can answer.

5      THE WITNESS:  No, there are a number of

6   different foots you may have.

7   BY MR. BROWN:

8      Q.    And when you say number of different

9   foots, you mean?

10      A.    Foot designs.

11      Q.    The shape of the foot could be different?

12      A.    Yes.

13      Q.    Are there any fundamental requirements for

14   the shape of the foot in order for it to function

15   that you would say is common to all of the feet you

16   have seen?

17      MS. THOMPSON:  Objection to the form of the

18   question.

19      THE WITNESS:  I wouldn't say there is a

20   commonality.  The majority are L. shaped or T.

21   shaped.

22   BY MR. BROWN:

23      Q.    And when you say L. shaped, what do you

24   mean?

1    A.    Sidewall and a foot.

2    Q.    So the sidewall and the foot form an L.?

3    A.    Yes.

4    Q.    And in some cases the sidewall is

5    connected to a foot running in either direction?

6    A.    Correct.

7    Q.    And is that what you are calling a T.?

8    A.    Yes.

9    Q.    And are you aware of any common

10   requirement for the shape of the foot itself?

11   A.    I'm not aware of any common requirement.

12   Q.    Who was involved in the decision to

13   develop the Diamond Paver Edge?

14   A.    Myself, Frank Soukup, Dominick Bertucci.

15   Q.    And can you tell me what role each of you

16   played in that decision?

17   A.    Frank was more the technical advisor.  He

18   dealt with the company that actually did the

19   manufacturing.  And Dominick and I were more on an

20   advisory level of what we wanted to see in the

21   product.

22   Q.    Do you know whether Mr. Soukup has any

23   experience in injection molding?

24   A.    I can't answer that.  I don't know.

# REDACTED

1    asterisk.

2        A.    From the top?  Yes.

3        Q.    Do you know what Mr. Bertucci was talking

4    about here?

5        A.    Probably the Diamond Paver Edge.

6        Q.    And so is it your understanding that

7    Unilock was asking if Valley View could duplicate

8    the B.E.A.S.T. product?

9        A.    Correct.  But if we go back, you had asked

10   me before if there was a customer that asked, and

11   Unilock was not a customer at that time.

12       Q.    I understand.  So there was a potential

13   customer that asked?

14       A.    Right.

15       Q.    And was this the beginning of the idea to

16   follow the B.E.A.S.T. product when you developed the

17   Diamond Paver Edge?

18       A.    No, I think it actually came before this

19   in June.

20       Q.    Which came in June?

21       A.    Our idea of having another edging to

22   complement our Diamond Lock.

23       Q.    So in June you had the idea to make an

24   injection-molded edging?

# REDACTED

103

1   development of the Diamond Paver Edge in November of

2   2007?

3       A.   Very close to having the drawings done.

4       Q.   How long was it -- once you started with

5   the B.E.A.S.T. design for your -- the configuration

6   of the feet for the Diamond Paver Edge, do you know

7   how many different versions there were of that

8   configuration before you arrived at the final

9   configuration?

10      A.   No.

11      Q.   When did you tell your independent reps

12  that you were going to come out with a Diamond Paver

13  Edge?

14      A.   I would estimate we probably told them in

15  late December.  Possibly in November.

16      Q.   And are your independent reps obligated to

17  only sell Valley View paver edging?

18      A.   Yes.

19      Q.   And are they obligated to only sell Valley

20  View lawn edging as well?

21      A.   Yes.

22      Q.   They can't sell competitive products with

23  yours?

24      A.   They can sell other products that are not

1    drawing.

2            THE WITNESS:  It appears to.

3            MS. THOMPSON:  Are you talking about this here?

4            MR. BROWN:  Yes.

5        Q.    And then do you see to the right of that

6    the configuration that says, "Old Detail"?

7        A.    Correct.

8        Q.    Does that look like the B.E.A.S.T. product

9    from --

10       A.    Well, I don't have the B.E.A.S.T. product

11   in front of me.

12       Q.    So without the B.E.A.S.T. product in front

13   of you, you don't know?

14       A.    I don't know.

15       Q.    Directly below at the bottom of that

16   drawing there's configuration that's labeled "Center

17   Detail."  Do you see that?

18       A.    I do.

19       Q.    Do you ever recall there being a thought

20   to put the chevron-shaped stake hole in over the

21   center hole of the Diamond Paver edge?

22       A.    No, I don't recall that.

23       MR. BROWN:  Let's mark as Exhibit 30 a two-page

24   document with Production Numbers VVW 1272 to 73.

REDACTED

114

1          Q.   Do you recall discussing how many pieces

2    of Diamond Paver Edge would be shipped on a single

3    pallet?

4          A.   Yes.

5          Q.   And what did you discuss about that?

6          A.   As it says here, we tried to get a

7    thousand per skid.

8          Q.   Did you end up with a thousand per skid?

9          A.   No.

10         Q.   Why not?

11         A.   The weight was too heavy for a pallet, for

12   a single pallet.

13         Q.   Do you see there is an e-mail at the

14   bottom that is from Mr. Bertucci to Mr. Soukup?

15         A.   Yes.

16         Q.   And he says, "Frank, it is clear with my

17   visits to the competitor of our new paver restraint

18   that we are going to have to ship on eight-foot

19   pallets.  Currently the customer base for our

20   competition is getting 600 eight-foot lengths

21   bundled on a pallet.  They are not wanting to

22   deviate from that."  Do you see that?

23         A.   Yes.

24         Q.   Was it then the customers who were giving

# REDACTED

1    with relation to its Diamond Paver Edge and

2    BrickStop Corporation?

3        A.   No.

4        MS. THOMPSON:  Objection to the form of the

5    question.

6    BY MR. BROWN:

7        Q.   To your knowledge has any customer or

8    potential customer attempted to order B.E.A.S.T.

9    products from Valley View?

10       A.   No.

11       Q.   Are you aware of any communications from

12    customers that in any way relate to BrickStop?

13       MS. THOMPSON:  Objection, form of the question.

14       THE WITNESS:  I guess I don't -- if you want to

15    rephrase that question.  Have we received

16    communication from customers?

17    BY MR. BROWN:

18       Q.   Where BrickStop was in any way the

19    subject?

20       A.   I think you have seen some e-mails from

21    Dominick as to pricing.

22       Q.   Other than the pricing e-mails that we

23    have looked at today?

24       A.   No.

175

1  Q. Have you ever heard of a product called

2 Edge All?

3  A. No.

4  Q. Have you ever heard of a product called

5 Son of the B.E.A.S.T.?

6  A. I have heard of it.

7  Q. What do you know about the Son of the

8 B.E.A.S.T.?

9  A. I have not seen it.

10  Q. Do you consider the Son of the B.E.A.S.T.

11 to be a competitor with the Diamond Paver Edge?

12  MS. THOMPSON:  Objection, calls for

13 speculation.

14  THE WITNESS:  That I don't know.

15 BY MR. BROWN:

16  Q. If Valley View -- is it your opinion

17 that -- when Valley View began developing the

18 Diamond Paver Edge, do you believe it would have

19 arrived at the shape of the product that it did if

20 it had not had reference to the BrickStop

21 B.E.A.S.T.?

22  A. I honestly can't answer that.

23  Q. Why not?

24  A. Because we might have chose a different --

# REDACTED

1    testing for its product?

2        A.    No.

3        Q.    Has Valley View ever employed any focus

4    groups or surveys with respect to the Diamond Paver

5    Edge?

6        A.    Not that I'm aware it.

7        Q.    Has Valley View ever done any surveying

8    with respect to the BrickStop B.E.A.S.T.?

9        A.    No.

10       Q.    Did you ever have a conversation with

11   Mr. Bertucci in which he related to you that someone

12   from BrickStop had approached him at a trade show?

13       A.    Yes.

14       Q.    What do you recall about that

15   conversation?

16       A.    He said he felt threatened at the trade

17   show, said that he thought it was the closest he

18   ever got into a fistfight with somebody at a trade

19   show and that the person was very angry and

20   threatened to sue Valley View.

21       Q.    Do you recall any more about what

22   Mr. Bertucci told you?

23       A.    No.

24       Q.    He said he had thought it almost came to a

1    fistfight?

2        A.    Yes.

3        Q.    Did he recount any of the words that were

4    used?

5        A.    He didn't recount any words to me outside

6    of he asked the gentleman to please leave.

7        Q.    Do you recall when that happened?

8        A.    That was at, if I'm correct, the Tennessee

9    hardscape show.

10        Q.    Do you recall whether that incident

11    happened before or after you received the letter

12    with BrickStop's complaints?

13        A.    I'm pretty sure it happened before.

14        Q.    And as you sit here today you can't

15    remember any other details that Mr. Bertucci told

16    you?

17        A.    No.

18        Q.    Did you ever in the process of developing

19    the Diamond Paver Edge, did you ever ask your

20    lawyers to give you any opinions about whether you

21    could imitate the B.E.A.S.T.?

22        MS. THOMPSON:    Objection.    Calls for

23    attorney/client communications.    I believe the only

24    waiver we have made is with respect to the patent

181

1    search.  If you are asking for something other than

2    a patent search, I believe that it would be

3    attorney/client.

4            I would instruct you not to answer that

5    one.

6        THE WITNESS:  I figured that.

7    BY MR. BROWN:

8        Q.    Did you ask your lawyers to do a patent

9    search?

10       A.    Yes.

11       Q.    Did you ask them to do any other kind of

12   search beyond a patent search?

13       THE WITNESS:  Am I answering that?

14       MS. THOMPSON:  In terms of -- to the extent you

15   can relate it to the point in time with respect to

16   the patent search, we have to waive the full

17   disclosure at that time.  I'm talking about anything

18   that starts with the letter on.  That's what we are

19   not talking about.  Does that make sense to you?

20       THE WITNESS:  No.

21       MS. THOMPSON:  Then with respect to the date

22   and time around the period of time where you asked

23   about the patent search, do you remember when that

24   was?

1       THE WITNESS:  Yes.

2       MS. THOMPSON:  Did you ask for any searches

3   other than a patent search at that point in time is

4   what he is asking.

5       THE WITNESS:  No.

6       MS. THOMPSON:  Did that recharacterize your

7   question or thereabouts?

8       MR. BROWN:  Right.  We will keep poking around.

9       Q.   Did you ask -- during the time frame when

10  you asked for the patent search when you were

11  developing the Diamond Paver Edge, did you ask your

12  lawyers whether you needed to be concerned about

13  anything other than patents?

14      A.   I honestly don't recall.

15      Q.   Do you recall what your lawyer said about

16  the patent search?

17      A.   There were no patents, current patents.

18      Q.   Did you ask your lawyers at that time

19  about trade dress issues?  At that time.

20      A.   I don't recall.

21      Q.   Did you ask your lawyers at that time

22  about trademark issues?

23      A.   Again, I don't recall.

24      MR. BROWN:  Let's mark as Exhibit 44 a one-page

1    document with Production Number VVW 2075.  And let's

2    mark as Exhibit 45 a document with Production

3    Numbers VVW 2076 through 2095.

4                         (Rynberk Exhibits 44 and 45

5                         marked.)

6    BY MR. BROWN:

7         Q.    Do you recognize the e-mail that's marked

8    as Exhibit 44?

9         A.    I do.

10        Q.    The e-mail that's Exhibit 44 is from James

11   Ryther.  Who is that?

12        A.    An attorney with DLA Piper.

13        Q.    And it's dated July 27th, 2007; is that

14   right?

15        A.    Yes.

16        Q.    That was around the time that you were

17   developing the Diamond Paver Edge?

18        A.    Probably before.

19        Q.    Before.  Why did you ask Mr. Ryther to do

20   a search about BrickStop?

21        A.    I actually had him do a search on other

22   paver edgers too.

23        Q.    Did Mr. Ryther present you with an e-mail

24   about the other paver edgers?

1    A.    He did.

2    Q.    Did you give that e-mail to your counsel?

3    A.    They pulled everything from our e-mail, so

4    it should be.

5    MR. BROWN:  Counsel, I think we are entitled to

6    see any e-mails from Mr. Ryther.

7    MS. THOMPSON:  We don't have any others.  I'm

8    not saying there weren't at some point in time, but

9    we have searched, and I don't have any others -- or

10    none of the others we were able to retrieve from

11    there.  I will check our records.

12    MR. BROWN:  Will you check the records of DLA

13    Piper?

14    MS. THOMPSON:  That's what I said.  I will

15    check our records.  But I'm not sure that there are

16    any others.  Mr. Ryther retired from the firm.

17    BY MR. BROWN:

18    Q.    Do you recall how many e-mails you got

19    from Mr. Ryther?

20    A.    Oh, I don't recall how many.

21    Q.    Was it more than two?

22    A.    Yes.

23    Q.    And these e-mail related to your

24    development of the Diamond Paver Edge?

```
 1          A.    No.   Some e-mails related to other
 2    matters.
 3          Q.    How about with respect to the e-mail
 4    relating to the Diamond Paver Edge?  How many
 5    e-mails did you get?
 6          A.    At least two.
 7          Q.    And was each one regarding patent
 8    coverage?
 9          A.    To the best of my knowledge.
10          Q.    You see that we've marked as Exhibit 45
11    Patent Number 5212917?
12          A.    I do.
13          Q.    Did that come with the information from
14    Mr. Ryther?
15          A.    It came at an earlier time.
16          Q.    So he had provided you with this patent
17    before this e-mail?
18          A.    Yes.
19          Q.    Did you look at the Kurtz patent, U.S.
20    Patent 5212917, when Mr. Ryther gave it to you?
21          A.    I probably glanced at it.
22          Q.    Did you look at the figures to see the
23    paver edge?
24          A.    I didn't review it in detail.
```

1     Q.    Whether or not you reviewed it in detail,

2   did you look at the figures that show this

3   particular paver edge?

4     A.    No, I didn't.

5     Q.    You didn't look at it at all?

6     A.    No.

7     Q.    Do you see the paver edge that's depicted

8   on the cover of Exhibit 45?

9     A.    I do.

10     Q.    Does that look to you to be the B.E.A.S.T.

11   paver edge?

12     A.    No.

13     Q.    Do you see the second sentence of

14   Mr. Ryther's e-mail?  He says, "I am assuming that

15   this illustrates the paver restraint edging referred

16   to in your request for the search."  Do you see

17   that?

18     A.    I do.

19     Q.    Did you ever tell Mr. Ryther that in fact

20   did not illustrate the paver restraint edging

21   referred to in your search?

22     A.    On this diagram, I don't think so.

23     Q.    Did you and Mr. Ryther ever discuss trade

24   dress issues with respect to the B.E.A.S.T. while

1    you were developing the Diamond Paver Edge?

2         A.    That I can't recall.

3         Q.    Did you and Mr. Ryther discuss trade dress

4    issues with respect to the B.E.A.S.T. at any time?

5         MS. THOMPSON:   Objection.   Calls for

6    attorney/client privilege after the litigation or

7    after the receipt of a cease and desist letter.   I

8    would instruct you not to answer that.

9         THE WITNESS:   Okay.

10        MR. BROWN:   I will just state for the record

11   that I'm not sure you can make a temporal cutoff

12   like that.

13        MS. THOMPSON:   I think we can, counsel.   I did

14   look at this before we made the production.

15        MR. BROWN:   Would you be kind enough to cite

16   some case law to me on that?

17        MS. THOMPSON:   No, I don't have anything here

18   with me.

19        MR. BROWN:   I don't expect you to pull it off

20   the top of your head.

21        MS. THOMPSON:   All right.   But it won't be

22   until I finish my brief.

23   BY MR. BROWN:

24        Q.    So just so I can lay the record, have you

188

```
 1      ever sought advice from a lawyer respecting trade

 2      dress rights of BrickStop in its B.E.A.S.T. product

 3      configuration?

 4           MS. THOMPSON:  That's a yes/no question.

 5           THE WITNESS:  I really don't know the answer to

 6      the question.

 7      BY MR. BROWN:

 8           Q.  Have your lawyers ever advised you about

 9      BrickStop's claims that there are trade -- there was

10      trade dress infringement because of the sales of the

11      Diamond Paver Edge?

12           MS. THOMPSON:  That's only a yes/no question.

13           THE WITNESS:  Yes.

14           MR. BROWN:  And what advice were you given?

15           MS. THOMPSON:  That's attorney/client

16      privilege.

17           MR. BROWN:  And you are instructing him not to

18      answer?

19           MS. THOMPSON:  I am instructing him not to

20      answer.  With the exception of since we revealed

21      this letter, if the advice you got came

22      contemporaneous with that period of time, you have

23      to reveal whatever was discussed that you recall.  I

24      was presuming it was subsequent.
```

189

1  BY MR. BROWN:

2      Q.   The e-mail says, "You will note that there

3  is no record that B.E.A.S.T. was registered, but it

4  would still be wise to avoid using any similar name

5  if you decide to adopt this product."  Do you see

6  that?

7      A.   Yes.

8      Q.   Did you understand that to be trademark

9  advice from Mr. Ryther?

10     A.    It would seem to be.

11     MR. BROWN:  And just so I understand the scope

12 of your instructions, counsel, the temporal cutoff

13 you are asserting begins the date that he received

14 the cease and desist letter?

15     MS. THOMPSON:  Correct.

16     MR. BROWN:  And you will -- so we don't have to

17 go through the exercise, you will instruct him not

18 to answer about any advice given after that date?

19     MS. THOMPSON:  Correct.  If that's after the

20 product has been developed and that's after a period

21 of time they would have sought any right to use

22 opinions, correct.

23     MR. BROWN:  If you would give me just a few

24 minutes, we might be done.

```
 1                    (Off-the-record discussion.)
 2         MS. THOMPSON:  Can we go on the record one
 3    second?
 4         MR. BROWN:  Sure.
 5         MS. THOMPSON:  You asked about other opinions
 6    with respect to other patents that were researched
 7    at the time of the creation of Diamond Paver Edge,
 8    but your requests that we responded to don't make
 9    such a broad -- I mean they simply ask that mention
10    or relate to any opinion of counsel indicating
11    whether Valley View's Diamond Paver Edge infringes
12    the BrickStop design.  We fully complied as to what
13    you asked for.  As far as looking for others, I
14    don't think I have any problem doing that if they
15    all relate to the same period of time of development
16    or pre-confrontation, shall we say, period.  I just
17    want to make clear on the record we fully complied.
18    We didn't hold back anything knowingly that was
19    requested.
20         MR. BROWN:  Okay.  I appreciate that.  But you
21    are willing to do that without another request?
22         MS. THOMPSON:  As long as I get my brief filed
23    in a timely manner, you know, and then I have a week
24    of vacation, but as soon as I get everything cleared
```

191

1    up, that will be one of the things I will do for

2    you, yes.  I may even have somebody to do that while

3    I am gone.

4         MR. BROWN:  I assume there would be somebody at

5    DLA Piper that could do that.

6         MS. THOMPSON:  You know, if there were more

7    people, I wouldn't be so frazzled right now.  Are

8    you going to finish looking at that?  If you are,

9    I'm going to take a break.

10                    (Recess taken.)

11   BY MR. BROWN:

12        Q.   Is it your understanding that the

13   injection molding process allows you to be more

14   creative in the shapes that are employed in a

15   product as compared to the extrusion process?

16        MS. THOMPSON:  Objection.  Form of the

17   question.  Also lack of foundation.  You can answer.

18        THE WITNESS:  Generally that's true.

19        MR. BROWN:  Okay.  I think I have nothing

20   further.

21        MS. THOMPSON:  Okay.  I have some questions

22   that we have to go through.

23

24

# REDACTED

# Exhibit K

1

**CONFIDENTIAL**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRICKSTOP CORPORATION,          )
                                )
          Plaintiff,            )
                                )
     vs.                        )          1:08-CV-02690
                                )
VALLEY VIEW INDUSTRIES, H.C.,)
INC.,                           )
                                )
          Defendant.            )

          The deposition of DOMINICK V. BERTUCCI,
called by the Plaintiff for examination, pursuant to
notice and pursuant to the Rules of Civil Procedure
for the United States District Courts pertaining to
the taking of depositions, taken before Patricia S.
Mann, CSR, RPR,  License No. 084-001853, a notary
public in and for the County of Cook and State of
Illinois, at Suite 1808, Two North LaSalle Street,
Chicago, Illinois, on Friday, August 1, 2008, at
9:40 o'clock a.m.

Reported for
LAKE SHORE REPORTING SERVICE, by:
Patricia S. Mann, CSR, RPR.
License No. 084-001853

**Lake Shore Reporting Service**

**CONFIDENTIAL**

1    would have been the only other time.

2        Q.    Did you send your sales sheet to any

3    potential customers?

4        A.    I don't recollect.

5        Q.    At the trade show in Nashville, did you

6    hand out any hard copies of the sales sheet?

7        A.    Yes.

8        Q.    Do you know how many?

9        A.    Maybe 75 to 100.

10       Q.    And that was to potential customers?

11       A.    Yes.

12       Q.    So other than the PDF that you sent to

13    your independent reps and the hard copies you

14    handed out at the two trade shows that you've

15    mentioned, do you recall sending in any form the

16    original sales sheet to any customer or potential

17    customer?

18       A.    I don't recall.

19       Q.    Did you do anything to retrieve any of

20    the sales sheets after BrickStop complained?

21       A.    The sales sheets that were in hand we

22    just destroyed.

23       Q.    Anything else?

24       A.    As I stated, I had made it clear to the

**CONFIDENTIAL**

1    reps to stop promoting that particular sales sheet.

2       Q.    Did you do anything to follow-up to see

3    if your independent reps actually stopped using that

4    sheet?

5       A.    I had made telephone calls and making sure

6    that they were clear that they weren't supposed to

7    be promoting that sheet.

8       Q.    In your understanding, what is required

9    of a paver edging in order for it to function for

10   its intended purpose?

11      MS. THOMPSON:  Objection, vague, objection to

12   the extent it calls for a legal conclusion and

13   possibly foundation.  You can answer.

14      THE WITNESS:  A.  Keeping the pavers in place.

15      MR. BROWN:  Q.  So that's the ultimate

16   function, to keep the pavers in place, right?

17      A.    Have a sturdy enough product that allows

18   for the use of the product to be functional in the

19   eyes of the user.

20      Q.    Are there any particular structural

21   features that are common to all paver edges?

22      A.    They all have sidewalls and they all have

23   anchor bases.

24      Q.    Anything else?

**CONFIDENTIAL**

1       A.   No.

2       Q.   And when you say sidewalls, that's the

3   portion that is actually abutted against the

4   pavers?

5       A.   In one respect, it can be an inside,

6   depending on the design of the product, or an

7   outside, but in one way, shape or form, the sidewall

8   is touching one part of the pavers.

9       Q.   When you say an inside or an outside, I'm

10   not too clear on what you mean by that.

11       A.   Some paver restraints are manufactured to

12   where you can reverse them.

13       Q.   So some of them you could use either side

14   of the sidewall to abut the pavers?

15       A.   Correct.

16       Q.   Okay.  And when you say "anchor bases,"

17   what do you mean?

18       A.   The spot where an anchor product is used

19   to adhere the product to the ground.

20       Q.   And that anchor being either a nail or a

21   stake?

22       A.   Yes.

23       Q.   Are there any other types of anchors that

24   you've heard of being used?

**CONFIDENTIAL**

1          A.    Not that I'm aware of.

2          Q.    Are you aware of any functional

3    requirements for the shape of the anchor base to

4    perform its function?

5          MS. THOMPSON:  Calls for speculation -- it's

6    not that, let me get it right.  Object to the extent

7    it calls for a legal conclusion and because the

8    question is vague and I forgot what the last one was

9    -- I'll just leave it, calls for speculation.  Go

10   ahead, you can answer.

11         THE WITNESS:  Can you restate the question?

12         MS. THOMPSON:  I'm sorry, I forgot it, too.

13         MR. BROWN:  Could you read it back, please?

14              (The requested portion of the record

15               was read.)

16         MS. THOMPSON:  Lack of foundation, that was my

17   last one, foundation.

18         THE WITNESS:  Can you repeat that again,

19   please?

20              (The requested portion of the record

21               was read.)

22         THE WITNESS:  A.  With respect to any type of

23   paver restraint or the paver restraint in question?

24         MR. BROWN:  Q.  With respect to any type of

54

**CONFIDENTIAL**

1    paver restraint.

2        A.    Yes.

3        Q.    Okay.

4        A.    It just has to have a spot that works

5    with -- in the view of Valley View with our anchor

6    stake to work with the product.

7        Q.    So it has to have a spot to receive either

8    the nail or the stake?

9        A.    Yes.

10        Q.    Are there any other requirements that

11    you're aware of for the anchor base?

12        MS. THOMPSON:  Same set of objections.

13        THE WITNESS:  A.    It has to be functional

14    enough to keep the sidewall sturdy enough to act as

15    its -- as the products wants to as a restraint.

16        MR. BROWN:  Q.  Are there any other functional

17    requirements for the anchor base that you're aware

18    of?

19        MS. THOMPSON:  Same objections.

20        THE WITNESS:  A.    No.

21        MR. BROWN:  Q.  Why did Valley View decide to

22    imitate the Beast product?

23        MS. THOMPSON:  Form of question.  Go ahead --

24    and lack of foundation.  Go ahead.

55

**CONFIDENTIAL**

1      THE WITNESS:   A.   It had been brought up with a
2    potential customer of Valley View back in July of
3    last year.
4      MR. BROWN:   Q.   Can you tell me what the
5    circumstances of that meeting were with the
6    potential customer?
7      A.    They had made mention and made -- made
8    mention of the name the Beast by name and had
9    mentioned the fact that it was affecting their
10   market share for the product they were currently
11   selling and they looked at Valley View to possibly
12   be a partner with them, having them distribute the
13   product for them.
14      Q.    Were you at that meeting?
15      A.    Yes.
16      Q.    And who was that meeting with?
17      A.    That was with Unilock.
18      Q.    When did that meeting occur?
19      A.    July of last year.
20      Q.    July of 2007?
21      A.    Yes.
22      Q.    Where did that meeting occur?
23      A.    That took place at the Aurora location of
24   Unilock.

# REDACTED

**CONFIDENTIAL**

69

1    Dave Martinet was a part of that meeting, also.

2        Q.    Who is Dave Martinet?

3        A.    He's an employee of Tamelings who is a

4    Unilock distributor.

5        Q.    Who is Howie Rynberk?

6        A.    He would be Howard Rynberk's son.

7        Q.    Was Howie Rynberk at the Unilock meeting?

8        A.    I don't recall.  He was in the building at

9    that time, but I don't recall if he was in a meeting

10   at that time.

11       Q.    And you'll see about five -- you see the

12   asterisk on the left-hand side?

13       A.    Uh-huh.

14       Q.    And these are your notes from the

15   meeting?

16       A.    Uh-huh.

17       Q.    Did you take any written notes while you

18   were at that meeting?

19       A.    Yes, I did.

20       Q.    And what did you do with those?

21       A.    I transcribed them into this e-mail.

22       Q.    And what did you actually do with the

23   written piece of paper?

24       A.    I had discarded it once I put it on

# REDACTED

**CONFIDENTIAL**

1    that the Beast is being sold by a potential

2    customer --

3         A.    Yes.

4         Q.    -- you focus on the fact that stakes can

5    be used with the Diamond Paver Edge?

6         A.    Correct.

7         Q.    Is there any other functional aspect of

8    the Diamond Paver Edge that you try and tout when

9    you know you're in competition with the Beast?

10        A.    Yes.  We have a connecting point that is

11   more of a vertical height than the Beast product

12   that makes it easier for the installer to do that

13   connecting point and have two pieces together and at

14   the same time, if there is any ground heave or

15   movement, the locking system will help prevent any

16   separation of the two products together.

17        Q.    Anything else?

18        A.    Our sidewall is a bit taller and that

19   adds a little bit more of functionality, strength on

20   the sidewall.  At the same time, it's hidden and

21   buried when the job is completed, but to the peace

22   of mind to the end user, we've added a little bit

23   of height to the product to, you know, maybe relieve

24   some concerns on the pliability of the product and

# REDACTED

CONFIDENTIAL

1   the drawing?

2       A.   He did not.

3       Q.   Did anyone ever ask you for any feedback

4   on the configuration of the product?

5       A.   The comments that I was receiving was the

6   fact that we were going to add the anchor stake to

7   the product to make it more functional with the

8   customer base out there that we were currently

9   selling, and I flat out said that was a great idea,

10  because we have a -- we were going to market this,

11  of course, to our current pool of customer base and

12  go after customers who are not selling, but to have

13  something developed where they could use two parts

14  interchangeably versus just having one, I thought

15  that was a really big feather in our cap.

16      Q.   Did you give any other feedback on the

17  shape of the product?

18      A.   No, not that I can recall.  Just the fact

19  that I just wanted to make sure that it was what

20  they were thinking of developing as a much higher

21  quality product along those comments.

22      Q.   Meaning much higher quality than the

23  Diamond Lok that you were presently selling?

24      A.   Correct.

**CONFIDENTIAL**

1    Q.   Let's just briefly look at Exhibit 30, if
2    we can.  This is out of order.  And I'll ask you if
3    you've seen that one before?
4    A.   This is --
5    MS. THOMPSON:  You have to take a look, is it
6    more than one page?
7    THE WITNESS:  A.  I don't recall, because these
8    are all looking the same to me.  So this looks like
9    our product here and it looks like the Beast
10   product.  All I can recall is seeing our style
11   product being developed on something like this,
12   but this exact piece, I cannot recall this exact
13   piece.
14   MR. BROWN:  Q.  You remember seeing
15   side-by-side drawings before, but that might not be
16   the one you've seen?
17   A.   Correct.
18   Q.   Okay.  Did you ever get any feedback from
19   customers that they did not want to deviate from
20   the palleting arrangement that they were presently
21   getting from BrickStop for sales of the Beast?
22   A.   That was never brought up as an issue
23   with me.
24   Q.   I'd like to show you what we previously

# REDACTED

**CONFIDENTIAL**

1      Q.    Can distributors go to, for instance, the

2    Irrigation Show?

3      A.    Yes.

4      Q.    Can resellers go to those shows?

5      A.    Yes.

6      Q.    Can contractors go to those shows?

7      A.    Yes.

8      Q.    Can all of those same types of people go

9    to distributor writing shows?

10     A.    No, the distributor writing shows are

11   normally market segmented, someone that lives in

12   Pennsylvania wouldn't go to a distributor show in

13   Illinois.  It depends on the market that the

14   distributor services, he therefore invites his

15   dealer base and then it's up to them, of course,

16   if they want to come to see the show.

17     Q.    So at a distributor show, you get the

18   distributor and his customers will arrive there?

19     A.    Correct, I have -- yes.

20     Q.    And can contractors and installers go to

21   those shows?

22     A.    Yes.

23     Q.    And when you're at these shows, do you

24   have contact with both distributors and end users

CONFIDENTIAL

1    like contractors and installers?

2        A.   Well, I wouldn't have contact with the

3    distributors because I'm at a sole distributor show,

4    so I'm there for his benefit, not promoting another

5    distributor that he might be a competitor of theirs.

6    So when he has his viewer base or his contractor

7    base there, I'm there promoting the product to the

8    landscaper on behalf of the distributor.

9        Q.   So you would -- you would run into or you

10    would have contact with both dealers and end users

11    at a distributor show?

12        A.   That is correct.

13        Q.   Have you in any of these shows had a

14    contractor or installer tell you he thought that

15    your product looked like the Beast, the Diamond

16    Paver Edge?

17        A.   Yes.

18        Q.   When did that happen?

19        A.   When we were at the E.P. Henry show and

20    the ICPI show.

21        Q.   At the E.P. Henry show, how many

22    contractors or installers made that comment?

23        A.   I would say maybe a half a dozen.

24        Q.   How about at the ICPI show, how many

**CONFIDENTIAL**

1   contractors or installers commented that your

2   product looked like the Beast?

3        A.    Probably about the same quantity which

4   would be about six.  But that show was more market

5   segmented for distributors than actual contractors,

6   though there were contractors in attendance, but

7   that show is more of an industry show for the

8   distribution market more than anything.

9        Q.    When you were at the E.P. Henry show, did

10  any one of the half dozen or so who commented about

11  your product looking like the Beast ask you whether

12  it was BrickStop's product?

13       A.    No.

14       Q.    At the ICPI show, did any of the half

15  dozen or so contractors who commented and said your

16  product looked like the Beast ask whether it was

17  BrickStop's product?

18       A.    No.  We were very clear in our literature

19  at that time -- I'm sorry, at the -- after we

20  corrected the literature, but at the booth, it's a

21  Valley View booth showing Valley View product, we

22  have a label on our product, we showed samples at

23  those two shows in Nashville and in Atlantic City

24  that were our product with our name stamped on it

**CONFIDENTIAL**

1    embossed in the product and also with a label on

2    the product.

3        Q.    Did anyone ask you whether you got it

4    from the same manufacturer as the Beast?

5        A.    No.

6        Q.    Did anyone ask you if it was the Beast?

7        A.    They did, and I corrected them and said

8    no, this is a Valley View product and here are the

9    design features that are different.

10        Q.    How many asked you if it was the Beast?

11        A.    Maybe a half dozen.

12    MS. THOMPSON:    Asked and answered.

13    MR. BROWN:    Q.    And was that between both

14    shows, maybe a half dozen asked you if it was the

15    Beast?

16        A.    Yes.

17        Q.    Have you ever heard of the North American

18    Hardscape Show?

19        A.    Yeah, that would have been what I was

20    referring to for the ICPI show.

21        Q.    So that's --

22        A.    Kind of one in the same.

23        Q.    Kind of one in the same?

24        A.    I'm sorry, there is an ICPI show and a

# REDACTED

**CONFIDENTIAL**

1    Q.    So -- and these are the samples that we

2  looked at in that earlier e-mail where he had given

3  you a list of addresses to send samples to?

4    A.    Yes, it would have been one of the -- you

5  know, one of the lists.

6    Q.    Okay.  And -- well, did he send you more

7  than one list?

8    A.    I only recall seeing one list -- big

9  list, but there could have been an e-mail here and

10  there that he said, oh, by the way, send it to so

11  and so, but that one document had most of them on

12  there.

13    Q.    And then this -- later in the exhibit

14  from the -- basically from the second page on are

15  his notes of the feedback he had received so far?

16    A.    Yes.  These lists aren't completely

17  restricted to Diamond Paver Edge, it's our other

18  product line as well.

19    Q.    Some of the comments refer to other

20  products?

21    A.    Yes.  So there could have been some

22  customers on here that are not paver people that

23  he's commenting on or I'm asking about.

24    Q.    Is there one that you saw that made you

# REDACTED

**CONFIDENTIAL**

1    zone about seven years ago.

2        Q.    So you've been up against Superior Stone

3    for seven years?

4        A.    Yes, but with our Diamond Lok products.

5        Q.    And in that time frame, has Superior

6    Stone been carrying the Beast?

7        A.    To my recollection, I don't know how long

8    they've been carrying the Beast.

9        Q.    Had you ever -- prior to the introduction

10   of the Diamond Paver Edge, had you competed for any

11   accounts with Superior Stone where Superior Stone

12   was selling the Beast and you were selling Diamond

13   Lok?

14       A.    I don't recall coming across the Beast

15   that much in my area of sales, and whenever we had

16   business with someone, we didn't have another

17   product outside of Diamond Lok, so there's really

18   nothing else I could sell them.  So if we were

19   selling them and they were buying Superior Stone's

20   product or somebody else's product, it was kind of

21   a moot point, we were all in this together and a

22   great majority of the people that we sell are

23   carrying usually another product brand.

24       Q.    So you're saying that when you were

# REDACTED

**CONFIDENTIAL**

1      Q.    Who's Herb Cantu?

2      A.    Herb works in our shipping department at

3  Valley View as far as coordinating UPS shipments and

4  requests from myself and the reps as far as getting

5  samples and catalogs out.

6      Q.    Okay.  So you're requesting him to send a

7  sample to the address indicated below?

8      A.    Yes.

9      Q.    And that address was -- do you know what

10  the e-mail at the bottom is, does it look to be an

11  e-mail from one of your independent reps to

12  somebody?

13      A.    Without seeing the from and to, I'm really

14  drawing a blank on where this was going and who was

15  the end -- who was this dedicated to.  It seems like

16  it was from a rep and it went to someone and then

17  they probably copied me on it, because it says

18  "their version," it didn't seem like it came from

19  me, because I would have referred to it as our

20  version, so that's the best I can --

21      MR. BROWN:  I wonder, Counsel, if in your

22  copious free time, if we could have someone look

23  and see if that's a rep who sent that e-mail and

24  perhaps give us an unredacted version of that?

# Exhibit L

1/8" X 1-3/4" X 8' (160' per box) - Hard Plastic

