**FILED**

**AUGUST 22, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BRICKSTOP CORPORATION, | ) | Case Number: 1:08-cv-02690 |
| | ) | |
| Plaintiff, | ) | Assigned Judge: Gettleman |
| | ) | |
| v. | ) | Designated |
| | ) | Magistrate Judge: Cole |
| VALLEY VIEW INDUSTRIES, H.C., Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S SUGGESTIONS IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

HOVEY WILLIAMS LLP
Scott R. Brown (Admitted *Pro Hac Vice*)
Matthew B. Walters (Admitted *Pro Hac Vice*)
10801 Mastin Boulevard, Suite 1000
84 Corporate Woods
Overland Park, Kansas 66210
Tel.     913-647-9050
Fax     913-647-9057
srb@hoveywilliams.com
mbw@hoveywilliams.com

Mark Hellmann
Hellmann Law Group
2 North LaSalle Street, Suite 1808
Chicago, Illinois 60602
Tel.     312-580-9070
Fax     847-556-0031
mark@hellmann.com

ATTORNEYS FOR PLAINTIFF
BRICKSTOP CORPORATION

**TABLE OF CONTENTS**

I.    Introduction............................................................ 1

II.   Argument............................................................. 1

      A.   BrickStop's Product Configuration Is Not Functional And Is Entitled To Trade Dress
           Protection........................................................ 1

           1.   Protection of BrickStop's Trade Dress Would Not Put Competitors at a
                Non-Reputational Competitive Disadvantage by Removing From the
                Public Domain Features Essential to Paver Edging Products or That Affect
                the Cost or Quality of Such Products........................... 1

           2.   Even Were Valley View's Improper Hindsight Approach Correct,
                BrickStop's Trade Dress Is Not Functional...................... 4

      B.   BrickStop Has Established the Existence of Secondary Meaning By Virtue of
           Unrebutted Evidence of Substantial and Exclusive Use of the Trade Dress Coupled
           With Valley View's Intentional Copying and the Resulting Instances of Actual
           Confusion of Distributors and Contractors....................... 8

           1.   BrickStop Does Not Rely On Its Distinctive Design to Establish Secondary
                Meaning....................................................... 8

           2.   BrickStop's Subtantial Sales, Advertising, and Continuous and Exclusive
                Use Establish Secondary Meaning in the Trade Dress.............. 9

           3.   Valley View's Copying Alone Establishes Secondary Meaning in the
                B.E.A.S.T. Trade Dress........................................ 10

           4.   The Evidence of Actual Confusion Demonstrates Secondary Meaning.
                ............................................................. 11

      C.   There Is A Strong Likelihood of Confusion if Valley View Is Not Enjoined From
           Selling Its "Knock-off" Product.................................. 11

           1.   The Identical Area and Manner of Concurrent Use Favors a Finding of
                Likelihood of Confusion....................................... 11

           2.   The Incidences of Actual Confusion to Date Strongly Counsel for a Finding
                of Likelihood of Confusion.................................... 12

           3.   The Relatively Inexpensive Nature of the Product and Reliance on Shape
                by Contractors Demonstrates the Degree of Customer Care in the Purchase
                Favors Finding Likelihood of Confusion........................ 13

    4. BrickStop's Strong Trade Dress Indicates Confusion is Likely... . . . . . 14

  D. Irreparable Harm, Balancing the Harms, and the Public Interest.. . . . . . . . . . . . 14

III. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## TABLE OF AUTHORITIES

### Statutes & Rules

Lanham Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

### Cases

*Best Lock Corp. v. Schlage Lock Co.,*
    413 F.2d 1195 (C.C.P.A. 1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*CAE, Inc. v. Clean Air Eng'g., Inc.,*
    267 F.3d 660 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14

*Chamberlain Group, Inc. v. Lear Corp.,*
    No. 05-cv-3449, 2007 WL 1017741 (N.D. Ill. Mar. 30, 2007). . . . . . . . . . . . . . . . . . . . . . . . 15

*Dorr-Oliver, Inc. v. Fluid-Quip, Inc.,*
    94 F.3d 376 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Inwood Labs, Inc. v. Ives Labs, Inc.,*
    456 U.S. 844 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Logan Graphic Prods., Inc. v. Textus USA, Inc.,*
    No. 02-cv-1823, 2002 WL 31870549 (N.D. Ill. Dec. 23, 2002). . . . . . . . . . . . . . . . . . . . . . . 12

*Logan Graphic Prods, Inc. v. Textus USA, Inc.,*
    No. 02-cv-1823, 2003 WL 21011746 (N.D. Ill. May 5, 2003). . . . . . . . . . . . . . . . . . . . . . . . . 4

*Qualitex Co. v. Jacobson Prods. Co., Inc.,*
    514 U.S. 159 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*Sara Lee Corp. v. Am. Leather Prods., Inc.,*
    No. 97-cv-4158, 1998 WL 433764 (N.D.Ill. July 29, 1998). . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*Talking Rain Beverage Co., Inc. v. S. Beach Beverage Co.,*
    349 F.3d 601 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Thomas & Betts Corp. v. Panduit Corp.,*
    138 F.3d 277 (7th Cir. 1998) (*Thomas II*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 9, 10, 13

*Thomas B. Betts Corp. v. Panduit Corp.,*
    65 F.3d 654 (7th Cir., 1995) (*Thomas I*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Tools USA and Equip. Co. v. Champ. Frame Straightening Equip. Inc.*,
  87 F.3d 654 (4th Cir. 1996)................................................................. 3, 11

*Traffix Devices, Inc. v. Marketing Displays, Inc.*,
  532 U.S. 23 (2001). ....................................................................... 2-4, 6

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 763 (1992). ......................................................................... 10

*Union Carbide Corp. v. Ever-Ready Inc.*,
  531 F.2d 366 (7th Cir. 1976). ................................................................ 11

*Versa Prods Co. v. Bifold Co. Mfg. Ltd.*,
  50 F.3d 189 (3rd Cir. 1995). ................................................................. 13

*Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*,
  259 F.3d 25 (1st Cir., 2001). .................................................................. 9

## I.    Introduction

Valley View wanted a new paver edge in its product line up. Faced with significant market feedback that the successful B.E.A.S.T. product was preferred in the market, and encouraged by a significant potential customer who wanted Valley View to copy the B.E.A.S.T., Valley View chose the easy course of action, copy rather than innovate and develop its own brand. Valley View's principal defenses are (1) everyone else copies and (2) the distinctively shaped B.E.A.S.T. is actually all functionally required. The first is no defense, and the second relies on a misreading of the law and ignores the nature of the freedom of design made possible by injection molding.

While Valley View complains that BrickStop seeks a "super patent," in fact just the opposite is true. BrickStop is one amongst many entries in the paver edging market, expects and accepts competition, and has never sought to exclude others from the market. BrickStop only seeks to prevent Valley View from trading off of the good will it has developed in its very distinctive foot shape; a shape it has used as a logo or crest for years, and that it has developed into a successful brand through hard work, long investment, and persistence. BrickStop welcomes competition, but should not have to compete against its own product.

BrickStop has exclusively marketed and sold its distinctive design for seven years establishing *prima facie* evidence of secondary meaning. Valley View has appropriated the design to sell through identical channels of trade, using identical means of promotion, to the same customers and potential customers. With repeated instances of actual confusion now coming to light, BrickStop will be irreparably harmed if Valley View is allowed to continue to sell its potentially inferior knock-off confusing the market and causing damage to BrickStop's brand.

## II.    Argument

### A.    BrickStop's Product Configuration Is Not Functional And Is Entitled To Trade Dress Protection.

#### 1.    *Protection of BrickStop's Trade Dress Would Not Put Competitors at a Non-Reputational Competitive Disadvantage by Removing From the Public Domain Features Essential to Paver Edging Products or That Affect the Cost or Quality of Such Products.*

The touchstone of the non-functionality requirement as established by the Surpeme Court is whether allowing the asserted trade dress protection would put a competitor at a significant non-reputationally related disadvantage. Under this standard a proposed trade dress is only functional if its protection would "put a competitor at a significant disadvantage because the feature is 'essential to the use or purpose of the article' or 'affects its cost or quality.'" *Qualitex Co. v. Jacobson Prods. Co.,*

*Inc.*, 514 U.S. 159, 169 (1995) (quoting *Inwood Labs, Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 850 n.10 (1982)). The Supreme Court reaffirmed this standard in *Traffix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32-33 (2001). But BrickStop does not seek to exclusively "control a useful product feature" in the paver restraint industry such as by denying all others the right to use a foot and spacer design. *See Qualitex* , 514 U.S. at 164.

The "use or purpose" of the products in question is securing pavers against lateral movement after they have been laid over a properly prepared base. (D.N. 13, Frieberg Dec., ¶ 4; Expert Report of Jordan I. Rotheiser ("Rotheiser"), ¶ 8.) Requiring that competitors not use BrickStop's exact shape of foot and spacer design takes nothing out of the public domain that is "essential to the use or purpose of the article' or 'affects its cost or quality." There are a myriad of possible designs in the market that achieve the same function. Indeed, BrickStop's expert Mr. Rotheiser has proposed a design in his report that achieves every function suggested by Valley View as pertaining to these products with a shape that is starkly different from BrickStop's trade dress.[1] (*See* Appendix A; Rotheiser ¶ 13, Ex. D-F.) Moreover, Valley View's President admitted both that injection molding allows a designer to be more creative in shapes that are employed than extrusion and that had Valley View started from a blank slate he could not say Valley View would have come up with the BrickStop design. (Declaration of Matthew B. Walters in Support of Plaintiff's Suggestions in Support of its Motion for Preliminary Injunction ("Walters Dec."), Ex. J; Rynberk Dep., 191:12-18 and 175:16 - 176:6.) He had to admit to these things because of the freedom of design injection molding allows and because the particular shape of BrickStop's foot is not functionally required to achieve a paver edging. (Rotheiser, ¶¶ 9, 13-31.)

Having copied BrickStop's overall trade dress, Valley View seeks to prevail on functionality by, after the fact, dissecting the design and ascribing functionality to each individual piece. The core of Valley View's functionality argument is a misreading of the *Traffix* decision. In *Traffix*, the plaintiff asserted that its trade dress in a temporary road construction sign used along highways was having (1) a base with (2) four legs, (3) two springs connecting the base to a sign, and (4) a sign. The alleged distinctive feature was having two springs. The springs functioned to allow the sign to resist the force of wind without toppling over. The plaintiff had an expired utility patent covering exactly these features. The Supreme Court found that because the asserted trade dress was the broad coverage of the

---

[1] Valley View asserts that BrickStop has not clearly identified its trade dress. But Valley View analyzes the case using the trade dress exactly as it was identified in BrickStop's opening brief: the combination top down view of the particular foot structure and spacer between the feet. (*See* D.N. 13, pp. 4-5.)

features that were necessary to make the article work, the very things claimed in the expired patent, the proposed trade dress was indeed functional. If BrickStop were asserting that its trade dress was to have a wall for holding bricks, a plurality of feet, spacers connecting the feet, and joiners to connect pieces of the system together, *Traffix* would be directly controlling.

But that is not the case. Rather, BrickStop's trade dress resides in the particular shape of the foot structure and spacers between the feet, and nothing else. BrickStop does not here allege that Valley View cannot sell a paver edging with feet and spacers, just these particular feet and spacers. BrickStop does not attempt to take anything out of the "public domain" that would put Valley View at any "non-reputational competitive disadvantage."

Indeed, Valley View's approach to the analysis of functionality is directly contrary to the law. A trade dress may be comprised of functional features arranged in a unique fashion that then develops product configuration trade dress protection. To attempt to dissect those features and ascribe function to them individually is improper:

> This tactic ignores the fact that the critical functionality inquiry is not whether each individual component of the trade dress is functional, but rather whether the trade dress as a whole is functional. *Tools USA and Equip. Co. v. Champ. Frame Straightening Equip. Inc.*, 87 F.3d 654, 658 (4th Cir. 1996).

Thus, as described below, once the general outline of BrickStop's foot was created, there may have been material added to support certain features or remove it from the mold. But, if the general non-functionally required outline were not selected, the subsidiary features also would not have been selected. This is why the trade dress must be viewed as a whole. Once a shape is selected in a product configuration, one can come in later, as Valley View has done, and say it has function. But if the particular shape was not required or particularly advantageous from a functional standpoint in the first instance, a different shape could be employed and would have that same function. Thus, the Seventh Circuit has stated, "some articles, made in a purely arbitrary configuration (e.g., the wine bottle considered in *Mogen David*) ... may *perform* a function, holding wine, which could equally well be served by containers of many other shapes, and in such circumstances the incidental function should not by itself preclude trademark registrability if the other conditions precedent are present." *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 288 (7th Cir. 1998) (*Thomas II*) (quoting *Best Lock Corp. v. Schlage Lock Co.*, 413 F.2d 1195, 1199 (C.C.P.A. 1969)). "The fact that the feature at issue serves some function is not enough." *Thomas II*, 138 F.3d at 297. Thus, a designer may select a particular curve to the leg of a chair. It is irrelevant to prove, as Valley View by analogy has attempted, that the curved leg performs a function for that chair. Obviously, if you remove the leg the chair will not

3

function. The question is whether a different curve or straight legs would equally perform the function thereby demonstrating the curve was not functionally required and removal of the feature from the public domain would not disadvantage competitors from a functional viewpoint.

Valley View's reliance on *Traffix* for the argument that alternative designs are irrelevant in this case is simply wrong. In *Traffix* the Court decided what evidentiary weight to accord an expired utility patent in assessing functionality, not the relevance of alternative designs in analyzing functionality. *Traffix*, 532 U.S. at 29. To be sure, in *Traffix*, alternative designs were irrelevant because the "dual-spring design is not an arbitrary flourish in the configuration of the MDI product; *it is the reason the device works*." *Id.* at 33 (emphasis added). Thus, the claimed invention in the expired patent conclusively established the functionality of the claimed distinctive feature of the trade dress. *Id.* at 34. This, however, is not the standard applied in the Seventh Circuit when a feature is functional but also has non-functional shape that may act as a source identifier. *Thomas II*, 138 F.3d at 297.

Two years after *Traffix*, this Court distinguished *Traffix* with exactly the same reasoning stating "unlike the case in *Traffix*, in our case functionality has not been established by the existence of expired patents. When making an initial determination about functionality, as we do here, it is appropriate to consider alternatives in the marketplace." *Logan Graphic Prods, Inc. v. Textus USA, Inc.*, No. 02-cv-1823, 2003 WL 21011746, at *4 (N.D. Ill. May 5, 2003). Therefore it is appropriate for this Court to examine industry alternatives in analyzing whether BrickStop's particular footing structure shape is functional. Nothing about BrickStop's arbitrary curvature, fill regions, empty triangular space, or x-patterned spacers are "the reason the device works" at holding bricks and pavers from shifting. Other foot and spacer shapes would work equally as well as evidenced by the legion of alternatives that exist as well as the design proffered by Mr. Rotheiser. BrickStop only "seeks to protect arbitrary, incidental, [and] ornamental aspects" of its particular paver restraint system.

### 2.    *Even Were Valley View's Improper Hindsight Approach Correct, BrickStop's Trade Dress Is Not Functional.*

Valley View's detailed functionality analysis suffers from two fatal flaws. First it identifies functions of individual features that bear no relationship to the use of the parts in the real world application of restraining bricks. Rather, Valley View merely asserts that certain features perform certain functions without regard to the functional requirements of paver edging. In this respect, Valley View seeks for the Court to deny trade dress protection because some *irrelevant but identifiable* function can be found. Second, Valley View asserts some functionality to the product that may be relevant to the real world application, but that is not aided by the shape of the trade dress. Neither type of argument

can preclude trade dress protection.

Valley View begins its functionality argument by focusing on six features touted from BrickStop's advertising that it asserts demonstrate functionality of the design:

- **"1-2. Has 'One Piece That Does Both [1] Straight Lines and [2] Curves.'"**

The one piece B.E.A.S.T. can indeed be used in straight line applications or curved applications. The principal feature that gives it this capability, as admitted by Valley View, is the wall thickness of the primary wall used to hold the pavers, which is no part of the trade dress. The wall is supported by the spacers between the feet as well, which can be either cut or removed to increase the bendability of the part. But the particular shape of the spacers do not intrinsically contribute to this function. This is demonstrated by the fact that the B.E.A.S.T. was originally sold with very different spacer structure indeed, a single cross rib. (Walters Dec., Ex. I, Kurtz Dep., 84:7-85:8.) The changed spacer that now forms part of the design did not change this functionality. In short, having material of some shape in between the feet contributes to this claimed function, but having the identical spacer that is part of the look of the B.E.A.S.T., is neither required, less expensive, nor more efficacious by any measure. Indeed, when soliciting early feedback on its "knock-off" part from customers, some feedback Valley View received was to make this piece different to make the part easier to cut. (Walters Dec., Ex. B.) Valley View ignored this sensible request presumably in favor of not changing the look of the part.

Contrary to the assertions of Valley View, the fill regions identified in (D.N. 13, Frieberg Dec., Ex. B) do not provide the function of resisting torsion, because torsion is not a force that paver edging faces in the real world. (Rotheiser, ¶¶ 8, 27, 44.) This is because the edging is installed over a hard and level base material so twisting forces in the direction claimed by Valley View are not exerted on the part.

Valley View's argument that the leg height and depth are sufficient to withstand the pressures of the application does not say that this leg height and depth was in any sense necessary to do so. Again, Valley View entirely fails to relate the asserted functionality to the actual real world requirements of the application. Moreover, leg height and depth in no way address the top down or plan view configuration of the feet, which is not functionally required to satisfy the application as demonstrated by Mr. Rotheiser and by all of the many alternatives available in the marketplace. There are several single piece systems that may be used in straights and curves that look nothing like the B.E.A.S.T. (D.N. 13, Frieberg Dec., Exs. E, G, I.)

Valley View asserts that the taper of the feet as they move away from the brick retaining wall towards their tip is functional because it allows for inside curves of the part without having the feet

5

overlap. In other words, they assert the taper allows the part to be bent further in a curved section. Once again, Valley View fundamentally fails to match its alleged function to the real world application. The minimum recommended radius of curvature for paver installations is three feet or 36 inches. On some occasions installers will use two feet or a 24 inch radius. If the B.E.A.S.T. were designed with feet of the same length as it presently has, but no taper so that the they formed a simple rectangular shape, they would be capable of being bent down to a 9 inch radius, less than 1/3 of recommended and less than ½ of the minimum radius ever used. (Rotheiser, ¶ 23, Ex. J.) The so called function of the taper has no application in the real world and does not contribute to the functionality of the part.

Moreover, even were the evidence contrary and the taper contributed a real world function, the B.E.A.S.T. has a unique double angle in its taper. Neither Valley View nor its expert have ever ascribed a function to the double angle. The double angle is a classic artistic flair, like the curve in the leg of a chair, and tracks exactly the example of a feature that the Supreme Court in *Traffix* said may be protectible. In sum, protection of BrickStop's trade dress would not remove single piece systems capable of holding straight lines and curves or being bent either to the inside or outside in installation from the public domain, only its distinctive look would be protected.

- **"3. 'Uses a Lattice Nailing Pattern for Strength and Stability.'"**

Lattice nailing is the process of nailing down the part with alternating distances from the wall on successive feet. This affect can be created by having holes that are varying distances from the paver wall. But neither the particular location of the holes in the B.E.A.S.T., nor the structure used to support the holes as utilized in the B.E.A.S.T., are functionally required. Indeed, the design proposed by Mr. Rotheiser shows that lattice nailing can be accomplished with far less material and stronger support with his proposed alternative. Protection of BrickStop's trade dress would not remove lattice nailing from the public domain, only its distinctive look that incidentally achieves lattice nailing would be protected.

- **"4. 'Has Structural Rib Re-enforcement SRR[TM] for perfect straight lines.'"**

Valley View makes little of this touted functionality because it contributes little to the look of the trade dress. Specifically, as stated by Valley View, this refers to the ridges that run along the top of the spacer legs. D.N. 36, p. 8. This advertising phrase was actually developed for the original single cross rib spacer design, and merely survived in BrickStop's advertising after the part was changed. (Kurtz Dep., 84:17-23; Walters Dec., Ex. H, Frieberg Dep. 248:12-249:24.) Thus, that the spacer shape can change without affecting this claimed functionality is empirically proven and the functionality asserted by Valley View does not affect in any way the top down or plan view look of the spacers.

- **"5. 'Has a 'Stable Sure-gripping Footprint SSF[TM] for stability.'"**

6

Valley View's ruminations about what this phrase might mean cannot convert the entire distinctive shape of BrickStop's foot structure into a functional requirement in the industry. As explained by Mr. Kurtz in his deposition, paver installation begins with the creation of a hard base, highly compacted with screening placed over it so that it is almost as hard as cement. The foot of the paver edging is placed onto this hard base and nailed into place with typically eight inch nails. It is the nail that causes gripping. Valley View's assertion that the "openwork of the foot, due to the action of friction and catching of the various edges is more likely to ground it in its bedding" is fanciful given the nature of the base. (Kurtz Dep., 138:1-20; Rotheiser, ¶ 8.) Moreover, even were Valley View right that this is a reference to "openwork of the foot," there are an infinite variety of open shapes available. Indeed, Mr. Rotheiser's proposed design would also have this feature, and it looks starkly different from the B.E.A.S.T. Thus, protection of BrickStop's trade dress would not remove "openwork feet" from the public domain, only its distinctive look that also purportedly achieves this function would be protected.

- **"6. Has a 'reverse application.'"**

The first part of Valley View's argument with respect to "reverse application" is puzzling indeed. It says this touted functionality arises from the lack of raised ridges on the foot side of the part, focusing on a feature that is not present on the part, and consequently no part of the asserted trade dress. This feature missing from the trade dress is irrelevant to the dispute. The second portion of Valley View's argument is both confusing and entirely unsupported in the record. Valley View asserts that the ability to install bricks on either side of the wall requires that the holes be enclosed. This is simply unsupported in logic, and no one has so testified. Moreover, even if this were a functional requirement, it does not require the particular shape of BrickStop's foot to achieve enclosing the holes. Mr. Rotheiser's proposed design also achieves this functionality yet is starkly different in configuration. A myriad of existing alternatives have enclosed holes and look different. Thus, protection of BrickStop's trade dress would not remove enlcosed holes from the public domain, only its distinctive look would be protected.

In sum, Valley View's reliance on BrickStop's advertising to demonstrate functionality utterly fails to relate the claimed advertising to the shape of the trade dress configuration or asserts purported functions that have no relevance to the application for which the product will be used. This case is unlike *Talking Rain*, relied on by Valley View, where the Ninth Circuit found that the plaintiff did not dispute the defendant's contentions that the trade dress at issue resulted in a utilitarian advantage. *Talking Rain Beverage Co., Inc. v. S. Beach Beverage Co.*, 349 F.3d 601, 604 (9th Cir. 2003). In *Talking Rain* the essence of the plaintiff's claimed distinctiveness in its trade dress was a functional grip, which "appear to be common in the beverage industry [and] tends to corroborate SoBe's assertion that

7

the grip area is indeed functional and not arbitrary." *Id.* at 605. In contrast, BrickStop's unprecedented design yields no utilitarian advantage not equally attainable with design alternatives, acts as a source identifier, and is, in fact, *more costly* to manufacture. (Rotheiser, ¶¶ 10-13.)

Valley View then focuses on a few miscellaneous features to which it attributes functionality. Specifically that cut away portions in the design and reduced depth of solid fill areas save material. Even were this true, BrickStop does not seek to monopolize cut away portions or shallow depth fill regions from the public domain, just this particular shape to those regions. A foot structure could easily be created in many shapes utilizing openings and shallow fill regions, just not these exact shapes. Likewise, while ejector pin pads may be placed to remove a part from the mold, had a different shape than the outline of BrickStop's foot been used, the pin pads would be located differently to accommodate that shape. BrickStop does not seek to remove the use of pin pads from the public domain, only pin pads of this particular size and in this particular location. Moreover, as stated by Mr. Rotheiser, no pin pads were necessary to be used, and a different shape could easily have been created. (Rotheiser, ¶¶ 22, 29, 50.)

Finally, Valley View states that the x-shaped legs of the spacer design allow plastic to flow to avoid the creation of seam lines in the final part in "critical places." Expert Dealey refers to this as a "flow runner." In essence, a "flow runner" is any portion of the part that plastic flows through during the injection process. To say that the x-shaped legs of the spacer design permit the flow of plastic, while sounding highly functional, means nothing more than that plastic will flow in that area during manufacture. Valley View is not saying, and could not say, that the x-shaped legs are an optimum design, or that a different shape would not work as well, or even that removal of the shape would prevent manufacture of the part if it were taken from the public domain. Indeed, empirically this cannot be true because the part was manufactured for several years without this shape to the spacer. (Rotheiser, ¶ 21.)

**B.  BrickStop Has Established the Existence of Secondary Meaning By Virtue of Unrebutted Evidence of Substantial and Exclusive Use of the Trade Dress Coupled With Valley View's Intentional Copying and the Resulting Instances of Actual Confusion of Distributors and Contractors.**

*1.  BrickStop Does Not Rely On Its Distinctive Design to Establish Secondary Meaning.*

Valley View spends a great deal of time addressing a straw argument of its own, that product configuration trade dress is not entitled to be considered inherently distinctive to establish secondary meaning. BrickStop agrees and never asserted that its distinctive design was entitled to such treatment. Rather, BrickStop relies on the unrebutted evidence of its substantial and exclusive seven year use of

8

the trade dress, which entitles it to a presumption of secondary meaning, coupled with the strong inference that arises from Valley View's intentional copying and the resulting instances of actual confusion of distributors and contractors discussed more fully below.

### 2. BrickStop's Subtantial Sales, Advertising, and Continuous and Exclusive Use Establish Secondary Meaning in the Trade Dress.

BrickStop's exclusive use of its signature design as featured in its substantial advertising and sales establishes that BrickStop's design has acquired secondary meaning. Secondary meaning is established by longstanding, continuous and exclusive use, coupled with substantial sales and advertising. *Sara Lee Corp. v. Am. Leather Prods., Inc.*, No. 97-cv-4158, 1998 WL 433764, at *13 (N.D.Ill. July 29, 1998). Valley View does not seriously contest any of the following: That BrickStop has sold approximately 34 million feet of the product in the United States; that BrickStop's sales of the product are exclusive;[2] that BrickStop has continuously advertised and promoted the BrickStop design as a source designator from its introduction in 2001 to the present including distribution of 25,000 brochures, 40,000 catalogs and over 1,000 T-shirts a year and maintenance of a website that all prominently display the BrickStop design to designate a source; and that BrickStop has distributed thousands of samples to potential customers in boxes with the B.E.A.S.T. logo prominently displayed on the outside. Indeed, BrickStop's geographic penetration of the market across the United States is impressive. (Supplemental Declaration of David Frieberg ("Supp. Frieberg Dec."), Ex. V.) This exclusive use has caused BrickStop's products featuring the signature design to become recognized by contractors and installers, the relevant consumer, as a source designation for BrickStop. (D.N. 13, Train Dec., ¶¶ 3-4.)

Valley View asserts that BrickStop's extensive advertising that displays the B.E.A.S.T. product configuration as a logo should not be considered because it is not "look for" advertising. Valley View cites *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25 (1st Cir., 2001), which itself cites *Thomas B. Betts Corp. v. Panduit Corp.*, 65 F.3d 654 (7th Cir., 1995) (*Thomas I*) for the proposition that only advertising that directs a consumer's attention to a particular aspect of the product is probative. But the Seventh Circuit clarified *Thomas I* when it stated "While we utilized as an example of such advertising the phrase 'look for the oval head,' we did not establish that such explicit direction was necessary." *Thomas II*, 138 F.3d at 292. Rather, any advertising that prominently features the trade dress can assist in determining whether secondary meaning exists. *Id.* For "there is no hard-and-fast

---

[2]Valley View has submitted evidence from Mr. Bertucci that others sell a similar product. As explained by Mr. Frieberg, each of those instances identified by Mr. Bertucci are merely resellers of BrickStop's B.E.A.S.T., not a similarly shaped competitive product. (Supp. Frieberg Dec., ¶¶ 24-25, Walters Dec., Ex. L.)

rule establishing that the shape of a product must be specifically pointed out in advertising in order for that advertising to be considered as evidence of secondary meaning." *Id.*

Even were the Court to entirely discount BrickStop's advertising efforts, BrickStop's seven years of exclusive continuous use establishes *prima facie* evidence that BrickStop's signature design has acquired secondary meaning. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) ("the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)."). Under 15 U.S.C. § 1052(f) [§ 2], proof of substantially exclusive and continuous use for a period of five years is *prima facie* evidence of distinctiveness and therefore secondary meaning.

### 3. *Valley View's Copying Alone Establishes Secondary Meaning in the B.E.A.S.T. Trade Dress.*

Rather than fight the obvious, that it copied BrickStop's design, Valley View retreats to the novel defense that everyone copies and therefore its expected by the industry and they should be excused for their actions. The kernel of truth in Valley View's assertion is that the prior existence of generic looking designs did lead to some copying in the industry. But it was exactly this state of affairs that led BrickStop to create its signature design. BrickStop wanted its product to stand out in a sea of generic looking designs, which was its motivation in arriving at its distinctive look. (Kurtz Dep., 151:3-152:11.) The intervening seven years of exclusive use then gave it rights protectable against copiers like Valley View.

That Valley View's copying is strong evidence of secondary meaning becomes clear when its true motivations are understood. Contrary to the tale of creation set forth in its brief, the emails it produced establish the real story. From at least as early as the spring of 2006, Valley View was receiving reports from its independent sales representatives who were selling its existing paver edging product to distributors that they were running into the B.E.A.S.T. in the field. The documentary record is replete with repeated reports of the B.E.A.S.T. being at potential distributors, being hard to displace, and being favored by end customers. (Walters Dec., Ex. A, *see e.g.*, VVW 1517, "he says his customers prefer B.E.A.S.T. . . . have been calling for 5 years trying to get them to change from the B.E.A.S.T.")

Then, to top off this significant market feedback, a major potential customer, Uni-Lok, approached Valley View and asked Valley View to make the B.E.A.S.T. for it. (Rynberk Dep., 96:6-14.) Valley View asserts that a product "similar" to the B.E.A.S.T. was requested, as if Uni-Lok merely wanted similar qualities as provided by the B.E.A.S.T. Uni-Lok, however, had wanted the B.E.A.S.T. for years but could never agree on a price with BrickStop. (Frieberg Dep., 72:16-73:9.) Mr. Bertucci's email

recounting Valley View's meeting with Uni-Lok makes clear that it was a "duplicate" that was requested by Uni-Lok. (Walters Dec., Ex. C. "If Valley View tries to *duplicate* the B.E.A.S.T. product, we could increase our potential greatly . . .", emphasis added). The resulting product speaks volumes, as do the drawings created by Valley View when it was copying the B.E.A.S.T. (Walters Dec., Ex. E.) Valley View did not deliver a product that had similar qualities and functionality as the B.E.A.S.T., Valley View knocked-off the B.E.A.S.T. to trade off its good will. (Walters Dec., Ex. G, *see e.g.,* VVW001127.)

Valley View's copying and its clear motives in copying constitute strong evidence that the marketplace has accepted the BrickStop design as a hallmark of quality and therefore the trade dress enjoys secondary meaning that this Court should protect. Intentional copying demonstrates that acquired distinctiveness exists. *Sara Lee Corp.*, 1998 WL 433764, at *13. Absent acquired distinctiveness, no logical reason exists for Valley View to copy BrickStop's design, which is not required for any functionality and is otherwise unused by others in the industry.

### 4. The Evidence of Actual Confusion Demonstrates Secondary Meaning.

The record now demonstrates that significant instances of actual confusion have arisen, despite the very short time that the two products have been in competition. It is well established that actual confusion demonstrates the existence of secondary meaning in the mark. *Tools USA*, 87 F.3d at 660 ("Evidence offered as to actual customer confusion, although also probative of likelihood of confusion, certainly tends to show that the relevant purchasing public associated [the asserted trade dress] with Tools USA"). "To establish secondary meaning it is not necessary for the public to be aware of the name of the manufacturer from which a product emanates. It is sufficient if the public is aware that the product comes from a single, though anonymous, source." *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 380 (7th Cir. 1976). Thus, the actual confusion discussed below is strong evidence of secondary meaning.

### C. There Is A Strong Likelihood of Confusion if Valley View Is Not Enjoined From Selling Its "Knock-off" Product.

#### 1. The Identical Area and Manner of Concurrent Use Favors a Finding of Likelihood of Confusion.

Each of the factors this Court should weigh in determining whether BrickStop has demonstrated that there is a likelihood of confusion tip sharply in favor of finding confusion will result from Valley View's actions. This first factor "assesses whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *CAE, Inc. v. Clean Air Eng'g., Inc.*, 267 F.3d 660, 681 (7th Cir. 2001) (internal quotation omitted). In this instance, Valley View does not dispute in its

11

opposition that BrickStop and Valley View use nearly identical types of advertising and trade channels. Both BrickStop and Valley view advertise at the same trade shows, and target identical customers. Both companies sell directly to wholesalers and/or resellers who then sell to contractors and installers. Valley View has already directly approached multiple BrickStop customers. Moreover, the trade dress at issue is used in precisely the same manner on the paver edging products. These undisputed facts alone indicate that this factor favors a finding of likelihood of confusion. *CAE*, 267 F.3d at 682; *Logan Graphic Prods., Inc. v. Textus USA, Inc.*, No. 02-cv-1823, 2002 WL 31870549, at *6 (N.D. Ill. Dec. 23, 2002).

### 2. The Incidences of Actual Confusion to Date Strongly Counsel for a Finding of Likelihood of Confusion.

The actual confusion of record includes the testimony of Eric Ashenbrenner, who has personally sold over 50,000 feet of the B.E.A.S.T., and who, when confronted with a sample of the Diamond Paver Edge, did not notice any distinctions from the B.E.A.S.T. Ashenbrenner believed it was in fact the B.E.A.S.T. He concluded that BrickStop and Valley View were sourcing the product from the same manufacturer. (D.N. 21, ¶¶ 1-5.) While Valley View asserts Ashenbrenner was not confused as to the source of the product, only the manufacturer, there is no distinction. Ashenbrenner upon viewing Valley View's product sample concluded that BrickStop and Valley View were actually sourcing the same product from a single manufacturer. Thus, an individual well familiar with the product and industry became immediately confused as to who the source of the B.E.A.S.T. was because of the existence of Valley View's product. Similarly, a manager at a wholesaler that historically has carried BrickStop's product, when confronted with the Diamond Paver Edge image on a website, said the product must be being sold by Valley View with the permission of BrickStop. (D.N. 13, Wein Dec., ¶ 9.)[3]

Most significantly, discovery of Valley View has revealed evidence of confusion amongst ultimate consumers, the contractors and installers. Valley View attends trade shows to display its products including the Diamond Paver Edge. Contractors and installers also attend these trade shows. Valley View's booth is well marked with its name. Despite this marking, at least half a dozen contractors have approached Valley View's Mr. Bertucci and asked him whether the Diamond Paver Edge product he was displaying at the Valley View booth was the B.E.A.S.T. (Walters Dec., Ex. K., Bertucci Dep., 142:14-143:11.) No clearer evidence could demonstrate that contractors look for the shape of the product to identify it, have become confused as to the source of this product, and will ignore even prominent

---

[3]Valley View seeks to strike this evidence as hearsay, which BrickStop will address in its opposition to the motion to strike.

labeling when confronted with that unique shape. This factor weighs heavily in favor of a finding of likelihood of confusion.

### 3. The Relatively Inexpensive Nature of the Product and Reliance on Shape by Contractors Demonstrates the Degree of Customer Care in the Purchase Favors Finding Likelihood of Confusion.

BrickStop set forth the appropriate standards in its opening brief regarding this factor. (D.N. 13, pp. 10-12.) Valley View responds by citing inapposite case law and asserting its labeling will prevent confusion. Of course, as demonstrated above, labeling has no real world affect when contractors can walk up to a prominently marked Valley View booth at a trade show and ask if the Diamond Paver Edge is the B.E.A.S.T. How much more so when the contractor goes to a brick yard with the materials being sold off of a pallet and the only label is the subtle stamp in the product which is of the same material and color as the entire eight foot strip of edging?

The Court must analyze the respective trade dresses in view of what happens in the marketplace. *Thomas II*, 138 F.3d at 296. In this respect, Valley View identifies its raised lettering stamped into the material to identify the source of the Diamond Paver Edge as a Valley View product. However, Valley View's raised lettering is akin to *Thomas II* where the Seventh Circuit noted that "each company embosses its name on the ties in the same color as the rest of the tie, rendering the name difficult to see." *Id.* Moreover, the small white labels that Valley View refers to in its brief are only affixed to its *samples* sent to distributors and are *not* found on the product when it is sold to end customers. Furthermore, the fact that Valley View utilized nearly identical sales literature that depicted the B.E.A.S.T. on it supports a finding of likelihood of confusion. (D.N. 13, Wein Dec., Exs. A and B.) Thus, it is disingenuous for Valley View to contend that Valley View's labeling and marketing of its product precludes a likelihood of confusion.

The cases Valley View relies on for the proposition that clear product labeling and marketing of products prevents a likelihood of confusion are inapposite to the facts of this case. In *Dorr-Oliver* the products cost $40,000 each and could only be sold to a potential marketplace of 12 sophisticated customers who purchased the goods after extensive negotiations. *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 378, 381 (7th Cir. 1996). Likewise, in *Versa Products* the safety control valves at issue were sold by reference to technical specifications, not by sight, to sophisticated consumers who select the products carefully to safeguard human life and huge possible property losses. *Versa Prods Co. v. Bifold Co. Mfg. Ltd.*, 50 F.3d 189, 213-14 (3rd Cir. 1995). In fact, the Third Circuit stated "this is not a case where the items are relatively inexpensive and consumers cannot be expected to examine the labels carefully." *Id.* at 213 (internal quotation omitted). Thus, *Versa* distinguishes itself from the facts

13

of this case where the products cost under $2.00 per foot and are sold to contractors who, once having decided they like the way a product works, subsequently will look for the shape on a brickyard to select it and can hardly be expected to examine it for labels before purchasing. (Martinet Dec., ¶ 26; D.N. 13, Train Dec., ¶ 3; Brown Dec., ¶ 7.)

### 4.    *BrickStop's Strong Trade Dress Indicates Confusion is Likely.*

A particular trade dress's strength flows from is distinctiveness, "meaning its propensity to identify the products or services sold as emanating from a particular source." *CAE*, 267 F.3d at 684. Long use of a mark or trade dress coupled with substantial sales and advertising expenditures indicates it is strong. *Id.* BrickStop's signature design is well known in the industry. (D.N. 13, Train Dec., ¶ 4.) This conclusion is undeniable when considering BrickStop's sales of over 34 million feet of product featuring the signature design, which accounts for over 60% of BrickStop's business. (D.N. 13, Frieberg Dec., ¶ 13.) Moreover, as shown in Exhibits D to K of the Frieberg Dec., BrickStop is the only paver edge company to incorporate a distinctive ornamental design into its product and BrickStop is unaware of any other competitive product in the marketplace that does so. (D.N. 13, Frieberg Dec., ¶ 9.) Thus, in a sea of generic product configurations, BrickStop's signature design is unequivocally strong in the industry. Thus, this factor favors a finding of a likelihood of confusion.

### 5.    *Taken Together, the Likelihood of Confusion Factors Weigh Strongly in Favor of Finding Confusion Likely.*

Weighing the foregoing factors indicates a likelihood of confusion between the trade dresses is imminent. BrickStop and Valley View market identical types of products with the same trade dress to the same target customers through the same trade channels. The products are so close in form that even consumers exercising a high degree of care when purchasing will not notice a difference. Despite the very recent introduction of Valley View's knock-off, eight instances of actual confusion have already come to light, engendered in distributors having a long familiarity with BrickStop's product, and in contractors seeing Valley View's product on display. This strongly militates in favor of a finding of likelihood of confusion. Thus, all of the factors identified as most important in balancing likelihood of confusion by the Seventh Circuit, similarity of the trade dress, Valley View's intent, and evidence of actual confusion, weigh heavily in favor of a finding of likelihood of confusion. Balancing all the factors leads to the inescapable conclusion that there is a strong likelihood that Valley View's adoption of the BrickStop design for its Diamond Paver Edge will cause actionable confusion in the marketplace.

### D.    Irreparable Harm, Balancing the Harms, and the Public Interest.

BrickStop set forth the standards for presuming irreparable harm in its opening papers. Given the

14

strong showing of likelihood of confusion and success on the merits, this Court should presume irreparable harm will occur absent an injunction. Significantly, the danger from loss of control of its trade dress is magnified because Valley View is using a different injection molding process than BrickStop, low pressure injection molding. Mr. Rotheiser explains in his report that the process of low pressure molding creates a product that simultaneously is "both weaker and stiffer than the B.E.A.S.T. - therefore more likely to fail in bending to suit a curved paving configuration." This only confirms Mr. Hutchinson's original testimony that the low pressure product "is more likely to create product that will fail during installation." (D.N. 13, Hutchinson Dec., ¶ 11.) Indeed, Valley View has already received at least one report of such a failure from a potential customer. (Walters Dec., Ex. F, VVW001311.)

If relevant consumers associate the BrickStop shaped foot as inferior because of Valley View's entry, such reputational harm would be difficult to detect and overcome in the marketplace. Moreover, absent an injunction prohibiting Valley View from advertising and selling its Diamond Paver Edge product, BrickStop has and will continue to face price erosion and lost customers. (D.N. 13, Brown Dec., ¶¶ 7-10; Frieberg Dec., ¶ 20.) Additionally, the substantial likelihood of confusion will result in incalculable lost sales, and both the price erosion and customer loss are likely irreversible. (D.N. 13, Frieberg Dec., ¶ 20.) Such harms have been recognized by this Court as being irreparable. *Chamberlain Group, Inc. v. Lear Corp.*, No. 05-cv-3449, 2007 WL 1017741, at * 6 (N.D. Ill. Mar. 30, 2007).

BrickStop fully addressed the balancing of the harms and the public interest in its opening brief and will not repeat that argument here.

## III. Conclusion

For all of the foregoing reasons BrickStop respectfully requests that the Court grant BrickStop's Motion for Preliminary Injunction.

Respectfully Submitted,

Date: August 22, 2008
  Mark Hellmann
  Hellmann Law Group
  2 North LaSalle Street, Suite 1808
  Chicago, Illinois 60602
  Tel.  312-580-9070
  Fax  847-556-0031
  mark@hellmann.com

  s/Scott R. Brown
Scott R. Brown (Admitted *Pro Hac Vice*)
Matthew B. Walters (Admitted *Pro Hac Vice*)
HOVEY WILLIAMS LLP
10801 Mastin Boulevard, Suite 1000
84 Corporate Woods
Overland Park, Kansas 66210
Tel.  913-647-9050
Fax  913-647-9057
srb@hoveywilliams.com
mbw@hoveywilliams.com

ATTORNEYS FOR PLAINTIFF
BRICKSTOP CORPORATION

15

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2008, the foregoing was hand delivered to the Clerk of the Court, and a copy was electronically mailed to the following:

Monica L. Thompson          monica.thompson@dlapiper.com
Richard Blake Johnston       blake.johnston@dlapiper.com
DLA Piper US LLP IL
203 North LaSalle Street
20th Floor
Chicago, IL 60601
(312) 368-4000

ATTORNEYS FOR DEFENDANT
VALLEY VIEW INDUSTRIES, H.C., INC.


                    s/Scott R. Brown

16

# Appendix A

# Appendix A



**Digital Image of the B.E.A.S.T.**



**Excerpt of Exhibit F to the Expert Report of Jordan I. Rotheiser**

## The Rotheiser design performs all of the functions identified by Valley View for the B.E.A.S.T.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BRICKSTOP CORPORATION, | ) | Case Number: 1:08-cv-02690 |
| | ) | |
| Plaintiff, | ) | Assigned Judge: Gettleman |
| | ) | |
| v. | ) | Designated |
| | ) | Magistrate Judge: Cole |
| VALLEY VIEW INDUSTRIES, H.C., Inc., | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S INDEX OF EXHIBITS FOR ITS
### SUGGESTIONS IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Plaintiff BrickStop Corporation by its attorneys submit the following exhibits in support of

their Reply to Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction:

1. Expert Report of Jordan I. Rotheiser

    Exhibit A.    CV of Jordan I. Rotheiser

    Exhibit B.    Digital image of BrickStop Corporation's B.E.A.S.T. product.

    Exhibit C.    Excerpt from *Rosato's Plastics Encyclopedia and Dictionary*.

    Exhibit D.    Copy of BrickStop document produced bearing production number B0011961

    Exhibit E.    Proposed Rotheiser triangular design

    Exhibit F.    Proposed Rotheiser triangular design

    Exhibit G.    Proposed Rotheiser triangular design

    Exhibit H.    Copy of BrickStop document produced bearing production number B0011971.

    Exhibit I.    Proposed Rotheiser triangular design.

    Exhibit J.    Depiction of B.E.A.S.T. curvature.

    Exhibit K.    Digital image of BrickStop's B.E.A.S.T. paver edge and Valley View

Industries, H.C., Inc.'s Diamond Paver Edge.

Exhibit L.      Diamond Lock "L Shape" sale sheet.

Exhibit M.      Web page depicting Lyle Edgings Inc. Bulldog-Edg™ product.

Exhibit N.      Brochure depicting Master Mark Plastics PaveMaster product.

Exhibit O.      Web page depicting Unilok Spikedge™ product.

Exhibit P.      Web page depicting Alliance Designer Products Inc. Gator Edge product.

Exhibit Q.      Brochure depicting Snapedge Canada Ltd. Snap Edge product.

Exhibit R.      Web page depicting Dimex Corporation EdgePro® product.

Exhibit S.      Web page depicting Pave Tech Pave Edge product.

Exhibit T.      Excerpt from *Plastics Engineering Handbook of the Society of the Plastics Industry, Inc.*

2.      Supplemental Declaration of David Frieberg

    A.      Exhibit V - Map

3.      Declaration of Matthew B. Walters in Support of Plaintiff's Reply to Valley View Industries, H.C., Inc.'s Opposition to Plaintiff's Request for Preliminary Injunction

Exhibit A.      E-mail correspondence produced by Valley View, bearing production numbers VVW001516-1518; VVW001500-1503; VVW001629; VVW000726-727; VVW001519-1520; VVW001285-1288; VVW001619-1623.

Exhibit B.      E-mail correspondence produced by Valley View, bearing production number VVW000151.

Exhibit C.      E-mail correspondence produced by Valley View, bearing production number VVW000598.

Exhibit D.      E-mail correspondence produced by Valley View, bearing production number VVW000406.

2

Exhibit E.    Copies of engineering drawings produced by Valley View, bearing production numbers VVW001272-1273.

Exhibit F.    E-mail correspondence produced by Valley View, bearing production numbers   VVW001098-1099;   VVW001306;   VVW001380; VVW001311-16; VVW001590; VVW001915.

Exhibit G.    E-mail correspondence produced by Valley View bearing production numbers   VVW000545-547;   VVW000561-565;   VVW000680; VVW001127; VVW001238-1239.

Exhibit H.    Excerpts from the transcript of the deposition of David Frieberg and an Amendment to Deposition signed by David Frieberg.

Exhibit I.    Excerpts from the transcript of the deposition of Rubin Kurtz.

Exhibit J.    Excerpts from the transcript of the deposition of Howard Rynberk.

Exhibit K.    Excerpts from the transcript of the deposition of Dominick Bertucci.

Exhibit L.    Digital image from Dreamscape website.

Respectfully Submitted,

Date: August 22, 2008

Mark Hellmann
Hellmann Law Group
2 North LaSalle Street, Suite 1808
Chicago, Illinois 60602
Tel.    312-580-9070
Fax    847-556-0031
mark@hellmann.com

s/Scott R. Brown

Scott R. Brown (Admitted *Pro Hac Vice*)
Matthew B. Walters (Admitted *Pro Hac Vice*)
HOVEY WILLIAMS LLP
10801 Mastin Boulevard, Suite 1000
84 Corporate Woods
Overland Park, Kansas 66210
Tel.    913-647-9050
Fax    913-647-9057
srb@hoveywilliams.com
mbw@hoveywilliams.com

ATTORNEYS FOR PLAINTIFF
BRICKSTOP CORPORATION

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BRICKSTOP CORPORATION, | ) | Case Number: 1:08-cv-02690 |
| | ) | |
| Plaintiff, | ) | Assigned Judge: Gettleman |
| | ) | |
| v. | ) | Designated |
| | ) | Magistrate Judge: Cole |
| VALLEY VIEW INDUSTRIES, H.C., Inc., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF BRICKSTOP CORPORATION'S**
**EXPERT REPORT OF JORDAN I. ROTHEISER**

## I.    **INTRODUCTION**

1.    My name is Jordan l. Rotheiser. I live in Highland Park, Illinois. I am an expert and consultant in the fields of plastic product design, injection molding and tooling design. I am the founder of my own consulting firm, Rotheiser Design, Inc. and have 48 years experience in the plastics industry. I have a BA in Industrial Design and a BSE in Industrial Engineering from the University of Illinois. Personally, I have eight patents. I have been retained as an expert by plaintiff BrickStop Corporation, Inc. to opine on whether various features of the BrickStop B.E.A.S.T. product are only functional, meaning they have no decorative aspect, and whether equally acceptable or even superior alternative configurations exist to achieve the desired function of securing pavers against lateral movement.

2.    Rotheiser Design Inc. provides industrial design and engineering services for plastic products. The profession of Industrial Design is a cross between art and engineering and is the service of creating and developing concepts and specifications that optimize the function, value and appearance of products and systems for the mutual benefit of both user and manufacturer (according to the Industrial Design Society of America). Rotheiser Design Inc. executes projects from concept through production or any portion thereof. Included are the completion of troubled projects started by others and consultation on product failures in the field. Other work includes the creation of books, seminars and periodicals on plastics design and expert witness consultation and testimony in lawsuits.

3.    During the past four years, I have given trial or deposition testimony as an expert witness in the following cases (clients are underlined):

> 3M Innovative Properties v. <u>Illinois Tool Works, Inc.</u>
>
> <u>Gary A. Downs</u> v. Isle of Capri Casinos, Inc.v
>
> Patent Reexamination for <u>Radio Shack Corp.</u>
>
> <u>RTC Industries, Inc.</u> v. William Merit & Associates

1

Robert Gorman v. Suncast Corporation

Seiko Epson v. Dynamic Print

Parfums de Coeur, Ltd. v. LePapillon, Ltd.

Mark Freeman and Timothy Stringer v. Gerber Products Company

ADC Telecommunications, Inc. v. Panduit Corp.

4. I have been a member of the Society of Plastics Engineers since 1960 and have held numerous offices within that organization. Currently, I am a councilor on its International Council, a seminar instructor and sit on the board of directors of its Product Design and Decorating and Assembly Divisions. I am a Fellow of the Society and have received several honors from the SPE including Honored Service Member. I have been honored with election to the Plastics Pioneers Association by the Society of the Plastics Industry. In addition, I am a professional member of the Industrial Design Society of America and have served on the board of directors of its Chicago Chapter.

5. I have authored several publications during the last ten years including a best selling book on joining of plastics. Those publications are listed in my C.V., included in this report as Exhibit A. My expert qualifications are also set forth in my C.V.

6. I am being compensated at my customary rate of $250 per hour for my work in this case. I have no financial interest in the outcome of this case, nor do I have any financial interest in, or fiduciary relationship to, BrickStop Corporation, Inc. or Valley View Industries, H.C., Inc.

7. In the preparation of this report, I have read BrickStop's Complaint and Exhibits, Valley View's Answer, BrickStop's Memo in Support of its Motion for Preliminary Injunction including the Declaration of David Frieberg and Exhibits, the Stipulated Protection Order, the Opposition Brief, the Declaration of Jason Brown, the Declaration of Al Train, the Declaration of Gary Wein and Exhibits, the Declaration of Joel Hutchinson, the Expert Report of Robert W. Dealey and the website of the Interlocking Concrete Paver Institute (ICPI). I have further

reviewed Valley View's Drawings Production Numbers VVW001856, VVW001857, VVW001858, VVW001859, VVW001860 and VVW001861 and BrickStop's Drawings Production Numbers BOO11932, BOO11941, BOO11951, BOO11961 and BOO11971. In addition, I have examined BrickStop's B.E.A.S.T. and Son of B.E.A.S.T. as well as Valley View Industries' Diamond Edge #DPE-8. I have also had conversations with David Frieberg, Rubin Kurtz and Andrew Savoie. David Frieberg and Rubin Kurtz are representatives of the Plaintiff in the case and have many years of experience in the paver installation industry. Andrew Savoie is a practitioner in the paver installation industry with 23 years experience who was a member of the Board of Directors of the Interlocking Concrete Pavers Institute (ICPI) from 2000 to 2006 and a member of its Construction Committee from 1996 to 2006, during which period he helped create ICPI's Technical Specifications for the installation of pavers.

8.      In my conversations with David Frieberg, Rubin Kurtz and Andrew Savoie, I was informed as to the function and usage of paver edging. Paver edging is placed along the perimeter of the paver constructed driveway, walk-way or patio in order to provide an edge restraint, which is essential for eliminating horizontal creeping of the pavers and loss of bedding sand.



Above is a diagram from the ICPI website illustrating the correct installation of the paver system with plastic paver edging. The bedding sand is placed over the aggregate base and under the pavers themselves. The edge restraint prevents the pavers and bedding sand from creeping. The

3

aggregate extends under the edge restraint as well. I was further informed that no torsional forces are placed on paver edging in normal usage. In my conversation with Andrew Savoie, he informed me that the minimum recommended paving curve is a 3 foot radius and the smallest radius he has ever seen was 2 feet. Andrew Savoie further stated that all of the paver edging marketed in North America is acceptable from a strength and function standpoint. In addition, in his 23 years of experience in the field, he has never seen a failure due to paver edging. When failures do occur, they are due to improper, or often complete lack of, preparation of the base, bedding sand or the use of lawn edging, which is too weak, instead of paver edging. He also informed me that 70% of jobs are done in the normal, not reverse, placement of the paver edging because it is cheaper to install that way. David Frieberg and Rubin Kurtz informed me that their intention was, "to create a design that looked different from the other products in the marketplace." In doing so, they created the B.E.A.S.T. (Exhibit B.)

9.      Rosato's Plastics Encyclopedia and Dictionary (Exhibit C.) states, "The injection molding (IM) process is greatly preferred by designers because the manufacture of parts of complex shapes and three-dimensions can be more accurately controlled and predicted with IM than with other processes." In particular, injection molding provides the freedom to create functional, decorative and distinctive shapes that could not be achieved with extrusion. Extruded shapes are limited to contours in two dimensions as the third dimension must be continuous as with, for example, pipe or soda straws.

**Comparison Between Valley View Industries' Diamond Edge #DPE-8 and BrickStop Corporation's B.E.A.S.T. and Son of B.E.A.S.T.**

10.     In Paragraph 28 of his expert report, Robert Dealey has stated that, "It is also well known in plastic part design that the least amount of material used to manufacture a product that performs in that application is the preferred design approach." I concur in that statement as it is a variant of the basic principle taught to all engineering students that the objective of engineering

4

design is to achieve the desired function using the least amount of natural resources. Therefore, any additional material used would be for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

11.     The designs offered by BrickStop Corporation as the B.E.A.S.T. and Son of B.E.A.S.T. use considerably more material than is required for the performance of its function (Exhibit B). This is done for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

12.     At an earlier point in the development of the B.E.A.S.T., BrickStop did create the optimum functional design for the product. That design is depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D.) Production Number B001196, a design intended to utilize the design freedom advantages of the process of injection molding. By utilizing straight ribs between the point of where the wall is loaded and the location of the pin, support is provided with the least amount of material usage (Exhibit E.). This reduced material usage would require less time for the molding cycle as well, thereby reducing the machine and labor cost for each part. A single cross rib, which can be cut for bends, between the triangles provides support for the lengthwise direction in the most economical manner. A lattice type layout could be achieved by simply alternating the height of the triangles (Exhibit F.). Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder. A prototype was made, however BrickStop did not use this design because it was deemed lacking in appearance and distinctiveness according to my conversation with Mr. Freiberg and Mr. Kurtz.

13.     The Opposition Brief refers to six attributes referred to in BrickStop's advertising for the B.E.A.S.T.

      1-2.     Has "One piece that does both [1] straight lines and [2] curves";

      3.     "Uses a lattice nailing pattern for strength and stability";

5

4. Has "Structural Rib Re-enforcement SRR™ for perfect straight lines.";

5. Has a "Stable Sure-gripping Footprint SSF™ for stability; and

6. Has a " reverse application"

All of the above attributes can be achieved with the design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D.) Production Number B001196. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

14. The first and second attributes refer to the suitability of the design for straight line and curved applications. Exhibit E is an enlargement of the basic structure of the design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D.), Production Number B001196. The vertical wall provides the physical strength for the structure. It should be noted that the vertical wall ribs and connection details depicted in Exhibit D were judged unnecessary based on the prototype that was constructed at the time. The triangular geometry provides rigidity across the base of the triangle. The straight ribs that form the triangle and the rib between the hole and the wall provide the strength to resist the pressure exerted against the retaining wall by the pavers. The cross rib between the triangles maintains rigidity for the portion of wall between the triangles. Removal of that rib lessens the rigidity which permits curvature of the wall for round paver patterns. A small dimple in the wall between the triangles provides a start for the curve to facilitate curvature of the wall. This design permits a smaller radius than the B.E.A.S.T., however I understand that a two foot radius is the smallest any of the principals or Mr. Savoie have ever seen in application. This design could be altered to provide for a chevron-shaped stake such as depicted in Exhibit G.

15. A lattice pattern for strength and stability could be easily attained with the design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D.), Production Number B001196. Simply alternating the heights of the triangles as shown in

6

Exhibit F. would permit a lattice pattern.

16.    The combination of triangles and lateral ribs in the design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, provides the stiffness necessary to assure perfect straight lines. The horizontal structural ribs provide "Structural Rib Re-enforcement SRR™ for perfect straight lines." The X pattern of the B.E.A.S.T. design spacer between its feet is unnecessary because the angular walls of the triangles provide angular stiffness in a more efficient manner with less material utilization.

17.    The triangle pattern of the design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, provides "Stable Sure-gripping Footprint SSF™ for stability" because it is flat on its bottom side without any surface disturbing protrusions and allows for attachment with nails.

18.    The triangle pattern of the design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, provides for reverse application because it is flat on both sides of its foot without any surface disturbing protrusions and pavers can be installed over the feet.

19.    The Opposition Brief refers to the expert report of Robert Dealey (¶ 28) where he has stated that the cut away portions and reduced depth of the solid fill areas help to minimize the use of plastic, thereby reducing the expense of manufacturing the products. The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, has no solid fill areas in the horizontal plane, thereby reducing the expense of manufacturing the product to its optimum. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

20.    The Opposition Brief further refers to the expert report of Robert Dealey (¶ 54, 58-60) where he states that knit lines, areas where the flows of hot plastic meet, can create weak spots in

7

the finished product. He specifically refers to the x-shaped legs on the spacers permitting the flow of hot plastic during the injection molding process to move in such a way that the seam lines do not occur at structurally critical places, such as the apex of the foot. An engineer would normally use a computer program, such as Moldflow, to determine the location of the knit lines in a complex design such as paver edging. The locations of knit lines are determined by gate locations, the sites where plastic enters the mold, and such a program permits the operator to simulate different gate locations in order to avoid structurally critical locations. While we have no proof that this was done for the triangle design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, we do know that Royal Plastics, the molder, had no objection to the moldability of this design and, in fact, prepared the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, for BrickStop. Consequently, the x-shaped legs on the spacers were not essential to the function of the design to assure the seam lines do not occur at structurally critical places as the design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, did not have them and the prototype was perfectly functional. They were therefore essentially decorative and distinctive in nature as additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

21.    In fact, BrickStop did indeed initially place the B.E.A.S.T. in production without the x-shaped legs on the spacers as depicted in the drawing titled Composite Brick Retainer and dated December 18, 2000 (Exhibit H.), Production Number B001197. Note that a simple rib is used in place of the X –shaped legs. This design performed perfectly well and seam lines did not occur at structurally critical places in the design.

22.    The Opposition Brief further refers to the expert report of Robert Dealey (¶ 54, 58-50)

8

where he states that the ejector pin pads are placed on the foot at those areas where the effects of the shrinkage of plastic as it cools is likely to make the connections against the mold tightest and in greatest need of the ejection pins for removing the finished piece. By using the large size ejector pads, the mold maker always has the option of using sturdier ejection pins as opposed to those which are smaller but have a tendency to break more often. While these statements are technically accurate, Mr. Dealey fails to mention the option of placing only part of the ejector pin under the wall of the part such as shown in Exhibit I. In this way, the ejector pin can be large enough to avoid becoming a maintainance problem without the need for an ejector pin pad, thus using less material. The design depicted in the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, does not incorporate ejector pin pads. They were therefore essentially decorative and distinctive in nature as additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

23.     The Opposition Brief states, "The B.E.A.S.T. functions because the shape of the foot tapers as it moves away from the retaining wall allowing the product to curve inwardly without overlapping the feet." In our conversation with Andrew Savoie, he informed me that the minimum recommended paving curve is a 3 foot radius and the smallest radius he has ever seen was 2 feet. Exhibit J. shows the B.E.A.S.T. bent into a circle. If the outer walls of the foot were straight and emanating perpendicularly from the vertical wall as illustrated by the dashed lines, the B.E.A.S.T. would be capable of a 9 inch radius. Therefore, the angles on the outer contour of the base have no practical value and exist solely for decorative and distinctive value.

24.     In his report, Robert Dealey (¶31) describes "the Valley View foot has a design feature of two ribs positioned approximately a 60° included angle between the wall and the first anchoring opening, in essence functioning as the support mechanism." The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production

9

Number B001196, performs this function with only one hole and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

25.    In his report, Robert Dealey (¶32) describes, "Another rib joins the chevron shaped stake hole with the first spike anchor hole and functions to absorb forces placed against the wall through the anchoring foot and to the stake." The addition of the chevron, Exhibit G., permits the design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, to perform this function with only the chevron, one hole and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

26.    In his report, Robert Dealey (¶33) describes, "The third anchoring hole is connected to the wall through the straight outer walls that have a double angle and radius termination. The inner wall of the chevron shaped opening also connects to the outer angled walls and provides strength acting as a rib like structure." The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only the chevron, one hole and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

27.    In his report, Robert Dealey (¶34) describes, "Two filled in areas, at the bottom of the part when viewed as installed, laying between the outer ribs and connecting the outer edges of the "V" shaped feature functions as a linear connecting mechanism and acts as a restraint for torsional forces and/or twisting in "X" axis (running the length of the part)." In my discussion

10

with Andrew Savoie, he informed me that lateral forces are the principle concern and torsional forces are not a problem with paver edging installations. The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one hole and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

28.    In his report, Robert Dealey (¶35) describes, "Another feature is positioned between the anchoring feet (with the exception of the last anchoring foot on each end), is connected to the wall and then with a series of four ribs connects to the adjacent anchoring feet. This feature remains in place when the installation calls for a straight section of the wall and provides additional restraint to the wall and increases stiffness. The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one cross rib and its supporting triangle ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

29.    In his report, Robert Dealey (¶36) describes, "Each of the other feet has four ejector pins and pads. When the ejector pins are positioned on part features that are not at least five-sixteenths of an inch in diameter, ejector pads are added to the part structure and function as a place to install ejector pads are added to the part structure and function as a place to install ejector pins of a diameter sufficient that ejector pin breakage will not be problematical." The ability to eject the part with five-sixteenths of inch in diameter ejector pins without the use of ejector pin pads is demonstrated in Figure I. as discussed in paragraph 20. The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and

F.), Production Number B001196, performs this function with only one hole and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

30.     In his report, Robert Dealey (¶37) describes, "The four angled connectors also function as a flow leader runner system feeding plastic to the anchoring foot during the injection phase of the injection molding cycle. This feature prevents or greatly reduces the location of two plastic flow fronts forming a knit line at the radius termination at the outer anchoring hole. The presence of a knit line at an area of high stress could result in a premature failure under tensile pressures concentrated in that area." The ability to fill this part without creating knit lines in an area of high stress and without the need for the four angled connectors functioning as a flow leader system is discussed in paragraph 20. The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one cross rib and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

31.     In his report, Robert Dealey (¶38) describes, "The connecting ribs can be cut or removed when installing the paver restraint in curved landscaping. Removal will allow the wall to be bent to conform to the desired contour." This is true, however it is not the most efficient method of removing the paver restraint as the design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one rib and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

12

32.     In his report, Robert Dealey (¶39) describes, "The end anchoring foot, as opposed to the other feet, has a solid wall on top of the anchoring foot (when viewed as installed). This solid wall with interruptions at only the spike/stake openings serves two functions. The first is to provide maximum support to the wall and strength for location preference during installation when only the end units are anchored." The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function without a solid wall on top of the anchoring foot and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder. As a further note, discussions with paving practitioners revealed that none had ever seen or heard of an installation where only the end feet were anchored.

33.     In his report, Robert Dealey (¶40) describes, "The second function of the solid wall is to provide an area for safety warnings, material recycling information and/or other pertinent information that can be permanently molded into the part." Safety warnings and other pertinent information can be placed on the vertical wall of the product by a hot stamping, a label or molded into the product, thereby requiring no solid wall on top of the anchoring foot. The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function without a solid wall on top of the anchoring foot and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

34.     In his report, Robert Dealey (¶41) describes, "It is my opinion, as an expert in the design and injection molding of plastics, that all of the features found on the Valley View Diamond Edge product that I inspected are a function of the design intent for the stated application of providing a restraint in landscaping applications." It is my opinion, as an expert in the industrial

13

design, mechanical design and injection molding of plastics, that the design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function without any of the additional design details discussed in the previous paragraphs by Mr. Dealey and is therefore, the optimum functional design.  Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

**Rebuttal of Mr. Robert Dealey's Expert Witness Report's Discussion of BrickStop Corporation's B.E.A.S.T. and Son of B.E.A.S.T. Design Details.**

35.    In his report, Robert Dealey (¶42) describes, "The BrickStop product is a long "L" shaped component distinguished by a wall approximately 0.195 inch wide and about 1.750 inches tall.  The intent is obvious as the function of one side of the shorter or horizontal portion of the "L" wall is to form an edging for retention of paving bricks or other landscaping blocks. The vertical or longer portion of the "L" contains an anchoring foot arrangement that generally repeats itself after the end units.  The anchoring foot is distinguished with two ribbed walls on both sides, then doubled angled to a radius termination opposite the wall."  The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one hole and its supporting ribs and is therefore, the optimum functional design.  Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

36.    In his report, Robert Dealey (¶43) describes, "The anchoring feet function as a support to the wall and serve as a platform that secures the wall into the desired position for the application."  The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with anchoring feet that have only one hole and supporting ribs and is therefore, the optimum

functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

37.    In his report, Robert Dealey (¶44) describes, "The anchoring feet have a series of two openings where landscaping spikes can be driven into the ground to maintain the desired location and absorb any force exerted on the wall from the pavers or landscape material. The spikes can be straight sided or fluted; the quad lobed hole further from the wall appears to be suitable for a spiral spike. However, a straight spike or stake could also be utilized." The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one hole and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

38.    In his report, Robert Dealey (¶45) describes, "The BrickStop product has two holes where spikes could be driven. The first spike hole is slightly greater than one inch from the inside wall. The second spike hole is about two and three-eights inches from the inside wall." The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one hole and its supporting ribs as discussed in paragraph 15 (Exhibit F.) and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

39.    In his report, Robert Dealey (¶46) describes, "The function of these anchoring feet is clear and with the option of the installer to utilize one of the two options for securing the foot to the ground thereby supporting the wall in contact with the paving blocks." The design depicted

by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one hole and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

40.     In his report, Robert Dealey (¶47) describes, "The use of this product, from a design standpoint is that of a static application. The forces acting on the foot and spike once installed are not repeatedly applied as in a dynamic application. In this regard when the foot is outside the paver the forces acting on the plastic are compressive. When the installation has the foot placement under the paver, the forces acting on the plastic are in tension." The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one hole and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

41.     In his report, Robert Dealey (¶48) describes, "Therefore, the design and function of the anchoring foot must take into account both compression and/or tensile forces after installation." The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one hole and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

42.     In his report, Robert Dealey (¶50) describes, "Additionally, the BrickStop foot has two ribs positioned at approximately a 60° included angle between the wall and the first anchoring opening, in essence functioning as the support mechanism. The opening between the two ribs

16

allows for some flexing in non-linear applications while providing maximum wall support for this structure." There are several competitive designs that have a solid wall with no opening and according to Andrew Savoie, and their advertising, are perfectly suitable for curved paver sections.

43.   In his report, Robert Dealey (¶51) describes, "Another rib joins the quad lobed hole with the first spike anchor hole and functions to absorb forces placed against the wall through the anchoring foot and to the stake." The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one hole and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

44.   In his report, Robert Dealey (¶52) describes, "Two filled in areas, at the bottom of the part when viewed as installed, laying between the outer ribs and connecting the outer edges of the "V" shaped feature function as a linear connecting mechanism and acts as a restraint for torsional forces and/or twisting in the "X" axis (running the length of the part)." In my discussion with Andrew Savoie, he informed me that lateral forces are the primary concern and torsional forces are not a problem with paver edging installations. The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one hole and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

45.   In his report, Robert Dealey (¶53) describes, "Another feature is positioned between the anchoring feet (with the exception of the last anchoring foot on each end), and is connected to

17

the wall and then with a series of four ribs connects to the adjacent anchoring feet. This feature remains in place when the installation calls for a straight section of the wall and provides additional restraint to the wall and functions to increase stiffness." The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one cross rib and its supporting triangle ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

46.    In his report, Robert Dealey (¶54) describes, "The four angled connectors also function as a flow leader runner system feeding plastic to the anchoring foot during the injection phase of the injection molding cycle. This feature prevents or greatly reduces the likelihood of the two plastic flow fronts forming a knit line at the radius termination at the outer anchoring hole. The presence of a knit line at an area of high stress could result in a premature failure under tensile pressures concentrated in that area." The ability to fill this part without creating knit lines in an area of high stress and without the need for the four angled connectors functioning as a flow leader system is discussed in paragraph 20. Royal Plastics, the molder, had no objection to the moldability of this design and, in fact, prepared the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, for BrickStop. The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function with only one hole and its supporting ribs and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

47.    In his report, Robert Dealey (¶55) describes, "The end anchoring foot, as opposed to the other feet, has a solid wall on top of the anchoring foot (when viewed as installed). This solid

wall with interruptions at only the two spike openings serves two functions. The first is to provide maximum support to the wall and strength for location preference during installation when only the end units are anchored." The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function without a solid wall on top of the anchoring foot and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder. As a further note, discussions with paving practitioners revealed that none had ever seen or heard of an installation where only the end feet where anchored.

48.     In his report, Robert Dealey (¶56) describes, "The second function of the solid wall is to provide an area for safety warnings, material recycling information and/or other desired information that can be permanently molded into the part." Safety warnings and other pertinent information can be placed on the vertical wall of the product, thereby requiring no solid wall on top of the anchoring foot." The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, requires no solid end feet and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

49.     In his report, Robert Dealey (¶57) describes, "Each foot has ejector pins, utilized to eject the part from the mold in the injection-molding process. The end foot has three ejector pin marks. The ejector pins are placed on a solid surface and only show as round impressions of approximately five-sixteenths of an inch in diameter." The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, requires no solid end feet and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive

19

purposes to enhance the desirability of the product in the eyes of the beholder.

50.      In his report, Robert Dealey (¶58) describes, "Each of the other feet has four ejector pins and pads.  When ejector pins are positioned on part features that are not at least five-sixteenths of an inch in diameter, ejector pads are added to the part structure and function as a place to install ejector pins of a diameter sufficient that ejector pin breakage will not be problematical." Robert Dealey (¶59) further states, "Ejector pin placement is a function of determining how and where the molded plastic will shrink inward and onto the mold features.  Experience tells us that openings and inner vertical walls will required the greatest forces where resistance to part removal (ejecting) will occur.  Accordingly, ejector pins are then positioned in or near these areas.  Polyethylene and Propylene have high shrinkage rates, which is partly a function of wall thickness, the grade of material and processing conditions.  However, PE and PP have high shrinkage numbers that often range from 0.020 to 0.040 inch per inch and considerable force is often necessary to eject a part from the mold." Robert Dealey (¶60) goes on to say, "Ejector pins are always placed on the side of the mold, normally referred to as the "B" side, core side or ejector side and with some exceptions, where the ejector mechanism is located on the injection-molding machine utilized to mold the parts."  The ability to eject the part with five-sixteenths of inch in diameter ejector pins without the use of ejector pin pads is demonstrated in Figure I. as discussed in paragraph 22.  The design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, does not incorporate ejector pin pads.  They were therefore essentially decorative and distinctive in nature as additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

51.      In his report, Robert Dealey (¶61) describes, "It is my opinion, as an expert in the design and injection molding of plastics, that all of the features found on the BrickStop product that I inspected are a function of the design intent for the stated application."  It is my opinion, as an

expert in the industrial design, mechanical design and injection molding of plastics, that the design depicted by the drawing titled Composite Brick Retainer and dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196, performs this function without any of the additional design details discussed in the previous paragraphs by Mr. Dealey and is therefore, the optimum functional design. Any additional material beyond this optimum functional design is used for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder.

**Comparison of the Triangle Design Depicted by the Drawing Titled Composite Brick Retainer and Dated October 3, 2000 (Exhibit D., E. and F.), Production Number B001196 with Competitive Products.**

52.    Valley View Industries has elected to copy the appearance of the B.E.A.S.T. Exhibit K. shows the B.E.A.S.T. placed directly on top of the Valley View Industries' Diamond Edge #DPE-8. Clearly it is nearly an exact copy. All of the paver edging competitors except Valley View have a different look from the B.E.A.S.T. and many sell for less than the B.E.A.S.T. It is obvious that it is possible to perform the function of a paver edging and be competitive without copying the appearance of the B.E.A.S.T.

53.    Andrew Savoie said that all of the paver edging marketed in North America is acceptable from a strength and function standpoint. In addition, in his 23 years of experience in the field, he has never seen a failure due to paver edging. When failures do occur, they are due to improper, or often complete lack of, preparation of the base or the use of lawn edging, which is too weak, instead of paver edging. He also informed me that 70% of jobs are done in the normal, not reverse, placement of the paver edging because it is cheaper to install that way. All of the paver edging competitors except Valley View have a different look from the B.E.A.S.T. and many sell for less than the B.E.A.S.T. It is obvious that it is possible to perform the function of a paver edging and be competitive without copying the appearance of the B.E.A.S.T. Indeed, even

21

Valley View offers other paver edging that does not copy the appearance of the B.E.A.S.T.

54.     The Valley View Diamond-Lok ("L Shape") Flexible 15 Foot (DLLF-15) and its companion Rigid 15 Foot (DLLR-15), Exhibit L., is such a product with a solid, tombstone shaped, base. The flexible version is for curves and the rigid version is for straight edges, although perforated V slots are provided on the rigid version to permit curves to be made. It is also manufactured by Valley View Industries and offers nearly the same features as the other paver edging on the market. It does not offer the lattice pinning option, however that could be achieve by alternating the hole locations in the bases. It is molded of medium density polyethylene (MDPE). Valley View Industries is sufficiently confident of the functionality of this product to offer a twenty year guarantee against cracking, fading or decomposing of this product. This product demonstrates that it is possible to perform the function of a paver edging and be competitive without copying the appearance of the B.E.A.S.T.

55.     The Bulldog-Edg™ product, Exhibit M., is offered by Lyle Edgings Inc. and is molded of polyvinyl chloride (PVC). It is similar to the Diamond-Lok except that it offers two pin holes instead of one and does not offer a separate rigid variant. This product demonstrates that it is possible to perform the function of a paver edging and be competitive without copying the appearance of the B.E.A.S.T.

56.     The PaveMaster, Exhibit N., is manufactured by Master Mark Plastics and is molded of high density polyethylene (HDPE). It is similar to the previous two products in that it has a solid base, however it has what appears to be a truncated triangle shape and one of its holes has an H configuration. This product demonstrates that it is possible to perform the function of a paver edging and be competitive without copying the appearance of the B.E.A.S.T.

57.     The Spikedge™, Exhibit O., is manufactured by Unilok and has a different appearance in that it has three holes in its solid base, one of which is offset from the other two. It also offers molded-in spikes and a removable "stabilizer tab" which can be removed in order to permit

22

bending for curved sections. This product demonstrates that it is possible to perform the function of a paver edging and be competitive without copying the appearance of the B.E.A.S.T.

58. The Gator Edge, Exhibit P., is offered by Alliance Designer Products Inc. and is offered in both rigid and flexible versions. Its flexible version has a unique appearance in that it has only enough base for a hole, thereby giving it the look of a wall with fingers protruding from it. The rigid version has as solid base with small tabs for the holes. This product demonstrates that it is possible to perform the function of a paver edging and be competitive without copying the appearance of the B.E.A.S.T.

59. The Snap Edge, Exhibit Q., is made by Snapedge Canada Ltd., which offers a lifetime guarantee for this product. It has a distinctive appearance of its own and is made of recycled materials. Ribs containing pin holes protrude from its vertical wall and connect with an outer rib running along the periphery of the edging. This outer rib is cut when the paver edging is to be used for a curve. This product demonstrates that it is possible to perform the function of a paver edging and be competitive without copying the appearance of the B.E.A.S.T.

60. The EdgePro®, Exhibit R., is made of polyvinyl chloride (PVC) by Dimex Corporation and is offered in two styles. EdgePro®, Paver Restraint has a solid tombstone base with a single hole and is intended for both straight and curved installations. EdgePro®, Rigid Restraint is "extra rigid for big jobs with straight installations." It has a nearly solid base, broken only by the pin holes, of which there are three in different shapes. These products demonstrate that it is possible to perform the function of a paver edging and be competitive without copying the appearance of the B.E.A.S.T.

61. From the advertising literature, the Pave Edge, Exhibit S., is manufactured by Pave Tech and appears to be constructed of two extruded strips rather than molded. The rigid version has a continuous triangle extrusion while the flexible variant has triangular shaped base segments. Both slide into slots in the vertical wall. The continuous extrusion can be cut to permit its use for

curves. The triangular wall construction gives this product a unique appearance. This product demonstrates that it is possible to perform the function of a paver edging and be competitive without copying the appearance of the B.E.A.S.T.

62.     In my opinion, Valley View Industries has elected to copy the appearance of the B.E.A.S.T. Other designs are radically different, yet they accomplish the function. All of the paver edging competitors have a different look from the B.E.A.S.T. and many sell for less than the B.E.A.S.T. It is obvious that it is possible to perform the function of a paver edging and be competitive without copying the appearance of the B.E.A.S.T.

**Comparison of High and Low Pressure Injection Molding.**

63.     In his report, Mr. Dealey (¶ 9) has opined that either polyethylene (PE) or polypropylene (PP) have been used for this application. The B.E.A.S.T. is indeed manufactured from polypropylene as is the Valley View Paver Edge, according to the PP symbol engraved in the product. However, due to the nature of the low-pressure foam molding process, the Valley View Paver Edge will have a lower tensile strength than the standard injection molded B.E.A.S.T. according to the Society of the Plastics Industry Plastics Engineering Handbook, page 586, column 2 (Exhibit T.). "The apparent tensile strength of any foamed material is less than that of the same material in a solid configuration. The strength is reduced considerably because of the density reduction and stress concentrations caused by each individual cell." Further down the page, the author discusses the relative stiffness of the standard injection molding vs. the low-pressure foam molding process where he states, "Compared to an equivalent weight of solid plastic, .250 foam can have twice the rigidity." Taken together, these two statements indicate that the Valley View Paver Edge is both weaker and stiffer than the B.E.A.S.T. – therefore more likely to fail in bending to suit a curved paving configuration.

64.     It is my opinion, as an industrial designer and an expert and consultant in the fields of plastic product design, injection molding and tooling design, that the B.E.A.S.T. and Son of

24

B.E.A.S.T. use additional material beyond the optimum functional design for decorative and distinctive purposes to enhance the desirability of the product in the eyes of the beholder. Furthermore, there is ample evidence that it is possible to perform the function of a paver edging and be competitive without copying the appearance of the B.E.A.S.T. or Son of B.E.A.S.T. As additional information becomes available, I reserve the right to add to my opinions accordingly.

Respectfully submitted:

Jordan I. Rotheiser    8/19/08

Jordan I. Rotheiser

August 19, 2008

25

# Exhibit A

## JORDAN I. ROTHEISER

### PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1964 to Present | **Rotheiser Design Inc.**<br>**3075 University Ave.**<br>**Highland Park, IL 60035**<br>**847-433-4288**<br>**rotheiser@sbcglobal.net** |

Rotheiser Design Incorporated provides industrial design and engineering services for plastic products. These services include the creation of product concepts, appearance, function, ergonomics, and engineering. Rotheiser Design Inc. executes projects from concept through production or any portion thereof. Included are the completion of troubled projects started by others and consultation on product failures in the field. Other work includes the creation of books, seminars and periodicals on plastics design and expert witness consultation and testimony in lawsuits.

Projects include:

- Developed first low pressure molding compound outdoor refrigeration unit housings.

- Developed first successful plastic outdoor refrigeration unit housings.

- Designed first plastic housing street sweeper.

- Miniaturized telephone headset connectors using plastics.

- Miniaturized electronic intravenous drop detector using plastics.

- Developed first thin-wall injection molded disposable cocktail glass.

- Designed first injection mold using "lost wax" process.

- Developed first plastic lawn and garden wheels.

- Developed first plastic caster using recycled polypropylene.

- Developed first disposable humidifiers and atomizers for inhalation therapy

- Designed first plastic underwater camera housing.

- Designed first mold using prototype DME collapsing core.

- Designed first commercial living hinge package (excluding closures)

- Developed miniaturized plastics hearing aid housing.

- Developed first polypropylene electrical bobbin.

- Designed first plastic fire extinguisher gauge

**1963 to 1964**          **Compagnie de l'Esthetique Industrielle (Raymond Loewy, Paris)**

**1960 to 1963**          **Abbott Laboratories**

- Designed first plastic microdrip intravenous system.

- Developed first plastics assembly system using induction heating.

- Developed first thermoplastic intravenous system.

**1959 to 1960**          **General Motors Corp.**
                          **Fisher Body Division Styling**

## EDUCATION

BS, Industrial Engineering, University of Illinois, 1960
BA, Industrial Design, University of Illinois, 1960

## PUBLICATIONS

### Books

Plastics chapter, *Handbook of Materials for Product Design*, McGraw-Hill, 2001

Joining of Plastics, *Handbook for Designers and Engineers*, Hanser Gardner, Oct., 1999

Joining of Plastics, *Handbook for Designers and Engineers 2nd Edition*, Hanser Gardner, June, 2004

Plastics Product Design chapter, *Modern Plastics Handbook*, McGraw-Hill, March 1999

Industrial Design chapter, *Handbook of Plastics Material and Technology*, John Wiley & Sons, NY, 1990

Industrial Design article, *American Educator Encyclopedia*, The United Educators, Inc., 1963

**Magazines**

"Staking of Plastics", *Plastics Decorating Magazine*, July/August 2007

"Assembly Innovations Take Center Stage at NPE 2006", *Plastics Decorating Magazine*, July/August 2006

"The Process of Vibration Welding, *Plastics Decorating Magazine*, July/August 2005

"Laser Welding of Plastics, *Plastics Decorating Magazine*, July/August 2002

"Automation and Volume Decorating", *Plastics Decorating Magazine*, April/May 2002

"K2001 Technology Review", *Plastics Decorating Magazine*, January/February 2002

"Laser Marking of Plastics, *Plastics Decorating Magazine*, November/December, 2001

"Decorating Hollow Parts," *Plastics Decorating Magazine*, June/July, 2001

Are Metallized Plastics Returning," *Plastics Decorating Magazine*, April/May, 2001

"In-Mold Decorating of Plastic Parts," *Society of Plastic Engineers ANTEC paper*, May, 2001

"Designing For Decorating And Assembly - Warpage," *Plastics Decorating Magazine*, March, 2001

"Heat Staking and Insertion," *Plastic Decorating Magazine*, Nov., 2000

"In-Mold Decorating," *Plastic Decorating Magazine*, Aug., 2000, Oct., 2006

"Design for Rotational Molding," *Society of Plastics Engineers ANTEC paper*, May, 2000

"The Bigger Picture," *Plastics Engineering Magazine*, January, 1997

"Hot Stamping Reaches New Level of Quality," *Plastics Design Forum*, Nov./Dec., 1990

"Appearance Factors in Hot Stamping," *Design for Decorating RETEC*, Oct., 1990

"Czar of the World," *Plastics Design Forum*, May/June, 1989

"Tomorrow's Design Challenges Roundtable," *Plastics Design Forum*, Jan./Feb., 1987

## EDUCATIONAL SEMINARS CREATED AND PRESENTED

Assembly of Plastics Update - University of Wisconsin - Milwaukee - 6 seminars between 6/91 and 12/94

Assembly Seminar - SPE - 5/92, 5/94, 6/94, SPE Chicago Section - 3/94, 4/95 and 9/97

Basic Principles of Assembly and Use of Fasteners - University of Wisconsin - Milwaukee - 1994

Cost Effective Assembly of Plastic Parts - SPE - 9/95, 5/96, 6/97, SPE Chicago Section - 1990, SPE Wichita Section - 2/97

Cost Effective Decorating of Plastics Parts - SPE - 5/92, 5/94, 6/94, 9/95, 6/97, SPE Chicago Section - 1990, SPE Wichita Section - 2/97, Plastics Fair Seminars - 11/93, The Plastics Seminars - 10/95

Cost Effective Part Design for Injection Molded Products - SPE - 3/96

Decorating and Finishing Plastic Products - The Plastics Seminars and SPE Chicago Section - 2/93

Design of Injection Molded Parts - The Plastics Seminars - 4/92, University of Wisconsin - Milwaukee - 12/95, SPE Chicago Section - 3/96, University of Akron – 11/05, 11/07, 1/07, 12/07, and 1/08.

Designing to Sell - Presented at Designing Plastic Products Symposium, Rockford, IL - 6/81

Designing for Outdoor Applications - University of Wisconsin - Milwaukee - 3/94

Environmentally Conscious Plastic Product Design - Ohio University - 3/94, 4/94, 5/94

Flexible Plastic Containers - University of Wisconsin - Milwaukee - 9/94

Jordan I. Rotheiser
Resume                                                                                              Page 5.

---

Fundamentals of Decorating Plastics  - Society of Manufacturing Engineers - 5/97

Fundamentals of Design for Injection Molded Products  - Modern Plastics Seminars - 17 seminars between 10/81 and 6/86

Joining and Fastening Plastic Parts -  The Plastics Seminars - 11/96 and 4/98

Labeling and Decorating of Plastics - University of Wisconsin - Milwaukee - 9/94

Plastics Finishing and Decorating Update - University of Wisconsin - Milwaukee - 6 seminars between 6/91 and 12/94

Plastic Packaging, Labeling and Decorating  - University of Wisconsin - Milwaukee - 1994

Plastic Packaging Materials  - University of Wisconsin - Milwaukee - 9/94

Plastic Part Design - The Finishing Touches - SPE - 18 seminars between 5/82 and 6/91

Rigid Plastic Containers and Closures - University of Wisconsin - Milwaukee - 9/94

Snap Fits, Press Fits and Joining of Plastics  - University of Wisconsin - Madison - 11/00, 12/01, 12/02

Snap Fits, Press Fits and Welding of Plastics  -  SPE Kansas City Section - 3/00, SPE Chicago Section - 4/99 and 4/00, National Plastics Exposition - 6/00, American Plastics Council - 1/01, Plastics USA - 10/01, San Francisco 5/02, Philadelphia, 3/03, National Plastics Exposition - 6/03, Plastics USA – 10/04, Boston 5/05, Milwaukee 9/05 and 6/08, Charlotte 5/06, National Plastics Exposition – 6/06, Cincinnati - 5/07, Irvine - 9/07,

## PATENTS

| Patent Number | Year Issued | Title |
|---|---|---|
| 6,905.274 | 2005 | Liquid Applicator |
| 5,935,281 | 1999 | Filter Apparatus |
| 4,541,541 | 1985 | Tamper-Resistant Closure for Dispenser |
| 4,170,384 | 1979 | Molded Wheel having a Decorative Side Wall |

Jordan I. Rotheiser
Resume                                                                                        Page 6.

| | | |
|---|---|---|
| D249679 | 1978 | Molded Wheel |
| D249678 | 1978 | Molded Wheel |
| 3,664,466 | 1972 | Wheel Wedge |
| 3,635,232 | 1972 | Rope Retaining Stake |

## PROFESSIONAL AFFILIATIONS & AWARDS

Society of Plastics Engineers - Offices Held:

Member of SPE since 1960

House Committee - Chicago Section - 1 year
Professional Activities Committee Chairman - Chicago Section - 1 year
Board of Directors - Chicago Section - 3 years
Membership Chairman - Chicago Section - 3 years
Created SPE Educational Traveling Display
SPE International Membership Chairman - 1 year
Charter Member - Plastics Product Design and Development Division
Board of Directors - Plastics Product Design and Development Division - 12
  years
Annual Technical Conference Program Chairman, Plastics Product Design and
  Development Division - 5 years
Annual Technical Conference Program Chairman, Decorating and Assembly
  Division – 2 years
SPE International Councilor - Plastics Product Design and Development Division
  - 3 years
SPE International Councilor - Decorating and Assembly Division - 8 years
Chairman-Elect - Plastics Product Design and Development Division - 1 year
Chairman - Plastics Product Design and Development Division - 1 year
Chairman - Plastics Product Design and Development Division Plastics
  Certification Committee
Past Chairman - Plastics Product Design and Development Division - 1 year
Plastics Product Design and Development Division Forum - Conference
  Chairman - 4 years
Charter Member - SPE Rotational Molding Division

Industrial Designers Society of America:
Professional Member
Member of Chicago Chapter Board of Directors - 5 years

**Jordan I. Rotheiser**
Resume

### Awards

Elected Fellow of the Society of Plastics Engineers, Inc.- May 2000

Elected Honored Service Member of the Society of Plastics Engineers, Inc.- May 2002

Elected to membership in the Plastics Pioneers Association - October 2001

Society of Plastics Engineers Plastics Product Design and Development Division Recognition and Appreciation of contributions to the Division through serving on the board of directors from 1987-1994 and serving as Chairman from 1995-1996.  Received 1996

Pride Award for Divisional Excellence - Society of Plastics Engineers Product Design and Development Division.  Received 1996

Chairman's Cup for Contributions Toward Creating Society of Plastics Engineers Plastics Product Design and Development Division.  Received 1995

**JORDAN I. ROTHEISER**

## LITIGATION SUPPORT EXPERIENCE ADDENDUM

Client company is underlined.

| | |
|---|---|
| Case: | 3M Innovative Properties v. <u>Illinois Tool Works, Inc.</u> |
| Matter: | Patent Infringement |
| Project: | Wrote expert reports. |
| Date: | 2007 to present |

| | |
|---|---|
| Case: | <u>Gary A. Downs</u> v. Isle of Capri Casinos, Inc. et al |
| Matter: | Product Liability |
| Project: | Wrote expert report and was deposed. |
| Date: | 2006 to present |

| | |
|---|---|
| Case: | Inter Partes Reexamination of Patent for <u>Radio Shack Corporation</u> |
| Matter: | Patent Validity |
| Project: | Wrote Affidavit |
| Date: | 2004 to 2007 |

| | |
|---|---|
| Case: | <u>Robert Gorman</u> v. Suncast Corporation |
| Matter: | Product Liability |
| Project: | Wrote expert report. |
| Date: | 2005 to 2007 |

| | |
|---|---|
| Case: | <u>RTC Industries, Inc.</u> v. William Merit & Associates |
| Matter: | Patent Infringement |
| Project: | Wrote declaration |
| Date: | 2004 |

| | |
|---|---|
| Case: | Seiko Epson v. <u>Dynamic Print, et al</u> |
| Matter: | Patent Infringement |
| Project: | Wrote declaration and was deposed |
| Date: | 2003 - 2005 |

| | |
|---|---|
| Case: | <u>Parfums de Coeur, Ltd.</u> v. LePapillon, Ltd. |
| Matter: | Product Liability |
| Project: | Wrote expert witness report and was deposed |
| Date: | 2003 – 2004 |

| | |
|---|---|
| Case: | Mark A. Freeman and Timothy K. Stringer v. <u>Gerber Products Company</u> |
| Matter: | Patent infringement |
| Project: | Wrote expert witness report and was deposed |
| Date: | 2003 to 2006 |

| | |
|---|---|
| Case: | ADC Telecommunications, Inc. v. <u>Panduit Corp.</u> |
| Matter: | Patent infringement |
| Project: | Wrote declaration, expert witness report and was deposed. |
| Date: | 2001-2003 |
| | |
| Case: | Don De Cristo Concrete v. <u>American Allsafe Company, Inc., Flex-O-Lite, Inc. and Jackson Products, Inc. dba Services & Materials Company</u> |
| Matter: | Patent infringement |
| Project: | Wrote expert witness report and was deposed. |
| Date: | 2000-2002 |
| | |
| Case: | Plastics Research Corp., Inc. v. <u>Brite-Millwork, Inc., Avon Plastics, Inc., Weyerhauser USA, Inc.</u> |
| Matter: | Patent infringement |
| Project: | Wrote expert witness report and was deposed. |
| Date: | 2001-2002 |
| | |
| Case: | Geomatrix, LLC and David A. Potts v. <u>Infiltrator Systems, Inc.</u> |
| Matter: | Trade secrets |
| Project: | Was deposed. |
| Date: | 2007 |

# Exhibit B



# Exhibit C

# Rosato's
# Plastics Encyclopedia
# and Dictionary



Hanser Publishers, Munich Vienna New York Barcelona

especially identified, is not to be taken as a sign that such names, as understood by the Trade Marks and Merchandise Marks Act, may accordingly be used freely by anyone.

While the advice and information in this book are believed to be true and accurate at the date of going to press, neither the authors nor the editor nor the publisher can accept any legal responsibility for any errors or omissions that may be made. The publisher makes no warranty, express or implied, with respect to the material contained herein.

*Die Deutsche Bibliothek – CIP-Einheitsaufnahme*

**Rosato, Dominick V.:** [Plastics encyclopedia and dictionary] Rosato's plastics encyclopedia and dictionary / Dominick V. Rosato. – Munich; Vienna; New York; Barcelona: Hanser; New York: Oxford Univ. Press, 1993
ISBN 3-446-16490-1
NE: HST

All rights reserved. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying or by any information storage and retrieval system, without permission from the publisher.

0.7 and 500 μm, in wave numbers, between 14,000 and 20 cm$^{-1}$. Molecules have specific frequencies which are directly associated with their rotational and vibrational motions. IR absorptions result from changes in the vibrational and rotational state of a molecular bond. Coupling with electromagnetic radiation occurs if the vibrating molecule produces an oscillating dipole movement that can interact with the electric field of the radiation.

For qualitative analysis, one of the best features of an IR spectrum is that absorption or the lack of absorption in specific frequency regions can be correlated with specific stretching and bending motions and, in some cases, with the relationship of these groups to the rest of the molecule. Thus, when interpreting the spectrum, it is possible that certain functional groups are present in the material and certain others are absent.

**Infusible**  Not capable of melting when heated, as are all cured thermoset plastics.

**Ingot**  A large casting that is subsequently rolled or forged.

**Inhibition and retardation**  Inhibitors prevent the formation of measurable amounts of plastic under conditions that otherwise would permit such polymerization. Retarders reduce the rate at which the polymer is formed. These effects may occur as a result of a reaction between the chain-initiating species and the inhibitor or retarder. Thus, in a catalytically initiated polymerization, the inhibitor destroys the catalyst. If all the catalyst is destroyed, one observes inhibition; if part of it is destroyed, the rate of subsequent polymerizations is proportionally reduced and retardation has occurred. These phenomena occur in Ziegler-Natta type and ionic polymerizations.

**Inhibitor**  A substance that retards a chemical reaction. Also used in certain types of monomers and plastics to prolong life.

**Initial modulus**  ▷ modulus, initial

**Initiator**  Source of free radicals, often peroxides or azo compounds. They are used in free-radical polymerizations, for curing thermoset plastics, and as crosslinking agents for elastomers and crosslinked polyethylene.

**Injection blow molding**  ▷ blow molding, injection

**Injection-compression molding**  ▷ coining

**Injection molding**  The injection molding (IM) process is greatly preferred by designers because the manufacture of parts of complex shape and three-dimensions can be more accurately controlled and predicted with IM than with other processes. As its method of operation is much more complex than others, IM require a thorough understanding. The Figs. below show schematics of the load profile and the molding cycle that highlight the way in which the melt is plasticized (softened) and forced into the mold, the clamping system for opening and closing the mold under pressure, the type of mold used, and the machine controls.

Plastic moves from the hopper onto the feeding portion of the reciprocating extruder



Example of an injection molding cycle processing thermoplastic.



Schematic of pressure loading on plastic melt during injection molding.

# Exhibit D



Attorney's Eyes Only

# Exhibit E



# Exhibit F



# Exhibit G



# Exhibit H

Attorneys' Eyes Only



# Exhibit I



# Exhibit J



# Exhibit K



# Exhibit L

**Diamond-Lok° ("L Shape") Flexible 15 Foot (DLLF-15)**                *Brick/Paver Edging*

**Product Diagram & Installation Details**



**Product Specifications**

| | |
|---|---|
| **Material:** | Medium density polyethylene with UV inhibitor |
| **Weight:** | Shipped 6 lbs (approximate) |
| **Height:** | Base x Height x Length<br>2.5"  x  1.75"  x   15' |
| **Packaging:** | 10 - 15 Foot Strips (60 lbs per bundle)<br>8 - 9 Inch Steel Stakes per Strip (included) |

**Installation Instructions**

**Edging Profile**

**(Top View)**



**Stake Profile**



| | |
|---|---|
| **Edging:** | Install bricks or pavers. Lay edging sidewall with snug against the bricks or pavers. Once in place against the bricks and paver secure them down with stakes. |
| **Stake:** | Sink stake through the holes provided on the bottom fin every 2 feet at a 45 degree angle on the side opposite of the bricks or pavers (as it is illustrated in the installation detail). Sink stake through the bottom fin until the top of stake is flush with the bottom fin. Additional stakes are needed for tight curves and at the ends of the edging. Note: Do not install stakes on the same side or underneath bricks or pavers. |

**(Front View)**

**Installation Detail**

Drive Stake
Through Holes
At 45° Angle    (Brick/Paver)



| | |
|---|---|
| **Guarantee:** | When installed according to our instructions, Valley View Industries provides a twenty year guarantee against cracking, fading, or decomposing. |



**Accessories:**



| | |
|---|---|
| **Accessories:** | 4 Pack Anchoring Stakes - Bulk (AS4-B)<br>Bulk Anchoring Stakes (BAS)<br>Diamond-Lok Stakes - Bulk (DLS8-B) |

**Toll Free Distribution Network:** 1-800-323-9369
☐        ☐        ☐         **Fax:** 1-800-323-3262



**ValleyView** *Industries*

13834 S. Kostner Ave.
Crestwood, IL. 60445
www.valleyviewind.com
valleyviewind@valleyviewind.com

Phone: 708-597-0885
Toll Free: 800-323-9369
Fax: 708-597-9959
Toll Free Fax: 800-323-3262

## Diamond-Lok˙ ("L" Shape) Rigid 15 Foot (DLLR-15)

*Brick/Paver Edging*

### Product Diagram & Installation Details



### Product Specifications

| | |
|---|---|
| **Material:** | Medium density polyethylene with UV inhibitor |
| **Weight:** | 7 lbs (approximate) |
| **Height:** | Base x Height x Length<br>2.5"  x  1.75"  x  15' |
| **Packaging:** | 10 - 15 Foot Strips (70 lbs per bundle)<br>8 - 9 Inch Steel Stakes per Strip (included) |

### Installation Instructions

**Edging:** Install bricks or pavers. Lay edging sidewall with snug against the bricks or pavers. Once in place against the bricks and paver, secure them down with stakes.

**Stake:** Sink stake through the holes provided on the bottom fin every 2 feet at a 45 degree angle on the side opposite of the bricks or pavers (as illustrated in the installation detail). If needed, you can cut along the perforated "V" slots on the fin to make tighter corners possible. Sink stake through the bottom fin until the top of stake is flush with the bottom fin. Additional stakes are needed for tight curves and at the ends of the edging. Note: Do not install stakes on the same side or beneath bricks or pavers.

**Guarantee:** When installed according to our instructions, Valley View Industries provides a twenty year guarantee against cracking, fading, or decomposing.

#### Edging Profile

(Top View)



#### Stake Profile



(Front View)



#### Installation Detail



Drive Stake Through Holes At 45°Angle  (Brick/Paver)



**Accessories:** 4 Pack Anchoring Stakes - Bulk (AS4-B)<br>Bulk Anchoring Stakes (BAS)<br>Diamond-Lok Stakes - Bulk (DLS8-B)

Accessories:



Toll Free Distribution Network: 1-800-323-9369
☐          ☐          ☐          Fax: 1-800-323-3262

**ValleyView** Industries ▲▲▲

13834 S. Kostner Ave.
Crestwood, IL. 60445
www.valleyviewwind.com
valleyviewwind@valleyviewwind.com

Phone: 708-597-0885
Toll Free: 800-323-9369
Fax: 708-597-9959
Toll Free Fax: 800-323-3262

# Exhibit M

Bulldog-Edg, Paver Restraints, Water Garden Edgings - Oly-Ola Edgings Inc. "Premium Edging Prod...

Home | About us | Products | Installation & Tips | Event Calendar | Distributors | Contact Us



The Industry's Best

Search  Find page with ● all or ○ any of these words.

**You Gotta Keep em' Separated!**



May 30, 2008

Home
About Oly-Ola
Our Guarantee
Paver Restraints
Landscape Edgings
Low-Profile Edgings
Water Garden Edging
Retail Display Rack
Accessories
Stakes
Installation & Tips
About 'Plastic'
Event Calendar
Office Hours
Photo Gallery
Submit Photos
Distributors
Testimonials
Request Newsletter
Employment
Advertisements
Contact Us

**Bulldog-Edg™**

Choose a Product

- The strongest paver restraint in Oly-Ola's line, Bulldog-Edg features a thicker PVC construction that makes it ideal for extra heavy-duty paver projects such as driveways and patios. Bulldog's one-piece design flexes without snipping or cutting to make tight curves. Its simple, yet effective, design makes it the perfect choice for serious professionals.

For a 1 inch version of the same restraint, check out STONE-EDG

- And, as with all Oly-Ola products, Bulldog-Edg is made with high grade PVC with no fillers or blown in material.  It can be install under or outside the paver.

**FLEXIBLE PIECES – Available in 7.5 ft. lengths or 15 ft. lengths**



6 - 15 ft pieces per bdl or 12 - 7.5 ft pieces per box/bdl (90 ft)
Edging only - Steel stakes and H-clip sold separate at discount
Black Rigid PVC and carbon black concentrate
Vertical:.175 - .185 of an inch Horizontal:.145 - .155 of an inch
Depth: 1.75" Vertical leg  Width: 2.75" Horizontal leg
15 foot bundle: 34 lbs.   7.5 foot bundle: 34 lbs.
7.5 foot box: 39 lbs. (incl.stakes)



Install under paver    Install outside paver

Bulldog-Edg, Paver Restraints, Water Garden Edgings - Oly-Ola Edgings Inc. "Premium Edging Prod...





**Landscape Architects:** Please use 800-334-4647 on all specifications.
This will allow us to help the contractor bid the job properly.

**For pricing information call or email us**

© Copyright 2003 Oly-Ola Edgings, Inc. All Rights Reserved
E-mail: edgings@olyola.com

Privacy Policy

# Exhibit N



# PaveMaster
## Industry Standard

# PaveMaster
## Landscape Edging

*Start Paving Your Own*
*Yellow Brick Road!*



## PaveMaster Benefits

Increase the value of your home with a paved surface! Do-it-yourself with easy to install *PaveMaster* edging. Use for walkways, driveways, or patios being prepared with pavers, bricks, or stones.

*PaveMaster* is made of heavy gauge HDPE recycled plastic for years of solid holding power. Available in 6' (1.8 m), 8' (2.4 m), and 15' (4.6 m) sections, this durable plastic edging will never rot or rust.

The unique design allows for installation in straight or curved areas with three options for anchoring - plastic stakes, steel stakes, or steel spikes.

No wonder homeowners, builders, and contractors choose *PaveMaster*. Simply put, it is the top quality pavement edging.

An 8-Step installation guide, including a checklist of recommended materials, is mapped out on the following pages. Because each pavement project is different, be sure to check with your paver supplier and local building codes to determine the necessary materials and guidelines.

**With Plastic Stakes**

**Steel Stakes**

**Steel Spikes**

"Don't forget your Stakes!"

## PaveMaster

PaveMaster is warranted to be free from defects in material and manufacturing. It will not be affected by water, mildew, insects, or separation. As with any exterior product manufactured, We do not cover labor or where you purchased the product, or save your proof of purchase.


*Do-It-Yourself proud!*

## Master Mark Plastics
One Master Mark Drive
Albany, MN 56307-0662
800-535-4838
www.MasterMark.com

Tour our facilities!
Builders, contractors, dealers, or distributors call us for plant tours at our Albany and Paynesville, MN locations.

Copyright ©2003 Master Mark Plastics – PaveMaster 8per8

# PaveMaster®



# 8-Step Installation Guide

**Materials:**
- Master Mark PaveMaster® 12103, 12109, 12120, 48130, 48303, or 48230
- Pavers
- Coarse Gravel
- Concrete Sand (not cement)

**Equipment:**
- Three 2'x4'x10' boards
- Level
- Tape Measure
- Wheelbarrow
- Gloves & Eye Protection
- Flat Shovel
- Rake (soft toothed)
- Broom (soft bristled)
- Rubber Mallet

**Rentals:**
- Masonry Saw
- Plate Compactor (Stp-Stp)
- Sod Kicker (if removing sod)

**1. Plans:** Plan for the area you wish to pave by bringing measurements to your paver supplier. This way, you get the right amount of pavers, edging and with local building codes for any recommendations on your project.

**2. Dig:** **Important:** Before you dig, have an inspection done to locate any underground cables! Excavate 6 inches wider than the area you wish to pave. Generally, dig 3 to 6 inches deep for pedestrian weight or 6 to 12 inches deep for vehicle weight. Run a plate compactor over the excavated area at least twice, being sure to overlap passes by a few inches. Make passes at 45° angles from each other.

Before filling in the gravel base, check with your paver supplier for recommendations on using landscape fabric. Landscape fabric aids in water drainage, helps distribute paver weight, and reduces shifting or sinking.

**3. Layer Gravel Base:** Preparation of the base is very important and could determine how long your pavement will last. If your base is uneven, your pavement will be uneven too.

A depth of 3 to 6 inches of gravel base is advised for installation in hard, stable soil that has remained undisturbed by digging or backfilling for at least 3 years. If the soil has been disturbed or the conditions cannot be determined, use 6 to 12 inches of gravel base. (See Fig.1)

Base material consists of coarse gravel, no larger than 3/4", mixed with concrete sand (fine-grained sand, not cement). Spread 2 inches of the gravel base across the excavated area. Rake evenly, then pack down with the plate compactor. Start at the outer edges and work toward the center. Add another 2 inches and repeat until the desired height is reached. Never pack more than 2 inches at a time. Keep the gravel base moist, but not soggy, to help the material compact better.



**4. Check Slope:** While layering the gravel base, maintain a proper slope to guide water away from buildings! Place a 2 x 4 and level perpendicular to the house. Measure from the top of the gravel base to the bottom of the 2 x 4. Create a slope of 1 to 2 inches per 10 feet. (See Fig.2)

more gravel base, not sand. If the paver is too high, remove some of the gravel base.

Check the final height of the pavement by screeding a ½ inch of sand in a small area. Place a paver on the sand. If the paver is not high enough, add

**5. Layer Sand:** Spread exactly 1 inch of concrete sand (not cement) on top of the gravel base. To screed, use two 2 x 4's as guides and the last 2 x 4 to level the sand evenly. Remember, if your base is uneven, your pavement will be uneven too. Do not walk on the leveled sand. (See Fig.3)

**6. Lay Pavers:** Start laying pavers in the corner nearest your supply, preferably by a fixture such as your house. When putting your pavers into place, you must not exceed a ⅛" gap between them. Note: Some pavers are manufactured with spacer bars on the proper spacing. Lay pavers from right to left, left to right, one row at a time, and so on. Set pavers lightly on the sand. Do not push down, twist, or slide the pavers. Walk only on the installed pavers and not on the sand. (See Fig.4)

Some pavers will have to be cut into shape with a masonry saw. Please follow all manufacturer's guidelines and safety precautions when using this potentially dangerous equipment!

**7. Install Edging:** Once all the pavers have been laid, install

PaveMaster® edging. Remove the concrete sand along the outside of the pavers. Place the edging on top of the exposed gravel base against the pavers. Tap edging with a rubber mallet until it is firmly against the pavers. Alternate between removing concrete sand and installing PaveMaster®. (See Fig.5)

Use Master Mark Plastics stakes (see materials), to anchor PaveMaster® every 2 feet for straight sections. Make sure edging is secure and rests firmly against the pavers. For curved installation, bend and contour the edging so it assumes the shape of your design. Anchor PaveMaster® every 1 foot for curved areas.

**8. Finish:** Sweep off excess sand. Make a few more passes over your pavers with the plate compactor. Sweep additional concrete sand (not cement) into any gaps to create a dry mortar. Keep making passes over the pavers and sweeping sand into the gaps until all gaps are full.

Sweep off all excess sand. Backfill with dirt and sod so that the anchors are covered and the lawn is flush against the wall of pavement. You have now finished your project! So take a walk down your proud-to-do-it-yourself yellow brick road!

# Exhibit O





Spikedge™ is an innovative all-in-one edge restraint system that has the spikes connected right to the edge restraint, so that you have them where and when you need them. Made from the same super-strong material as the restraint itself, spikes have been conveniently attached to the edge restraint which easily snap off, giving you the right number of spikes for your installation. Spikedge™ reduces installation time and saves you money by eliminating the need for costly spikes.

**Dimensions:**
8'
2.44 m

**Installation:**
Spikedge™ can be installed in straight or curved applications. Simply snap one or more "stabilizer tabs", to allow Spikedge™ to flex for either inside or outside curved applications. 1. Remove spikes from strip with a knife or snips. 2. Snap our the "stabilizer tabs" (between base pads) for curved applications. 3. Using a 2 - 3 lb mallet to install spikes: Normal Load: walkways and patios 12" to 18" apart (on average every 4th hole). Heavy Load: driveways 12" apart (every 3rd hole). 4. Angle spikes inward, slightly towards the pavers when hammering them in. Hold spike with one hand while pounding in with the other to avoid vibration. (NOTE: hit spike head flush with mallet to avoid damaging the spike).

**Warning:**
NOTE: Do not install plastic spikes in gravels containing stones larger than 3/4" in diameter. CAUTION: Plastic may become brittle in cold weather. Always wear proper eye protection when installing plasic or metal spikes. Minimum radius 4 ft.

**Note:**
For exisiting installations simply peel away the sod from the edges of the pavers, remove the soil, add gravel, straighten the edge pavers if required, and install Spikedge™. Spikedge™ is made using a sophisticated foam injection process that produces a highly durable, weather resistant material. Unlike metal spikes that rust, Spikedge™ will not rust or decompose and will stand up to severe freeze and thaw conditions.

**Important:**
Read complete instructions on container prior to application.

# Exhibit P



WEBDESIGN : CASSI

© ALLIANCE DESIGNER PRODUCTS INC., All rights reserved

# Exhibit Q



Superior strength
and simplicity...

...that's out of sight



**SNAP EDGE**

Snapedge Canada Ltd.
1-800-720-SNAP(7627)

Visit our website for more information
www.snapedge.ca

Made with Recycled Materials

Distributed by:

PRINTED IN CANADA

37741

## Advantages & Benefits



- One piece system does it all; straight, curved; or even a complete radius, without waste
- Open design allows for grass growth along paver border creating a strong, yet invisible edge
- Interlock and spike ends together, ensuring a secure connection with extra support
- Rugged injection moulded plastic ensures the strongest edge designed for commercial, vehicular and patio or walkway applications
- Easy to install before or after the pavers have been laid
- Snap Edge® requires no extra connectors for a permanent piece to piece connection
- Convenient and efficient packaging makes it easy to handle and transport



# Exhibit R

Dimex Corporation; Paver Restraint

# EdgePro®

*The Professionals' Choice!*

**Heavy-duty PVC edging for interlocking concrete or brick pavers.**

## EdgePro® Paver Restraint



- Extra rugged design withstands heavy traffic. **EdgePro®** can be used for either walkway, patio or driveway installations.

- Durable **EdgePro®** PVC will not crack, rot or deteriorate. Designed for both straight and radius installations without snipping or cutting.

- L-shape design eliminates turf "brownout" by allowing maximum backfill against the pavers.

- Compact 7 1/2 foot design is convenient and efficient, allowing easy storage and hauling.

- **EdgePro®** Paver Restraint can be anchored with standard 3/8 X 12 inch or 9 inch landscape stakes.

## EdgePro® Rigid Restraint



- Extra Rigid for big jobs with straight installations.

- Durable **EdgePro®** PVC will not crack, rot or deteriorate.

- Compact 7 1/2 foot design is convenient and efficient, allowing easy storage and hauling.

## Specifications

|  | *EdgePro® Paver Restraint* | *EdgePro® Rigid Restraint* |
|---|---|---|
| Material | Engineered Rigid PVC Alloy | Engineered Rigid PVC Alloy |
| *Dimensions* |  |  |
| Length | 7 1/2 feet | 7 1/2 feet |
| Vertical Section | 1 7/8 inches | 1 7/8 inches |
| Horizontal Section | 3 1/2 inches | 3 1/2 inches |

restraint

*Minimum Wall Thickness*

| | | |
|---|---|---|
| Vertical Section | 0.125 inches | 0.125 inches |
| Horizontal Section | 0.220 inches | 0.125 inches |
| Minimum Rib Thickness | --- | 0.280 inches |

## Material Tests

| | *ASTM Test Method* | *Minimum* |
|---|---|---|
| Tensile Strength | D-638 | 5,000 PSI |
| Flexural Modules | D-790 | 280,000 PSI |
| Impact Strength | D-256 | 120 in lbs/inch |

**EdgePro® passes Ultraviolet and Weathering Tests per Federal Std 191 A, Method 5804.**

### Installation Guidelines

Install compacted gravel base. Consult your paving stone supplier for proper width and depth for the specific application.

After pavers have been set in place, install edging along outside row of pavers.

No snipping or cutting is necessary for easy installation of radius designs. Simply bend **EdgePro®** Paver Restraint into the desired radius.





Secure **EdgePro®** by driving standard 9 inch landscape stakes or 3/8 x 12 inch landscape spikes into compacted base.

Recommended spike placement:

- Flexible section, every 18 inches
- Rigid section, every 24 inches



Backfill perimeter with topsoil, seed or sod as preferred.

© *2000 Dimex Corporation* | *Dimex@Dimexcorp.com* | *1-800-334-3776*

# Exhibit S

Home | PAVE EDGE | SANDLOCK | Tools and Equipment | Adhesives | Chemicals | Material Handling Equipment | New Products



- Home
- PAVE EDGE
- Tools and Equipment
- Paver Brights
- PAVE CHEM
- Product Specials
- Brochures & Promotional Items
- Industry News
- Installation & Education
- Paver School
- Customer Projects and Comments
- Events Calendar
- About Us / Contact us



Applied Language

Translate this page in



## PAVE EDGE

Print this page

**Features | Products | Specialized Applications | Specifications
Installation | Testing & Engineering | Job Cost Calculator**

*The Japanese have a philosophy called "Zero Defect." This concept states that "it is always cheaper and more profitable to do the job right the first time." It is unbelievable how much money it costs to go back and repair a job. Man hours, mileage, equipment, loss of customer confidence, damaged reputation, and loss of revenue from not working on a paying job.*

*PAVE EDGE offers unchallenged design flexibility, simple installation requirements, lightness in weight, superior strength and durability. Because it is the last edging designed exclusively for pavers. It is the most widely accepted and used paver edge restraint system in use today! Designed to match the durability of the pavers.*

*PAVE EDGE will maintain the perimeter interlock better than any other product. Designed to work well for sidewalks, patios and driveways.*

**Products:**

| Click on a small image below to see larger PDF image! |
|---|
|  |
| Flexible    Rigid    Connection    Industrial |

### RIGID - The original PAVE EDGE.



- Designed for straight areas, but flexible enough to support gradual curves. For smaller curves PAVE EDGE RIGID can be easily cut
- If you run out of PAVE EDGE FLEXIBLE on the job, you can easily cut the back of our PAVE EDGE RIGID with a hacksaw to transform it into flexible edging
- Designed to withstand loading forces equivalent to that of a heavily trafficked residential driveway and able to withstand occasional heavy truck loading

### FLEXIBLE:

 

- PAVE EDGE FLEXIBLE combines the durability and design of PAVE EDGE RIGID with flexibility to produce tighter and shorter curves.
- Easily connected to PAVE EDGE RIGID, the two combine to do every job possible!
- Designed to withstand loading forces equivalent to that of a heavily trafficked residential driveway and able to withstand occasional heavy truck loading
- Do not use PAVE EDGE FLEXIBLE edging on straight areas, use only for radius areas

### INDUSTRIAL:

PAVE EDGE - Interlocking Concrete & Brick Paver Edge Restraints & Installation by PAVE TECH

 

- Large, stronger design made especially for heavy vehicular, commercial, and industrial applications
- Only Paver Edge Restraint large enough for use with the thicker paver and bedding layer on a typical permeable application.
- Designed for the harsh environment of Commercial and Industrial Pavements

**HI-VIZ**

 

View PDF - Hi-Viz Brochure
View PDF - Hi-Viz Installation

- Bright yellow PAVE EDGE Rigid
- Lipped design enables HI-VIZ to hold pavers and sand in place
- Reduces trip hazards
- Transitions nicely from an aisle to booth area
- Easy to install
- 6' lengths

© Copyright 2006  PAVE TECH, INC.
Privacy Policy | Legal Notice | Support

Site by Optimaway.com



*Flexible*

# Exhibit T

# SPI Plastics
# Engineering
# Handbook
## of the Society of the
## Plastics Industry, Inc.

### Fifth Edition

### Edited by

# Michael L. Berins



CHAPMAN & HALL

ITP An International Thomson Publishing Company

New York • Albany • Bonn • Boston • Cincinnati • Detroit • London • Madrid • Melbourne •
Mexico City • Pacific Grove • Paris • San Francisco • Singapore • Tokyo • Toronto • Washington

Copyright © 1991 by Van Nostrand Reinhold

This edition published by Chapman & Hall, New York, NY

Printed in the United States of America

For more information contact:

Chapman & Hall
115 Fifth Avenue
New York, NY 10003

Thomas Nelson Australia
102 Dodds Street
South Melbourne, 3205
Victoria, Australia

Nelson Canada
1120 Birchmount Road
Scarborough, Ontario
Canada M1K 5G4

International Thomson Editores
Campos Eliseos 385, Piso 7
Col. Polanco
11560 Mexico D.F.
Mexico

Chapman & Hall
2-6 Boundary Row
London SE1 8HN
England

Chapman & Hall GmbH
Postfach 100 263
D-69442 Weinhelm
Germany

International Thomson Publishing Asia
221 Henderson Road #05-10
Henderson Building
Singapore 0315

International Thomson Publishing - Japan
Hirakawacho-cho Kyowa Building, 3F
1-2-1 Hirakawacho-cho
Chiyoda-ku, 102 Tokyo
Japan

All rights reserved. No part of this book covered by the copyright hereon may be reproduced or used in any form or by any means—graphic, electronic, or mechanical, including photocopying, recording, taping, or information storage and retrieval systems—without the written permission of the publisher.

Case 1:08-cv-02690 Document 46-3 Filed 08/22/2008 Page 88 of 92

with wall sections as low as 0.125 inch. The design criteria of a structural foam part must be considered before the optimum wall thickness is selected.

*Draft Angles.* In injection molding, sufficient draft angles are necessary; but because of the lower pressures involved in foam molding, smaller draft angles can be tolerated. Generally, an angle of 0.5 to 3° will provide sufficient draft to release the part.

Textured surfaces on sidewalls generally require an additional 1° draft per 0.001 inch depth of texture. For best results, one should consult the engraver before specifying the draft requirements.

*Fillets and Radii.* Sharp corners create points of stress concentration and restrict material flow. They are often a cause of part failure. One should use as large a radius as possible on inside and outside corners to minimize this stress concentration and to aid in mold filling. In most parts, the minimum inside radius should be 0.060 inch. If the section is under load or subject to impact, a minimum radius of 0.125 inch should be used.

A radius equal to 0.6 times the wall thickness will provide a desirable fillet for most situations.

*Bosses.* Bosses can be easily incorporated into structural foam parts to accept fasteners and support components. In many applications, the addition of molded-in bosses, mounting pads, standoffs, and retainers can replace costly brackets and miscellaneous small metal part assemblies. In general, boss diameters should be two times that of the cored hole. This recommendation will vary, depending on the resin used and the boss wall thickness.

Bosses should be cored to prevent the formation of a thick section in the part. Generous fillet radii should be used at the base of the boss to avoid stress concentration and resist torque loading.

*Transition Sections.* Transition sections from thick to thin walls are more easily

be tapered for proper processing. In molding parts with wall sections of varying thicknesses, it often is desirable to gate the part in the thin section and allow the material to flow into the thicker area.

*Hinges.* Properly designed, integral structural foam hinges offer a fastening technique while eliminating costly bracketry and assembly time. Hinges can be designed to be either hidden or visible, depending on their location.

*Snap-fits.* The superior rigidity and strength of structural foam permits increased utilization of snap-fits for assembly and for mounting heavy components in bases. A quick and extremely economical assembly method, snap-fitting eliminates the need for added screws, brackets, and fasteners, significantly reducing labor.

## Mechanical Properties

*Tensile Strength.* The apparent tensile strength of any foam material is less than that of the same material in a solid configuration. The strength is reduced considerably because of the density reduction and stress concentrations caused by each individual cell. Therefore tensile stresses should not exceed the proportional limit of the material.

*Compressive Strength.* The compressive strength of a foam material is higher than its tensile strength. In bending, a compressive failure—although extremely rare—normally involves buckling of the skin and collapse of the cellular core.

*Stiffness-to-Weight.* The high stiffness-to-weight ratio of structural foam is the primary advantage of this material has over metal and standard (nonfoamed) injection-molded plastics. An equivalent weight of 0.250 inch foam can have over seven times the rigidity of steel and thirteen times the rigidity of zinc. Compared to an equivalent weight of solid plastic, 0.250 inch foam can have twice the rigidity.

*Flexural Properties.* Structural foam's distribution of material at any cross section makes

# Exhibit V



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BRICKSTOP CORPORATION, | ) | Case Number: 1:08-cv-02690 |
| | ) | |
| Plaintiff, | ) | Assigned Judge: Gettleman |
| | ) | |
| v. | ) | Designated |
| | ) | Magistrate Judge: Cole |
| VALLEY VIEW INDUSTRIES, H.C., INC., | ) | |
| | ) | |
| Defendant. | ) | |

### SUPPLEMENTAL DECLARATION OF DAVID FRIEBERG

I, David Frieberg, hereby declare:

21.     I have personal knowledge of the statements made herein and would testify to them if called as a witness in this matter.

22.     I am the same David Frieberg who has submitted a previous declaration in this matter in support of BrickStop Corporation's motion for a preliminary injunction. To avoid confusion with my last declaration filed on June 6, 2008, the paragraph numbers in this declaration begin consecutively with the next number after my last declaration and the exhibits attached hereto begin consecutively with the next letter after the last exhibit in my previous declaration.

23.     I have reviewed BrickStop's sales database for United States sales of the B.E.A.S.T., Son of B.E.A.S.T. and Edge-All from 2001 to the present. Based upon my review of BrickStop's sales, the map attached hereto as Exhibit V, is a fair and accurate representation that depicts a substantial number of cities in to which BrickStop has sold the B.E.A.S.T. line of products to dealers and distributors, who then resell BrickStop products to contractors. It should be noted that this does not include the approximately 800 Home Depot stores that carry BrickStop's Edge-All product, which is differently named, but identical to the Son of B.E.A.S.T. product.

-1-

24.    Sure-Loc, a company that sells paver restraints, carries a plastic paver edging that appears visually similar to the B.E.A.S.T. In fact, it is the B.E.A.S.T. Sure-Loc is a BrickStop customer that sells the B.E.A.S.T. In fact, I have confirmed that the paver restraint depicted in Sure-Loc's sales material that appears visually similar to the B.E.A.S.T. is BrickStop's B.E.A.S.T. product.

25.    Moreover, Dreamscape, another company that sells paver restraints, carries a product that appears visually similar to the B.E.A.S.T. This is because it is the B.E.A.S.T. Dreamscape is a Sure-Loc customer that merely resells the B.E.A.S.T. product. As such, the Dreamscape product that appears visually similar to the B.E.A.S.T. is BrickStop's B.E.A.S.T. product. I have personally visited Dreamscape's website and confirmed that the product depicted on the Dreamscape website is the B.E.A.S.T. product.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: August 21, 2008            By: _____
                                          David Frieberg

-2-

# Exhibit A

EXHIBIT
26

**Business Center - Chicago**

| | |
|---|---|
| From: | Mark D. Heath [mdheath@pa.net] |
| Sent: | Thursday, November 29, 2007 7:12 AM |
| To: | Dominick Bertucci |
| Subject: | Re: April Sales |

Dominick,

I have looked and cannot find a response from Dave. Many times Dave would call me rather than send an email. He has made 2 trips out here as well in the last several years. Not really to make sales calls, but to help with PANTS and to review sales.

I found these emails yesterday after Howard's email to me regarding a Woman on the fishing trip. I know Dave and Howard had said that would not be a problem and I was looking for an email to back that up and could not find. Dave communicated over the phone with me, much more than in email.

Mark D. Heath
----- Original Message -----
From: "Dominick Bertucci" <dbertucci@valleyviewind.com>
To: "Mark D. Heath" <mdheath@pa.net>
Sent: Wednesday, November 28, 2007 9:50 PM
Subject: RE: April Sales


Mark,
DON"T WORRY about the emails. I need as much of these as possible to understand your sales zone.....so thank you!!!
Did Dave ever reply to this email?? IF so, please forward to me.

Dominick

---

From: Mark D. Heath [mailto:mdheath@pa.net]
Sent: Wed 11/28/2007 12:48 PM
To: Dominick Bertucci
Subject: Fw: April Sales


Dominick,

Below FYI. I am not trying to burden you with emails, I thought you might want a sampling of emails that have transpired between V.V. and me so you have a better idea about our territory. If nothing else you can print them off and read them on the plane ride here?

Mark D. Heath

----- Original Message -----
From: Mark D. Heath <mailto:mdheath@pa.net>
To: Dave Ignowski <mailto:dignowski@valleyviewind.com>
Cc: Dwight Jay Hammond <mailto:dhammond@ptd.net> ; Howard Rynberk
<mailto:hrynberk@valleyviewind.com>
Sent: Friday, May 05, 2006 10:48 AM
Subject: April Sales

Dave,

I wanted to share some thoughts with you in addition to what we discussed on the phone. It is discouraging to me to be down. I have been going the extra mile all for quite awhile to try and get new V.View business! Their

CONFIDENTIAL

VVW001516

1

REDACTED

are several factors why my territory is down.  I have several customers that I have lost and I have intense competition.  I opened ..... up last year and now they are going out of business!  The product called "The Beast" is making inroads in our market share.  It is a 8' piece of paver restraint that comes with 8 spikes per length and cost delivered is between $4.50-$5.00.  It is a hard plastic type of material.  You cut the back side when you want to use it in a radius.  I am told the guys like it's rigidness and that it stays tightly against the paver.  I lost                ' to this product as well as

I also frequently see Diamex and Olya Olya in my territory as well.  Diamex customers are loyal, they have good price,  decent product and the freight is cheaper than V.V.  Olya Olya customers are a little more likely to switch.

I am not trying to be negative, I have added new customers and I have many more "in the works".  Below is a update on customers that I have left multiply samples with and their current status.  These are all "new business" type accounts and I am not mentioning current accounts.  I have also followed up on every lead V.V. has sent.

                        Poly Board, they like it for a form, but are not sure how it will work as an expansion joint material.  I have called them every week for 3 months.  Still working on them.

            goes back and forth from V.View to Diamex and Snap Edge. Trying to get him to commit to our product line.

                    New poly Board customer, distributor to concrete yards.

                    fairly new paver Mfg.  Have been trying to get DiamondLok in, they just decided to add Beast instead of V.View.  They are still listening to me and may add V.View as well.  Beast is in catalog.

                        Currently carry Beast and Diamex, trying to get them to switch.

                ' Have been trying to get edging business from Olya Olya and new poly board business.  Last summer and fall I pitched them several times on both.  Left samples and literature and they were interested but non commital.   I went in in Feb and they had just received an order of Poly Board.  They had used info, samples I gave them and ordered thru Total Marketing Rep!  I was not happy with that, but the Total Rep knows the owner very well and has been calling on them for 25 plus years.  I still may get fill in edging business this spring.

switch.    .  ......,             rries the beast and I am trying to get them to switch.

        ..   ..        carries Beast, got him to try our product two years ago.  Most of it he still has, he says his customers prefer Beast. Still working on him.

                    have been calling for 5 years trying to get them to change from the beast

            ....              has the Beast I am working on getting him to switch.

Looking at Poly board and plastic.            does not carry a plastic edging, only metal.  Good potential to land account.    Would be 10K plus account.

Poly Board.              . carries our product and is considering adding

Highly Confidential - Attorneys' Eyes Only

VVW001517

REDACTED

Does not carry an edging, may add ours.

pitched for several years, finally bought edging
tnru                          dropship.

Former owner has tried our product and I am working
on new owners to bring in product for this year.

carries Olya Olya and I am working on getting them
for next year.

carries Diamex edging put I got him to
try Poly Board.

does multiple trucks of Diamex every year.  He is not
budging, put I keep trying.

Carries the Beast.    I am trying to get him to
switch.

Other accounts that I have called on this spring and left samples at and am
pursuing,

Ones I have yet to call on my list,

I am optimistic.  I think things will get better.  I know I will land some
of the above potential accounts I have been working on.  I honestly have
been really pushing Valley View this spring that is why it is so
discouraging to be down.,  Dave if you came out here
and spent a little time with me, maybe you could help me close some of these
potential accounts I listed above!?

Look forward to seeing you at the Hardware Show.    Thanks for your constant
support.  All the staff in the office are outstanding, especially Gina!

Mark D. Heath


Internal Virus Database is out-of-date.
Checked by AVG Free Edition.
Version: 7.5.430 / Virus Database: 268.14.0/524 - Release Date: 11/8/2006
1:40 PM

Highly Confidential -
Attorneys' Eyes Only

VVW001518

3

EXHIBIT
28
Fynberk

Mark, keep me posted on Buffalo and the          accounts.

Both of you, have me send samples to people for you if needed.

I put the word in for you guys with Universal Lighting.

Mark, email Howard to send you the check for the Wetsel rep. How did the meeting go??

Mark/ Dwight,  reply copying each other with the questions on this email. Talk among yourselves if you desire before emailing me back.

Remember, there's a new sheriff in town. I am taking no prisoners and there won't be any bullets left in my gun when I am done. Shoot first, ask questions later.

Dominick

---

From: Mark D. Heath [mailto:mdheath@pa.net]
Sent: Thu 11/29/2007 7:45 AM
To: Dominick Bertucci
Subject: Fw: Sales

Dominick,

I am sending this email for you to add to the ones you are bringing on the airplane. It is a response I sent to Howard after he looked at a sales report about          and after Dwight told him that          carried another cheaper product. He was upset. I found this looking for a response from Dave that you had requested. Thought you should see. For the most part, Dave was always in our corner, but recently with sales falling in our territory Howard has been "concerned" with our performance. I understand his feelings, but truly Dwight and I have been making an enormous effort to turn the corner, but are running into major obstacles...... Diamex and the Beast, are the most formidable!          is King out here and they put a major emphasis on the beast. Not trying to make excuses, we are making headway, just trying to keep you informed of what we are up against and what has transpired between Howard, Dave and Hammond Associates.

On a side note, if you could somehow improve the sales reports to be more accurate, this would be very beneficial.

How is Dave? Will he be back to V.View at all before he heads down to Florida?

Mark D. Heath

----- Original Message -----
From: David Ignowski <mailto:DIgnowski@valleyviewind.com>
To: Mark D. Heath <mailto:mdheath@pa.net>
Sent: Thursday, November 09, 2006 3:47 PM
Subject: RE: Sales

Hello Mark, I saw Howard's message to you when I returned from Irrigation Show.....Your reply was as it really is so I know your doing the best you can... thus we just need to turn the corner with a few of the contractors pickup distributor yards to make an Impact in sales and change momentum in a positive way.

VVW001500

CONFIDENTIAL

3

From: Mark D. Heath [mailto:mdheath@pa.net]
Sent: Wednesday, November 08, 2006 1:00 PM
To: Howard Rynberk; Dwight Hammond
Cc: David Ignowski; Bonnie O'Neill; Diana Knudsen
Subject: Re:
Importance: High

REDACTED

Howard,


First let me say that Dwight and I both want to and know we need to increase
our V.View sales.  Howard the reports do not give the whole picture.  Dwight
and myself thought that we communicated some things with you and Dave
apparently we did not do it well enough.  I am not trying to make excuses
but let me highlight a few things.  I am doing this from memory, you can
verify and correct me if I am wrong.


December 2005        places $35,000.00 Early Order which ships in December
2005.  This 35K goes on V.View 2005 sales records but is really
product for spring 2006.  When I speak with        they tell me in their
system that their sales are up significantly over last year.  They sold 23K
of V.View in 2005, YTD        V.View sales are 58K.  More than doubled.  It
is simply a matter of bringing 2006 product in December 2005.  If you take
this 35K off of 2005 Valley View sales report  and add it to 2006 it is a
70K difference and makes our numbers look considerably better.


Another issue that hurt us this year is that one of my new accounts,
        , went out of business.  This is 30K in Diamond Lok sales that we
lost this year.


As far as _____, I cannot give a full account like Dwight can.  I can tell
you that Dwight told me he was in their on a regular basis Jan-May asking
for the V.View order.  They did not bring in another Mfg.  They have had
this other product BEFORE they ever carried V.View and they have never
discontinued.  They have always sold multiple products from different mfg's.


Please believe me when I tell you that Valley View is one of our top
priorities!   We are trying to increase our numbers.  We spend more time
trying to sell Valley View than anything else.  Everyone I speak to tells
me flat strips of plastic edging sales are flat, paver restraint sales are
rising.  We are running into significant challenges!   "EdgePro" is
continually making a big push in our territory with numerous new and unique
products, cheaper pricing and prepaid freight.   "The Beast" is also cheaper
and is pushed heavily by        (I                        , has
probably 60-70% of paver business) and it is hard to get their dealers to
switch.  Olya Olya is here but probably the easiest to sell against.  These
are our three main competitors for Diamond Lok and are all formidable.


Howard FYI the main objections I hear on Diamond Lok:


"It is to flimsy, not rigid enough."

Highly Confidential -
Attorneys' Eyes Only

VVW001501

1

"6' is to short but 15' is to long." (Beast is 8')

"I don't want the stakes, we use the spikes they work better."

"I get a better price and prepaid freight."

"My guys want the 8' piece and prefer the beast to your product."

Howard would you please consider a 8' DLLF without stakes at a "promo price". This would gives us a tool we need to compete against many of the objections!

**REDACTED**

Howard Dwight and I have a plan to increase our sales!  We have been working on it and will be continually.  Our goal is to grow current L&G business we have with distributors.  The strategy is different for each distributor.  With v     I would like to offer either a cash spiff or fishing trip to the nignest increased     t sales rep.  I also suggest we participate in their April/May ad campaign.   I am meeting with     next Monday at 10:00 am and I am going to speak with them on which promo would work better and than make a proposal to you.  We are also looking for new business.   This is a continual process!  We are targeting specifically,
                                                                and many others.  We are also making appointments with paver mfg.  We have at least 5 in our territory,  ?                                                We are trying to get them to carry and endorse Diamond Lok.  I have been in to
         and              already and they are not currently interested, but I will continue to push!

Howard Valley View is a great company with great products!   We like our products and believe in them.  I truly hope we can restore your faith in us! We are definitely giving it our best shot!

Mark D. Heath

J.A. Hammond Associates

----- Original Message -----

From: Howard Rynberk <mailto:HRynberk@valleyviewind.com>

To: Mark D. Heath <mailto:mdheath@pa.net>  ; Dwight Hammond <mailto:dhammond@ptd.net>

Cc: David Ignowski <mailto:DIgnowski@valleyviewind.com>  ; Bonnie O'Neill <mailto:BONeill@valleyviewind.com>  ; Diana Knudsen <mailto:DKnudsen@valleyviewind.com>

Sent: Monday, November 06, 2006 12:15 PM

Highly Confidential - Attorneys' Eyes Only

VVW001502

REDACTED

Dear Mark and Dwight,

As you know, your sales have been dismal this year.

One problem I have with you, is that it was me that keep pushing you on
            , as I new they had not ordered. Finally, you went out there
and round a competitor products there.  By then, half the season was over.

You have not told me any other specific reasons or problems with any other
distributors.

I ran a history today on sales volume with Wetsel vs last year.

Last year ·        bought $53,143 of product and this year they have only
bought thru 11/4/06, $23,327.

This is a decrease of 56%!!  Don't you think Valley View should have been
informed of any problems or why this big decrease in sales?

I am really losing faith in you guys. I don't even think you knew this and
if you didn't, why not and if you did why did you not address it

in your previous e-mails?

I can absolutely guarantee you that if you do not get your sales up and be
more aware of you accounts, you will NOT be representing us in 2008.

Howard


Internal Virus Database is out-of-date.
Checked by AVG Free Edition.
Version: 7.1.408 / Virus Database: 268.13.12/499 - Release Date: 10/26/2006


Internal Virus Database is out-of-date.
Checked by AVG Free Edition.
Version: 7.1.408 / Virus Database: 268.13.12/499 - Release Date: 10/26/2006

--
Internal Virus Database is out-of-date.
Checked by AVG Free Edition.
Version: 7.5.430 / Virus Database: 268.14.0/524 - Release Date: 11/8/2006
1:40 PM

Highly Confidential - Attorney
Eyes Only

- · VVW001503

6

# REDACTED

## Business Center - Chicago

From:     Mark D. Heath [mdheath@pa.net]
Sent:     Friday, January 04, 2008 6:34 AM
To:       Dominick Bertucci
Subject:  Fw: Follow up.



---- Original Message ----
From: Mark D. Heath
To: Howard Rynberk
Cc: Dwight Jay Hammond
Sent: Friday, April 06, 2007 1:55 PM
Subject: Re: Follow up.

Howard,

I was at                    yesterday.  They had just brought a pallet of the Beast in for $4.30 and it was prepaid on 600 pieces.
I have heard this same story at two many places for it to not be true.  Will see if we can get you a published price.

Mark D. Heath

--- Original Message ---
From: Howard Rynberk
To: Mark D. Heath
Sent: Friday, April 06, 2007 12:46 PM
Subject: RE: Follow up.

Mark,
Can you get a copy of the prices for the beast. I would like to see it as the price seems to good. .
Howard

From: Mark D. Heath [mailto:mdheath@pa.net]
Sent: Thursday, April 05, 2007 6:31 AM
To: Howard Rynberk
Subject: Follow up.

Howard,

I have a potential new customer,                    . They are a 2-step distributor selling concrete, stone and
paver yards. They do not have trucks. Everything is sent out from their warehouse, LTL, UPS or drop shipped.  He is looking
for a paver restraint. He wants the best price and a product that can be drop shipped.   Can we come up with a prepaid price
for him?  He covers from Maine down to South Carolina. . We are up against the, "Beast".  It comes in 7.5' lengths and is
$4.60, prepaid on a 600 piece pallet. I see the beast quite a few places and it is tough selling diamond lok against this price
point with prepaid freight.

Let me know your thoughts.

Mark D. Heath

---

Internal Virus Database is out-of-date.
Checked by AVG Free Edition.
Version: 7.5.430 / Virus Database: 268.14.0/524 - Release Date: 11/8/2006 1:40 PM

VVW001629

Highly Confidential -
Attorneys' Eyes Only

**Business Center - Chicago**

From:            Dominick Bertucci
Sent:            Thursday, November 29, 2007 7:28 AM
To:              dhammond@ptd.net
Subject:         FW: RE:

Mark/Dwight,
          is as big of a landscape supply yard as they come in the
Chicagoland area. Their price is NO WHERE close to what you guys are
seeing. Thus, the uncertainty with what price is being sold. I have been
able to get customers in my zone to photo copy invoices regarding other
products; snap edge, etc. But nothing close to what you are reporting with
The Beast.

This is critical as we are essentialy knocking off the beast but our current
pricing based on your figures, won't get us anywhere. That is why it is
critical to have either you or Dwight get a copy of an invoice/quote so I
can show Howard.

Dominick

---

From: Mark D. Heath [mailto:mdheath@pa.net]
Sent: Wed 11/28/2007 12:45 PM
To: Dominick Bertucci
Subject: Fw:

FYI

Mark D. Heath
----- Original Message -----
From: Mark D. Heath <mailto:mdheath@pa.net>
To: Howard Rynberk <HRynberk@valleyviewind.com>
Cc: Dwight Jay Hammond <mailto:dhammond@ptd.net>
Sent: Wednesday, April 11, 2007 11:32 AM
Subject: Re:

Howard,

I have had at least 6 people tell me that they pay $4.30-4.60 per strip for
the BEAST. This is a delivered price for a pallet of 600 pieces. These
have all been potential new customers. They are all separate customers who
do not coordinate their response to me. I know Dwight is trying to get the
Beast price from          to forward to you. Regarding the quote you received
from          , was it for the pallet of 600? Was it prepaid. They may
have different pricing structures just like we have Blue, Green and Yellow
price lists. Also I am not sure where the BEAST is shipped from, but it may
be out east here somewhere making the freight less of an issue for them.

Mark D. Heath

----- Original Message -----
From: Howard Rynberk <mailto:HRynberk@valleyviewind.com>
To: Mark D. Heath <mailto:mdheath@pa.net>
Sent: Tuesday, April 10, 2007 12:15 PM

Δ π EXHIBIT 57

Deponent
Date 8/1-08 Rptr.
WWW.DEPOBOOK.COM

Highly Confidential -
Attorneys' Eyes Only

VVW000726

1

Mark,

I had a price for the beast faxed over to ⁻                    , which is a landscape
supply company that I own.

The price they received was $5.88 per strip.

Howard

**REDACTED**

Internal Virus Database is out-of-date.
Checked by AVG Free Edition.
Version: 7.5.430 / Virus Database: 268.14.0/524 - Release Date: 11/8/2006
1:40 PM

--
Internal Virus Database is out-of-date.
Checked by AVG Free Edition.
Version: 7.5.430 / Virus Database: 268.14.0/524 - Release Date: 11/8/2006
1:40 PM

Highly Confidential -
Attorneys' Eyes Only

VVW000727

EXHIBIT

27

*Rynberk*

Page 1 of 2

## Business Center - Chicago

| | |
|---|---|
| **From:** | Mark D. Heath [mdheath@pa.net] |
| **Sent:** | Wednesday, November 28, 2007 12:28 PM |
| **To:** | Dominick Bertucci |
| **Subject:** | Fw: Sales leads. |
| **Attachments:** | Valley View Paver Account Leads 2-27-2007.doc; Valley View VA Accounts 3-27-2007.doc; Valley View NY List 3-26-2007.doc; Valley View PA List 3-26-2007.doc |

Dominick,

FYI

Mark

----- Original Message -----
From: Mark D. Heath
To: Howard Rynberk
Cc: Dave Ignowski ; Dwight Hammond
Sent: Wednesday, May 16, 2007 4:05 PM
Subject: Sales leads.

**REDACTED**

Howard,

I am attaching lists of leads that I have used this Spring. Back in March I pooled all my leads from all the sources I had and made 4 distinct lists. PA accounts, NY accounts, VA accounts, Paver Mfg. Accounts. All total there is over 90 accounts that I have been working on this spring. I have landed several and I anticipate on landing at least 2 more decent size accounts this spring. I will give specific details for you on new accounts. I know I have told you before but the main thing I am running up against is Diamex. They have 4 different paver restraint products, a better price and sell anybody and everybody at their distributor price. The Beast and Snap Edge are the main players in my market. 95% of what is sold are 8' strips. Most manufactures are also paying the freight on minimum quantities. Below are new accounts or probable new accounts.

-      sells large quantities of Steel Edging and Aluminum Paver restraint. I anticipate selling her Valley View this spring.
-      calls on stone and paver yards from New England down to Florida. He is debating between us and Diamex. He carries tools and caulk for pavers but no edging. Diamex is $.50 a foot. We are at $.55. I have sold him on our product being superior and that we would not sell his customers direct. I think we are going to get the business!
-      is 7 locations. Carries Olya Olya we have a decent chance of getting this switched over.
-      Account who bought Diamond Lok in the past and switched to Diamex which we should be getting back. She has to sell thru her Diamex inventory and we should get an order later this summer.
-      uses approx. 10K a year in edging buying thru Russell's, Diamex distributor in Buffalo. Will switch to us when he needs edging.
-      uses Olya Olya. 10K a year. We should get the business next year
-      New Customer, switched to Valley View this spring.
-      New Customer, switched to Valley View this spring.
-      credit application in process, once approved will be buy.

Howard the offer of 8' diamond lok you gave me should help land more new accounts. This will really help. It would have been better to have earlier in the season but will still help this season.

     promotion is going well. To be honest it is hard to track how much of an increase we are having with the contest. I send out monthly reminders and post who is ahead in the contest via email to all      reps.

Thank you for your support Howard. Call or email me with any questions.

Mark D. Heath

Highly Confidential -
Attorneys' Eyes Only

VVW001519

VVW001520

**Business Center - Chicago**

From:        Dwight Hammond [dhammond@ptd.net]
Sent:        Monday, April 21, 2008 9:44 AM
To:          Dominick Bertucci
Cc:          Mark Heath
Subject:     Re: New Diamond Paver Edge

Dominick,

Sorry for the delay in my response. I wanted to have as many answers as
possible to your questions when I responded. Below is as much information
as I have right now. I did get the email sell sheet and I am printing them
to take with me on the road this week. I hope to secure several more new
customers. Be sure to read down to the end. I have responded to other
emails at the end.

Dwight J. Hammond
J.A. Hammond Associates
Phone:  570-476-6580
Fax: 570-476-6581
Email: dhammond@ptd.net

----- Original Message -----
From: "Dominick Bertucci" <dbertucci@valleyviewind.com>
To: "Dwight Hammond" <dhammond@ptd.net>
Sent: Tuesday, April 15, 2008 11:08 AM
Subject: RE: New Diamond Paver Edge


Dwight,
Did you confirm that these people received the DPE sample? I want to
make sure they all received it. Howard was talking with            and
they mentioned they didn't receive it.

Please advise.

Dominick

-----Original Message-----
From: Dwight Hammond [mailto:dhammond@ptd.net]
Sent: Tuesday, February 05, 2008 2:52 PM
To: Dominick Bertucci
Cc: Mark Heath
Subject: New Diamond Paver Edge

Dominick,

Here is my list. I will most likely have several additional one after
the .
NE Grows Show. I have made several attempts to contact all these
customers.
Some I have spoken to directly, others I have left messages. They
should
all be aware of the samples coming to their attention. Mark should have
you
his list by Friday.

Dwight J. Hammond
J.A. Hammond Associates
Phone:  570-476-6580
Fax:  570-476-6581
Email: dhammond@ptd.net

△ π EXHIBIT 60
Deponent
Date 5-1-08 Rptr.
WWW.DEPOBOOK.COM

Highly Confidential -
Attorneys' Eyes Only

VVW001285

1

NE Grows

**REDACTED**

They did get the samples! I spoke to          this morning. Several
reasons why the didm't order any DPE. First they had no literature to
present to thier customers. Secondly they don't have a forklift to get the
product off the truck. I told her we would send 50 sell sheets and 12-12"
samples of DPE. Told her we could drop ship pallets to dealers. She said
they could also breakdown the pallets when they came in to thier warehouse.
She said she would get around to present the product as soon as the samples
and literature arrived.


They did recieve the sample and I have been into see          I am going into
see          at thier second location          as he is tne one who likes
and sells that type of edging. The products          he carries is much
less expensive then the DPE but I will do my best to convert then over.
They are almost ready to order so the timing is good.


     did get the sample but he says he doesn't get any call for it. He will
put the sample out and bring the product in if they get some demand.


Difficult to get a hold of on the phone. I was thinking about stopping in
to see him this week.


He has samples and I will get him literature. He seems very interested but
non commital. I will try to see him again this week.

Highly Confidential -
Attorneys' Eyes Only

VVW001286

Very interested but they bought the EP Edge. Says the customers don't care
for it. Poor quality. Sending sell sheet and will followup with him the
end of the week.

REDACTED

Did get the sample but has commited to Dimex's EP Edge due to pricing.  He cannot compete with the Beast and make any money selling DPE.

@ NE Grows

Has sample and I am seeing him this week to hopefully secure an order.

will be @ NE Grows

Hasn't taken my calls.  He was very cold to us at the NE Grows Show.  I'll try to get thru to him thru my friend Pete Mckennel who works for him.

@ EP Show

Has recieved the sample and is interested.  I am visiting with him this week to bring him the sell sheet and quote him pricing.

RE: EP Henry show leads:    I visited with everyone and here are a few comments.  Sorry if I did not send this to you before.

:- I had seen      last year and he had some interest in the poly board.  He carries Brickstop.  I am stopping to see him this week.

- They are still only a mulch yard.  They have not gotten things off the ground with the "new" building.  Located right next to

- They know      and he has been in contact with them regarding Valley View.

They carry our BD-20.  Has a bunch of the Beast in inventory. Don t think we are able to compete with a $400 freight charge per pallet.

had left but I have been in contact with him and he should be ordering this month.  Not interested in DPE, they sell very little PR on the island.

: - They have spoken with      in the past and I am sure he is following up with regard to DPE etc.

Highly Confidential -
Attorneys' Eyes Only

VVW001287

Lastly, I have to say in regards to Brickstop "The Beast" isn't the only product they sell.  A number of people have told me they buy Tools, fabric, adhesives etc. from Brickstop in addition to the Beast.  They still have to do business with them even if they buy our DPE.  They seem to be afriad that

3

if they switch they may be blacklisted by Brickstop.  Hope this covers
everything.  Hopefully this will be the week I land that truckload plus
account.  Let me know if I have missed responding to any of your other
requests.

Dwight J. Hammond
J.A. Hammond Associates
Phone:  570-476-6580
Fax: 570-476-6581
Email: dhammond@ptd.net

Highly Confidential -
Attorneys' Eyes Only

VVW001288

4

REDACTED

EXHIBIT
36
Rynberk

**Business Center - Chicago**

| | |
|---|---|
| From: | Dwight Hammond [dhammond@ptd.net] |
| Sent: | Friday, February 15, 2008 3:36 PM |
| To: | Dominick Bertucci |
| Cc: | Mark Heath; Howard Rynberk |
| Subject: | Re: update |

Dominick,

I follow up on all leads I receive. I have nothing from this year on my computer regarding planters. I know I spoke with someone last month from Long Island NY and referred them to Bissett. I think they were in the Hamptons? Is this who complained? I will double check my laptop when I get home to see if there is anything on there that I might have missed. I also received a lead from Dave, I                    The number on the email was incomplete but I found it on the internet. I left them a message, (called several times and got answering machine).

As for new customers I also expect          to come on board but they may not place an EO due to inventory.              in Thorofare NJ promised me an order.   You should keep you eye out for          at the EP Henry show. I know we will get a lot of leads from that show. I was hoping also to get around this week with the new Diamond edge. When I tell people about they are interested in seeing it. I haven't gotten my samples yet. I spoke to many potential customers and told them to stop by the Booth @ EP Henry show and see the new diamond edge. I didn't put them on my list to send samples to but I can update the list to include all of them if you would like. As for requesting samples for people other then who you visited with me; the only person you and I saw on my list was the Stone Center. The nine others were accounts I contacted and spoke with on my own. The list is right at the bottom of this email. Dominick it sounds like you are saying we are just sitting back and letting you will do all the work for us and that is just not true. I appreciate your help with Northeast Nursery. Working together as a team is critical to our success. I can send you a recap of my sales calls and phone contacts trying to get new business for Valley View. I am trying very hard and realize the potential we have to grow this territory. Working with us you took note of what we are up against and the volume of business we don't have. It's because of products like the Beast @ .55 prepaid on 600pcs. And Dimex prepaying 200-300 pcs of lawn edging for $5.50. And as I told you in my email Jan. 17 that Dimex is selling a paver restraint to          for approx. .47 cents/ft. This is the only way          can be competitive reselling to the dealers who currently buy the beast direct.

As for the 5          locations I call on them regularly. I meet this week with all 30 of the site managers at a conference in PA where I trained them on spreader calibration. I will be seeing the all sites in my territory in the next thirty days. I feel it will be best for me to personally bring the samples into those site managers and pitch them face to face. I can have you send them by mail also if you think that will help. Some will probably even be at the EP show next week. I'll see you then.

I will continue to give it my best and I'll send you reports on my calls and progress if you would like. I wish I had the new paver restraint on Jan. 1 but I'll do my best as soon as I have the samples and literature to take around. People need to see it!

Dwight J. Hammond
J.A. Hammond Associates
Phone: 570-476-6580
Fax: 570-476-6581
Email: dhammond@ptd.net

1

VVW001619

Highly Confidential –
Attorneys' Eyes Only

----- Original Message -----
From: "Dominick Bertucci" <dbertucci@valleyviewind.com>
To: "Mark D. Heath" <mdheath@pa.net>
Cc: "Dwight Hammond" <dhammond@ptd.net>
Sent: Thursday, February 14, 2008 11:50 PM
Subject: update

**REDACTED**

Hey Guys,

We have to get things moving soon with some new accounts. So far to date,
you have only logged one (        ).  You can count I
though I got them interested at in snow.

Mark, I did not receive a list of accounts to send the new Diamond Paver
Edge.

I don't know if you guys are sending samples to prospects, but I haven't got
any requests to send anything to any customers outside of my sales visits
with you. Mark, stay on

We have got to get some new accounts in your territory.  Dwight, why haven't
you requested me to send samples to the Shemins branches that don't carry
our product.

Also, Dwight, Valley View took a call from an irate caller from New York on
Thursday stating that they haven't received a return call regarding
planters.  What's the deal with this??

I have made three visits to your area, the fourth being next week at EP
Henry.  Tell me something is brewing big as I am not feeling the vibes.  You
both were made aware back in December that Mighty Diamond is your new "Ace"
product.

The new paver restraint and Mighty Diamond can pull you  both out of
Howard's dog house.  You know I am willing to help you sell.  Give me some
more love.

Dominick

---

From: Mark D. Heath [mailto:mdheath@pa.net]
Sent: Tue 2/5/2008 6:33 PM
To: Dominick Bertucci
Subject: Re: New Diamond Paver Edge


Dominick,

Thank you.

Mark

----- Original Message -----
From: "Dominick Bertucci" <dbertucci@valleyviewind.com>
To: "Dwight Hammond" <dhammond@ptd.net>
Cc: "Mark Heath" <mdheath@pa.net>
Sent: Tuesday, February 05, 2008 4:24 PM
Subject: RE: New Diamond Paver Edge

Highly Confidential -
Attorneys' Eyes Only

VVW001620

Mark,
Had a very nice convesation with        I am sending him more samples of
Mighty Diamond.  I told him we would sell him Mighty Diamond at $5 for an
order to        He reiterated that        does not go through the quantity

2

that was told to us in our meeting.

Dominick

---

From: Dwight Hammond [mailto:dhammond@ptd.net]
Sent: Tue 2/5/2008 2:51 PM
To: Dominick Bertucci
Cc: Mark Heath
Subject: New Diamond Paver Edge

Dominick,

Here is my list. I will most likely have several additional one after the
NE Grows Show. I have made several attempts to contact all these customers.
Some I have spoken to directly, others I have left messages. They should
all be aware of the samples coming to their attention. Mark should have you
his list by Friday.

Dwight J. Hammond
J.A. Hammond Associates
Phone:   570-476-6580
Fax:  570-476-6581
Email: dhammond@ptd.net


West Hartford, CT


Ramsey, NJ


Bridgewater, NJ [__

REDACTED

Seaville, NJ (

W

Lawrenceville, NJ

Highly Confidential -
Attorneys' Eyes Only

VVW001621

Wilmington, DE

3

Woodbury, NJ

Sparta NJ

**REDACTED**

Westford MA (

South Amboy NJ

> Subject: New Diamond Paver Edge
>
>
> In less than two weeks, Valley View is excited to provide the paver
> industry another product that will set the industry standard- Diamond
> Paver Edge.
>
> Production will finally begin on a product that for sure will allow each
> of you to grow your sales.
> Within days of production, each rep office will receive four- three ft.
> samples.
>
> Because of the timing with this product, we will incur the expense of
> sending out immediate samples to your top prospects; paver manufacturers,
> landscape supply yards, etc.
>
> Sell sheets will be sent along with samples to you and your customers.
>
> This is what I want; send me contact names/addresses of customers you want
> to have a sample sent to.  I would like pricing to come from you as a
> follow up with the product.  Samples will be in your customers hands by
> February 15th.
> AGAIN, send me a listing consisting of:
>
> Company Name
> Contact Name
> Address
>
> BY FEBRUARY 8TH!!!!!!!!!!!!!!!!!!!!!!!!!!
>
> Pricing is as follows to quote.  COPY ME ON ANY ONE YOU SEND PRICING TO.
>
> Here is the product info:
> Item # DPE-8-10  (packs of 10 8' strips)

4

VVW001622

Highly Confidential -
Attorneys' Eyes Only

```
> Item # DPE-8-600 (pallets of 600).
>
> Valley View anchor stakes sold separately.  10"/12" spikes can be used
> with product but will not be sold by Valley View.  These are readily
> available in hardware stores/landscape supply.
>
>
> Unless otherwise stated from me, quote the following:
>
> Paver manufacturer- .65/ft
> Landscape Supply - .70/ft (Distributor price)
> Dealer Price         - .77/ft
>
>
> Freight is the same as the Valley View program.  If necessary, discuss a
> custom program with me.
>
> What is so special about this product versus the current Diamond Lok?
>
> For many years, we have been watching our current customer base carry
> higher priced, more "rigid" products alongside or in place of our Diamond
> Lok.  Now you have an additional tool to combat that and increase sales.
> The research done in the paver market for the amount of paver restraints
> sold is astounding.
>
> Get the message out.  There's a new sheriff in town for paver restraints,
> it's called Diamond Paver Edge.
>
> Good selling,
>
> Dominick V. Bertucci
> National Sales Manager
> www.valleyviewind.com
>
>
>
>
>
>
```

--
Internal Virus Database is out-of-date.
Checked by AVG Free Edition.
Version: 7.5.430 / Virus Database: 268.14.0/524 - Release Date: 11/8/2006
1:40 PM

VVW001623

Highly Confidential -
Attorneys' Eyes Only

# Exhibit B

**Frank Soukup**

| | |
|---|---|
| From: | Dominick V. Bertucci [dvinb@yahoo.com] |
| Sent: | Thursday, September 06, 2007 7:12 AM |
| To: | Howard Rynberk |
| Cc: | Frank Soukup |
| Subject: | Hedberg comments of new brick/paver edging |

Hedberg likes the idea of the new product though would like to see the following changes to the Beast sample that I showed:

* Easier to snip for turning in to a flexible product over current Beast product
* A small lip on the product similiar to Pave Tech.

They want to see/be told of a final design before fully comitting. Though I do believe they will comitt, it's just a matter of how they feel about the design versus the other two items they sell to push our product over the others. Also, we are going to have to be at .60-.63 per foot.

They buy $150,000+ from Snap edge and Pave Tech and get some very good pricing.
We wouldn't get all that business, though our price to them will dictate how that is divided with us.

Dominick


Fussy? Opinionated? Impossible to please? Perfect. Join Yahoo!'s user panel and lay it on us.



Highly Confidential -
Attorneys' Eyes Only

VVW000151

1

# Exhibit C

Page 1 of 1

**Business Center - Chicago**



From:    Dominick V. Bertucci [dvinb@yahoo.com]
Sent:    Thursday, July 19, 2007 12:31 PM
To:      Howard Rynberk
Cc:      Howie Rynberk; Dave Martinet
Subject: Notes from Unilock meeting

**REDACTED**

Howard,

Here are the specifics from the meeting today. I am copying Howie and Dave should you be at '          . in the
future and need to reference.

*       currently buys from Snap Edge around $400-500,000 and around $50,000 in pave grip
* They at one point were at $600-700,000 before the Beast hit the market
* We need to be at .52 per foot *without* stakes ($7.80 for 15ft.) for          o make a margin to the dealer market to
consider switching over to our Diamond Lok.
* Dave mentioned that has opening order next week would probably much higher if he were to have this price.
* If Valley View tries to duplicate the Beast product, we could increase our potential greatly with
*          has a total of 10 branches. Buffalo, NY has the main contact (Dave McIntyre) to iniate contacts with the
other branches.
* ICPI show is a show to consider in Nashville next March.

Other thoughts........

If we give          a lower price, we have to be prepared for repercussions from the market when there dealer price is
listed. I'll cross that bridge once we get to it. It will be a good problem to deal with should          decide to go with
us.

I want to contact the Buffalo, NY contact to let him know we are giving a "below market" price to '          and we
would expect them to consider for other branches to maintain this pricing. I want to reiterate with          .... that I
would appreciate his recommendation of this nature with the buyer in Buffalo to go along with our desires.

Other notable customers in my current zone that could do a lot more with us should we develop a Beast type product:

* .          .          , MN - They do $100,000 with us in edging and $0 with Diamond Lok because of the
"perception" of a higher quality higher priced product in Pave Tech.
*          They sell alot of our competiion
*
*          locations. A current          customer       **REDACTED**
* .          . :- Des Moines - They buy $0 in Diamond Lok
*
* 75% of my customers who distribute Diamond Lok also sell one or more of our competitors. Another new sku
could help them buy easier from us since they are already getting shipped.

See you around 11 on Friday at V.V.

Highly Confidential –
Attomeys' Eyes Only

VVW000598

Take the Internet to Go: Yahoo!Go puts the <u>Internet in your pocket:</u> mail, news, photos & more.

6/28/2008

# Exhibit D

EXHIBIT ld
32 Kg
Rynberk

Page 1 of 1

## Business Center - Chicago

From:     Frank Soukup
Sent:     Wednesday, December 05, 2007 9:42 AM
To:       'Dominick V. Bertucci'
Cc:       Howard Rynberk
Subject:  RE: Diamond paver edge

This should not be a big deal. We originally discussed 1,000 per skid from our supplier. With the smaller skid quantity, the packaging costs may go up since more pallets would be required. We should still be able to get 20,000 per truckload from our supplier, so shipping costs will not be affected.

Am I to assume that we will not need any boxes for this product?

**Frank Soukup**
**Plant Manager**
**Valley View Industries**
**13834 S. Kostner Avenue**
**Crestwood, Illinois 60445**
**P 708-597-0885**
**F 708-597-9959**

From: Dominick V. Bertucci [mailto:dvinb@yahoo.com]
Sent: Wednesday, December 05, 2007 6:43 AM
To: Frank Soukup
Cc: Howard Rynberk
Subject: Diamond paver edge

Frank,
It is clear with my visits to the competitor of our new paver restraint that we are going to have to ship on eight foot pallets. Currently, the customer base for our competition is getting 600 8' lengths banded on a pallet. they are not wanting to deviate from that.

Dominick

Be a better friend, newshound, and know-it-all with Yahoo! Mobile. Try it now.

Highly Confidential —
Attorneys' Eyes Only

VVW000406

# Exhibit E





CONFIDENTIAL

VVW001272



CONFIDENTIAL

VVW001273



VVW001856



VVW001857



VVW001858



STAKE SLOT SUKKE IMIDSEN)

OVER ROUND HOLE

VVW001859



VVW001860



VVW001851

# Exhibit F

**Business Center - Chicago**

From:     Dominick V. Bertucci [dvinb@yahoo.com]
Sent:     Thursday, February 28, 2008 12:38 AM
To:       Dominick Bertucci
Subject:  Fwd: Diamond Paver Edge pricing/Valley View

*"Dominick V. Bertucci"* <*dvinb@yahoo.com*> wrote:

Date: Wed, 27 Feb 2008 16:48:24 -0800 (PST)          **REDACTED**
From: "Dominick V. Bertucci" <dvinb@yahoo.com>
Subject: Fwd: Diamond Paver Edge pricing/Valley View
To:
CC:

Thanks for taking a minute with me yesterday to discuss the new paver restraint.

Please allow me to reiterate why          is better suited going with us. Please see the past email below this
one. Here are the hi lights:

* You are in the early order time period which affords          an additional **6%** off the .67/ft. that we
offered.
* Your rebate was set up realistically that .     will get *another 5 and 10% discount.*
* The 5% discount     will do "with your eyes closed" . The additional 5% would be from the
landscapers/dealer/garden centers that I would feed to you.

          is a sharp business and wants to maximize profit. Your net with me will easily be .60/ft.
The additional 5% will put your net around .57/ft. *Is Superior Stone going to compete with my program???*
*If so, God bless      Though I don't believe they can match my program.* I believe they are matching
the .67/ft. Though your net price with me is well below that.

I'll extend your e/o for DPE-8 to April 1 since          mentioned you have inventory on hand from the Beast.
So you have so time to reconsider.

Kind regards,

Dominick

*"Dominick V. Bertucci"* <*dvinb@yahoo.com*> wrote:



Date: Fri, 28 Dec 2007 14:29:25 -0800 (PST)
From: "Dominick V. Bertucci" <dvinb@yahoo.com>
Subject: Diamond Paver Edge pricing/Valley View          **REDACTED**
To:                                                                    Highly Confidential -
CC:                                                                    Attorneys' Eyes Only

VVW001098

Sorry our schedules are conflicted. As          and I discussed, emailing the price/program is probably

better at this point.

I think it would be smart for both of us to decide BEFORE Mid Am on how you will approach the new paver restraint. I would be soliciting your approval should that be the case.
The below pricing is *below* what your "range" was for what you emailed me for Snap Edge/The Beast.
I really want you guys to sell a lot and make good margin with this sku.

Here is the program:

Item # DPE-8
Diamond Paver Edge
Shipped 600 per pallet
8' lengths
.67 ft/$5.36 per length pre paid with minimums- shouldn't be an issue
Volume Bonus:
rebate at the end of year; credit memo/free goods, etc. for purchases for this SKU:

$30,000- $49,000  5% of sku purchases from the first $1
$49,000+ 10% of sku purchase from the first $1

This program is only good for 08' and will be reviewed at the end of the year to see if it made sense for both of us.

You are the only distributor that has this program. Selling beyond your branch locations is recommended to other wholesalers, etc.

Net Net program, no additional coop

Please email/call me to discuss/confirm.

Kind regards,

Dominick
708-205-4198

Never miss a thing. Make Yahoo your homepage.

Be a better friend, newshound, and know-it-all with Yahoo! Mobile. Try it now.

Be a better friend, newshound, and know-it-all with Yahoo! Mobile. Try it now.

Highly Confidential -
Attorneys' Eyes Only

VVW001099

6/27/2008

## Business Center - Chicago

**From:**   Nancy Schoeneman
**Sent:**   Monday, March 31, 2008 1:13 PM
**To:**   Dominick Bertucci
**Subject:** FW: Agenda for Monthly Office Meeting

**From:** Dominick Bertucci
**Sent:** Wednesday, February 27, 2008 11:20 PM
**To:** Nancy Schoeneman
**Subject:** RE: Agenda for Monthly Office Meeting

REDACTED

Nancy,
Please report the following in my absence:

* I           packaging finalized
* Diamond Pave Edge launched- Competiton is lowering price to keep business.  The "War" has officially begun.
* Industry paver show today where high volume users in attendance
* Sell sheet produced for product
* Lighted edging very popular out west.  Recommend fall launch selling edging separate from lighting
* New warehouse agreements in           :) and !
* Lack of early orders points to lack of incentive for customers to order and unwillingness to contribute 1/3 payment.  Howard and me need to visit on in summer to address for 09'
* Customers will order eventually, but at a later date.
* Off to Europe next week.  Remember I am seven hours ahead of you.  I will most likely be on the internet while you are counting sheep and possible between 4-5p.m during office hours.  Will call in around 4-5p.m whene it is possible.

**From:** Nancy Schoeneman
**W**
**To:** Bonnie O'Neill; David T. Ignowski; Diana Knudsen; Dominick Bertucci; Frank Soukup; Gina Delgiudice; Herb Cantu; Howard Rynberk; Jennifer Lappin; Jennifer Rynberk; John Neblock
**Subject:** Agenda for Monthly Office Meeting

JUST A REMINDER the office meeting is on Friday, February 29 at 10:30.

Agenda is attached

Thanks, Nancy

Δ π EXHIBIT 62
Deponent
Date 3-1-08 Rptr.
WWW.DEPOBOOK.COM

Highly Confidential -
Attorneys' Eyes Only

VVW001306

6/27/2008

**Business Center - Chicago**

From: mpcasey708@aol.com
Sent: Friday, March 28, 2008 11:13 AM
To: Dominick Bertucci
Subject: Re: orders for DPE

Δ π EXHIBIT 28
Deponent
Date 708
www.rpr.com Rptr.

Dom,
    I think Suzanne will be ordering 2 to 4 pallets. I already told her about picking up in Fort Wayne and that she would have to work with us regarding a pick up time.
    I will try calling the paver manufactures today but most of them are not returning my calls(
          ).    told me they are sticking with the three lines they carried last year Snap Edge, Pave Tech, and Edge Pro.
    I can leave for the Hardware Show on either Sunday or Monday.

    Mike


-----Original Message-----
From: Dominick Bertucci <dbertucci@valleyviewind.com>
To: mpcasey708@aol.com
Sent: Fri, 28 Mar 2008 8:53 am
Subject: RE: orders for DPE

Mike,
Hope your niece is feeling better.

Do you know approximately how many pallets Suzanne will order? We may have to
ship her from Valley View otherwise she will have to work with us when the
factory starts making it in Ft. Wayne some time next month.

I need to know why the paver manufacturers are saying no.  I ran in to people in
Minnesota that were buying the Beast and the beast said they would match any
price we gave. If this is happening, I need to relay this information to Howard.

Also, I didn't realize that the hardware show is Tue/Wed/Thur. in Vegas. I
thought it was Wed/Thur/Friday.  I am thinking of flying out late Sunday night.
Do you want to go with me on my flight?  Probably a 7:30 or 9:15 flight.

Dominick


From: mpcasey708@aol.com [mailto:mpcasey708@aol.com]
Sent: Thu 3/27/2008 8:58 AM
To: Dominick Bertucci
Subject: Re: orders for DPE

REDACTED

Dom,
    I talked to :        this week and they will definitely be ordering but she
is not sure how much because her sales people are trying to book some orders
before she puts her first order together. I met the Beasts price of 65 cents per
foot delivered for        '  '        and he should be ordering in a few weeks
after he sells out or his Beast inventory. I haven't had any luck with the Brick
Paver manfacturers to date and most of them do not even call me back butI have
been calling them once a week.
    I will not be in the office until tomorrow  because I had to take my niece
to LaGrange hospital last night and didn't get much sleep. Kathleen is OK but
she has a bad case of the flu and her parents are in Florida so I got the phone
call. I just hope I don't get that shit because it's really bad this year. Mike

Highly Confidential -
Attorneys' Eyes Only

VVW001308

## Business Center - Chicago

**From:** mpcasey708@aol.com
**Sent:** Wednesday, March 19, 2008 2:51 PM
**To:** Dominick Bertucci
**Subject:** Re: orders for DPE

Δ π EXHIBIT _16_
Deponent_____
Date _8-11-08_ Rptr.____
www.DEPOBOOKE.COM

Dom,
    Will keep you informed. I left a message on his voice mail today. Mike


-----Original Message-----
From: Dominick Bertucci <dbertucci@valleyviewind.com>
To: mpcasey708@aol.com
Sent: Wed, 19 Mar 2008 10:42 am
Subject: RE: orders for DPE

Mike,
Make me proud.........get the business at whatever cost you see fit.


**From:** mpcasey708@aol.com [mailto:mpcasey708@aol.com]
**Sent:** Wednesday, March 19, 2008 10:22 AM
**To:** Dominick Bertucci
**Subject:** Re: orders for DPE

**REDACTED**

Dom,
    I'll try '              again this afternoon. '                        doesn't call me back. I talked to          : this morning
in          : who is a landscape supply yard and he was quoted 65 cents per foot delivered on one pallet from the
Beast yesterday. I     would still like to switch to our product because he doesn't like the way the Beast is whoring up
the market.            ' about three pallets of the Beast a year. Mike


-----Original Message-----
From: Dominick Bertucci <dbertucci@valleyviewind.com>
To: mpcasey708@aol.com
Sent: Tue, 18 Mar 2008 4:32 pm
Subject: RE: orders for DPE


**From:** mpcasey708@aol.com [mailto:mpcasey708@aol.com]
**Sent:** Tuesday, March 18, 2008 10:24 AM
**To:** Dominick Bertucci
**Subject:** Re: orders for DPE

**REDACTED**

Dom,
      also told me that they will not carry the Diamond Paver Edge right now because they are already carrying
three edgings Snap Edge, Pave Tech, and Edge Pro.          also told me that the edging split up the side wall
when they beat the sample. Mike

Highly Confidential -
Attorneys' Eyes Only

VVW001311

-----Original Message-----
From: Dominick Bertucci <dbertucci@valleyviewind.com>.

6/27/2008

Page 2 of 2

To: mpcasey708@aol.com
Sent: Tue, 18 Mar 2008 8:29 am
Subject: orders for DPE.

Mike,
Are there any orders forthcoming for the people you have quoted?

Dominick

---

Supercharge your AIM. Get the AIM toolbar for your browser.

---

Supercharge your AIM. Get the AIM toolbar for your browser.

---

Supercharge your AIM. Get the AIM toolbar for your browser.

Highly Confidential -
Attorneys' Eyes Only

VVW001312

6/27/2008

Page 1 of 1

**Business Center - Chicago**

From:    mpcasey708@aol.com
Sent:    Wednesday, March 19, 2008 10:22 AM
To:      Dominick Bertucci
Subject: Re: orders for DPE

REDACTED

Dom,
    I'll try            , again this afternoon. '            , doesn't call me back. I talked to            , this morning in l          n who is a landscape supply yard and he was quoted 65 cents per foot delivered on one pallet from the Beast yesterday.       would still like to switch to our product because he doesn't like the way the Beast is whoring up the market. I        sell about three pallets of the Beast a year. Mike


-----Original Message-----
From: Dominick Bertucci <dbertucci@valleyviewind.com>
To: mpcasey708@aol.com
Sent: Tue, 18 Mar 2008 4:32 pm
Subject: RE: orders for DPE


From: mpcasey708@aol.com [mailto:mpcasey708@aol.com]
Sent: Tuesday, March 18, 2008 10:24 AM
To: Dominick Bertucci
Subject: Re: orders for DPE

Dom,
        also told me that they will not carry the Diamond Paver Edge right now because they are already carrying three edgings Snap Edge, Pave Tech, and Edge Pro.           also told me that the edging split up the side wall when they bent the sample. Mike


-----Original Message-----
From: Dominick Bertucci <dbertucci@valleyviewind.com>
To: mpcasey708@aol.com
Sent: Tue, 18 Mar 2008 8:29 am
Subject: orders for DPE

Mike,
Are there any orders forthcoming for the people you have quoted?

Dominick


Supercharge your AIM. Get the AIM toolbar for your browser.


Supercharge your AIM. Get the AIM toolbar for your browser.

Highly Confidential -
Attorneys' Eyes Only
VVW001313

6/27/2008

## Business Center - Chicago

| | |
|---|---|
| From: | Dwight Hammond [dhammond@ptd.net] |
| Sent: | Tuesday, March 18, 2008 2:32 PM |
| To: | Dominick Bertucci |
| Cc: | Mark Heath |
| Subject: | Re: EP Henry leads |

REDACTED

Dominick,

Thanks for the help @ MAHTS. I will get right on these leads. I have made comments on some that I have already made contact with. I have seen others not on this list as well.                    ; liked new paver restraint and was going to show it to other location and possible replace Nova Edge with ours.                had inventory to start the season but Barb told me she would be ordering in April.                and             are going to be tough to convert right now but Mark and I have been visiting the sites and getting samples and information to them. I have to tell you many of these EP Henry guys have bought the Dimex product. It is .55 or less delivered thru EP Henry. The paver manufacturers are asking me how can I resell your Beast knock off when my customers can bv it for the same price you are quoting me? How do I respond to this? It's not all negative, I have a number of                    guys interested. It a question in their minds if the difference is enough to warrant a change. I will be out there this week and next trying to see everyone I can.

Dwight J. Hammond
J.A. Hammond Associates
Phone: 570-476-6580
Fax: 570-476-6581
Email: dhammond@ptd.net

----- Original Message -----
From: Dominick Bertucci
To: Dwight Hammond
Cc: Mark Heath
Sent: Friday, February 22, 2008 11:16 AM
Subject: EP Henry leads

Guys,

Follow up with these accounts for distribution of the product line but especially the Diamond Paver Edge. Spellings may not exactly be correct in some cases. Go to the yellow pages/google to get addresses/telephone numbers.

— Saw last week — Bought EP Edge
— Saw last week — Very interested but he has a pallet in stock — Check back in April

— Visited last year several times—will show him Diamond Edge

/ they buy The Beast through someone

REDACTED

Highly Confidential -
Attorneys' Eyes Only

VVW001314

- said they sell some valley view    — Used to sell VV-    said he has very little call for it now

6/27/2008

-- They are a current customer--Had carryover to start 2008--LI no Paver restrait sales (concrete)

REDACTED

)uys Bric Stop through someone

-- Very interested--quoted him on DL & I will see him on Diamond edge this week

-- Met with Tim Korengel and he liked the new Diamond Edge. Left him a sample he was showing his customers. Hoping for an order this week from him.

Talk to                    his customer is              -- Buys VV 150-200pcs at a time

-- Current distributor we visited together

-Was very negative towards VV last year

Any luck with corporate offices?    I have tried at the site level so many times but I just can't get an order out of them. Only about 6-8 have potential in our territory. The rest are very small specialty shops with no place to put our products.

Highly Confidential -
Attorneys' Eyes Only
VVW001315

6/27/2008

REDACTED

– Has potential--will revisit them again

I have been working on this account for 3 years--Diamond edge may be answer
I visited one location last week.  I will see thier other location next week.

Highly Confidential -
Attorneys' Eyes Only

VVW001316

6/27/2008

## Business Center - Chicago

**From:** Howard Rynberk

**Sent:** Thursday, March 27, 2008 12:47 PM

**To:** Dominick Bertucci

**Subject:** RE: The Beast/DPE competitor



Dom,

As I said before, ex[lain to the customer that Brickstop has been overcharging them for years.
If the customer continues to go with Brickstop, you should tell them to get e rebate on ALL the beast product they bought to the .50 ft. price.
That should rattle Brickstop. Also our product is heavier, taller with a slot for a stake.
H

**From:** Dominick Bertucci
**Sent:** Thursday, March 27, 2008 8:34 AM
**To:** Howard Rynberk
**Cc:** Diana Knudsen; Bonnie O'Neill
**Subject:** The Beast/DPE competitor

REDACTED

Howard,

The people who make the Beast are telling anyone who sells their product, that they will match or go below our price to keep the business.

In Minnesota, one of our lawn edging accounts buys four pallets/year. Two pallets at a time. They were paying .59/ft delivered. When I quoted .52/ft. they came down to .50/ft.  *Two pallets delivered, prepaid from Toronto to Minnesota for .50/ft.*
I am meeting today with                       I who are paying .58/ft from them. I am going to quote .52/ft. with them and see what happens.

Dominick

Highly Confidential -
Attorneys' Eyes Only



Δ π EXHIBIT

Deponent
Date        Rptr.
WWW.DEPOBOOK.COM

## Herb Cantu

**From:** Dominick V. Bertucci [dvinb@yahoo.com]
**Sent:** Friday, February 29, 2008 9:48 AM
**To:** Herb Cantu
**Subject:** Sample

Herb,
Please send one 3' sample of DPE to below.

wrote:

**REDACTED**

Subject: FW: Attn: Russ FW: jpeg of Diamond Paver Restraint
Date: Fri, 29 Feb 2008 09:35:26 -0600
Fron
To: "Dominick V. Bertucci" <dvinb@yahoo.com>

Dominick,

Can you have a sample piece of the new Diamond Paver Edge restraint sent to:

Attn:

Oconomowoc, WI

Thanks

**From.**
**Sent:** Friday, February 29, 2008 9:28 AM
**To:**
**Subject:** Attn:     FW: jpeg of Diamond Paver Restraint

**REDACTED**

Here's a picture of Valley View's new  Diamond Paver Edge restraint. Their version to compete with the BEAST product. You can see from the picture, the cool feature they added was a slot for a regular landscape stake. So you can use spikes or stakes, whatever you prefer. Also means you can sell them spike or stakes. I'm going to have Valley View send you a piece to look at. These come packed 10 in a bundle, but really the best way to buy them is in a pallet that has 630 - 8' pieces, runs $5.60 a strip. From what I'm being told by other customers, thats better than what they're paying for the competitor, and they like this product better because of the stake feature. Look for the sample sometime next week.  I'll be in touch.

Thanks

VVW001915

# Exhibit G

## Business Center - Chicago

**From:** mjohnson@po.buckhorninc.com
**Sent:** Thursday, September 06, 2007 8:07 AM
**To:** Frank Soukup
**Cc:** Howard Rynberk; John Neblock
**Subject:** RE: Valley View Paver Edging Quote



Good morning Frank

I appricate all the information you sent - - I am looking forward to receiving the sample part

I will review all of your information with my mfg group - - Let's plan to have a conversation early next week

Thanks

Mike Johnson
Custom Molding Sales Manager

Buckhorn
55 West TechneCenter Drive
Milford OH 45150
800-543-4454
513-831-4402
513-831-5474 - Fax
mjohnson@po.buckhorninc.com
www.buckhorncustommolding.com
www.buckhorninc.com

---

"Frank Soukup" <fsoukup@valleyviewind.com>

09/05/2007 05:08 PM

To  "Frank Soukup" <fsoukup@valleyviewind.com>, Mike Johnson/Milford/MyersInd@Milford
cc  "John Neblock" <JNeblock@valleyviewind.com>, "Howard Rynberk"
    <HRynberk@valleyviewind.com>
Subject  RE: Valley View Paver Edging Quote

Mike,

One more thing.  Please quoted landed costs, FOB Crestwood, Illinois.

Thanks.

**Frank Soukup**
**Plant Manager**
**Valley View Industries**
**13834 S. Kostner Avenue**
**Crestwood, Illinois 60445**

6/28/2008

Highly Confidential -
Attorneys' Eyes Only

VVW000545

P 708-597-0885
F 708-597-9959

**From:** Frank Soukup
**Sent:** Wednesday, September 05, 2007 4:04 PM
**To:** Frank Soukup; mjohnson@po.buckhorninc.com
**Cc:** John Neblock; Howard Rynberk
**Subject:** RE: Valley View Paver Edging Quote

Mike,

Sorry I forgot to attach the drawing file.  Here it is.

Frank Soukup
Plant Manager
Valley View Industries
13834 S. Kostner Avenue
Crestwood, Illinois 60445
P 708-597-0885
F 708-597-9959

**From:** Frank Soukup
**Sent:** Wednesday, September 05, 2007 4:01 PM
**To:** 'mjohnson@po.buckhorninc.com'
**Cc:** John Neblock; Howard Rynberk
**Subject:** Valley View Paver Edging Quote

Mike,

It was nice speaking with you today regarding our new project.  I am sending you a sample part UPS which you should have by Friday.  Attached is a preliminary drawing of the design of the part we would like to have quoted.  The following lists the details to quote on:

**Material –** We are open on material.  The part needs to have good rigidity to support the paver brick but be flexible enough to make curves without breaking.  The incumbent product is made of Polypropylene.  We would be open to quotes in PE, PP, PVC etc.

**Finish –** We would prefer the parts to look similar in finish to the sample I am sending you.  I realize that this may not be possible with structural foam.  We can discuss this after you've had a chance to review the information.

**Timing –** We are looking to launch this product to our distributors by 2/15/08.  I would think we should have first shot samples by mid January 08.

**Method –** We are open to injection, structural foam or gas assist processes.  If feasible, quote tooling and part cost in each process.

**Volume –** First year volume is projected to be 100,000 – 150,000 with growth approaching 500,000 pcs in subsequent years.  Life cycle of product is unknown.

**Quote quantities –** Please quote in order quantities of 5,000, 10,000, 20,000 and 40,000 pcs.

**Packaging –** Parts should be packaged in bundles of (10) with (100) bundles or 1,000 pcs per 40"x98" 4-way pallet.

Thanks for your time and I look forward to speaking with you early next week.

Highly Confidential -
Attorneys' Eyes Only

Regards,

VVW000546

6/28/2008

Frank Soukup
Plant Manager
Valley View Industries
13834 S. Kostner Avenue
Crestwood, Illinois 60445
P 708-597-0885
F 708-597-9959

Highly Confidential -
Attorneys' Eyes Only

VVW000547

6/28/2008

## Business Center - Chicago

| | |
|---|---|
| **From:** | Dominick V. Bertucci [dvinb@yahoo.com] |
| **Sent:** | Sunday, February 10, 2008 9:38 PM |
| **To:** | Frank Soukup |
| **Subject:** | pictures |
| **Attachments:** | 1802760159-downersgroveartshow 090.jpg; 726990644-downersgroveartshow 092.jpg; 68935282-downersgroveartshow 091.jpg; 3466350226-downersgroveartshow 103.jpg |

The product in the boxes is from Dimex.

The bulk pallet is from the people who make The Beast.  The product we knocked off.
These were taken at one location on the east coast.

---

Looking for last minute shopping deals? Find them fast with Yahoo! Search.

Highly Confidential -
Attorneys' Eyes Only

VVW000561



Highly Confidential -
Attorneys' Eyes Only

VVW000562

12/05/2007



Highly Confidential -
Attorneys' Eyes Only

VVW000563

12/05/2007



Highly Confidential -
Attorneys' Eyes Only

VVW000564



2/12/2007

Highly Confidential -
Attorneys' Eyes Only

VVW000565

**Business Center - Chicago**

| | |
|---|---|
| From: | James Hammar [JHammar@VisionPS.com] |
| Sent: | Friday, February 29, 2008 10:28 AM |
| To: | Dominick Bertucci |
| Subject: | RE: REDESIGN: Diamond sheet |

Not a problem....  I will talk to the designer tonight and see if he can put together a different look....

Jim Hammar

-----Original Message-----
From: Dominick Bertucci [mailto:dbertucci@valleyviewind.com]
Sent: Friday, February 29, 2008 9:41 AM
To: James Hammar
Cc: David T. Ignowski; Kenneth Rech
Subject: REDESIGN: Diamond sheet

We received a threatening letter from our competitors lawyers that we knocked off because the sell sheet looked too similiar to their sell sheet.  Please re design with this in mind.

I am going to be in Europe the next two weeks, I will have access to internet but will put this in the hands of David at Valley View. Once he gets the blessing from our owner that the new sheet is acceptable, we need to re print.

Dominick

From: James Hammar [mailto:JHammar@VisionPS.com]
Sent: Mon 2/25/2008 8:02 AM
To: Dominick Bertucci
Cc: David T. Ignowski; Kenneth Rech
Subject: FW: Diamond sheet

Final PDF Of Sell Sheet ....

-----Original Message-----
From: Scott Sriver [mailto:scottsriver@comcast.net]
Sent: Friday, February 22, 2008 10:20 PM
To: James Hammar
Subject: Diamond sheet

CONFIDENTIAL

VVW000680

1

## Business Center - Chicago

**From:** Dominick V. Bertucci [dvinb@yahoo.com]
**Sent:** Thursday, February 14, 2008 10:28 AM
**To:** Dominick Bertucci
**Subject:** New sku #'s for Valley View paver restraint

The new paver restraint by Valley View- **Diamond Paver Edge**, is now in production.

There are a large contingent of customers that did not take too much of a liking to our Diamond Lok sku's in favor of the more "rigid" competitiors.  Yes, we do have contractors using our Diamond Lok, but not at the level of the higher priced competition.  No more.

Diamond Paver Edge is easily converted to flexible.  Product specifics:

*Available in bundles of 10 8' strips or pallets of 660 (66 bundles of 10)
*Can be used with Valley View anchor stakes or spikes. Spikes not sold by Valley View
*This product is NOT in the current 2008 catalog

**Item # DPE-8-10**
**Packaged:  10 per bundle**
**Cost:  .70/ft**

**Item # DPE-8-660**
**Packaged:  660 per pallet (66 bundles of 10)**
**Cost:  .63/ft**

Drop shipment of product will be handled like any other order.  Drop ship/fuel surcharges will apply where applicable.

Samples are in transit to each of your branches.  Sell sheets should be available and will be sent to all branches by February 25th.

The competitors you are going after with this product: Snap Edge, **The Beast (our product is a knock off of the beast at a lower price)**, Pave Tech

Please advise if you need anything else.

Dominick

Never miss a thing. Make Yahoo your homepage.



Δ π EXHIBIT 59

Deponent_____
Date 8-1-08 Rptr.___
WWW.DEPOBOOK.COM

Highly Confidential -
Attorneys' Eyes Only

VVW001127

RE: Good to see you at                    **REDACTED**

**Business Center - Chicago**

**From:**
**Sent:**    Sunday, February 10, 2008 9:28 AM
**To:**      Dominick Bertucci
**Subject:** RE: Good to see you at

I'll look for one at the show. If they make it, then it will be there. It's amazing the amount of equipment on display.

Thanks again.

---

**From:** Dominick Bertucci [mailto:dbertucci@valleyviewind.com]
**Sent:** Sun 2/10/2008 10:17 AM
**To:**
**Subject:** RE: Good to see you at

Yes, I can have one faxed to her on Monday.
Safe travels to Lost Wages!!

By the way, do you rent out trenchers? They are specific for installing lawn edging and irrigation pipe and are not the trencher with the four foot blade you may be thinking about. This machine looks like an over sized edger.
If you are not familiar, I can find the website and forward to you. I believe the machines are around $3,500.

Dominick

---

**From:**                                                    **REDACTED**
Sent: Sat 2/9/2008 9:32 PM
To: Dominick Bertucci
Subject: RE: Good to see you at

Dominick,

First of all, I am very excited about your representation at the Open House. It will be a great way for you to get the word out about your product to many of our best customers.

and I are heading to        first thing Monday morning for the        Is there any chance you could contact our AP Department and fax them a credit application (sorry I don't know their direct fax line)?        one number is.        This way they can have the application filled out for        to sign when we return. If you put a cover sheet, make a note that there is an order pending so they know to put priority on it.

Thanks for the quick response.

---

**From:** Dominick Bertucci [mailto:dbertucci@valleyviewind.com]
Sent: Sat 2/9/2008 3:01 PM
To:
Cc:
Subject: Good to see you at

Highly Confidential -
Attorneys' Eyes Only

VVW001238

6/27/2008

RE: Good to see you at

REDACTED

Good to talk with you at the show this past week.

You'll be receiving a sample of the new paver restraint that is a knock off of the Beast later this week. I'll have a sell sheet sent to you within the next few weeks to use as a promotional piece. Please get your credit application in ASAP.

Your price for the new paver edging called Diamond Paver Edge is .55/ft. It is available in bundles of 10 or a pallet of 660 (66 bundles of 10). I am hoping you take in a pallet or more as freight will be a nightmare if we have to ship just that item to you in the summer.

As you are putting together your order, the larger the order, the less freight you will be subject to. We can further discuss once you know what you need.

Dwight and I look forward to working with you. Dwight will be attending your open house on the 4th.

Kind regards,

Dominick V. Bertucci

National Sales Manager

www.valleyviewind.com

Highly Confidential -
Attorneys' Eyes Only

VVW001239

6/27/2008

# Exhibit H

CONFIDENTIAL - ATTORNEY'S EYES ONLY

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

BRICKSTOP CORPORATION,            )

      Plaintiff,               )

    vs.                              ) No. 08 CV 2690

VALLEY VIEW INDUSTRIES, H.C.,)

INC.,                             )

      Defendant.               )

THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL.

The 30(b)(6) deposition of BRICKSTOP
CORPORATION, by DAVID FRIEBERG, called for
examination, taken pursuant to the Federal Rules of
Civil Procedure of the United States District
Courts pertaining to the taking of depositions,
taken before DINA G. VILLIS, a Certified Shorthand
Reporter within and for the State of Illinois,
CSR No. 84-3400 of said state, at Suite 1900, 203
North LaSalle Street, Chicago, Illinois, on the
30th day of July, A.D. 2008, at 9:36 a.m.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

71

1  customer of the B.E.A.S.T.

2          They purchase other edging products from

3  us.

4      Q.    As far as their location in Illinois,

5  you have an exclusive distributor in Illinois,

6  correct?

7      A.    Correct.

8      Q.    And that is?

9      A.    Superior Stone.

10      Q.    So could you have even supplied the

11  UniLock location or distributor in Illinois with

12  B.E.A.S.T. product?

13      A.    We could have.

14      Q.    That would not have violated your

15  exclusivity with Superior Stone?

16      A.    No.  We had discussed the possibility of

17  selling UniLock with our exclusive distributor who

18  did not have a problem with us doing that.

19      Q.    And why would that be?

20      A.    Well, it was additional business for

21  him.

22          I mean, we weren't going to do it for

23  nothing.  We had agreed to give him a piece of some

24  of the profits.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

72

1    Q.    So you would have paid your exclusive

2    distributor for the right to furnish to UniLock?

3    A.    Yes.  I mean, it would have -- it would

4    have probably still gone through the same channels.

5    Although, we may have shipped directly

6    to UniLock based on, I would assume, truckload

7    quantities because they're a large user of the

8    B.E.A.S.T. product, or could have been.

9    Q.    I understand, though.

10    You weren't going to be cutting out your

11    exclusive distributor?

12    A.    No, no, absolutely not.

13    Q.    You were going to pay him for whatever

14    you sold to UniLock?

15    A.    Correct.

16    Q.    With respect to UniLock, at what level

17    were you negotiating this potential purchase of

18    B.E.A.S.T.?

19    A.    We've actually been discussing

20    B.E.A.S.T. for probably several years; in fact,

21    likely from the time that we produced the product

22    in 2001.

23    Q.    So for eight years, you've been pursuing

24    the UniLock business?

CONFIDENTIAL - ATTORNEY'S EYES ONLY

73

1     A.     They were actually pursuing us to buy

2  the product and had been pursuing us to buy the

3  product for the last several years.

4     Q.     But they obviously weren't offering to

5  pay the price you wanted, correct?

6     A.     That's correct.

7     Q.     Otherwise, I would assume there would

8  have been a sale?

9     A.     That's correct.

10    Q.     And do you know whether or not anyone

11 from UniLock approached Valley View and asked them

12 to make a product comparable to B.E.A.S.T.?

13    A.     I don't know that for a fact.

14    Q.     Have you heard anything to that effect?

15    A.     We spoke to the UniLock people earlier

16 in the year.

17           UniLock told us that they had been

18 talking to Valley View and they were in

19 negotiations to purchase their new Diamond Edge

20 product.

21    Q.     Did they indicate to you that they had

22 requested that Valley View make the Diamond Edge

23 product?

24    A.     I'm not aware of that.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

247

1    tests that I conducted, there was no effect on the

2    product whatsoever.

3         Q.    Now, so I understand, you took out

4    completely the "D's"?

5         A.    No.  Just --

6         Q.    You just shaved them down to be an even

7    space, as opposed to a ridged leg?

8         A.    Yes.

9         Q.    And your tests were hand-done?

10        A.    Yes.

11        Q.    So you don't have any quantitative

12    measurements to present to me to show that there

13    was no --

14        A.    I do not.

15        Q.    Is that all the testing that you did?

16        A.    Yes.

17        Q.    Now, with respect to testing, did you or

18    anyone ever, to your knowledge, test the Diamond

19    Paver Edge product to determine whether or not it's

20    more brittle in its application than the B.E.A.S.T.

21    product?

22        A.    No.

23        Q.    And you are aware that Mr. Hutchinson

24    submitted an affidavit suggesting that products of

CONFIDENTIAL - ATTORNEY'S EYES ONLY

248

1    low pressure injection mold intend to be more

2    brittle than high pressure injection molding?

3        A.    That's what he claims in his --

4        Q.    Affidavit?

5        A.    -- affidavit, yes.

6        Q.    But you're not aware of any testing

7    where that was proven out using the Diamond Paver

8    Edge product?

9        A.    I'm unaware of any tests.

10       Q.    I know it seems like a long day, but I'm

11   really close to being done with you.

12            With that picture in front of you, do

13   you agree with what -- well, can you point out to

14   me what you believe is referred to as the

15   "structural rib reinforcement, SRR, for perfect

16   straight lines"?

17       A.    Frank Belmont -- and Rubin was incorrect

18   yesterday when he thought it might have been Daniel

19   Davidson because Daniel wasn't with us at the time

20   that we designed this product.

21            It was Frank, and Frank was coming up

22   with all sorts of things that were "SSR" and

23   "IDF" -- I mean, he came up with a lot of stuff.

24            And half of it we threw out the window,

**CONFIDENTIAL - ATTORNEY'S EYES ONLY**

249

1    and then some of it sounded good, and we said,

2    "Yeah.  Let's run with it."  So --

3        Q.    Well, you ran with that one in

4    advertisements, correct?

5        A.    Yeah.

6        Q.    So what was he referring to, do you

7    know?

8        A.    Yeah.  I think what he was referring

9    to -- and it would have been more apparent in the

10   original design, but we followed through with it

11   for the same reason -- I believe was this "D," the

12   upper portion of the -- that rib.

13       Q.    The very things you cut away with a

14   knife to determine that it was not --

15       A.    Yeah.  Again --

16       Q.    So you're telling people in your

17   advertisements that that is -- adds structural --

18       A.    That's marketing.

19       Q.    -- for perfect straight lines, but

20   you're telling me today that you tested it by

21   cutting it away, and you didn't -- you don't think

22   it is?

23       A.    It's the same thing.  It's just

24   marketing.  It sounds good.

1          AMENDMENT TO DEPOSITION

2          I, David Frieberg, wish to make the following changes in the testimony as

3     originally given:

4     PAGE   LINE   SHOULD READ              REASON

5     236    24     IT DOES ALLOW FOR MORE    — upon my return from
                                              CHICAGO, AND having neve
6     ___    ___    OF AN INTERIOR BEND ON THIS   really consider this Rad.
                                              AND I were able to tes
7     ___    ___    product, however in practical terms   AND demonstrate this.

8     ___    ___    AND based on the distance between

9     ___    ___    the feet even a straight line

10    ___    ___    would facilitate an inside curve of

11    ___    ___    even less than A 2 FT Radius without

12    ___    ___    any overlap of the feet which of course

13    ___    ___    is much more then would ever be required

14    ___    ___    when installing paver edging in a most

15    ___    ___    common installation in the industry.

16    ___    ___

17

18    _____

19                              WITNESS

20          IN WITNESS WHEREOF, I hereunto affix my signature and seal this

21    21ST day of August                    , 2008.

22

23    _____

24                              GENERAL NOTARY PUBLIC

25          My Commission Expires:

# Exhibit I

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

BRICKSTOP CORPORATION,          )
                                )
            Plaintiff,          )
                                )
        -vs-                    )   No. 1:08-CV-02690
                                )
VALLEY VIEW INDUSTRIES, H.C. INC., )  Judge Gettleman
                                )
            Defendant.          )

        The deposition of RUBIN KURTZ, taken pursuant

to the Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking of

depositions, taken before CHRISTINE LIUBICICH,

Certified Shorthand Reporter of the State of Illinois,

at 203 , 19th Floor, Chicago, Illinois, on Tuesday,

July 29, 2008, at 9:15  a.m.

1   stopped selling in the shrink wrap form?

2       A.   I would assume three, four years ago.

3       Q.   Three or four years ago, however, is this a

4   correct depiction of the label that was used with the

5   EdgeALL product?

6       A.   It appears to be, yes.

7       Q.   Did you use more than one spacer design with

8   the EdgeALL product?

9       A.   What do you mean by spacer?

10      Q.   The anchor side of a paver --

11      A.   Uh-huh.

12      Q.   -- at least with respect to the B.E.A.S.T.,

13  Son of B.E.A.S.T. and EdgeALL has foot and a spacer --

14      A.   Uh-huh.

15      Q.   -- did the design of the spacer change, or

16  did you use more than one type of spacer design with

17  the EdgeALL product?

18      A.   I believe we did.

19      Q.   Did you use more than two?

20      A.   No.

21      Q.   Can you describe the two types of spacer

22  designs that were use in the EdgeALL product?

23      A.   One was a strap, and one was its current

24  little square with the Xs.

1      Q.    And the little square with X spacer design is

2    the one that's depicted --

3      A.    That's the printed one.

4      Q.    -- depicted in the court papers that were

5    filed in connection with this action, correct?

6      A.    That's correct.

7      Q.    Now, with respect to the strap, that is just

8    a single bar that goes between the feet?

9      A.    That's correct.

10     Q.    And the strap was used for how long?

11     A.    Three or four years.

12     Q.    And the strap designed for spacer, was that

13   used also with the B.E.A.S.T. product?

14     A.    Yes, it was.

15     Q.    For the same period of time?

16     A.    Yes, it was.

17     Q.    Is it currently used with any sale of

18   B.E.A.S.T. product today?

19     A.    No, it is not.

20     Q.    Do you know if it is advertised today with

21   just the strap design spacer?

22     A.    There maybe the odd guy that still has an old

23   picture that hasn't updated their site.

24     Q.    Do you know if there is a odd guy that still

1    sells the strap product --

2         A.   No.

3         Q.   -- the strap spacer product?

4         A.   No, there is not.  That I know of.

5         Q.   But the strap product, strap spacer design

6    with respect to the B.E.A.S.T., when was that changed

7    made?

8         A.   I believe 2005.

9         Q.   You had mentioned instructions earlier with

10   respect to the use of the paver edge products.  The

11   instructions that are on page 1369, are those the

12   instructions you are referring to?

13        A.   That's correct.

14        Q.   Now, it's true, is it not, that neither the

15   Son of B.E.A.S.T. nor the EdgeALL products can be used

16   with a lattice nailing pattern, correct?

17        A.   Excuse me.

18        Q.   The Son of B.E.A.S.T. and the EdgeALL

19   product, neither of those will take a lattice nailing

20   pattern, will they?

21        A.   Geeze, you've got me stumped.  I'm not sure.

22   I would have to have a piece in front of me.

23        Q.   I am not sure if your pictures are any better

24   than mine, but if you can look on page 1368, and this

1    A.    Yes.

2    Q.    SRR, I note, has a Tm besides it; have you

3    ever attempted to register the term SRR?

4    A.    No.

5    Q.    Have you ever considered SRR a trademark of

6    BrickStop?

7    A.    No.

8    Q.    And if you could draw a similar line with the

9    letter B to the part that shows, or that denotes,

10   "stable sure gripping footprint," SSF for stability?

11   A.    A lot of little acronyms.

12   Q.    I didn't invent them.

13   A.    I know.  I know.

14         It's the foot.

15   Q.    The foot itself.  So can you just draw like

16   a --

17   A.    (Witness complies.)

18   Q.    Fine, and we'll put a B on that.

19         What about the foot has stable sure

20   gripping -- is stable sure gripping?

21   A.    What about the foot?

22   Q.    Yes.  What about the foot?

23   A.    I would think it's just an advertising

24   statement.

1    Q.    So your testimony that the words "stable sure

2    gripping footprint," have no meaning?

3    A.    Very limited.

4    Q.    And they don't refer to any quality of the

5    foot to grip or gain traction in soil or loam in which

6    it might be resting?

7    A.    It won't be resting on loam or soil.

8    Q.    What will it be resting on?

9    A.    It will be resting on granular compacted

10    granite screenings, or lime stone screenings, or a

11    combination of sand and Portland cement.

12    Q.    Let's call those base preparations?

13    A.    Base preparations.

14    Q.    Is it your testimony that the B.E.A.S.T. foot

15    does not have stable sure gripping footprint on the

16    base preparation?

17    A.    No.

18    Q.    Then what about the foot of the B.E.A.S.T.

19    has that quality or produces that quality?

20    A.    The fact that it's nailed.

21    Q.    And you believe that that statement then

22    refers to nailing?   "Stable sure gripping footprint."

23    A.    I think it's an advertising slogan.

24    Q.    Do you know who made it up?

139

1      A.    Dan Davidson.

2      Q.    I am sorry.

3      A.    Dan Davidson.

4      Q.    Who is Dan Davidson?

5      A.    Dan Davidson is one of my shippers.

6      Q.    And you approved putting that statement in

7   the advertisements for the B.E.A.S.T.?

8      A.    Yes.

9      Q.    Each B.E.A.S.T. foot will accommodate more

10  than one nail, correct?

11     A.    It can.

12     Q.    And it doesn't require a special size nail,

13  does it?

14     A.    It requires something that will fit through

15  the hole.

16     Q.    Do more than one manufacturer make nails for

17  landscaping products such as the B.E.A.S.T. paver edge

18  that will fit through the holes of the B.E.A.S.T.?

19     A.    Yes.

20     Q.    They can be spiral nails or straight,

21  correct?

22     A.    Yes.

23     Q.    What orifices in the foot -- if you could

24  draw a C line -- show me where the nails can be used,

150

1    could provide technical support?

2        A.    That's correct.  As limited as the technical

3    sport is required.

4        Q.   Why did you change the B.E.A.S.T.

5    configuration from the straight bar depicted in

6    Exhibit 10 to the crosshatch with a rectangular thumb

7    piece, if you will, that's in Exhibit 9?

8        A.    There was an allegation that we were

9    infringing a patent.  So after negotiations we decided

10   to change it, came to an agreement with the allegator

11   (sic) we'll call him, and he said no problem, and we

12   changed it.

13       Q.   Who was the patent holder who alleged

14   infringement?

15       A.    Snap Edge.

16       Q.   Do you know which patent they were referring

17   to?

18       A.    I didn't know that they had a whole series

19   them.

20       Q.   Do you know if Snap Edge made the product

21   based on the patent that they alleged you were

22   infringing.

23       A.    Yes.

24       Q.   Is it the current product that Snap Edge



1     could guess dissociated?

2         A.    Sometimes it did go loosely in the box.

3         Q.    If it happened to be loosely in the box, then

4     the product itself didn't necessarily have a

5     BrickStop --

6         A.    It had no name on it.

7         Q.    -- stamp on?

8         A.    It had no name on it.  I was a generic --

9         Q.    So were you going to make something more

10    distinctive?

11        A.    Exactly.

12        Q.    This was an extruded product that you made?

13        A.    Uh-huh.

14        Q.    Was the extruded product as thick-walled as

15    the B.E.A.S.T., legs are?

16        A.    Close.

17        Q.    It was that thick?

18        A.    Fairly close.  When you -- are you talking

19    about thickness this way, thickness this way

20    (indicating?)

21        Q.    I'm talking about thickness this way

22    (indicating.)

23        A.    No.

24        Q.    Because you can't make extruded product

1   efficiently at that thickness?

2        A.    You can.   Dimex makes something as thick as

3   that.

4        Q.    And that is approximately what, a little over

5   a quarter of an inch?

6        A.    Dimex makes a product that thick.

7        Q.    But you weren't making an extruded product

8   that thick?

9        A.    No.

10       Q.    With respect to the product that you were

11  making, was it as sturdy an application as the

12  B.E.A.S.T., or was it more flexible?

13       A.    It was more flexible.

14       Q.    So you were determined you were going to make

15  a product that didn't look like others.   What else lead

16  to the creation of the B.E.A.S.T.?

17       A.    We realized with injection molding, because

18  you can make any design you wanted, you weren't limited

19  to what you were with an extrusion.

20       Q.    What are the limitations with the extrusion

21  process?

22       A.    Everything has to look the same.   The only

23  exceptions are when you stamp; you could stamp whatever

24  you want into the base or into the wall, but it's

# AMENDMENT TO DEPOSITION

I, Rubin Kurtz, wish to make the following changes in the testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|------|------|-------------|--------|
| 143 | 16 | Yes it would but | |

so would any shape
including a rectangle
upon my return to
Toronto I did some
simple testing, discovering that
even a rectangle having no scope
could form a radius of about 1ft
in the real world of paver installation
there is rarely a radius of as small
as 2ft, therefore simple research should
have shown foot could be virtually any
shape without fear of overlap

_____
WITNESS

IN WITNESS WHEREOF, I hereunto affix my signature and seal this

22 day of August , 20 08

_____
GENERAL NOTARY PUBLIC

My Commission Expires:

1   **AMENDMENT TO DEPOSITION**

2   I, Rubin Kurtz, wish to make the following changes in the testimony as

3   originally given:

4   PAGE   LINE   SHOULD READ                    REASON

5   142    23    I AGREE HOWEVER THIS          DAVID AND I DID

6                WAS NO APPLICATION IN         A SIMPLE TEST WHEN WE

7                THE REAL WORLD AS             RETURNED TO OUR OFFICES

8                RADII ARE RARELY LESS         AND DISCOVERED

9                THAN 3 FT.                    THAT EVEN IF WALL WAS

10                                             A STRAIGHT EDGE YOU

11                                             COULD STILL MAKE A

12                                             RADIUS OF CLOSE TO

13                                             1 FT WITHOUT ANY

14                                             OVERLAP

15

16

17

18   _____

19                WITNESS

20   IN WITNESS WHEREOF, I hereunto affix my signature and seal this

21   22 day of AUGUST _____, 2008.

22

23   _____

24                GENERAL NOTARY PUBLIC

25   My Commission Expires:

# Exhibit J

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRICKSTOP CORPORATION,            )
                                  )
              Plaintiff,          )
                                  )
         -vs-                     )   No. 08-CV-02690
                                  )
VALLEY VIEW INDUSTRIES, H.C.,     )   Judge Gettleman
INC.,                             )
                                  )
              Defendant.          )


         The deposition of HOWARD RYNBERK, taken

pursuant to the Federal Rules of Civil Procedure of

the United States District Courts pertaining to the

taking of depositions, taken before KRISTA R.

DOLGNER, Certified Shorthand Reporter of the State

of Illinois, at 2 North LaSalle Street, Suite 1808,

Chicago, Illinois, on Thursday, July 31, 2008, at

9:30 a.m.




Reported for
LAKE SHORE REPORTING SERVICE, By:
Krista R. Dolgner, CSR, RPR
Illinois License No. 084-002878.

BY MR. BROWN:

    Q.   But do you understand that if you don't understand what I am asking you, you can ask me to clarify?

    A.   I do.

    Q.   Have you ever been involved with a lawsuit prior to this dispute and the real estate matter that you mentioned before?

    A.   You mean not in the real estate?

    Q.   Let me restate the question.

    A.   Yeah.

    Q.   Other than the real estate matter --

    A.   No.

    Q.   -- have you had any time prior to this lawsuit when you have come to any understanding about trademark law?

    MS. THOMPSON:  Objection, vague.

    THE WITNESS:  No.

BY MR. BROWN:

    Q.   Prior to this lawsuit, had you ever heard of trade dress?

    A.   I have.

    Q.   In what context had you heard of trade dress prior to this lawsuit?

1      MS. THOMPSON:  And I'm going to impose an

2   objection only in so far as to instruct the witness

3   if it was in conversations with an attorney about

4   whom you were seeking advice, you would not discuss

5   your conversations with the attorney.  If there was

6   some external event or something other than in

7   conversations with an attorney, you can speak.

8      THE WITNESS:  It was only in conversations with

9   an attorney.

10  BY MR. BROWN:

11     Q.   Can you tell me what the subject matter

12  was?

13     A.   Yes.  It related to a lawn edging.  It did

14  not relate to this case.

15     Q.   How long ago was that?

16     A.   Oh, I think it's been maybe a year ago,

17  two years ago.

18     Q.   And was another party making an allegation

19  about trade dress in a lawn edging?

20     A.   They were asserting a trade dress.

21     Q.   Who was that party?

22     A.   Cobraco Manufacturing in Illinois.

23     Q.   Is that Cobraco?

24     A.   Yes.

1      Q.    What was the name of the lawn edging

2 involved, Cobraco's lawn edging?

3      A.    I don't recall.

4      Q.    And what specifically did they allege

5 about -- I assume this was an activity of Valley

6 View Industries that they were complaining about?

7      A.    No, it wasn't.

8      Q.    What were they complaining about?

9      A.    They weren't complaining to me.  They had

10 alleged that years ago that their design was a trade

11 dress.

12      Q.    And why were they raising that with you?

13      A.    They didn't raise it with me.

14      Q.    How did it come about that you learned

15 about their allegations about trade dress?

16      A.    Because another manufacturer was making

17 their similar lawn edging.

18      Q.    Was the claim that Cobraco was making, did

19 it relate to the product configuration of the lawn

20 edging?

21      A.    It did.

22      Q.    So explain to me how this Cobraco

23 allegation came to your attention.

24      A.    Originally it came back to my attention,

1     probably their patent ran out, and, again, you are

2     going to ask me years, and I don't recall the years;

3     so I'm going to estimate their patent might have run

4     out in 2002.

5          Q.   So Cobraco had a patent on a lawn edging

6     that expired?

7          A.   Uh-huh, that's correct.

8          Q.   And then how did you learn that they were

9     making allegations about trade dress in the lawn

10    edging?

11         A.   Because another manufacturer was making

12    that lawn edging after their patent expired.

13         Q.   I see.  And who was it they were

14    complaining about?

15         A.   Master Mark.

16         Q.   And what were the circumstances that you

17    learned about Cobraco's allegations against Master

18    Mark?

19         A.   Just hearsay in the marketplace.

20         Q.   I see.  So you learned that Cobraco -- had

21    they brought a lawsuit?

22         A.   No.

23         Q.   Master Mark had come out with a new

24    product?

1    year?

2        A.    Approximately $12 million.

3        Q.    So then if things continue, you would

4    expect that you will have higher gross revenue this

5    year than you did last year?

6        A.    No, that is not the case.  You sell 70

7    percent of your product in the first six months of

8    the year.

9        Q.    So you would expect if this year is true

10   to form to other years that you've earned

11   approximately 70 percent of the gross revenue you

12   will see this year?

13       A.    Correct.

14       Q.    What is a paver edge?

15       MS. THOMPSON:  No longer attorneys' eyes.

16       THE WITNESS:  A paver?

17   BY MR. BROWN:

18       Q.    Paver edge.

19       A.    Paver edge.  I'm sorry.  It's actually an

20   edging restraint used to hold pavers in place.

21       Q.    When people in the industry are installing

22   pavers, is that sometimes referred to as hardscape?

23       A.    It is.

24       Q.    Is it also sometimes referred to as

1      landscape?

2          A.    It is.

3          Q.    So those terms are used somewhat

4      interchangeably?

5          A.    It is, yes.

6          Q.    What are the functional requirements of a

7      paver restraint?

8          A.    Well, I think the functional requirement

9      would be to hold the edging in place.

10         Q.    So the overall function is to hold the

11     pavers in place?

12         A.    Yes.

13         Q.    And to do that you need to be able to hold

14     the edging in place?

15         A.    Yes.

16         Q.    What is needed to achieve that function of

17     holding the edging in place?

18         MS. THOMPSON:  And I object only to the extent

19     it calls for any legal conclusions.  You can go

20     ahead.

21         THE WITNESS:  Well, you would have to have a

22     sidewall to hold the paver, and you would have to

23     have a footing of some sort to hold the restraint in

24     place.

BY MR. BROWN:

    Q.   Can you think of anything else you would need to have in a paver edging restraint?

    A.   Yeah.   You would have to have something to put the -- to hold the restraint in the ground, whether it be a stake, a nail, or any other type of device.

    Q.   Anything else?

    A.   No.

    Q.   So somewhere in the paver restraint you would need to have a hole in order to put the stake or nail in?

    A.   That's correct.

    Q.   Can you ever stake or nail through the paver restraint without the hole?

    A.   I have not seen it done.

    Q.   So to have a functional paver restraint all you need is a sidewall, a foot of some sort, and a hole in the foot to receive the nail?

    MS. THOMPSON:   Same objection.

    THE WITNESS:   Yes.

BY MR. BROWN:

    Q.   Does the foot have to be any particular shape in order to achieve its function?

1   MS. THOMPSON: Can I just impose a continuing

2 objection for as long as you use the word function?

3 To the extent it has any legal significance, I

4 object to it, but he can answer.

5   THE WITNESS: No, there are a number of

6 different foots you may have.

7 BY MR. BROWN:

8   Q. And when you say number of different

9 foots, you mean?

10   A. Foot designs.

11   Q. The shape of the foot could be different?

12   A. Yes.

13   Q. Are there any fundamental requirements for

14 the shape of the foot in order for it to function

15 that you would say is common to all of the feet you

16 have seen?

17   MS. THOMPSON: Objection to the form of the

18 question.

19   THE WITNESS: I wouldn't say there is a

20 commonality. The majority are L. shaped or T.

21 shaped.

22 BY MR. BROWN:

23   Q. And when you say L. shaped, what do you

24 mean?

1     A.    Sidewall and a foot.

2     Q.    So the sidewall and the foot form an L.?

3     A.    Yes.

4     Q.    And in some cases the sidewall is

5    connected to a foot running in either direction?

6     A.    Correct.

7     Q.    And is that what you are calling a T.?

8     A.    Yes.

9     Q.    And are you aware of any common

10   requirement for the shape of the foot itself?

11    A.    I'm not aware of any common requirement.

12    Q.    Who was involved in the decision to

13   develop the Diamond Paver Edge?

14    A.    Myself, Frank Soukup, Dominick Bertucci.

15    Q.    And can you tell me what role each of you

16   played in that decision?

17    A.    Frank was more the technical advisor.  He

18   dealt with the company that actually did the

19   manufacturing.  And Dominick and I were more on an

20   advisory level of what we wanted to see in the

21   product.

22    Q.    Do you know whether Mr. Soukup has any

23   experience in injection molding?

24    A.    I can't answer that.  I don't know.

1     Q.   Did Valley View rely on any outside

2   vendors to provide it expertise with respect to

3   injecting molding?

4     A.   Yes.

5     Q.   Who is that?

6     A.   DeKalb Plastics.

7     Q.   So that was all done within DeKalb?

8     A.   Yes.

9     Q.   Do you know who -- the Diamond Paver Edge

10   is made from an injection molding tool; is that

11   correct?

12     A.   That's correct.

13     Q.   Who made the tool?

14     A.   I don't have that answer.  We had DeKalb

15   Plastics make the tool for us.  Who they

16   subcontracted with, I'm not aware of.

17     Q.   Now, you said you and Mr. Bertucci were in

18   an advisory role of what you wanted to see in the

19   product; is that right?

20     A.   Correct.

21     Q.   What did you want to see in the product?

22     A.   I wanted to see the basic L. shape that we

23   had in an injection molded product with a slot for a

24   stake, and those were my requirements.

1      Q.    Those were all of the requirements that

2   you personally wanted to see in the product?

3      A.    Correct.

4      Q.    And when you say that, is this throughout

5   the development cycle for the product?  Those were

6   your only requirements?

7      A.    That and price points.

8      Q.    And when you say price points, what

9   specifically do you mean?

10      A.    What it would cost to be landed at our

11   factory.

12      Q.    And to your understanding how did the

13   design of the product relate to the landed cost at

14   your factory?

15      A.    It came within our parameters.

16      Q.    What was your parameters?

17      MS. THOMPSON:  This would be attorneys' eyes

18   only.

19      THE WITNESS:  To be in the 35-cent range

20   shipped out of our door.

21   BY MR. BROWN:

22      Q.    Is that what you went into the project

23   wanting?

24      A.    Yes.

1    show you that they could do $100,000?

2    A.    Usually you would know on a given

3    customer, even if it's a new one, how large they

4    are, and you have to go probably by what they say

5    they could purchase in the first year, and if they

6    don't, then the next year you would have to adjust

7    that pricing.

8    Q.    Do you know if you have customers who are

9    getting the 50 cent per foot price?

10    A.    I don't recall.

11    Q.    Did you set that volume figure associated

12    with the 50 cent per foot price?

13    A.    Yes.

14    Q.    Is the range that you give Mr. Bertucci

15    written down anywhere?

16    A.    No.

17    Q.    Does the range that you have given

18    Mr. Bertucci relate for the price per foot to the

19    volume you expect for that price?

20    A.    In most instances, yes.

21    Q.    And how have you communicated that to him?

22    A.    Face-to-face.

23    MR. BROWN:    I would like to mark as Exhibit 25,

24    it's a one-page document with Production Number VVW

1    598.

2                    (Rynberk Exhibit 25 marked.)

3    BY MR. BROWN:

4        Q.    And I'll ask you if you recognize what

5    Exhibit 25 is.

6        A.    Yes.

7        Q.    What is it?

8        A.    A meeting he had with Unilock.

9        Q.    And who is Unilock?

10       A.    They are a brick paver manufacturer.

11       Q.    Where is Unilock located?

12       A.    Well, as it says, they have ten branches;

13   one of them being in Aurora, Illinois; another in

14   Buffalo, New York.

15       Q.    Do you know where the headquarters for

16   Unilock is?

17       A.    I do not, but I think they are in Canada.

18       Q.    When you said he, you are interpreting

19   this to have been a meeting between Mr. Bertucci and

20   someone from Unilock?

21       A.    Correct.

22       Q.    Who is Howard Rynberk?  Is that you?

23       A.    Yes.

24       Q.    And who is Howie Rynberk?

1        A.    My son.

2        Q.    And who is Dave Martinette?

3        A.    He runs Tameling's.

4        Q.    Where does Howie Rynberk work?

5        A.    Tameling's.

6        Q.    They are both at Tameling's.  Do you know

7    why they were cc'd on this?

8        A.    Yes, because I think Dominick used them to

9    arrange a meeting with their Unilock rep.

10        Q.    Do you know if Unilock has started buying

11    Diamond Paver Edge from Valley View?

12        A.    They have.

13        Q.    In what volumes have they done that?

14        A.    I can't definitely give you a volume.

15        Q.    Are certain locations buying it, or is the

16    corporate buying it?

17        A.    If I am correct, it's only the Aurora

18    location.

19        Q.    You see there is a list of bullet points

20    on the e-mail?

21        A.    Uh-huh.

22        Q.    And there is one that says, begins if

23    Valley View tries to duplicate the B.E.A.S.T.

24    product.  Do you see that?  It's the fifth bullet or

1   asterisk.

2       A.   From the top?  Yes.

3       Q.   Do you know what Mr. Bertucci was talking

4   about here?

5       A.   Probably the Diamond Paver Edge.

6       Q.   And so is it your understanding that

7   Unilock was asking if Valley View could duplicate

8   the B.E.A.S.T. product?

9       A.   Correct.  But if we go back, you had asked

10  me before if there was a customer that asked, and

11  Unilock was not a customer at that time.

12      Q.   I understand.  So there was a potential

13  customer that asked?

14      A.   Right.

15      Q.   And was this the beginning of the idea to

16  follow the B.E.A.S.T. product when you developed the

17  Diamond Paver Edge?

18      A.   No, I think it actually came before this

19  in June.

20      Q.   Which came in June?

21      A.   Our idea of having another edging to

22  complement our Diamond Lock.

23      Q.   So in June you had the idea to make an

24  injection-molded edging?

1    Q.   There is an entry that says, "Other

2    notable customers in my current zone that could do a

3    lot more with us should we develop a B.E.A.S.T. type

4    product."  Do you see that?

5    A.   I do.

6    Q.   Did Mr. Bertucci tell you why he thought a

7    B.E.A.S.T.-type product would give you a better shot

8    at these customers in his zone?

9    A.   Well, probably from his sentence further

10   down, because of the perception of a higher quality,

11   higher-priced product.

12   Q.   Who is Pave Tech?

13   A.   That's one of the competitors in the

14   paving restraint market.

15   Q.   And what kind of product do they make?

16   A.   Injection mold.

17   Q.   Did you look at the Pave Tech molding when

18   you were --

19   A.   I did.

20   Q.   Did it have any type of protection that

21   concerned you?

22   A.   If I remember correctly, they still had a

23   current patent.

24       MR. BROWN:  Let's mark as Exhibit 26 a

1    multi-paged document with Production Numbers VVW

2    1516 through 18.

3                         (Rynberk Exhibit 26 marked.)

4    BY MR. BROWN:

5        Q.   Do you recognize what we've marked as

6    Exhibit 26?

7        A.   Uh-huh.

8        Q.   You see that this is a printout of an

9    e-mail chain?

10       A.   Uh-huh.

11       MS. THOMPSON:  You have to say yes or no or

12   make a statement.

13       THE WITNESS:  Yes.

14   BY MR. BROWN:

15       Q.   And there's a message that begins at the

16   bottom of the first page of Exhibit 26 that was from

17   Mark D. Heath to Dave Ignowski with a cc to Dwight

18   Hammond and yourself.  Do you see that?

19       A.   I do.

20       Q.   And Mr. Ignowski was the sales manager

21   prior to Mr. Bertucci?

22       A.   Yes.

23       Q.   Who is Dwight Hammond?

24       A.   An independent sales rep.

1       Q.   And who is Mark Heath?

2       A.   He's one of the people that constitutes JA

3  Hammond.

4       Q.   So he is with J. Hammond?

5       A.   Yes.

6       Q.   Do you know if there were any other reps

7  with J. Hammond?

8       A.   Dwayne Hammond and Mark Heath.

9       Q.   Those are the only two?

10      A.   Yes.

11      Q.   And you had stated earlier today that you

12  had received reports about running into the

13  B.E.A.S.T. on the east coast.  Do you recall that?

14      A.   I do.

15      Q.   Is this what you are referring to?

16      A.   Yes.

17      Q.   What is the territory for J. Hammond?

18      A.   From Virginia up to Maine.

19      Q.   Did any of your other reps say they were

20  running into the B.E.A.S.T.?

21      A.   Not to my knowledge.

22      THE REPORTER:  Is it initial J or J-A-Y?

23      THE WITNESS:  J.

24

1   BY MR. BROWN:

2       Q.   Did Mr. Hammond or did anyone from J.

3   Hammond ever quantify for you how many sales they

4   thought they were losing to the B.E.A.S.T.?

5       A.   Not to me.

6       Q.   Do you know if they did to any of your

7   sales managers?

8       A.   I don't know.

9       MR. BROWN:   Let's mark as Exhibit 27 a two-page

10  document with Production Numbers VVW 1519 to 20.

11                      (Rynberk Exhibit 27 marked.)

12  BY MR. BROWN:

13      Q.   Do you recognize Exhibit 27 as an e-mail

14  chain produced out of the files of Valley View?

15      A.   Yes.

16      Q.   And the original message that starts about

17  a third of the way down the page was sent to you in

18  May of 2007 from Mark Heath; is that correct?

19      A.   Correct.

20      Q.   And he says here, "The B.E.A.S.T --" and

21  this is the second to last sentence of the first

22  paragraph.   "The B.E.A.S.T. and Snap Edge are the

23  main players in my market.   95 percent of what is

24  sold are 8-foot strips."   Do you see that?

1      A.   I do.

2      Q.   Did that give you the idea to follow or

3  imitate the B.E.A.S.T. when developing the Diamond

4  Paver Edge?

5      A.   I would think that's reasonable to assume.

6  But I do think that we wanted to complement our line

7  as well and grab market share.  If you notice also

8  there is a Snap Edge product that is the main player

9  in there.

10     Q.   Do you know if Snap Edge's product comes

11  in 8-foot strips?

12     A.   It does.

13     MR. BROWN:  Let's mark as Exhibit 28 a

14  four-page document with Production Numbers VVW 1500

15  through 03.

16                  (Rynberk Exhibit 28 marked.)

17  BY MR. BROWN:

18     Q.   And do you recognize Exhibit 28 as another

19  e-mail chain that was printed off of Valley View's'

20  system?

21     A.   Yes.

22     Q.   And on the first page of Exhibit 28 there

23  is an e-mail to Mr. Bertucci from Mark Heath in

24  November of 2007.  How far were you in the product

1  development of the Diamond Paver Edge in November of

2  2007?

3      A.    Very close to having the drawings done.

4      Q.    How long was it -- once you started with

5  the B.E.A.S.T. design for your -- the configuration

6  of the feet for the Diamond Paver Edge, do you know

7  how many different versions there were of that

8  configuration before you arrived at the final

9  configuration?

10     A.    No.

11     Q.    When did you tell your independent reps

12  that you were going to come out with a Diamond Paver

13  Edge?

14     A.    I would estimate we probably told them in

15  late December.   Possibly in November.

16     Q.    And are your independent reps obligated to

17  only sell Valley View paver edging?

18     A.    Yes.

19     Q.    And are they obligated to only sell Valley

20  View lawn edging as well?

21     A.    Yes.

22     Q.    They can't sell competitive products with

23  yours?

24     A.    They can sell other products that are not

1  drawing.

2         THE WITNESS:  It appears to.

3         MS. THOMPSON:  Are you talking about this here?

4         MR. BROWN:  Yes.

5         Q.  And then do you see to the right of that

6  the configuration that says, "Old Detail"?

7         A.  Correct.

8         Q.  Does that look like the B.E.A.S.T. product

9  from --

10        A.  Well, I don't have the B.E.A.S.T. product

11  in front of me.

12        Q.  So without the B.E.A.S.T. product in front

13  of you, you don't know?

14        A.  I don't know.

15        Q.  Directly below at the bottom of that

16  drawing there's configuration that's labeled "Center

17  Detail."  Do you see that?

18        A.  I do.

19        Q.  Do you ever recall there being a thought

20  to put the chevron-shaped stake hole in over the

21  center hole of the Diamond Paver edge?

22        A.  No, I don't recall that.

23        MR. BROWN:  Let's mark as Exhibit 30 a two-page

24  document with Production Numbers VVW 1272 to 73.

1                    (Rynberk Exhibit 30 marked.)

2    BY MR. BROWN:

3         Q.    And I'll ask you if you recall seeing the

4    drawings that have been marked as Exhibit 30.

5         A.    No.

6         Q.    Do you know who made these drawings?

7         A.    I do not.

8         Q.    The final drawing that you approved, was

9    it presented to you in a diagram that had a label on

10   it by DeKalb?

11        A.    Oh, boy, I don't know.

12        Q.    Do you know if DeKalb did the CAD drawings

13   for the Diamond Paver Edge?

14        A.    I know we didn't.

15        Q.    So no one -- Frank Soukup didn't do them?

16        A.    No.

17        MR. BROWN:   Let's mark as Exhibit 31 a

18   three-page document with Production Numbers VVW 545

19   to 47.

20                    (Rynberk Exhibit 31 marked.)

21   BY MR. BROWN:

22        Q.    And you are a recipient of the e-mail

23   chain that's been marked as Exhibit 31?

24        A.    Yes.

1       Q.    Do you recall this e-mail?

2       A.    No.

3       Q.    Do you know who M. Johnson is?

4       A.    I do not.

5       Q.    Do you know who the company Buckhorn is?

6       A.    I do not either.

7       Q.    Do you have any information as to why

8    Mr. Soukup would be sending the information that's

9    contained here to Mr. Johnson?

10          MS. THOMPSON:  Calls for speculation.

11          THE WITNESS:  I don't.

12   BY MR. BROWN:

13      Q.    Was this e-mail sent during the time frame

14   when Valley View was still selecting the

15   manufacturer for the Diamond Paver Edge?

16      A.    To the best of my knowledge it was.

17      Q.    On the second page of this exhibit,

18   Production Number 546, there is an e-mail from Frank

19   Soukup to M. Johnson dated September 5, 2007.  Do

20   you see that?

21      A.    Uh-huh, yes.

22      Q.    And under material the entry that's

23   material is in bold.  There's a sentence that says

24   the incumbent product is made of polypropylene.  Do

1    A.    Appearance wise.

2    Q.    You just wanted it to appear like the

3  Diamond Lock products?

4    A.    Yes.

5    Q.    In finish?

6    A.    Correct.

7    Q.    There is a volume entry on that same page.

8  It says, "First year volume is projected to be

9  100,000 to 150,000 with growth approaching 500,000

10  pieces in subsequent years."  Do you see that?

11    A.    I do.

12    Q.    Did you provide estimates for projected

13  volume in your first year of the Diamond Paver Edge?

14    A.    No.

15    Q.    Who did?

16    A.    I would think Dominick Bertucci did.

17    Q.    Did you discuss with him any of his

18  projections?

19    A.    I don't recall.

20    Q.    When you decided to create a plastic

21  injection-molded product, did you have expectations

22  for the volumes you would see in sales?

23    A.    I had basic expectations, but you have to

24  temper your expectations with those of your sales

1    managers, because they are never quite realistic.

2         Q.    Who is more realistic, sales managers or

3    presidents?

4         A.    Presidents.

5         MS. THOMPSON:  Objection.  Calls for

6    speculation.

7    BY MR. BROWN:

8         Q.    What was your expectation for the Diamond

9    Paver Edge in the first year of sales?

10        A.    60,000.

11        Q.    Pieces?

12        A.    Yes.

13        Q.    Do you think you will hit your

14   expectations?

15        A.    I don't know.

16        MR. BROWN:  Let's mark as Exhibit 32 -- this is

17   a single page with Production Number VVW 406.

18                          (Rynberk Exhibit 32 marked.)

19   BY MR. BROWN:

20        Q.    Have you ever seen the e-mail that's been

21   marked as Exhibit 32 before?

22        A.    Yes.

23        Q.    Do you recall it?

24        A.    I do.

114

1      Q.   Do you recall discussing how many pieces

2   of Diamond Paver Edge would be shipped on a single

3   pallet?

4      A.   Yes.

5      Q.   And what did you discuss about that?

6      A.   As it says here, we tried to get a

7   thousand per skid.

8      Q.   Did you end up with a thousand per skid?

9      A.   No.

10     Q.   Why not?

11     A.   The weight was too heavy for a pallet, for

12  a single pallet.

13     Q.   Do you see there is an e-mail at the

14  bottom that is from Mr. Bertucci to Mr. Soukup?

15     A.   Yes.

16     Q.   And he says, "Frank, it is clear with my

17  visits to the competitor of our new paver restraint

18  that we are going to have to ship on eight-foot

19  pallets.  Currently the customer base for our

20  competition is getting 600 eight-foot lengths

21  bundled on a pallet.  They are not wanting to

22  deviate from that."  Do you see that?

23     A.   Yes.

24     Q.   Was it then the customers who were giving

1    sales reps.  They will give you optimistic sales

2    numbers and low costs.

3         Q.   Low costs from the competitors?

4         A.   Yes.

5         Q.   Why would they do that?

6         A.   Because if you match it, they can get

7    increased sales, presumably get increased sales.

8         Q.   Have you ever seen any information

9    directly that you believed or made you believe that

10   BrickStop was selling at a 58 cent to 65 cent?

11        A.   I never saw anything.

12        Q.   Have you ever seen any invoices that have

13   a price for BrickStop product on it?

14        A.   No.

15        Q.   Do you know if --

16        A.   With one exception.  Is the invoice to

17   Tameling's.

18        Q.   What did Tameling's get on it?

19        A.   72 cents.

20        Q.   And that was for one pallet?

21        A.   Yes, 72 cents a foot.  That's why I have a

22   hard time believing the price.

23        Q.   Do you still have a hard time believing

24   the price that's recited in this invoice?

1     A.   I do.

2     Q.   Who is A. J. DiMassious?  Have you ever

3  heard that name before?

4     A.   No, I'm not sure.  Does it list the

5  company?

6     Q.   No, it appears to be a name to me.  It's

7  not on the document that's in front of you.  Have

8  you ever heard of a show called Northeast Grow?

9     A.   Northeast what?

10    Q.   Grow?

11    A.   No.

12    Q.   Have you ever heard of the ARA Rental

13  Show?

14    A.   RA Rental Show?

15    Q.   ARA Rental Show?

16    A.   No.

17    Q.   To your knowledge Mr. Bertucci referred to

18  the Diamond Paver Edge as a knockoff of the

19  B.E.A.S.T.?

20    MS. THOMPSON:  Asked and answered.

21    THE WITNESS:  I don't know if he has or has

22  not.

23    MR. BROWN:  Let's mark as, I believe it's 34, a

24  one-page document with Production Number VVW 1590.

1                    (Rynberk Exhibit 34 marked.)

2     BY MR. BROWN:

3         Q.   Do you recognize the e-mail chain that's

4     been marked as 34?

5         A.   I do.

6         Q.   And the lower e-mail on Exhibit 34, it's

7     from Mr. Bertucci to yourself dated March 27, 2008,

8     and in it he says, "The people who make the

9     B.E.A.S.T. are telling anyone who sells their

10    product that they will match or go below our price

11    to keep the business."  Do you see that?

12        A.   I do.

13        Q.   Has that been Valley View's experience,

14    that BrickStop has been dropping its price to keep

15    accounts from switching to Valley View?

16        A.   I would think from reading this that

17    that's potentially true.

18        Q.   Now, you say, "As I said before, explain

19    to the customer that BrickStop has been over

20    charging them for years."  Do you see that?

21        A.   I do.

22        Q.   Are you referring to a conversation you

23    had with Mr. Bertucci there?

24        A.   Well, I'm referring to if they are

1     Q.   Who is it?

2     A.   Unilock.

3     Q.   Is this one of the Unilock locations?

4     A.   No.  Aurora.  Aurora, Illinois, the only

5 one we've ever sold to.

6     Q.   In other words, is he talking about the

7 Aurora --

8     A.   Yes.

9     Q.   -- location in this e-mail?

10     A.   Yes.

11     Q.   Can you tell me geographically where

12 Valley View is attempting to sell Diamond Paver

13 Edge?

14     A.   Throughout the U.S.

15     Q.   Is it attempting to sell it anywhere else

16 in North America?

17     A.   Not to my knowledge.

18     Q.   But you are attempting to sell it to

19 distributors and resellers throughout the U.S.?

20     A.   Yes.

21     Q.   Have you ever heard of the E. P. Henry

22 show?

23     A.   I have heard of it.

24     Q.   Do you know who E. P. Henry is?

1    A.    No, I don't.   I think it's on the east

2    coast.

3        MR. BROWN:   Let's mark as 36 a multiple-page

4    document with Production Numbers VVW 1619 through

5    23.

6                    (Rynberk Exhibit 36 marked.)

7    BY MR. BROWN:

8        Q.    Do you recognize what we have marked as

9    Exhibit 36?

10       A.    Yes.   It's an e-mail from one of our

11   outside sales reps.

12       Q.    To Mr. Bertucci with you as a cc?

13       A.    Yes.

14       Q.    In February of this year?

15       A.    Yes.

16       Q.    And he is reporting here on competition he

17   is seeing?

18       A.    Yes.

19       Q.    There's a reference -- well, it's about

20   midway through the third paragraph.   It says, "I'm

21   trying very hard and realize the potential we have

22   to grow this territory.   Working with us you took

23   note on what we are up against and the volume of

24   business we don't have.   It's because of products

1   like the B.E.A.S.T. at 55 cents prepaid on 600

2   pieces."  Do you see that?

3      A.   Yes.

4      Q.   So he is complaining here about having to

5   compete against the B.E.A.S.T.?

6      A.   Competing against the B.E.A.S.T. and

7   Dimex.

8      Q.   And Dimex too.  And he says, "And Dimex

9   pre-paying 200 and 300 pieces of lawn edging for

10  $5.50."  Do you understand the reference to

11  pre-paying referring to freight?

12     A.   I do.

13     Q.   How would you -- is there any way you can

14  make an apples to apples comparison between the

15  Dimex price and the B.E.A.S.T. price that are

16  purportedly quoted in this e-mail?

17     A.   No.

18     Q.   Do you know what he is talking about when

19  he says $5.50?

20     A.   I don't, as I don't know the length of the

21  Dimex product.

22     Q.   He said at the end of that paragraph, "And

23  as I told you in my e-mail of January 17, that Dimex

24  is selling a paver restraint to "blank" for

1    with relation to its Diamond Paver Edge and

2    BrickStop Corporation?

3        A.    No.

4        MS. THOMPSON:    Objection to the form of the

5    question.

6    BY MR. BROWN:

7        Q.    To your knowledge has any customer or

8    potential customer attempted to order B.E.A.S.T.

9    products from Valley View?

10        A.    No.

11        Q.    Are you aware of any communications from

12    customers that in any way relate to BrickStop?

13        MS. THOMPSON:    Objection, form of the question.

14        THE WITNESS:    I guess I don't -- if you want to

15    rephrase that question.    Have we received

16    communication from customers?

17    BY MR. BROWN:

18        Q.    Where BrickStop was in any way the

19    subject?

20        A.    I think you have seen some e-mails from

21    Dominick as to pricing.

22        Q.    Other than the pricing e-mails that we

23    have looked at today?

24        A.    No.

1        Q.   Have you ever heard of a product called

2   Edge All?

3        A.   No.

4        Q.   Have you ever heard of a product called

5   Son of the B.E.A.S.T.?

6        A.   I have heard of it.

7        Q.   What do you know about the Son of the

8   B.E.A.S.T.?

9        A.   I have not seen it.

10       Q.   Do you consider the Son of the B.E.A.S.T.

11  to be a competitor with the Diamond Paver Edge?

12       MS. THOMPSON:  Objection, calls for

13  speculation.

14       THE WITNESS:  That I don't know.

15  BY MR. BROWN:

16       Q.   If Valley View -- is it your opinion

17  that -- when Valley View began developing the

18  Diamond Paver Edge, do you believe it would have

19  arrived at the shape of the product that it did if

20  it had not had reference to the BrickStop

21  B.E.A.S.T.?

22       A.   I honestly can't answer that.

23       Q.   Why not?

24       A.   Because we might have chose a different --

1    different design.

2        Q.    And so if you hadn't had reference to the

3    B.E.A.S.T., the Diamond Paver Edge might have looked

4    completely different?

5        MS. THOMPSON:   Calls for speculation.

6        THE WITNESS:   Possibly.

7    BY MR. BROWN:

8        Q.    What was Valley View's cost to develop the

9    Diamond Paver Edge?

10        A.    What costs are you referring to?

11        Q.    Well, what was the cost of the tool?

12        A.    I'll give you an estimate.  I don't have

13    the exact.  I would say it would be about 180,000.

14        Q.    What other costs were involved in the

15    development?

16        A.    You had a small design charge.

17        Q.    Anything else?

18        A.    No.

19        Q.    And the cost of the tool and the cost of

20    the design charge were both paid to DeKalb?

21        A.    Yes.

22        Q.    Were there any other direct costs to

23    Valley View for the design of the Diamond Paver Edge

24    product?

1      A.    No.

2      MR. BROWN:    Let's mark as 42 I believe a

3   document -- it's a group of documents with

4   Production Numbers 98 through 121.

5                      (Rynberk Exhibit 42 marked.)

6      THE WITNESS:    This is confidential too.

7      MS. THOMPSON:    That is correct.    It is.    It

8   says highly confidential, attorneys' eyes only.

9      THE WITNESS:    Okay.

10  BY MR. BROWN:

11     Q.    Do you know -- I'm not even sure these

12  documents go together.    Do you know what you are

13  looking at here and what we have marked as

14  Exhibit 42?

15     A.    I don't recall seeing it before, but it

16  looks like a summary of manufacturers and costs.

17     Q.    You believe the summary was created by

18  Mr. Soukup?

19     A.    I would assume that.

20     Q.    But you are not entirely sure what this is

21  from personal knowledge?

22     A.    No.

23     Q.    Do you know who Tina Walters is?

24     A.    No.

1  testing for its product?

2      A.   No.

3      Q.   Has Valley View ever employed any focus

4  groups or surveys with respect to the Diamond Paver

5  Edge?

6      A.   Not that I'm aware it.

7      Q.   Has Valley View ever done any surveying

8  with respect to the BrickStop B.E.A.S.T.?

9      A.   No.

10     Q.   Did you ever have a conversation with

11 Mr. Bertucci in which he related to you that someone

12 from BrickStop had approached him at a trade show?

13     A.   Yes.

14     Q.   What do you recall about that

15 conversation?

16     A.   He said he felt threatened at the trade

17 show, said that he thought it was the closest he

18 ever got into a fistfight with somebody at a trade

19 show and that the person was very angry and

20 threatened to sue Valley View.

21     Q.   Do you recall any more about what

22 Mr. Bertucci told you?

23     A.   No.

24     Q.   He said he had thought it almost came to a

1   fistfight?

2       A.   Yes.

3       Q.   Did he recount any of the words that were

4   used?

5       A.   He didn't recount any words to me outside

6   of he asked the gentleman to please leave.

7       Q.   Do you recall when that happened?

8       A.   That was at, if I'm correct, the Tennessee

9   hardscape show.

10      Q.   Do you recall whether that incident

11  happened before or after you received the letter

12  with BrickStop's complaints?

13      A.   I'm pretty sure it happened before.

14      Q.   And as you sit here today you can't

15  remember any other details that Mr. Bertucci told

16  you?

17      A.   No.

18      Q.   Did you ever in the process of developing

19  the Diamond Paver Edge, did you ever ask your

20  lawyers to give you any opinions about whether you

21  could imitate the B.E.A.S.T.?

22      MS. THOMPSON:   Objection.   Calls for

23  attorney/client communications.   I believe the only

24  waiver we have made is with respect to the patent

1   search.  If you are asking for something other than

2   a patent search, I believe that it would be

3   attorney/client.

4           I would instruct you not to answer that

5   one.

6      THE WITNESS:  I figured that.

7   BY MR. BROWN:

8      Q.   Did you ask your lawyers to do a patent

9   search?

10     A.   Yes.

11     Q.   Did you ask them to do any other kind of

12  search beyond a patent search?

13     THE WITNESS:  Am I answering that?

14     MS. THOMPSON:  In terms of -- to the extent you

15  can relate it to the point in time with respect to

16  the patent search, we have to waive the full

17  disclosure at that time.  I'm talking about anything

18  that starts with the letter on.  That's what we are

19  not talking about.  Does that make sense to you?

20     THE WITNESS:  No.

21     MS. THOMPSON:  Then with respect to the date

22  and time around the period of time where you asked

23  about the patent search, do you remember when that

24  was?

1        THE WITNESS:  Yes.

2        MS. THOMPSON:  Did you ask for any searches

3   other than a patent search at that point in time is

4   what he is asking.

5        THE WITNESS:  No.

6        MS. THOMPSON:  Did that recharacterize your

7   question or thereabouts?

8        MR. BROWN:  Right.  We will keep poking around.

9        Q.   Did you ask -- during the time frame when

10  you asked for the patent search when you were

11  developing the Diamond Paver Edge, did you ask your

12  lawyers whether you needed to be concerned about

13  anything other than patents?

14       A.   I honestly don't recall.

15       Q.   Do you recall what your lawyer said about

16  the patent search?

17       A.   There were no patents, current patents.

18       Q.   Did you ask your lawyers at that time

19  about trade dress issues?  At that time.

20       A.   I don't recall.

21       Q.   Did you ask your lawyers at that time

22  about trademark issues?

23       A.   Again, I don't recall.

24       MR. BROWN:  Let's mark as Exhibit 44 a one-page

1    document with Production Number VVW 2075.  And let's

2    mark as Exhibit 45 a document with Production

3    Numbers VVW 2076 through 2095.

4                        (Rynberk Exhibits 44 and 45

5                        marked.)

6    BY MR. BROWN:

7        Q.    Do you recognize the e-mail that's marked

8    as Exhibit 44?

9        A.    I do.

10       Q.    The e-mail that's Exhibit 44 is from James

11   Ryther.  Who is that?

12       A.    An attorney with DLA Piper.

13       Q.    And it's dated July 27th, 2007; is that

14   right?

15       A.    Yes.

16       Q.    That was around the time that you were

17   developing the Diamond Paver Edge?

18       A.    Probably before.

19       Q.    Before.  Why did you ask Mr. Ryther to do

20   a search about BrickStop?

21       A.    I actually had him do a search on other

22   paver edgers too.

23       Q.    Did Mr. Ryther present you with an e-mail

24   about the other paver edgers?

1    A.    He did.

2    Q.    Did you give that e-mail to your counsel?

3    A.    They pulled everything from our e-mail, so

4  it should be.

5    MR. BROWN:  Counsel, I think we are entitled to

6  see any e-mails from Mr. Ryther.

7    MS. THOMPSON:  We don't have any others.  I'm

8  not saying there weren't at some point in time, but

9  we have searched, and I don't have any others -- or

10  none of the others we were able to retrieve from

11  there.  I will check our records.

12    MR. BROWN:  Will you check the records of DLA

13  Piper?

14    MS. THOMPSON:  That's what I said.  I will

15  check our records.  But I'm not sure that there are

16  any others.  Mr. Ryther retired from the firm.

17  BY MR. BROWN:

18    Q.    Do you recall how many e-mails you got

19  from Mr. Ryther?

20    A.    Oh, I don't recall how many.

21    Q.    Was it more than two?

22    A.    Yes.

23    Q.    And these e-mail related to your

24  development of the Diamond Paver Edge?

1      A.    No.   Some e-mails related to other

2   matters.

3      Q.    How about with respect to the e-mail

4   relating to the Diamond Paver Edge?   How many

5   e-mails did you get?

6      A.    At least two.

7      Q.    And was each one regarding patent

8   coverage?

9      A.    To the best of my knowledge.

10      Q.    You see that we've marked as Exhibit 45

11   Patent Number 5212917?

12      A.    I do.

13      Q.    Did that come with the information from

14   Mr. Ryther?

15      A.    It came at an earlier time.

16      Q.    So he had provided you with this patent

17   before this e-mail?

18      A.    Yes.

19      Q.    Did you look at the Kurtz patent, U.S.

20   Patent 5212917, when Mr. Ryther gave it to you?

21      A.    I probably glanced at it.

22      Q.    Did you look at the figures to see the

23   paver edge?

24      A.    I didn't review it in detail.

1    Q.    Whether or not you reviewed it in detail,

2    did you look at the figures that show this

3    particular paver edge?

4    A.    No, I didn't.

5    Q.    You didn't look at it at all?

6    A.    No.

7    Q.    Do you see the paver edge that's depicted

8    on the cover of Exhibit 45?

9    A.    I do.

10    Q.    Does that look to you to be the B.E.A.S.T.

11    paver edge?

12    A.    No.

13    Q.    Do you see the second sentence of

14    Mr. Ryther's e-mail?  He says, "I am assuming that

15    this illustrates the paver restraint edging referred

16    to in your request for the search."  Do you see

17    that?

18    A.    I do.

19    Q.    Did you ever tell Mr. Ryther that in fact

20    did not illustrate the paver restraint edging

21    referred to in your search?

22    A.    On this diagram, I don't think so.

23    Q.    Did you and Mr. Ryther ever discuss trade

24    dress issues with respect to the B.E.A.S.T. while

1   you were developing the Diamond Paver Edge?

2       A.   That I can't recall.

3       Q.   Did you and Mr. Ryther discuss trade dress

4   issues with respect to the B.E.A.S.T. at any time?

5       MS. THOMPSON:  Objection.  Calls for

6   attorney/client privilege after the litigation or

7   after the receipt of a cease and desist letter.  I

8   would instruct you not to answer that.

9       THE WITNESS:  Okay.

10      MR. BROWN:  I will just state for the record

11  that I'm not sure you can make a temporal cutoff

12  like that.

13      MS. THOMPSON:  I think we can, counsel.  I did

14  look at this before we made the production.

15      MR. BROWN:  Would you be kind enough to cite

16  some case law to me on that?

17      MS. THOMPSON:  No, I don't have anything here

18  with me.

19      MR. BROWN:  I don't expect you to pull it off

20  the top of your head.

21      MS. THOMPSON:  All right.  But it won't be

22  until I finish my brief.

23  BY MR. BROWN:

24      Q.   So just so I can lay the record, have you

1    ever sought advice from a lawyer respecting trade

2    dress rights of BrickStop in its B.E.A.S.T. product

3    configuration?

4         MS. THOMPSON:  That's a yes/no question.

5         THE WITNESS:  I really don't know the answer to

6    the question.

7    BY MR. BROWN:

8         Q.   Have your lawyers ever advised you about

9    BrickStop's claims that there are trade -- there was

10   trade dress infringement because of the sales of the

11   Diamond Paver Edge?

12        MS. THOMPSON:  That's only a yes/no question.

13        THE WITNESS:  Yes.

14        MR. BROWN:  And what advice were you given?

15        MS. THOMPSON:  That's attorney/client

16   privilege.

17        MR. BROWN:  And you are instructing him not to

18   answer?

19        MS. THOMPSON:  I am instructing him not to

20   answer.  With the exception of since we revealed

21   this letter, if the advice you got came

22   contemporaneous with that period of time, you have

23   to reveal whatever was discussed that you recall.  I

24   was presuming it was subsequent.

1    BY MR. BROWN:

2        Q.    The e-mail says, "You will note that there
3    is no record that B.E.A.S.T. was registered, but it
4    would still be wise to avoid using any similar name
5    if you decide to adopt this product."  Do you see
6    that?

7        A.    Yes.

8        Q.    Did you understand that to be trademark
9    advice from Mr. Ryther?

10        A.    It would seem to be.

11        MR. BROWN:  And just so I understand the scope
12    of your instructions, counsel, the temporal cutoff
13    you are asserting begins the date that he received
14    the cease and desist letter?

15        MS. THOMPSON:  Correct.

16        MR. BROWN:  And you will -- so we don't have to
17    go through the exercise, you will instruct him not
18    to answer about any advice given after that date?

19        MS. THOMPSON:  Correct.  If that's after the
20    product has been developed and that's after a period
21    of time they would have sought any right to use
22    opinions, correct.

23        MR. BROWN:  If you would give me just a few
24    minutes, we might be done.

1                    (Off-the-record discussion.)

2        MS. THOMPSON:  Can we go on the record one

3   second?

4        MR. BROWN:  Sure.

5        MS. THOMPSON:  You asked about other opinions

6   with respect to other patents that were researched

7   at the time of the creation of Diamond Paver Edge,

8   but your requests that we responded to don't make

9   such a broad -- I mean they simply ask that mention

10  or relate to any opinion of counsel indicating

11  whether Valley View's Diamond Paver Edge infringes

12  the BrickStop design.  We fully complied as to what

13  you asked for.  As far as looking for others, I

14  don't think I have any problem doing that if they

15  all relate to the same period of time of development

16  or pre-confrontation, shall we say, period.  I just

17  want to make clear on the record we fully complied.

18  We didn't hold back anything knowingly that was

19  requested.

20       MR. BROWN:  Okay.  I appreciate that.  But you

21  are willing to do that without another request?

22       MS. THOMPSON:  As long as I get my brief filed

23  in a timely manner, you know, and then I have a week

24  of vacation, but as soon as I get everything cleared

1  up, that will be one of the things I will do for

2  you, yes.  I may even have somebody to do that while

3  I am gone.

4      MR. BROWN:  I assume there would be somebody at

5  DLA Piper that could do that.

6      MS. THOMPSON:  You know, if there were more

7  people, I wouldn't be so frazzled right now.  Are

8  you going to finish looking at that?  If you are,

9  I'm going to take a break.

10                      (Recess taken.)

11  BY MR. BROWN:

12      Q.   Is it your understanding that the

13  injection molding process allows you to be more

14  creative in the shapes that are employed in a

15  product as compared to the extrusion process?

16      MS. THOMPSON: Objection.  Form of the

17  question.  Also lack of foundation.  You can answer.

18      THE WITNESS:  Generally that's true.

19      MR. BROWN:  Okay.  I think I have nothing

20  further.

21      MS. THOMPSON:  Okay.  I have some questions

22  that we have to go through.

23

24

1                        EXAMINATION

2    BY MS. THOMPSON:

3        Q.   The first thing I was going to ask you

4    about was Exhibit 22 for identification.  While we

5    were looking at it -- counsel, I will show you.  I

6    have just squared off -- there is a number of them

7    like this, but on page 1 -- do you have Exhibit 22?

8    If you can look down.

9        A.   This is it.  All right.

10        Q.   Ten lines down?

11        A.   2.

12        Q.   Where it says 2 and has a dollar quantity

13    of 6,048?

14        A.   Uh-huh.

15        Q.   I believe your earlier testimony is you

16    believed that the number related to the strips of

17    8-foot paver edging?

18        A.   Uh-huh.

19        Q.   Let's go back to the top.

20        A.   Yes.

21        Q.   Remember you had 630?

22        A.   Yes.

23        Q.   And then you see 3,270 in the first line

24    entry?

# Exhibit K

**CONFIDENTIAL**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRICKSTOP CORPORATION,        )
                              )
              Plaintiff,      )
                              )
         vs.                  )    1:08-CV-02690
                              )
VALLEY VIEW INDUSTRIES, H.C., )
INC.,                         )
                              )
              Defendant.      )

        The deposition of DOMINICK V. BERTUCCI,

called by the Plaintiff for examination, pursuant to

notice and pursuant to the Rules of Civil Procedure

for the United States District Courts pertaining to

the taking of depositions, taken before Patricia S.

Mann, CSR, RPR,  License No. 084-001853, a notary

public in and for the County of Cook and State of

Illinois, at Suite 1808, Two North LaSalle Street,

Chicago, Illinois, on Friday, August 1, 2008, at

9:40 o'clock a.m.

Reported for
LAKE SHORE REPORTING SERVICE, by:
Patricia S. Mann, CSR, RPR.
License No. 084-001853

## CONFIDENTIAL

1    would have been the only other time.

2        Q.   Did you send your sales sheet to any

3    potential customers?

4        A.   I don't recollect.

5        Q.   At the trade show in Nashville, did you

6    hand out any hard copies of the sales sheet?

7        A.   Yes.

8        Q.   Do you know how many?

9        A.   Maybe 75 to 100.

10        Q.   And that was to potential customers?

11        A.   Yes.

12        Q.   So other than the PDF that you sent to

13    your independent reps and the hard copies you

14    handed out at the two trade shows that you've

15    mentioned, do you recall sending in any form the

16    original sales sheet to any customer or potential

17    customer?

18        A.   I don't recall.

19        Q.   Did you do anything to retrieve any of

20    the sales sheets after BrickStop complained?

21        A.   The sales sheets that were in hand we

22    just destroyed.

23        Q.   Anything else?

24        A.   As I stated, I had made it clear to the

**CONFIDENTIAL**

1  reps to stop promoting that particular sales sheet.

2      Q.    Did you do anything to follow-up to see

3  if your independent reps actually stopped using that

4  sheet?

5      A.    I had made telephone calls and making sure

6  that they were clear that they weren't supposed to

7  be promoting that sheet.

8      Q.    In your understanding, what is required

9  of a paver edging in order for it to function for

10  its intended purpose?

11      MS. THOMPSON:  Objection, vague, objection to

12  the extent it calls for a legal conclusion and

13  possibly foundation.  You can answer.

14      THE WITNESS:  A.  Keeping the pavers in place.

15      MR. BROWN:  Q.  So that's the ultimate

16  function, to keep the pavers in place, right?

17      A.    Have a sturdy enough product that allows

18  for the use of the product to be functional in the

19  eyes of the user.

20      Q.    Are there any particular structural

21  features that are common to all paver edges?

22      A.    They all have sidewalls and they all have

23  anchor bases.

24      Q.    Anything else?

**CONFIDENTIAL**

1      A.    No.

2      Q.    And when you say sidewalls, that's the

3  portion that is actually abutted against the

4  pavers?

5      A.    In one respect, it can be an inside,

6  depending on the design of the product, or an

7  outside, but in one way, shape or form, the sidewall

8  is touching one part of the pavers.

9      Q.    When you say an inside or an outside, I'm

10  not too clear on what you mean by that.

11      A.    Some paver restraints are manufactured to

12  where you can reverse them.

13      Q.    So some of them you could use either side

14  of the sidewall to abut the pavers?

15      A.    Correct.

16      Q.    Okay.  And when you say "anchor bases,"

17  what do you mean?

18      A.    The spot where an anchor product is used

19  to adhere the product to the ground.

20      Q.    And that anchor being either a nail or a

21  stake?

22      A.    Yes.

23      Q.    Are there any other types of anchors that

24  you've heard of being used?

**CONFIDENTIAL**

1    A.   Not that I'm aware of.

2    Q.   Are you aware of any functional

3 requirements for the shape of the anchor base to

4 perform its function?

5    MS. THOMPSON:  Calls for speculation -- it's

6 not that, let me get it right.  Object to the extent

7 it calls for a legal conclusion and because the

8 question is vague and I forgot what the last one was

9 -- I'll just leave it, calls for speculation.  Go

10 ahead, you can answer.

11    THE WITNESS:  Can you restate the question?

12    MS. THOMPSON:  I'm sorry, I forgot it, too.

13    MR. BROWN:  Could you read it back, please?

14         (The requested portion of the record

15           was read.)

16    MS. THOMPSON:  Lack of foundation, that was my

17 last one, foundation.

18    THE WITNESS:  Can you repeat that again,

19 please?

20         (The requested portion of the record

21           was read.)

22    THE WITNESS:  A.  With respect to any type of

23 paver restraint or the paver restraint in question?

24    MR. BROWN:  Q.  With respect to any type of

**CONFIDENTIAL**

1    paver restraint.

2        A.    Yes.

3        Q.    Okay.

4        A.    It just has to have a spot that works

5    with -- in the view of Valley View with our anchor

6    stake to work with the product.

7        Q.    So it has to have a spot to receive either

8    the nail or the stake?

9        A.    Yes.

10        Q.    Are there any other requirements that

11    you're aware of for the anchor base?

12        MS. THOMPSON:  Same set of objections.

13        THE WITNESS:  A.    It has to be functional

14    enough to keep the sidewall sturdy enough to act as

15    its -- as the products wants to as a restraint.

16        MR. BROWN:  Q.    Are there any other functional

17    requirements for the anchor base that you're aware

18    of?

19        MS. THOMPSON:  Same objections.

20        THE WITNESS:  A.    No.

21        MR. BROWN:  Q.    Why did Valley View decide to

22    imitate the Beast product?

23        MS. THOMPSON:  Form of question.  Go ahead --

24    and lack of foundation.  Go ahead.

**CONFIDENTIAL**

1    THE WITNESS:   A.   It had been brought up with a

2    potential customer of Valley View back in July of

3    last year.

4    MR. BROWN:   Q.   Can you tell me what the

5    circumstances of that meeting were with the

6    potential customer?

7    A.    They had made mention and made -- made

8    mention of the name the Beast by name and had

9    mentioned the fact that it was affecting their

10   market share for the product they were currently

11   selling and they looked at Valley View to possibly

12   be a partner with them, having them distribute the

13   product for them.

14   Q.   Were you at that meeting?

15   A.   Yes.

16   Q.   And who was that meeting with?

17   A.   That was with Unilock.

18   Q.   When did that meeting occur?

19   A.   July of last year.

20   Q.   July of 2007?

21   A.   Yes.

22   Q.   Where did that meeting occur?

23   A.   That took place at the Aurora location of

24   Unilock.

1    A.    No.

2    Q.    In your experience, do customers tend to

3    have a preference for one or the other type, the

4    distinction being between aluminum and plastic?

5    A.    Yes, but the aluminum market is a very --

6    we think is a very small market.

7    Q.    Do your independent reps have the same

8    price scale, in other words, can an independent rep

9    quote as low as 49 cents per foot?

10    A.    No, they would need my review of that

11    before that happens.

12    Q.    What are your independent reps allowed to

13    quote without seeking your review?

14    A.    They are at 55 cents a foot or higher.

15    Q.    Have you had any independent reps ask for

16    you to depart below the 55 cent price figure?

17    A.    Yes.

18    Q.    Which ones have asked for that?

19    A.    That has both been the Hammond -- two,

20    Hammond personnel and Michael Casey.

21    Q.    And were those in situations where they

22    were competing against the Beast?

23    A.    Yes.    And other times -- there was a

24    few other times where there was not the Beast

1    involved.

2        Q.    Have you let your independent reps depart

3    below the 55 cent per foot?

4        A.    Yes.

5        Q.    What's the lowest price anyone between

6    yourself and all of your independent reps have

7    quoted?

8        A.    49 cents a foot.

9        Q.    Have you let any of your independent reps

10   quote the 49 cent per foot?

11       A.    No.

12       Q.    I'm going to show you what we have

13   previously marked as Exhibit 25 and ask you if you

14   have seen that document before?

15       A.    Yes.

16       Q.    This is an e-mail from yourself to

17   Mr. Rynberk --

18       A.    Yes.

19       Q.    -- dated July 19th, 2007?

20       A.    Yes.

21       Q.    Is this -- does this constitute the notes

22   you have from the Unilock meeting that we discussed

23   earlier today?

24       A.    Correct.  I was -- I was just unaware that

CONFIDENTIAL

69

1    Dave Martinet was a part of that meeting, also.

2        Q.    Who is Dave Martinet?

3        A.    He's an employee of Tamelings who is a

4    Unilock distributor.

5        Q.    Who is Howie Rynberk?

6        A.    He would be Howard Rynberk's son.

7        Q.    Was Howie Rynberk at the Unilock meeting?

8        A.    I don't recall.  He was in the building at

9    that time, but I don't recall if he was in a meeting

10   at that time.

11       Q.    And you'll see about five -- you see the

12   asterisk on the left-hand side?

13       A.    Uh-huh.

14       Q.    And these are your notes from the

15   meeting?

16       A.    Uh-huh.

17       Q.    Did you take any written notes while you

18   were at that meeting?

19       A.    Yes, I did.

20       Q.    And what did you do with those?

21       A.    I transcribed them into this e-mail.

22       Q.    And what did you actually do with the

23   written piece of paper?

24       A.    I had discarded it once I put it on

**CONFIDENTIAL**

1    e-mail.

2         Q.   Did you consult at all with any of the

3    other participants about what went on to make sure

4    your notes were accurate?

5         A.   That was the reference to the e-mail and

6    that, you know, I was recapping the meeting.

7         Q.   Did anyone respond to this e-mail saying

8    I don't remember it that way?

9         A.   I don't recall.

10        Q.   Now, about -- so I started by pointing

11   out the asterisk on the left-hand side, the bullet

12   points, and the fifth one down says "If Valley View

13   tries to duplicate the Beast product, we could

14   increase our potential greatly with blank," I assume

15   that's probably with Unilock.  Does Unilock have ten

16   branches?

17        A.   Yes.

18        Q.   Is one of them in Buffalo?

19        A.   Yes.

20        Q.   Is Dave McIntyre with Unilock?

21        A.   Yes.

22        Q.   Was Dave McIntyre at the meeting?

23        A.   No, he was not.

24        Q.   So is this consistent, this "if Valley

1  View tries to duplicate the Beast Product," and

2  this date July 19th, 2007, that at that point, the

3  project hadn't officially begun yet, you were still

4  considering whether to create an injection molded

5  product?

6       A.   Yes, it was -- this was in the very

7  infancy stages, I would -- I would say.

8       Q.   Okay.  The last thing says "ICPI show is

9  a show to consider in Nashville next March."  What

10 is that about?

11      A.   That's -- that was an industry show that

12 we were at which is a hardscape show in the paver

13 retaining wall industry.

14      Q.   And when you say "is a show to consider,"

15 did you just mean it was a show to consider

16 attending?

17      A.   What I meant by that was a show to

18 consider exhibiting at.

19      Q.   Exhibiting everything or the new product?

20      A.   Everything, yes.

21      Q.   Had you not been in the ICPI show prior

22 to this?

23      A.   No, we had never gone -- that was only

24 the -- 2007 would have been the -- only the second

**CONFIDENTIAL**

1    that the Beast is being sold by a potential

2    customer --

3        A.    Yes.

4        Q.    -- you focus on the fact that stakes can

5    be used with the Diamond Paver Edge?

6        A.    Correct.

7        Q.    Is there any other functional aspect of

8    the Diamond Paver Edge that you try and tout when

9    you know you're in competition with the Beast?

10       A.    Yes.  We have a connecting point that is

11   more of a vertical height than the Beast product

12   that makes it easier for the installer to do that

13   connecting point and have two pieces together and at

14   the same time, if there is any ground heave or

15   movement, the locking system will help prevent any

16   separation of the two products together.

17       Q.    Anything else?

18       A.    Our sidewall is a bit taller and that

19   adds a little bit more of functionality, strength on

20   the sidewall.  At the same time, it's hidden and

21   buried when the job is completed, but to the peace

22   of mind to the end user, we've added a little bit

23   of height to the product to, you know, maybe relieve

24   some concerns on the pliability of the product and

CONFIDENTIAL

1  rigidity of the product.

2      Q.    Anything else?

3      A.    That would be it.

4      Q.    In your experience in selling against

5  BrickStop, when they're selling the Beast to a

6  potential customer, is price the most significant

7  driver?

8      A.    Yes.

9      Q.    And that's because the products are very

10  similar?

11      A.    Yes.

12      MR. BROWN:  I'd like to mark as -- I think it's

13  46, this is a one-page document with production

14  number VVW 1629.

15                    (Deposition Exhibit Number 46 was

16                    marked for identification as

17                    requested.)

18      THE WITNESS:  Did you want me to review this?

19      MR. BROWN:   Q.  Yes.  Can you tell me what

20  we've marked as Exhibit 46 is?

21      A.    It says there's an e-mail from Mark to

22  Howard and then after that there was from Mark to

23  me in January of '08.

24      Q.    And the e-mail at the bottom is from Mark

**CONFIDENTIAL**

1  Heath to Mr. Rynberk and that was in April of 2007,

2  is that right?

3      A.   Yes.

4      Q.   And he's supplying customer feedback to

5  Mr. Rynberk?

6      A.   Yes.

7      Q.   And he says -- he's talking about some

8  customer, he says "They are a two-step distributor

9  selling concrete, stone and paver yards," do you see

10  that?

11      A.   Uh-huh.

12      Q.   So that would be what you call a

13  distributor and then the stone and paver yards

14  would be a dealer as you described earlier?

15      A.   Yes.

16      Q.   Okay.   He says "We are up against the

17  Beast, it comes in seven-and-a-half-foot lengths and

18  it is $4.60 prepaid on a 600-piece pallet," do you

19  see that?

20      A.   Uh-huh.

21      Q.   Is it your understanding the Beast is

22  sold on pallets with 600 pieces?

23      A.   I believe that is correct, yes.

24      Q.   Is that what you sell?

## CONFIDENTIAL

1  that point forward.

2      Q.   Okay.  So they asked you to get a photo of

3  a BrickStop pallet?

4      A.   No.  I happened to be doing some sales

5  calls and when they were in development of the

6  product, I said, here, take a look at this, but it

7  was not only the BrickStop product, I took photos

8  of other competitive products.

9      Q.   Do you remember when you were -- when you

10  took the photo of the BrickStop product?

11     A.   I want to say I was somewhere in New

12  Jersey or Pennsylvania on a trip out over the

13  wintertime.

14     Q.   Was it one of your customers existing

15  that you got this picture from?

16     A.   Yes, yes.

17     Q.   So it was someone you were selling Diamond

18  Lok to at the time?

19     A.   Or a lawn edging.

20     Q.   And did you take -- you said you took a

21  picture of another competitive product on pallet,

22  was that at the same location?

23     A.   Yes.

24     Q.   Mr. Heath says "I see the Beast quite a

1    few places and it is tough selling Diamond Lok

2    against this price point with prepaid freight, too,"

3    you see that?

4         A.    Yes.

5         Q.    Do you know did the Beast price

6    information that Valley View was receiving from the

7    field help Valley View set its prices for the

8    Diamond Paver Edge?

9         A.    Yes.

10        Q.    And that e-mail from Mr. Heath to

11   Mr. Rynberk was before the development of the

12   Diamond Paver Edge began?

13        A.    Yes.

14        MR. BROWN:   Let's mark as 47 a one-page

15   document, it has production number VVW 151.

16                  (Deposition Exhibit Number 47 was

17                   marked for identification as

18                   requested.)

19        MR. BROWN:   Q.   And Exhibit 47 is an e-mail

20   from yourself to Mr. Rynberk dated September 6th,

21   2007, is that right?

22        A.    Uh-huh.

23        Q.    And the subject line is "Hedberg comments

24   of new bricks slash paver edging."

**CONFIDENTIAL**

1    A.   Uh-huh.

2    Q.   Who's Hedberg?

3    A.   That would be a customer of Valley View

4 up in Minneapolis.

5    Q.   Was Hedberg at the time that -- well, was

6 this a meeting you went to?

7    A.   Yes.

8    Q.   And you showed them a sample at that

9 time?

10    A.   We did not have a sample of the Diamond

11 Paver Edge at that time.

12    Q.   I see.  So this is September of '06 and

13 you went to Hedberg and you must have shown them a

14 sample of the Beast then?

15    A.   Correct.

16    Q.   And what was the purpose of the meeting?

17    A.   To get their feedback on us developing a

18 new product that is similar to that product.

19    Q.   So you took the Beast sample to Hedberg

20 and said we're going to do this or we're thinking

21 about this?

22    A.   Yes.

23    Q.   Do you remember which of those things you

24 said?

**CONFIDENTIAL**

1    A.    I think at that point in September, I

2    think it was more so we're thinking about this.

3    Q.    Okay.

4    A.    And it was in development phase still.

5    Q.    Okay.  So had someone within Valley View

6    asked that you get feedback from a customer?

7    A.    Yes.

8    Q.    Who had asked that?

9    A.    That was Howard Rynberk.

10    Q.    Did he ask you to actually take a sample

11    of the Beast to a customer?

12    A.    No, I had taken it on my own.

13    Q.    Okay.  Because you knew that's what you

14    thought you were going to be imitating?

15    A.    Correct.

16    Q.    And at the time, was Hedberg a Beast

17    customer?

18    A.    No.

19    Q.    And so you showed them -- how big was the

20    sample?

21    A.    It was probably a two-foot sample.

22    Q.    Okay.  And did you drop it off and say,

23    hey, have a look at this and I'll get back to you or

24    was it a meeting where you sat down to review the

CONFIDENTIAL

1   the drawing?

2        A.   He did not.

3        Q.   Did anyone ever ask you for any feedback

4   on the configuration of the product?

5        A.   The comments that I was receiving was the

6   fact that we were going to add the anchor stake to

7   the product to make it more functional with the

8   customer base out there that we were currently

9   selling, and I flat out said that was a great idea,

10  because we have a -- we were going to market this,

11  of course, to our current pool of customer base and

12  go after customers who are not selling, but to have

13  something developed where they could use two parts

14  interchangeably versus just having one, I thought

15  that was a really big feather in our cap.

16       Q.   Did you give any other feedback on the

17  shape of the product?

18       A.   No, not that I can recall.  Just the fact

19  that I just wanted to make sure that it was what

20  they were thinking of developing as a much higher

21  quality product along those comments.

22       Q.   Meaning much higher quality than the

23  Diamond Lok that you were presently selling?

24       A.   Correct.

**CONFIDENTIAL**

1    Q.   Let's just briefly look at Exhibit 30, if

2    we can.   This is out of order.   And I'll ask you if

3    you've seen that one before?

4    A.   This is --

5    MS. THOMPSON:   You have to take a look, is it

6    more than one page?

7    THE WITNESS:   A.   I don't recall, because these

8    are all looking the same to me.   So this looks like

9    our product here and it looks like the Beast

10   product.   All I can recall is seeing our style

11   product being developed on something like this,

12   but this exact piece, I cannot recall this exact

13   piece.

14   MR. BROWN:   Q.   You remember seeing

15   side-by-side drawings before, but that might not be

16   the one you've seen?

17   A.   Correct.

18   Q.   Okay.   Did you ever get any feedback from

19   customers that they did not want to deviate from

20   the palleting arrangement that they were presently

21   getting from BrickStop for sales of the Beast?

22   A.   That was never brought up as an issue

23   with me.

24   Q.   I'd like to show you what we previously

CONFIDENTIAL

1    marked as Exhibit 32 which is an e-mail -- at the

2    top it's an e-mail from Frank Soukup to yourself

3    and the bottom there's an e-mail from you to

4    Mr. Soukup, do you see that?

5        A.    Uh-huh.

6        Q.    And in your e-mail, you say "Frank, it is

7    clear with my visits to the competitor of our new

8    paver restraint that we are going to have to ship

9    on eight-foot pallets.  Currently, the customer base

10   for our competition is getting 600 eight-foot

11   lengths banded on a pallet, they are not wanting to

12   deviate from that," do you see that?

13       A.    Uh-huh.

14       Q.    Is the competitor there the Beast?

15       A.    Yes.  Though what I'm referring to is a

16   deviation -- you know, a -- not wanting to deviate

17   from that.  As I recall this now, that they don't

18   want to go to a thousand pieces or three hundred

19   pieces.

20       Q.    Okay.  And so was it based on this

21   feedback that Valley View decided to use 600

22   pieces?

23       A.    He -- Frank being the plant manager was

24   giving me feedback as they were developing this on

**CONFIDENTIAL**

1      Q.   Can distributors go to, for instance, the

2  Irrigation Show?

3      A.   Yes.

4      Q.   Can resellers go to those shows?

5      A.   Yes.

6      Q.   Can contractors go to those shows?

7      A.   Yes.

8      Q.   Can all of those same types of people go

9  to distributor writing shows?

10     A.   No, the distributor writing shows are

11  normally market segmented, someone that lives in

12  Pennsylvania wouldn't go to a distributor show in

13  Illinois.  It depends on the market that the

14  distributor services, he therefore invites his

15  dealer base and then it's up to them, of course,

16  if they want to come to see the show.

17     Q.   So at a distributor show, you get the

18  distributor and his customers will arrive there?

19     A.   Correct, I have -- yes.

20     Q.   And can contractors and installers go to

21  those shows?

22     A.   Yes.

23     Q.   And when you're at these shows, do you

24  have contact with both distributors and end users

CONFIDENTIAL

1    like contractors and installers?

2        A.    Well, I wouldn't have contact with the

3    distributors because I'm at a sole distributor show,

4    so I'm there for his benefit, not promoting another

5    distributor that he might be a competitor of theirs.

6    So when he has his viewer base or his contractor

7    base there, I'm there promoting the product to the

8    landscaper on behalf of the distributor.

9        Q.    So you would -- you would run into or you

10   would have contact with both dealers and end users

11   at a distributor show?

12       A.    That is correct.

13       Q.    Have you in any of these shows had a

14   contractor or installer tell you he thought that

15   your product looked like the Beast, the Diamond

16   Paver Edge?

17       A.    Yes.

18       Q.    When did that happen?

19       A.    When we were at the E.P. Henry show and

20   the ICPI show.

21       Q.    At the E.P. Henry show, how many

22   contractors or installers made that comment?

23       A.    I would say maybe a half a dozen.

24       Q.    How about at the ICPI show, how many

**CONFIDENTIAL**

1  contractors or installers commented that your

2  product looked like the Beast?

3    A.    Probably about the same quantity which

4  would be about six.  But that show was more market

5  segmented for distributors than actual contractors,

6  though there were contractors in attendance, but

7  that show is more of an industry show for the

8  distribution market more than anything.

9    Q.    When you were at the E.P. Henry show, did

10  any one of the half dozen or so who commented about

11  your product looking like the Beast ask you whether

12  it was BrickStop's product?

13    A.    No.

14    Q.    At the ICPI show, did any of the half

15  dozen or so contractors who commented and said your

16  product looked like the Beast ask whether it was

17  BrickStop's product?

18    A.    No.  We were very clear in our literature

19  at that time -- I'm sorry, at the -- after we

20  corrected the literature, but at the booth, it's a

21  Valley View booth showing Valley View product, we

22  have a label on our product, we showed samples at

23  those two shows in Nashville and in Atlantic City

24  that were our product with our name stamped on it

**CONFIDENTIAL**

1    embossed in the product and also with a label on

2    the product.

3        Q.    Did anyone ask you whether you got it

4    from the same manufacturer as the Beast?

5        A.    No.

6        Q.    Did anyone ask you if it was the Beast?

7        A.    They did, and I corrected them and said

8    no, this is a Valley View product and here are the

9    design features that are different.

10       Q.    How many asked you if it was the Beast?

11       A.    Maybe a half dozen.

12   MS. THOMPSON:   Asked and answered.

13   MR. BROWN:   Q.   And was that between both

14   shows, maybe a half dozen asked you if it was the

15   Beast?

16       A.    Yes.

17       Q.    Have you ever heard of the North American

18   Hardscape Show?

19       A.    Yeah, that would have been what I was

20   referring to for the ICPI show.

21       Q.    So that's --

22       A.    Kind of one in the same.

23       Q.    Kind of one in the same?

24       A.    I'm sorry, there is an ICPI show and a

**CONFIDENTIAL**

1  North American Hardscape Show, but we only attended

2  one of them.  They're the same type of industry

3  format, it's just one is more with poured concrete

4  and one is more with hardscapes.

5     Q.    Which one is the North American Hardscape

6  Show, the one that's hardscapes?

7     A.    Yes.

8     Q.    And the ICPI is more with poured

9  concrete?

10    A.    Yes.

11    Q.    Is there an application for paver edging

12  with poured concrete?

13    A.    Not necessarily, but there might be a

14  customer base that is -- that transcends into both

15  types of industries, so that's probably why there is

16  marketing for both.

17    Q.    Which one did you go to, the ICPI or the

18  North American Hardscapes?

19    A.    North American Hardscapes, that would have

20  been the show in Nashville which is also the show in

21  Atlanta coming up.

22    Q.    Are you going to the Atlanta show?

23    A.    Yes.

24    Q.    Has Valley View made any efforts to sell

**CONFIDENTIAL**

1    region of Home Depot to make a decision on

2    purchasing an accessory stake display from us.

3        Q.    Is that what MSD 300 is?

4        A.    Yes.

5        Q.    What's Barrier Edge?

6        A.    That's a competitor product which is

7    actually a different name for Snap Edge.

8        Q.    Okay.  So Snap Edge is being sold as

9    Barrier Edge at Home Depot?

10       A.    Yes.

11       Q.    But is it the same product?

12       A.    Yes.

13       Q.    And he says "Find out cost for Barrier

14   Edge and try to substitute the Diamond Paver Edge,"

15   do you see that?

16       A.    Correct.

17       Q.    Did you attempt to do that?

18       A.    Well, in discussions with the reps and

19   the product, we just -- we talked about it, but we

20   didn't really make a presentation to the buyer per

21   se because of our -- we just thought after what our

22   current SKU situation is with Home Depot, we don't

23   want to really -- we have other things that we want

24   to grow with Home Depot besides that product.

**CONFIDENTIAL**

1    Q.   So when you say we talked about it, you
2  mean you talked about it with your reps?
3    A.   Yes.
4    Q.   But you didn't talk about it with the
5  district supply manager --
6    A.   Correct.
7    Q.   -- of Home Depot?
8    A.   Yes.  At this juncture right here in
9  April, you're not trying -- you can't get anything
10 new in to them for '08 because it's too late.
11 Howard's e-mail was more regarding the MSD 300
12 display and that was something else he brought up
13 as an FYI more so.
14    MR. BROWN:  Let's mark as 55 a three-page
15 document, production numbers VVW 1117 to 19.
16                     (Deposition Exhibit Number 55 was
17                      marked for identification as
18                      requested.)
19    MR. BROWN:  Q.   Can you tell me what Exhibit
20 55 is?
21    A.   This would have been an e-mail back to me
22 from one of our rep groups out east mentioning their
23 customer base who they were going to be sending
24 samples to of our new Diamond Paver Edge.

CONFIDENTIAL

1    Q.   Okay.  So there's no names, but there
2  are -- there's partial addresses and these are the
3  addresses for accounts that the Hammond group was
4  going to send samples to?
5    A.   That's correct -- or actually we were
6  going to send samples to on their behalf.
7    Q.   I see.  So when he said here is my list,
8  he's responding to a request from you?
9    A.   Yes.
10    Q.   And what specifically was your request?
11    A.   To give me the names of people that would
12  be targets for this particular product.
13    Q.   And did you send samples to all of the
14  people that he identified?
15    A.   Yes.
16    Q.   On the last page of Exhibit 55, there's
17  a statement from you, "The research done in the
18  paver market for the amount of paver restraints
19  sold is astounding."  What are you referring to
20  there?
21    A.   Well, becoming a national sales manager
22  outside of my area that I had for the better part
23  of eleven years, it was evident that in their
24  region, the amount of pavers and restraints in that

**CONFIDENTIAL**

1  in that area, they may have been aware of it and it

2  was the easiest way for me to give them an idea of

3  what we were going to be presenting them.

4      Q.  You say your price for the new paver

5  edging called Diamond Paver Edge is 55 cents per

6  foot, do you see that?

7      A.  Yes.

8      Q.  What information had he given you such

9  that you were willing to quote him 55 cents a

10  foot?

11      A.  I don't recall him giving me any

12  information that was going to be -- that price is

13  our standard price going out east and it was

14  something that was our standard price for that

15  product going out there.

16      Q.  Is that still your standard price --

17      A.  Yes.

18      Q.  -- for locations on the East Coast?

19      A.  Correct -- well, with respect to him, he

20  was going to be buying other products in our

21  product line, so it made sense for -- I had an

22  understanding, you know, because I made a reference

23  to freight so that he can have an idea what he was

24  going to pay for the product, but then there would

**CONFIDENTIAL**

1    be a possible issue of freight involved, too.

2        Q.    And on your pallets, do you ship 66

3    bundles of ten?

4        A.    That was changed to 63 bundles so that

5    was -- you know, that was done the first week of

6    February and that's when production started.  And

7    I believe that the producer of the product had

8    some issues on how much per pallet and a few weeks

9    later, they settled on 630 strips per pallet.

10        Q.    63 bundles --

11        A.    Yes.

12        Q.    -- of ten?

13        A.    Right.

14        MR. BROWN:  Now we're up to 57, this has

15    production number VVW 726 to 727.

16                    (Deposition Exhibit Number 57 was

17                     marked for identification as

18                     requested.)

19        MR. BROWN:  Q.  And this is a e-mail from you

20    to someone at the Hammond independent rep?

21        A.    Yes.

22        Q.    It's addressed Mark slash Dwight.  Are

23    those both individuals who work for Hammond?

24        A.    That is correct.

**CONFIDENTIAL**

1    MS. THOMPSON:  Excuse me, can I see what you're

2   looking at?

3        MR. BROWN:  Did I give you something wrong?

4        MS. THOMPSON:  Yeah.  Tricky of you.

5        MR. BROWN:  What did I give you?  I don't know

6   how you -- is that not it either?  Did I just hand

7   you the same thing again?

8        MS. THOMPSON:  Yes, you did.

9        MR. BROWN:  Well, I think you can fix it if

10  you rip off the first page.

11       MS. THOMPSON:  Then it will be perfect.

12       MR. BROWN:  Then it will be just like the

13  exhibit.

14       MS. THOMPSON:  Exhibit repaired.

15       MR. BROWN:  Q.  Were you trying to obtain

16  price information from BrickStop in order to set

17  prices for the Diamond Paver Edge?

18       A.    Correct.  This is -- the date of this

19  e-mail is in the very, very infancy stages of market

20  information around the country.  This is my third

21  week on the job and I needed to gather as much

22  information as possible, and from that, I gathered

23  over the coming months that there was prices all

24  over the place for the product.

**CONFIDENTIAL**

1    Q.    And for the product meaning the Beast?

2    A.    The Beast, yes.

3    Q.    And so there was a big landscape supply

4    in the Chicagoland area that you're talking about

5    here?

6    A.    Yes.

7    Q.    What was the name of that?

8    A.    That would have been Town & Country, I

9    believe, Town & Country Landscape Supply.

10    Q.    So you had gotten from Town & Country

11    some information about what price they were getting

12    the Beast at?

13    A.    Yes.

14    Q.    And you say their price is "Nowhere --"

15    in capital letters "-- close to what you guys are

16    seeing." So you're referring there to price

17    information that Hammond had communicated to you

18    about the Beast?

19    A.    Correct. And at the same time, I'm

20    gathering, you know, more knowledge of where they're

21    selling it at what price and --

22    Q.    And then you say in the second paragraph

23    "This is critical as we're essentially knocking off

24    the Beast, but our current pricing based on your

CONFIDENTIAL

1    figures won't get us anywhere," do you see that?

2         A.    Yes.

3         Q.    And so your concern there was because the

4    two products were so close in design, the only way

5    you would get sales is by competing on price?

6         A.    Correct.

7         MR. BROWN:  Let's mark as 58, it's a one-page

8    document, VVW 1308.

9                    (Deposition Exhibit Number 58 was

10                    marked for identification as

11                    requested.)

12        MR. BROWN:  Q.  Who is M.P. Casey?

13        A.    That would be our rep for Indiana, Ohio

14   and Michigan which is Michael Casey.

15        Q.    And is that the name of the organization

16   he works for as well?

17        A.    His organization is Mike Casey Sales.

18        Q.    And in the subject line, it says "Re

19   orders for DPE."  DPE is a reference to Diamond

20   Paver Edge?

21        A.    Correct.

22        Q.    Internally, have you given the product the

23   designation DPE-8?

24        A.    Yes.

**CONFIDENTIAL**

1    Q.   And the dash eight refers to the length of

2    the strip?

3    A.   Correct.

4    Q.   Do you know what hardware show Mr.

5    Casey's referring to in this March 28th e-mail to

6    you?

7    A.   Yes, that's the National Hardware Show

8    which took place the first week of May in Las

9    Vegas.

10    Q.   Below that e-mail there's an e-mail from

11    you to Mr. Casey dated March 28th, 2008.  In the

12    middle paragraph of that e-mail, you say "I need to

13    know why the paver manufacturers are saying no.  I

14    ran into people in Minnesota that were buying the

15    Beast and the Beast said they would match any price

16    we gave.  If this is happening, I need to relay this

17    information to Howard," do you see that?

18    A.   Uh-huh.

19    Q.   What are you discussing there?

20    A.   Market information for his market and his

21    customer, his customer base he's trying to sell and

22    he's providing me with some feedback of what he's

23    experiencing out there.

24    Q.   What paver manufacturers were you trying

**CONFIDENTIAL**

1    to sell the Diamond Paver Edge to at the time?

2         A.    There's a few in his market, I believe

3    one of them is Oberfeld's in Michigan, and I can't

4    recall one other one that he might -- he might have

5    tried to promote the product to.

6         Q.    So, in other words, in this reference in

7    the e-mail, he had gone to paver manufacturers to

8    try and sell the Diamond Paver Edge and so far he

9    was getting no's?

10        A.    Yes.

11        Q.    And in that process, he was trying to

12   replace the Beast product at those paver

13   manufacturers?

14        A.    No, that's not true.  They probably had

15   another paver restraint that they were carrying and

16   it was another option for us to go with a new

17   product to a customer.

18        Q.    I understand.  And then you say "I ran

19   into people in Minnesota that were buying the Beast

20   and the Beast said they would match any price we

21   gave," and there you were recounting something that

22   you had done?

23        A.    Yes.

24        Q.    Has it been your experience to date that

CONFIDENTIAL

1    the Beast BrickStop has matched any price you have

2    given where there was direct competition?

3        A.    Yes.

4        Q.    Was there ultimately any information

5    about the paver manufacturers that you relayed to

6    Mr. Rynberk?

7        A.    If I relayed anything to him, it was the

8    cost competitiveness of not only BrickStop, but

9    other manufacturers that they were selling to.  We

10   weren't only selling our product to customers of

11   the Beast, that was only a small segment of the

12   customer base we were going after, but we were

13   going after other of our competitors and dealing

14   with the problems that we have been seeing in these

15   e-mails.

16       MR. BROWN:  Let's mark as 59 a document with

17   production number VVW 1127.

18                    (Deposition Exhibit Number 59 was

19                     marked for identification as

20                     requested.)

21       MR. BROWN:  Q.  And I'll ask you what Exhibit

22   59 is because it looks to me to be an e-mail from

23   yourself to yourself.

24       A.    Yes.

CONFIDENTIAL

1      Q.    What is this?

2      A.    Well, it might have been I couldn't get

3    access to my Outlook on the road, so I could get

4    onto my Yahoo account and send it to my Outlook at

5    Valley View.

6      Q.    I see.  So you were on your Yahoo account,

7    sending it to your Valley View account?

8      A.    You know, previous to me becoming a sales

9    manager, I still had a tremendous amount of people

10   that had my Yahoo address, so to make the jump

11   didn't happen as quick as you'd like to see it, I'd

12   like to consolidate it all into Valley View, but it

13   just didn't happen that fast.

14     Q.    So what was this e-mail that you were

15   sending to yourself?

16     A.    That is an e-mail discussing pricing to a

17   distributor -- a prospective distributor that I

18   would set up as a template, I had probably a

19   distributor in mind.

20     Q.    So you were setting this up as a template

21   for just one distributor or you were going to use

22   it for more than one distributor?

23     A.    This was probably going to more than one

24   distributor.

**CONFIDENTIAL**

1    Q.    And did it eventually go out in this form
2    to distributors?
3    A.    No, I can't recollect.  I might have --
4    I might have revised this somehow, but in some way,
5    shape or form, it would have been sent out in some
6    manner like this.
7    Q.    Did you ever turn any of the information
8    that's in Exhibit 59 into a more formal document
9    than an e-mail for distributors, in other words,
10   did you create any kind of literature out of it?
11   A.    The only literature that we created was
12   the sell sheet which didn't have pricing on there.
13   And none of our sell sheets do have pricing, just
14   the product, because this was at this time period,
15   we already had our price for 2008 and our price
16   sheets, we did not have this on a price list, so we
17   had to basically give this to people custom.
18   Q.    Got you.  Now, normally, with your
19   products, you actually have some -- is it the
20   catalog that has your prices in it?
21   A.    No, the catalog is separate from the
22   price list.
23   Q.    With your other products, you send a price
24   list to potential customers?

**CONFIDENTIAL**

1    A.    Yes.   Normally when we're working

2    industry conventions, we have a catalog and we have

3    a wholesale price sheet and what that price is, it

4    gives the landscaper an idea what he can pay for

5    the product, but it's not stepping on the toes of

6    the regional distributors who have a lower price.

7    Q.    So you wouldn't show on that price sheet

8    the price that your distributors are getting?

9    A.    Correct.

10    MR. BROWN:   Let's go off the record.

11              (After a brief recess, the deposition

12              was resumed as follows:)

13    MR. BROWN:   Okay.   Let's mark as 60 a document

14    with production numbers VVW 1285 to 1288.

15              (Deposition Exhibit Number 60 was

16              marked for identification as

17              requested.)

18    MR. BROWN:   Q.   Can you tell me what Exhibit 60

19    is?

20    A.    Okay.   It looks like this is an e-mail

21    that Dwight has responded on from my question about

22    the samples that we sent out for them to find out

23    what the response has been and if they followed up

24    with the people or the customers.

**CONFIDENTIAL**

1    Q.   So -- and these are the samples that we

2    looked at in that earlier e-mail where he had given

3    you a list of addresses to send samples to?

4    A.   Yes, it would have been one of the -- you

5    know, one of the lists.

6    Q.   Okay.  And -- well, did he send you more

7    than one list?

8    A.   I only recall seeing one list -- big

9    list, but there could have been an e-mail here and

10   there that he said, oh, by the way, send it to so

11   and so, but that one document had most of them on

12   there.

13   Q.   And then this -- later in the exhibit

14   from the -- basically from the second page on are

15   his notes of the feedback he had received so far?

16   A.   Yes.  These lists aren't completely

17   restricted to Diamond Paver Edge, it's our other

18   product line as well.

19   Q.   Some of the comments refer to other

20   products?

21   A.   Yes.  So there could have been some

22   customers on here that are not paver people that

23   he's commenting on or I'm asking about.

24   Q.   Is there one that you saw that made you

**CONFIDENTIAL**

1  think that?

2      A.   Well, there's -- the names are blocked

3  out, so I'm not aware from looking at these blocked

4  out names.

5      Q.   In other words, did you see an entry that

6  you looked at and you said to yourself that can't be

7  a Diamond Paver Edge issue?

8      A.   No, I haven't seen an entry like that.

9      Q.   So, in other words, you're just saying

10  it's possible that some of these are not about the

11  Diamond Paver Edge?

12      A.   Correct.

13      Q.   But you don't know that to be true?

14      A.   Correct.   It could have been someone that

15  they wanted a sample of paver restraint so he sent

16  it to them, but they're not in the paver business

17  and it's something they want to show a new item to

18  them from Valley View.

19      MR. BROWN:   Let's mark as Exhibit 61 a document

20  with production number VVW 1311 to 1312 -- actually,

21  let me amend that, it's 1311 to 1316.

22                    (Deposition Exhibit Number 61 was

23                        marked for identification as

24                        requested.)

169

**CONFIDENTIAL**

1        MR. BROWN:   Q.   And the first two pages of

2   Exhibit 61 are an e-mail chain between you and

3   Mr. Casey, is that right?

4        A.   Correct.

5        Q.   And then the last three pages are an

6   e-mail chain between you and Mr. Hammond?

7        A.   Yes.

8        Q.   Okay.  At the bottom of the first page of

9   Exhibit 61, Mr. Casey says -- and the subject is

10   orders for DPE, do you see that?

11        A.   Yes.

12        Q.   And he said "Dom, blank also told me that

13   they will not carry the Diamond Paver Edge right now

14   because they are already carrying three edgings,

15   Snap Edge, Pave Tech and EdgePro," do you see that?

16        A.   Yes.

17        Q.   And then he continues "Blank also told me

18   that the edging split up the sidewall when they bent

19   the sample, Mike."  Do you see that?

20        A.   Yes.

21        Q.   So that's an instance where someone had

22   tested a sample and the sample had failed, is that

23   correct?

24        A.   Well, it seems to be that it's just the

CONFIDENTIAL

1        A.    One, two, three, okay -- am I on the right
2    page?
3        MS. THOMPSON:  It's not the third, it's the
4    fourth maybe or the second.
5        MR. BROWN:  Let me look at this.
6        MS. THOMPSON:  What's the Bates number?
7        MR. BROWN:  It's 1314.
8        MS. THOMPSON:  Okay.
9        MR. BROWN:  I'm sorry, it's the fourth page.
10       MS. THOMPSON:  He had a long day.
11       THE WITNESS:  Okay.
12       MR. BROWN:  Q.  Do you see that Mr. Hammond in
13   that first paragraph says towards the bottom "The
14   paver manufacturers are asking me how can I resell
15   your Beast knock-off when my customers can buy it
16   for the same price you were quoting me," do you see
17   that?
18       A.    Uh-huh.
19       Q.    Did you respond to that question?
20       A.    I may have responded to him with respect
21   to saying that we would not sell their customers
22   direct and that we would set them up as a
23   distributor and sell their customers through them.
24   Because of our destination and where we're at, it

**CONFIDENTIAL**

1    would be near impossible feasibly to sell a paver

2    manufacturer a customer and that was the intention

3    of what probably preceded March 18th forward.

4        Q.   Okay.  So I understand, when you say --

5    you're assuming he's talking about customers of

6    E.P. Henry here, is that right, because the re line

7    is "E.P. Henry leads"?

8        A.   Yes.  Well, he's talking about E.P. Henry

9    plus other paver manufacturers.  E.P. Henry is one

10   of many paver manufacturers and he talks about them

11   both in that paragraph.  And the 55 cents or less

12   delivered to E.P. Henry, that's not the Beast

13   product, that's the Dimex product.

14             So when he's going up against other

15   manufacturers, the manufacturers -- manufacturer

16   customers are buying the Beast direct and in the

17   course of action I put them on as get the comfort

18   level with the distributor being the brick

19   manufacturer and let them know that, you know, the

20   way we would be set up, we wouldn't sell them direct

21   so that can keep them in the loop.

22        MR. BROWN:  Let's mark as 62 a document with

23   production number VVW 1306.

24

CONFIDENTIAL

1        (Deposition Exhibit Number 62 was

2         marked for identification as

3         requested.)

4    MR. BROWN:   Q.   Who's Nancy Zonman?

5    A.   She's an employee -- an office employee

6 of Valley View Industries.

7    Q.   And the subject of the top e-mail on

8 Exhibit 62 is "Agenda for monthly office meeting,"

9 do you see that?

10    A.   Yes.

11    Q.   Is there a regularly scheduled meeting

12 that she's referring to in that re line?

13    A.   Yes.

14    Q.   Who attends those meetings?

15    A.   That would be the office staff, including

16 myself when I'm in town.

17    Q.   And is there a fairly standard agenda for

18 those meetings?

19    A.   Not really, it's just an open discussion

20 of things going on within the business and the

21 company itself.

22    Q.   Who attends those meetings?

23    A.   There's six office people, Howard, myself

24 and the plant manager.

## CONFIDENTIAL

1     Q.   So would you consider the plant manager,

2   Mr. Soukup, yourself and Howard to be the senior

3   management for the company?

4     A.   No, I would consider Howard to be the

5   senior management and Howard only.

6     Q.   Okay.  And so your response e-mail,

7   apparently you weren't going to be able to make

8   that monthly meeting, is that right, because you

9   say "Nancy, please report the following in my

10   absence."

11     A.   Correct, I was -- I was traveling, I was

12   probably in California earlier in that week.

13     Q.   Your second bullet point is "Diamond Pave

14   Edge launched, competition is lowering price to keep

15   business," is that referring to BrickStop?

16     A.   No, that's referring to not only

17   BrickStop, but our other competitors out there.  As

18   I stated earlier, we were going off more than just

19   BrickStop.

20     Q.   And then you say "The war has officially

21   begun."  What are you referring to there?

22     A.   With respect to our competitors that were

23   selling lower priced restraints, Dimex, BrickStop.

24     Q.   So this was a price war you were talking

**CONFIDENTIAL**

1    zone about seven years ago.

2        Q.   So you've been up against Superior Stone

3    for seven years?

4        A.   Yes, but with our Diamond Lok products.

5        Q.   And in that time frame, has Superior

6    Stone been carrying the Beast?

7        A.   To my recollection, I don't know how long

8    they've been carrying the Beast.

9        Q.   Had you ever -- prior to the introduction

10   of the Diamond Paver Edge, had you competed for any

11   accounts with Superior Stone where Superior Stone

12   was selling the Beast and you were selling Diamond

13   Lok?

14       A.   I don't recall coming across the Beast

15   that much in my area of sales, and whenever we had

16   business with someone, we didn't have another

17   product outside of Diamond Lok, so there's really

18   nothing else I could sell them.  So if we were

19   selling them and they were buying Superior Stone's

20   product or somebody else's product, it was kind of

21   a moot point, we were all in this together and a

22   great majority of the people that we sell are

23   carrying usually another product brand.

24       Q.   So you're saying that when you were

CONFIDENTIAL

1    selling Diamond Lok, it wasn't a situation of

2    Diamond Lok replacing Beast, you were just selling

3    to a common customer that Superior Stone was selling

4    to?

5        A.    Correct.

6        Q.    Do you consider Superior Stone to be a

7    large distributor in the Chicago area?

8        A.    I don't know their volume, I don't know

9    how much they will sell.  I would think they are

10   because they have, from what I understand, a variety

11   of products, but we don't sell them, so -- and never

12   have to my recollection.

13       MR. BROWN:  Let's mark as 63 a two-page

14   document, production numbers VVW 1098 to 99.

15                   (Deposition Exhibit Number 63 was

16                    marked for identification as

17                    requested.)

18       MR. BROWN:  Q.  And is this -- this is an

19   e-mail that you were forwarding from your Yahoo

20   account to your Valley View account, is that right?

21       A.    Yes.

22       Q.    And the e-mail you forwarded is also an

23   e-mail from yourself, is that right?

24       A.    Yes.

**CONFIDENTIAL**

1    Q.   And do you know who you were sending that

2    e-mail to?

3    A.   That would have been a customer of ours

4    currently that is called Aspen Valley Landscape

5    Supply.

6    Q.   Are you selling Diamond Paver Edge to

7    Aspen Valley?

8    A.   No, we are not.

9    Q.   Have you attempted to do that?

10   A.   Yes.

11   Q.   But you've been unable to make the sale

12   so far?

13   A.   Correct.

14   Q.   Is Aspen Valley an account you call on?

15   A.   Yes.

16   Q.   And to your knowledge, does Aspen Valley

17   carry the Beast?

18   A.   They used to and they don't anymore.

19   Q.   Do you know when that stopped?

20   A.   That stopped this year.

21   Q.   And how do you know that stopped?

22   A.   Because I'm in constant contact with them

23   and I had -- immediately after this is when I was

24   made aware that they weren't going to carry either

**CONFIDENTIAL**

1  and still work?

2      MS. THOMPSON:  Objection to form of the

3  question.

4      THE WITNESS:  A.  I'm not a design engineer,

5  so I'm -- I couldn't answer that.

6      MR. BROWN:  Q.  Okay.  Are you aware of anyone

7  calling Valley View and ordering the Beast?

8      A.  No.  When they call Valley View, they

9  know they're calling Valley View looking for a

10  particular product, whether it be the Diamond Paver

11  Edge, Diamond Lok, Black Diamond Lawn Edging, there

12  is -- to my recollection, there's been no -- no

13  misrepresentation in that manner by an incoming

14  call.

15      Q.  Have you had anyone call you to complain

16  about the Beast product?

17      A.  No.

18      Q.  Have you had anyone call you to complain

19  about BrickStop?

20      A.  No.

21      MR. BROWN:  Let's mark as 66 a document with

22  production numbers VVW 958 to 961.

23

24

**CONFIDENTIAL**

1          (Deposition Exhibit Number 66 was

2              marked for identification as

3              requested.)

4      MR. BROWN:   Q.   And is Exhibit 66 an e-mail

5  chain between yourself and Dwight Hammond?

6      A.   Yes.

7      Q.   On the second page of Exhibit 66, there's

8  an e-mail that begins in the middle of the page and

9  it's from you to somebody cc'ing Mr. Hammond, do you

10 see that?

11     A.   That is correct.

12     Q.   So that's a customer of Mr. Hammond's that

13 you're contacting there?

14     A.   Yes, that I had met at a conference.

15     Q.   And you say "Thanks again for the time

16 spent at the meetings this past week.  Though a

17 short amount of time, I am confident I was candid on

18 what we need to do to gross sales beyond the Great

19 Lakes office," do you see that?

20     A.   Yes.

21     Q.   You say "To reiterate, there is not room

22 for us unless a determination is made with our

23 competitors," do you know what that's referring to?

24     A.   Yes.   This is a lawn and garden

**CONFIDENTIAL**

1  distributor, it's -- we currently do business with

2  their Great Lakes office which is in Grand Rapids,

3  Michigan, they are based in Baltimore and they

4  primarily service the independent garden centers

5  and they carry a couple of our competitors in lawn

6  edging and to some extent the paver restraints, but

7  the gist of this conversation and meeting is to sell

8  them lawn edgings.

9           And with the volume they were doing,

10  my comment was it would be difficult because they

11  wouldn't be -- you know, where they're located in

12  Baltimore, if they're buying from three separate

13  people instead of one or two, their freight minimums

14  -- there's almost not enough to go around, so it

15  would almost be, you know, detrimental for them to

16  take our product line on.

17      MR. BROWN:  Let's mark as 67 a document with

18  production number VVW 1915.

19                  (Deposition Exhibit Number 67 was

20                   marked for identification as

21                   requested.)

22      MR. BROWN:  Q.  And Exhibit 67 is an e-mail

23  between you and Herb Cantu?

24      A.    Uh-huh.

CONFIDENTIAL

1     Q.   Who's Herb Cantu?

2     A.   Herb works in our shipping department at

3 Valley View as far as coordinating UPS shipments and

4 requests from myself and the reps as far as getting

5 samples and catalogs out.

6     Q.   Okay.  So you're requesting him to send a

7 sample to the address indicated below?

8     A.   Yes.

9     Q.   And that address was -- do you know what

10 the e-mail at the bottom is, does it look to be an

11 e-mail from one of your independent reps to

12 somebody?

13     A.   Without seeing the from and to, I'm really

14 drawing a blank on where this was going and who was

15 the end -- who was this dedicated to.  It seems like

16 it was from a rep and it went to someone and then

17 they probably copied me on it, because it says

18 "their version," it didn't seem like it came from

19 me, because I would have referred to it as our

20 version, so that's the best I can --

21     MR. BROWN:  I wonder, Counsel, if in your

22 copious free time, if we could have someone look

23 and see if that's a rep who sent that e-mail and

24 perhaps give us an unredacted version of that?

# Exhibit L



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

BRICKSTOP CORPORATION,　　　　　　　)　　Case Number: 1:08-cv-02690
　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　　)　　Assigned Judge: Gettleman
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　　Designated
　　　　　　　　　　　　　　　　　　　)　　Magistrate Judge: Cole
VALLEY VIEW INDUSTRIES, H.C., INC.,　 )
　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendant.　　　　　　　　)

### DECLARATION OF MATTHEW B. WALTERS
### IN SUPPORT OF PLAINTIFF'S REPLY SUGGESTIONS

I, Matthew B. Walters, declare:

1.　　　I am a member in good standing of the bar of the state of Kansas, am admitted pro hac vice in the above-captioned case, and am an associate in the law firm Hovey Williams LLP, 10801 Mastin Blvd., Suite 1000, 84 Corporate Woods, Overland Park, Kansas 66210 and represent BrickStop Corporation ("BrickStop") in the above-captioned case.　I have personal knowledge of the statements made herein.

2.　　　This Declaration accompanies BrickStop's Reply to Valley View Industries, H.C., Inc.'s ("Valley View's") Memorandum of Law in Opposition to Plaintiff's Request for Preliminary Injunction.

3.　　　Attached hereto as Exhibit A are true and accurate copies of email correspondence produced by Valley View, which bear the following bates labels: VVW001516 – VVW001518; VVW001500 -- VVW001503; VVW001629; VVW000726 – VVW00727; VVW001519 – VVW001520; VVW001285 – VVW001288; VVW001619 – VVW001623.

4.　　　Attached hereto as Exhibit B is a true and accurate copy of an email correspondence produced by Valley View, which bears bates label VVW000151.

1

5.    Attached hereto as Exhibit C is a true and accurate copy of an email correspondence produced by Valley View, which bears bates label VVW000598.

6.    Attached hereto as Exhibit D is a true and accurate copy of an email correspondence produced by Valley View, which bears bates label VVW000406.

7.    Attached hereto as Exhibit E are true and accurate copies of engineering drawings produced by Valley View, which bear the bates labels VVW001272 – VVW001273, and VVW001856 – VVW001861.

8.    Attached hereto as Exhibit F are true and accurate copies of email correspondence produced by Valley View, which bear bates labels VVW001098 – VVW001099; VVW001306; VVW001308; VVW001311 – 1316; VVW001590; and VVW001915.

9.    Attached hereto as Exhibit G are true and accurate copies of email correspondence produced by Valley View, which bear bates labels VVW000545 – VVW00547; VVW000561 – VVW000565; VVW000680; VVW001127; VVW001238 – VVW001239.

10.    Attached hereto as Exhibit H is a true and accurate copy of excerpts from the transcript of the deposition of David Frieberg and an Amendment to Deposition signed by David Frieberg.

11.    Attached hereto as Exhibit I is a true and accurate copy of excerpts from the transcript of the deposition of Rubin Kurtz and an Amendment to Deposition signed by Rubin Kurtz.

12.    Attached hereto as Exhibit J is a true and accurate copy of excerpts from the transcript of the deposition of Howard Rynberk.

13.    Attached hereto as Exhibit K is a true and accurate copy of excerpts from the transcript of the deposition of Dominick Bertucci.

2

14.    Attached hereto as Exhibit L is a true and accurate copy of a digital image I printed off of the Dreamscape website on August 22, 2008. I downloaded this image from the following url: www.yardproduct.com/popup_image.php?pID=374.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated:  August 22, 2008                    By:    _Matthew B. Walters_____

                                                  Matthew B. Walters

3